**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY RADTKE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>REGENERON PHARMACEUTICALS, INC., LEONARD S. SCHLEIFER, CHRISTOPHER FENIMORE, ROBERT E. LANDRY, AND MARION MCCOURT<br><br>Defendants. | No. 1:25-cv-00145-MKV |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ..... 2

A. Defendants Misled Investors About Eylea ..... 4

1. Eylea Instantly Became Regeneron's Most Important Product After Its Launch ..... 4

2. Defendants Engaged in an Undisclosed and Illegal Scheme to Induce Customers to Choose Eylea over Its Competitors ..... 5

3. Defendants Told Investors That Eylea's Success Was the Result of Its Superior Design and Effectiveness ..... 7

B. Defendants Misled Investors About Eylea HD ..... 8

1. Defendants Rolled Out Eylea HD, the Purported Successor to Eylea ..... 8

2. Right Away, Defendants Knew There Was Little Demand for Eylea HD ..... 9

3. To Hide Eylea HD's Low Demand, Defendants Engaged in Backroom Deals and Unethical Sales Practices ..... 10

4. Defendants Told Investors the Demand for Eylea HD was Robust and Driving Significant Sales ..... 12

C. The Truth Began to Emerge While Defendants Continued to Mislead Investors ..... 13

1. April 10, 2024 – The DOJ Filed a Lawsuit Against Regeneron ..... 13

2. October 31, 2024 – Defendants Disclosed Below-Expected Sales for Eylea and Eylea HD ..... 14

3. January 13, 2025 – Defendants Disclosed More Disappointing Results for Eylea HD ..... 15

4. April 29, 2025 – The Full Truth was Revealed ..... 16

II. JURISDICTION AND VENUE ..... 17

III. PARTIES ..... 18

A. Lead Plaintiff ..... 18

B. Defendants ........ 18

1. Corporate Defendant ........ 18

2. Individual Defendants ........ 18

3. Relevant Third Parties ........ 20

IV. SUBSTANTIVE ALLEGATIONS ........ 23

A. Relevant Company Background ........ 23

B. Relevant Industry Background ........ 25

1. Medicare Part B and CMS Regulations ........ 25

2. Retina Practices Seek Reimbursement Under Medicare B ........ 26

C. Defendants Devised the Illegal Credit Card Fee Reimbursement Scheme to Gain a Competitive Advantage in the Wet AMD Market ........ 27

D. Defendants Knowingly Violated Federal Law by Not Reporting the Credit Card Fee Reimbursements as Price Concessions ........ 30

1. Defendants Knew that Credit Card Fee Reimbursements Were Not BFSFs ........ 31

2. Defendants Failed to Establish Adequate Internal Controls over the Evaluation of BFSFs ........ 32

3. To Keep Eylea's ASP and Reimbursements Stable, Defendants Did Not Report Credit Card Payments as Price Concessions ........ 33

4. The DOJ Caught on to the Defendants' Scheme ........ 35

E. Defendants Misled Investors about the Source of Eylea's Success ........ 36

F. Faced with Eylea's Looming Patent Expiration, Defendants Scrambled to Release Eylea HD ........ 38

1. Eylea HD Was Meant to Take Over for Eylea ........ 39

2. Defendants Rushed Eylea HD to Market ........ 40

G. Several Problems Harmed the Success of Eylea HD's Launch ........ 41

1. A Temporary J-Code Led to Lower Demand from Retina Practices ........ 41

2. The Lack of Pre-Filled Syringes Caused Lower Demand for Eylea HD ........ 42

3. Eylea HD's Longer and Inflexible Dosing Frequency Drove Away Retina Practices ........ 43

H. Following Eylea HD's Launch, Defendants Saw Internal Data and Reports That Showed Weak Demand for Eylea HD ........ 44

I. To Hide the Lack of Demand for Eylea HD, Defendants Engaged in Backdoor Deals and Unethical Sales Practices ........ 46

1. Defendants Made Backdoor Deals to Hide Low Demand ........ 47

2. Defendants Pushed Unethical Sales Practices to Try to Make Up for Low Eylea HD Demand ........ 49

J. Weak Eylea HD Demand Led to Inventory Build-Ups ........ 51

K. Defendants Misled the Market about Eylea HD's Demand ........ 53

L. Truth Began to Emerge Through a Series of Partial Disclosures While Defendants Continued to Mislead Investors ........ 55

1. The DOJ Complaint Revealed Defendants' Credit Card Fee Reimbursement Scheme on April 10, 2024 ........ 55

2. Defendants Continued to Conceal the True Source of Eylea's Success ........ 57

3. Defendants Disclosed Lagging Eylea and Eylea HD Sales on October 31, 2024 ........ 59

4. Defendants Revealed Worsening Financial Results for Eylea HD on January 13, 2025 ........ 63

M. Defendants Revealed the Full Truth About the Lack of Demand on April 29, 2025 ........ 64

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........ 66

1. May 4, 2023 – Q1 2023 Financial Results ........ 67

2. June 14, 2023 – Goldman Sachs Global Healthcare Conference ........ 71

3. November 2, 2023 – Q3 2023 Financial Results ........ 71

4. November 15, 2023 – Jefferies London Healthcare Conference ........ 81

5. February 2, 2024 – 4Q and Full Year 2023 Financial Results ..... 82

6. April 15, 2024 – Media Statement ..... 84

7. May 2, 2024 – 1Q 2024 Financial Results ..... 84

8. August 1 2024 – 2Q 2024 Financial Results ..... 85

9. October 31, 2024 – Q3 2024 Financial Results ..... 87

10. Defendants Executed Fraudulent SOX Certifications Concerning the Company's Internal Controls ..... 88

VI. LOSS CAUSATION/ECONOMIC LOSS ..... 91

A. April 10, 2024 – First Partial Corrective Disclosure/Materialization of the Risk ..... 93

B. October 31, 2024 – Second Partial Corrective Disclosure/Materialization of the Risk ..... 96

C. January 13, 2025 – Third Partial Corrective Disclosure/Materialization of the Risk ..... 100

D. April 29, 2025 – Final Corrective Disclosure/Materialization of the Risk ..... 102

VII. ADDITIONAL INDICIA OF SCIENTER ..... 105

A. The Individual Defendants Closely Monitored and Were Involved in the Minutia of Eylea and Eylea HD ..... 106

B. Documents Obtained by the DOJ and the Court's Findings in the DOJ Action Are Indicative of Scienter ..... 108

C. Eylea and Eylea HD Were Critical to Regeneron's Financial Success ..... 110

D. Defendants' Statements, Including Their SOX Certifications, Support a Strong Inference of Scienter ..... 111

VIII. CLASS ACTION ALLEGATIONS ..... 115

IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ..... 117

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ..... 119

XI. CONTROL PERSON ALLEGATIONS ..... 120

XII. CAUSES OF ACTION ..... 121

COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against Defendant Regeneron and the Individual Defendants) .......... 121

COUNT II For Violations of Section 10 (b) of the Exchange Act and SEC Rule 10b-5(a) and (c) (Against Defendant Regeneron and the Individual Defendants) ......... 123

COUNT III For Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants) .......... 125

XIII. PRAYER FOR RELIEF .......... 126

XIV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS .......... 126

Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa ("Lead Plaintiff"), by its undersigned attorneys, brings this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company") during the period from May 4, 2023 through April 28, 2025, inclusive (the "Class Period"), subject to certain exclusions (the "Class"), against Defendants Regeneron, Leonard S. Schleifer ("Schleifer"), Christopher Fenimore ("Fenimore"), Robert E. Landry ("Landry"), and Marion McCourt ("McCourt") (the "Individual Defendants," together with Regeneron, "Defendants").[1]

The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: public filings of cases relevant to the matter alleged, including *United States v. Regeneron Pharmaceuticals, Inc.*, No. 1:2020-CV-11401 (D. Mass) (the "DOJ Action"); SEC filings by Regeneron; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of Regeneron and relevant third parties ("FEs") with knowledge of the

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director and/or control person of Regeneron during the Class Period, and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any excluded person has or had a controlling or beneficial interest; (v) Regeneron's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

matters alleged; and consultation with experts in the areas of loss causation and damages.[2] Lead Counsel's investigation into the matters alleged is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery. On behalf of themselves and the Class they seek to represent, Lead Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. This securities fraud case arises from Defendants' false and misleading statements about Regeneron's most important products: Eylea and Eylea HD, prescription eye injections that are used to treat certain retinal diseases.

2. Since launching Eylea in 2011, Defendants consistently touted the Company's sales and told investors Regeneron's success was the result of its superior retinal disease drug, leading investors to believe that Eylea's results were driven by a better product and thus sustainable.

3. However, the truth proved far otherwise. Investors did not know that Eylea's success was driven by an undisclosed—and illegal—scheme that Defendants employed to achieve sales of Eylea. Specifically, Defendants agreed to pay for their customers' credit card fees, effectively lowering the purchase price of Eylea. Moreover, Defendants hid those payments from the federal government, which resulted in higher Medicare reimbursements for Regeneron's customers. These actions defrauded the government out of hundreds of millions of dollars, but they had their desired effect—Defendants' scheme induced customers to purchase Eylea not because it was a better or more effective drug, but because it gave those customers effectively free money.

---

[2] Emphasis added unless otherwise noted.

4. Then, in 2023, Defendants launched Eylea HD, a new high-dose version of Eylea that was supposed to replace Eylea in the marketplace. Despite knowing from internal data that physician demand for Eylea HD was extremely low, Defendants told investors the opposite—that demand was robust and driving significant sales. As a result, investors believed that Regeneron was convincing physicians and patients to switch from Eylea to Eylea HD and thus maintaining the Company's dominant market position.

5. In reality, however, physicians did not like Eylea HD and did not prescribe it to their patients. To hide from investors this lack of demand, Defendants made backroom deals with private-equity owned retina practices—convincing them to make large, bulk orders of Eylea HD by offering rebates and other financial incentives, even though physicians were not prescribing Eylea HD to patients. Although these backroom deals allowed Defendants to create a short-term appearance of demand, they could not conceal the truth forever.

6. Investors gradually learned the truth about Eylea and Eylea HD through a series of partial corrective disclosures. First, on April 10, 2024, the DOJ filed a complaint against Regeneron alleging that Defendants' illegal scheme had defrauded the U.S. government out of hundreds of millions of dollars in Medicare reimbursements, which revealed to investors that Eylea's success was significantly driven by an undisclosed and unsustainable practice (and not because it was a superior product, as Defendants led investors to believe). Then, after two disclosures of disappointing results for both Eylea and Eylea HD, Defendants revealed the full truth on April 29, 2025, when they finally admitted that there was a lack of physician demand for Eylea HD.

7. After the DOJ Action's allegations and Regeneron's announcements fully revealed the truth of Defendants' fraudulent scheme and misleading public statements, the Company's stock price tumbled, causing billions of dollars in losses for investors.

**A. Defendants Misled Investors About Eylea**

**1. Eylea Instantly Became Regeneron's Most Important Product After Its Launch**

8. Regeneron is a biotechnology company that manufactures and commercializes medicines. In 2011, Regeneron obtained approval from the U.S. Food and Drug Administration ("FDA") for Eylea. Eylea is an injection designed to treat wet age-related macular degeneration ("Wet AMD"), an eye disease that causes distorted vision. Critically, commensurate with the FDA's approval, the agency also granted Regeneron a market exclusivity right for 12 years, meaning no other company could sell a generic version of Eylea with the same active ingredient for at least 12 years, or until 2023.

9. Regeneron typically does not sell Eylea directly to its end customers, i.e., the Retina Practices[3] that purchase Eylea and administer it to their patients. Instead, to distribute Eylea, Regeneron entered into distribution contracts with several drug distributors (also known as "wholesalers"), who then sold Eylea to the Retina Practices.

10. After its launch, Eylea instantly became Regeneron's most successful and important product. In fact, within a year of its approval, Regeneron not only gained a significant share of the Wet AMD market, but Eylea also drove Regeneron's profitability. Indeed, Defendants repeatedly emphasized in the Company's Annual Reports that Regeneron had become

[3] Retina Practices refer to any physician or doctor's office that treated patients with Wet AMD, including retina surgeons, injecting ophthalmologists, and their practices.

"substantially dependent on the success of Eylea." As a result, investors understood that the Company's financial success depended on Regeneron's sales of Eylea.

### 2. Defendants Engaged in an Undisclosed and Illegal Scheme to Induce Customers to Choose Eylea over Its Competitors

11. For years, Defendants assured investors that Regeneron secured a significant share of the Wet AMD market because Eylea was the best and most effective drug available. As a result, investors believed that Eylea's dominant market position resulted organically from the drug's unique characteristics and design, rather than some other reason.

12. However, Defendants hid from investors the true story. Behind the scenes, Defendants had built up Eylea's market position through an illegal scheme designed to induce Eylea's customers (the Retina Practices) to purchase and prescribe Eylea because it would make the Retina Practices more money, and not because Eylea was a better or more effective drug than other options.

13. Specifically, Defendants knew that Retina Practices preferred paying for Eylea (and other drugs) with credit cards—so they could reap credit card rewards, including "cash back" rewards, on millions of dollars' worth of drug purchases. Defendants also knew that the distributors charged the Retina Practices a fee if they purchased those drugs with a credit card. Thus, Defendants told the distributors **not to charge the customer a fee** if they purchased Eylea with a credit card, and instead, **bill Regeneron for it**. This effectively lowered the Retina Practices' cost of purchasing Eylea (because credit card fees are, on average, around 2% or more of the total purchase price).

14. Worse, Defendants did not report these credit card reimbursements to the government, in contravention of federal law. Eylea is a "buy-and-bill" drug, meaning that the Retina Practices purchased Eylea (from the distributor) and then later request reimbursement from

a third-party payor, typically Medicare. Medicare then reimburses the Retina Practices based on the average sales price ("ASP") of the drug.

15. To determine the ASP, the Centers for Medicare and Medicaid Services ("CMS") requires the manufacturer (here, Regeneron) to report the ASP to CMS so the Retina Practices can get reimbursed for their drug purchases. Critically, Regeneron was supposed to include **all discounts**, or "price concessions," so that CMS could accurately reimburse the customer. However, because Defendants did not report to CMS the credit card fee reimbursements, Regeneron's ASP remained artificially elevated, and CMS paid the Retina Practices more in Medicare reimbursements than they should have.

16. Defendants' undisclosed scheme—referred to herein as the "Credit Card Fee Reimbursement Scheme"—constituted a significant cause of Eylea's success, as Retina Practices chose Eylea not because it was a better drug (as Defendants publicly stated) but because it made the Retina Practices more money.

17. Specifically, and as explained below, the Credit Card Fee Reimbursement Scheme made Eylea more profitable for Retina Practices (and therefore incentivized Retina Practices to choose Eylea over competitor products) in three main ways.

18. First, because Defendants paid the credit card fee for Retina Practices, these practices effectively paid less for Eylea than they would have had to otherwise. For example, if a Retina Practice ordered $1,000,000 worth of Eylea from a distributor, the Retina Practice would normally pay $1,020,000 (if the credit card fee was 2%). However, under the Credit Card Fee Reimbursement Scheme, the distributor would charge the Retina Practice only $1,000,000 (i.e., no credit card fee) and would bill Regeneron for the remaining $20,000 (the credit card fee). The Retina Practice thus spent $20,000 less on Eylea than it would have.

19. Second, Retina Practices received substantial credit card bonuses, including cash back rewards, from using their credit card—further reducing the effective cost to purchase Eylea. Specifically, because many credit card companies offer cash back rewards based on how much you spend on your credit card, Retina Practices received substantial sums of money back from their credit card companies. For instance, in 2019, one ophthalmic practice received over $445,000 in cash back rewards from its Eylea purchases.

20. Third, the Credit Card Fee Reimbursement Scheme gave Retina Practices a higher reimbursement for each purchase of Eylea. Medicare reimburses Eylea and similar drugs at a rate of 106% of the reported ASP. The difference between the Medicare reimbursement rate and the amount a Retina Practice actually paid to purchase the drug is referred to as the "spread," or in other words, the Retina Practice's profit on the drug. By failing to report the credit card fee reimbursements, Defendants kept Regeneron's ASP higher than it should have been. This in turn meant Retina Practices were reimbursed more for their purchases of Eylea (since the higher the ASP, the higher the reimbursement).

21. Together, these three benefits induced Retina Practices to purchase Eylea instead of competitor options because it made them more money—and not because Defendants' retinal disease drug was better or more effective.

**3. Defendants Told Investors That Eylea's Success Was the Result of Its Superior Design and Effectiveness**

22. Throughout the Class Period, however, Defendants repeatedly touted Eylea's financial success, bragging that Regeneron's impressive economic results sprang from Eylea's superior "clinical profile." For example, on June 14, 2023, Defendant McCourt stated: "***the clinical profile of EYLEA is what has allowed for this very robust performance over 12 years in the marketplace***." Put differently, Defendants stated that Eylea generated more revenue (and

therefore profits) for Regeneron—and gained a larger market share than competitors' options, like Avastin, Lucentis, and Vabysmo—because Eylea was more effective in treating Wet AMD and was therefore a better drug overall.

23. However, Defendants' statements touting Eylea's source of success were false and misleading because they completely and consistently omitted the material fact that Defendants had built up Eylea's market position through the Credit Card Fee Reimbursement Scheme. Thus, contrary to what Defendants led investors to believe—that Eylea simply had a superior product profile—in reality, Defendants built up Eylea's market position through an illegal (and unsustainable) scheme.

## B. Defendants Misled Investors About Eylea HD

### 1. Defendants Rolled Out Eylea HD, the Purported Successor to Eylea

24. Although investors did not know that the Credit Card Fee Reimbursement Scheme was driving Regeneron's apparent financial success, they did understand that Eylea's market exclusivity right—which barred generic drugs from entering the market—would expire in November 2023. Thus, as that date approached, investors focused on whether, and if so, how, Regeneron could maintain its market position in the Wet AMD market when cheaper, generic versions hit the market.

25. Defendants' answer to this question was a new high-dose version of Eylea, called Eylea HD. Eylea HD builds on the same active ingredient as Eylea, but is designed to be stronger and allow for less frequent doses than Eylea. Indeed, the market had high hopes that Eylea HD would allow Regeneron to continue its dominance in the Wet AMD market. For example, in July 2020, Bernstein Research noted that "[i]f successful, HD Eylea will allow Regeneron to hold onto a significant portion of the franchise when the biosimilars," i.e., generic versions of the drug, "come in and give it some protection against the branded competitors."

### 2. Right Away, Defendants Knew There Was Little Demand for Eylea HD

26. Even before Eylea HD launched, Defendants knew that physician demand was going to be low for Eylea HD. Specifically, Defendants hired an external consultant, ZS Associates, to conduct market research on Eylea HD, which identified problems that would adversely impact the demand for Eylea HD.

27. This internal research showed that physicians were skeptical of Eylea HD's dosing frequency. Eylea HD was approved for injections only once every 8 weeks, whereas Eylea could be administered every 4 weeks, if needed. Physicians did not like Eylea HD's lack of flexibility, as it created safety concerns for patients that needed more frequent injections. Similarly, Retina Practices also did not like that Eylea HD could not be administered as often as Eylea or other drugs because it would significantly reduce profits for the Retina Practice (since, of course, fewer office visits mean less money for the Retina Practice).

28. Moreover, Eylea HD did not have a permanent J-Code—a medical billing code that Retina Practices and insurers (including Medicare) need to process claims and reimburse the Retina Practices correctly. This meant Retina Practices were reluctant to purchase Eylea HD since they might not get reimbursed for the drug.

29. Despite knowing of these problems, Defendants nevertheless launched Eylea HD on August 18, 2023, mere months before legacy Eylea's market exclusivity was set to expire in November 2023. The launch of Eylea HD was a failure from the start.

30. Indeed, internal sales figures showed little physician or patient demand for Eylea HD. As explained in great detail below, several FEs personally viewed weekly sales reports for the entire country which showed that Eylea HD was not performing as expected and stood in stark contrast to Defendants' public statements. According to one FE who reviewed internal sales data

on the Company's internal analytics platform, called Navigator, sales representatives came nowhere near meeting their internal sales quotas for Eylea HD. This FE explained that she achieved only 50-70% of her sales quota during the first two quarters. As a result, another FE, who worked in forecasting for Regeneron, explained that the Company's internal demand forecasting for Eylea HD sales kept getting adjusted downwards following the launch.

31. Specifically, according to several FEs, the Individual Defendants discussed Eylea HD's poor sales numbers and low demand during monthly meetings starting directly after its launch. During these meetings, Defendants discussed the slow rollout of Eylea HD, among other things.

32. Indeed, one FE, a Reimbursement Business Manager, recalled that well before the fourth quarter of 2023, Regeneron's leadership, including everyone from the CEO down to first line managers, had already begun panicking about Eylea HD's performance. This FE explained that Eylea HD's sales performance got so bad that the CEO, Defendant Schleifer, was personally calling physicians personally in the FE's market.

### 3. To Hide Eylea HD's Low Demand, Defendants Engaged in Backroom Deals and Unethical Sales Practices

33. The Individual Defendants tried to hide the lack of demand for Eylea HD from investors. For example, Defendants, including Defendant Schleifer, took the Company's private jet around the country to make clandestine deals with large, private equity-owned Retina Practices[4] to purchase Eylea HD in bulk (often at the end of the quarter). Defendants gave these private equity-owned Retina Practices significant financial incentives—such as large rebates and the right

[4] As explained below, it is common for private equity firms to own several Retina Practices. Private equity firms often target these Retina Practices because they have stable demand—as an aging population gives rise to retinal diseases, like Wet AMD—and predictable cash flows from expensive procedures and injections, like Eylea, which are often reimbursed by Medicare.

to return the product—to convince them to take on large quantities of Eylea HD and create the appearance of strong sales. This, in turn, created the false appearance of demand, even though physicians were hardly prescribing Eylea HD (because Eylea HD did not have a permanent J-Code, did not come in pre-filled syringes, and could not be administered every four weeks if needed).

34. However, as one FE explained, the deals Defendants struck with private equity-owned Retina Practices were like putting a band-aid over a bullet hole. Although the large bulk deals to these practices created the appearance of demand, the physicians at the Retina Practices were not actually using Eylea HD, which created an inventory glut of unused products. Indeed, according to FEs at private equity-owned Retina Practices, these Retina Practices experienced significant inventory build-up for Eylea HD after their large bulk purchases because the physicians were not using Eylea HD. Thus, these Retina Practices had no need to purchase more Eylea HD. In fact, according to one FE, the private equity-owned Retina Practice she worked at had millions of dollars' worth in excess inventory.

35. As the demand gap continued to worsen, Defendants' behind-the-door deals with private equity-owned Retina Practices could not solely sustain Eylea HD sales. Consequently, Defendants resorted to directing sales representatives to sell Eylea HD at any cost, even if the sales representatives were on the verge of breaking the law. For example, FEs confirmed that Regeneron directed Reimbursement Managers who had access to sensitive patient protected health information ("PHI") to assist in selling Eylea HD, even though this violated federal law. Similarly, Regeneron directed sales representatives to lie to Retina Practices about Eylea HD's reimbursement so the Retina Practices would be more comfortable purchasing the product.

### 4. Defendants Told Investors the Demand for Eylea HD was Robust and Driving Significant Sales

36. Despite knowing that the Eylea HD launch was not going well due to low physician demand, Defendants misrepresented the demand for and sales of Eylea HD. Specifically, Defendants told investors that the Eylea HD launch was an enormous success and attributed that success to purportedly strong demand from physicians.

37. For example, during the November 2, 2023 earnings call, Defendant Schleifer touted sales of Eylea HD, stating: "[w]e launched in late August, shortly following FDA approval, and recorded $43 million of net product sales in the final six weeks of the quarter . . . Importantly, ***revenues were driven by strong initial demand*** with multiple reorders by distributors before the end of the quarter."

38. Then again, on February 2, 2024, Regeneron held a conference call with analysts and investors to discuss the Company's Fourth Quarter and Full Year 2023 results—the first full quarter of Eylea HD's launch. Defendant McCourt stated, "In its first full quarter, EYLEA HD net product sales were $123 million, ***based on growing demand and positive early physician experience*** . . . . ***This share gain was driven by the differentiated efficacy and safety profile of our medicines***."

39. However, Defendants' statements were false and misleading because they led investors to believe that sales came from growing physician demand and "positive early physician experience," when in reality, physician demand was low and much of the sales of Eylea HD were driven by bulk purchases from private equity-owned Retina Practices (which would not lead to future sales, since physicians at the Retina Practices did not want to use Eylea HD). Indeed, because Defendants did not disclose their deals with private equity-owned Retina Practices to

purchase Eylea HD in bulk, investors were kept in the dark and therefore believed demand for Eylea HD was robust and organic, and thus, the Company's stock price remained inflated.

### C. The Truth Began to Emerge While Defendants Continued to Mislead Investors

#### 1. April 10, 2024 – The DOJ Filed a Lawsuit Against Regeneron

40. On April 10, 2024, after the market closed, the Department of Justice (the "DOJ") announced the DOJ Action, alleging that Regeneron fraudulently manipulated Medicare reimbursement for Eylea by knowingly failing to report hundreds of millions of dollars' worth of reimbursed credit card fees as price concessions.[5] On this news, the price of Regeneron's common stock declined by $31.50, or 3.36%, over two consecutive trading days.

41. Following this news, investors wondered what this would mean for Regeneron's sales of Eylea. Indeed, analysts grew concerned about whether Regeneron's undisclosed Credit Card Fee Reimbursement Scheme might have contributed to much of Eylea's commercial success and wanted to know how it would change the Company's sales moving forward.

42. However, Defendants quickly dismissed these concerns and tried to assure the market that the DOJ's allegations were "meritless." Specifically, on April 15, 2024, Regeneron issued a media statement, falsely pledging that "***[t]he filing of this lawsuit will not change our practices with respect to reimbursement of credit card fees incurred by our distributors***."

43. In fact, Defendants continued to conceal that the Credit Card Fee Reimbursement Scheme was fueling Eylea's success. For example, on August 1, 2024, during the earnings call for the second quarter of 2024, an analyst asked whether the DOJ Action would have any impact on Regeneron's practices. Defendant Schleifer falsely answered: "***There's nothing in the***

---

[5] *See* intervenor complaint, Dkt. No. 58, in *United States v. Regeneron Pharmaceuticals, Inc.*, No. 1:2020-CV-11401 (D. Mass.), attached hereto as Exhibit B (the "DOJ Complaint") and cited as "DOJ ¶ __" herein. Quotations from the DOJ Complaint, cited herein, retain their original emphasis.

***marketplace related to this lawsuit. And frankly, we think, there's nothing to this lawsuit. And we have not changed our practice.***"

44. Based on these misstatements, Defendants led investors to believe that the DOJ Action would not change how Regeneron did business or affect its sales of Eylea or Eylea HD. However, this was not the truth since, as explained below, the Company's sales and demand for Eylea and Eylea HD dropped significantly following the DOJ Action.

**2. October 31, 2024 – Defendants Disclosed Below-Expected Sales for Eylea and Eylea HD**

45. Despite Defendants' false reassurances that the DOJ Action would not change Regeneron's practices or affect the Company's sales, the truth was further revealed on October 31, 2024, when Regeneron disclosed that "net product sales of EYLEA in the third quarter of 2024 were adversely impacted by a lower net selling price."[6] At the same time, Defendants disclosed poor results for Eylea HD, which posted sales of only $392 million, significantly missing consensus estimates of $415 million to $425 million.

46. Following this news regarding Eylea and Eylea HD, the price of Regeneron's common stock declined 9.2%, a reduction of $84.59 per share, in a single day, as investors started to learn more about Eylea and Eylea HD sales following the DOJ Action.

47. However, Defendants continued to conceal the full truth from investors. Specifically, with respect to Eylea HD, although the Company disclosed poor sales of Eylea HD, it also disclosed positive inventory levels from the distributors (i.e., the wholesalers), stating,

[6] Net selling price is derived from dividing the net product sales of a product (here, Eylea) by the number of products sold. According to Defendants' public filings with the SEC, net product sales are revenue from product sales "net of applicable provisions for rebates, chargebacks, and discounts; distribution-related fees; and other sales-related deductions."

"sales were favorably impacted by approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD."

48. Investors saw this as somewhat contradictory—as Regeneron posted weaker than expected sales but higher inventory levels, which could have meant one of two things to investors. First, if the distributors increased inventory because of strong customer demand, that would be a positive sign since it reflects that future demand is expected. But second, if distributors maintained higher inventory levels only because large bulk sales to private equity-owned Retina Practices, and physician demand was low, that would be a warning sign that future sales of the product would remain low. Moreover, private equity-owned Retina Practices **would not purchase more Eylea HD** because of existing, excess inventory and low physician demand.

49. Defendants led investors to believe that it was the first reason—that strong physician demand was causing the higher inventory—when it was in the truth the second, exact opposite reason—the distributors had higher inventory only to fulfill the bulk orders to private equity-owned Retina Practices, but as the distributors delivered Eylea HD to those private equity-owned Retina Practices, they stopped ordering more Eylea HD because of the low demand, a fact Defendants soon revealed.

**3. January 13, 2025 – Defendants Disclosed More Disappointing Results for Eylea HD**

50. Next, before the market opened on January 13, 2025, Defendants announced preliminary financial results for the Company's Fourth Quarter and Full Year 2024. Defendants again reported disappointing results for Eylea HD, which were well below analysts' expectations. This time, however, Defendants disclosed that Eylea HD suffered "lower wholesaler inventory levels." This revealed that demand was not as high as Defendants claimed previously, and signaled that distributors were not ordering more inventory because of the low demand for Eylea HD.

51. On this news, the price of Regeneron's common stock dropped $27.64 per share, or 3.97%, to open at $669.24 per share on January 13, 2025, and on January 14, 2025, the price of Regeneron's common stock continued to decline 3.6%, or $26.03 per share, to close at $690.87 per share.

### 4. April 29, 2025 – The Full Truth was Revealed

52. The full truth was revealed on April 29, 2025. On that day, Defendants disclosed more disappointing results for Eylea and Eylea HD.

53. Specifically, Defendants disclosed that First Quarter 2025 U.S. net sales for Eylea were "down 39%." With respect to Eylea HD, sales in the first quarter of 2025 were $307 million, well below expectations, and were flat on a sequential basis. Further, Defendants explained that the physician unit demand "was offset primarily by a modest wholesaler inventory drawdown." In other words, wholesalers (i.e., the distributors) quickly pulled back on purchasing Eylea HD from Regeneron and instead were relying on their existing inventory because of the weak demand for Eylea HD from doctors' offices.

54. Moreover, Defendants finally revealed the full truth for the first time—that physician demand had never been strong for Eylea HD—and disclosed that "sequential physician unit demand for EYLEA HD and EYLEA declined by 11%."

55. In response to this news, the price of Regeneron's stock dropped $41.95, or 6.87%, from a closing price of $610.86 per share on the prior trading day down to $568.91 per share on April 29, 2025.

56. Critically, analysts finally connected the dots between the Credit Card Fee Reimbursement Scheme and Eylea's abysmal sales and demand. For instance, on May 1, 2025, Bank of America explained, "[w]hat could be more impactful in our view is if the DOJ lawsuit compels a change in how REGN does business . . . REGN has told us previously it continues to

reimburse such fees while this dispute is ongoing. If it were to stop, it could potentially level the playing field with competitors." Similarly, in stark contrast to Defendants' statements throughout the Class Period, the disclosure about the steep decline in Eylea HD's physician unit demand revealed to investors, for the first time, that demand for Eylea HD was weak.

57. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Regeneron's securities, Lead Plaintiff and Class members have suffered significant losses and damages. This Action seeks to recover those losses caused by Defendants' securities fraud.

## II. JURISDICTION AND VENUE

58. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Jurisdiction is conferred by Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

59. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as upon information and belief, Regeneron shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this District, the false and misleading statements were disseminated in this District, and the manipulative conduct was carried out in part in this District.

60. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

### A. Lead Plaintiff

61. Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa (the "Tampa Fund"), headquartered in Tampa, Florida, is a single-employer, defined benefit plan with approximately $3.2 billion in total assets under management, as of September 30, 2024. The Tampa Fund is administered by a nine-member Independent Board of Trustees and serves all active and retired firefighters and police officers for the City of Tampa. On July 10, 2025, the Court appointed the Tampa Fund as Lead Plaintiff for this litigation. As set forth in its attached certification (attached hereto as Exhibit A), the Tampa Fund purchased Regeneron Class A common stock during the Class Period and suffered damages as a result of Defendants' violations of federal securities laws alleged herein.

### B. Defendants

#### 1. Corporate Defendant

62. Defendant Regeneron is incorporated under the laws of New York, with its principal executive offices located at 777 Old Saw Mill River Road, Tarrytown, New York. The Company's common stock is traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "REGN."

#### 2. Individual Defendants

63. Defendant Schleifer was, at all relevant times, the Co-Founder and Chief Executive Officer of Regeneron and served in those roles during the Class Period. During the Class Period, in his role as CEO, Defendant Schleifer participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material facts, among other things, relating to Eylea and Eylea HD. In his role

as the CEO of Regeneron, Defendant Schleifer was kept apprised of all major developments and material information relevant to Eylea and Eylea HD.

64. Defendant Fenimore served in multiple roles during the Class Period. Defendant Fenimore has been the Chief Financial Officer and Executive Vice President, Finance of Regeneron since February 2024. Prior to his current role, Defendant Fenimore was Senior Vice President, Controller from January 2021 to February 2024; Vice President, Controller from February 2017 to January 2021; and Vice President, Financial Planning & Analysis from January 2012 to February 2017. During the Class Period, Defendant Fenimore participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material facts, among other things, relating to Eylea and Eylea HD. Further, Defendant Fenimore attended Accounting Department meetings during which the performance of Eylea HD was discussed.

65. Defendant Landry served in multiple roles before and during the Class Period. Defendant Landry was the Chief Financial Officer of Regeneron from September 2013 to January 2024 and then served as a Senior Advisor from February 2024 to January 2025. During the Class Period, Defendant Landry participated in various media interviews, earnings calls, and conferences with securities analysts, during which he made false and misleading statements and omissions of material facts, among other things relating to Eylea and Eylea HD. Further, Defendant Landry attended Accounting Department meetings during which the performance of Eylea HD was discussed.

66. Defendant McCourt was, at all relevant times, the Executive Vice President and Head of Commercial of Regeneron. Defendant McCourt joined the Company in February 2018. During the Class Period, Defendant McCourt participated in various media interviews, earnings

calls, and conferences with securities analysts, during which she made false and misleading statements and omissions of material facts, among other things relating to Eylea and Eylea HD. In her role as the Executive Vice President and Head of Commercial of Regeneron, Defendant McCourt also closely monitored the commercial performance of Eylea and Eylea HD.

67. Defendants Schleifer, Fenimore, Landry, and McCourt, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (i.e., the market). The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

### 3. Relevant Third Parties[7]

68. FE-1 was employed by Regeneron prior to the Class Period and was a member of the Launch Team responsible for the pre-launch and launch of Eylea HD.

69. FE-2 was employed by Regeneron from before the Class Period until April 2024 as a Medical Specialist, Ophthalmology/Retina – Eylea and explained that she had experience in the retina sales space roughly 10 years. FE-2 explained that Medical Specialists were the title of the "primary" sales representatives at Regeneron, and she was responsible for the Northern New

[7] FEs are identified herein by number (FE-1, FE-2, etc.). All FEs are described in the feminine to protect their identities.

England territory as a part of the Northeast Region. FE-2 recalled that every Tuesday she had a meeting where she was able to see her sales figures from the previous week "down to the vial."

70. FE-3 was employed by Regeneron from September 2023 until March 2025 as an Associate Manager, Accounting. FE-3 explained that her responsibilities were those of a Product Revenue Accountant and she was responsible for all commercial products at Regeneron. FE-3 explained that as a part of her role she had access to sales forecasts for all products, including Eylea HD.

71. FE-4 was employed by Regeneron as a Staff Accountant from October 2023 until March 2025. FE-4 explained that her responsibilities were that of a General Ledger Accountant and she was responsible for certain expense and revenue lines. According to FE-4, the Accounting Department at Regeneron had approximately 120 to 200 employees globally across various areas with approximately 50 to 60 responsible for various product lines that contributed to financial statements that were broken up into five or six teams.

72. FE-5 was employed by Retina Consultants of America[8] ("RCA") from March 2022 until September 2024. FE-5 explained that she was a Senior Accountant from the time she joined the Company until she was promoted in October 2023 to Senior Financial Analyst. According to FE-5, she was one of four or five Senior Financial Analysts who were responsible for between five to seven physicians' offices. FE-5 explained that these offices were "pillars" and a total of approximately 200 subsidiaries rolled up under these approximately 20 "big" physicians' offices.

[8] Retina Consultants of America was formed by a private equity firm's acquisition of leading Retina Practices. In November 2024, Cencora, which also owns Besse Medical ("Besse"), announced that it acquired RCA for about $4.6 billion, one of the largest transactions in specialty eye care.

73. FE-6 was employed by Regeneron from prior to the Class Period until October 2024 as a Medical Specialist in the Southwest for six years. FE-6 explained that she was responsible for driving sales in all indications for Eylea and Eylea HD in one of the largest geographies at Regeneron and FE-6 reported to a Regional Sales Director in the Western U.S.

74. FE-7 was employed by Regeneron from prior to the Class Period until February 2025 and held a Senior Managerial Role in the Commercial Operations Division at Regeneron's Home Office. FE-7 was responsible for supporting the Reimbursement Team in Regeneron's Ophthalmology Division, specifically for Eylea and Eylea HD.

75. FE-8 was employed by Regeneron in a variety of roles in sales and reimbursement from before the Class Period until Fall 2024. FE-8 concluded her tenure as a Reimbursement Business Manager in the Ophthalmology Division in part of the Midwest region and was responsible for facilitating reimbursements for practices using Eylea and Eylea HD.

76. FE-9 was employed by American Vision Partners ("AVP") as an Assistant Controller from August 2021 until May 2024. According to FE-9, as a part of her role she assessed how much Eylea HD (as well as other drugs) was purchased, how much was used, how much was wasted, and rebate figures against budgeted or projected figures on a monthly basis. FE-9 explained that she met monthly with the CFO of American Vision Partners to go over those figures. FE-9 further explained that her direct report had regular meetings with the C-Suite of AVP, Operations directors, Finance directors, and AVP's Chief Medical Officer to discuss drug performance. FE-9 added that information discussed in these meetings was then disseminated to her by her superior.

77. FE-10 was employed by Regeneron as a member on the Brand and Marketing Operations Team from the start of the Class Period until after the Class Period.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Relevant Company Background

78. Regeneron, founded in 1988 by Defendant Schleifer, is a biotechnology company that manufactures and commercializes medicines for various diseases, including eye diseases, allergic and inflammatory diseases, cancer, cardiovascular and metabolic diseases, among others. After its founding, the Company poured almost all of its resources into researching and developing new drugs. Although Regeneron remained unprofitable for years, Regeneron sustained itself mainly through the capital raised from its initial public offering and commercial partnerships with big pharmaceutical companies.

79. Everything changed in 2011, when Regeneron obtained approval from the FDA for Eylea, an aflibercept[9] injection to treat Wet AMD by blocking a protein called vascular endothelial growth factor ("VEGF"), a condition where new blood vessels grow beneath the retina and leak blood and fluid, causing distortion and/or blind spots in central vision. To treat Wet AMD, Eylea is administered by a physician at a recommended dose of 2 milligrams ("mg") every four weeks for the first 12 weeks, followed by 2 mg every eight weeks. Eylea was also approved to be administered every four weeks if needed. Moreover, Eylea is currently available in pre-filled syringes, which avoid the risk of contamination and allow physicians to quickly administer the injection without needing to draw the medication.

80. Along with the FDA approval, Regeneron was also granted a market exclusivity right for Eylea until November 2023, which barred competitors from introducing generic versions of the drug, or "biosimilars," with the same or similar active ingredients and clinical efficacy.

---

[9] Aflibercept is a protein compound used to treat Wet AMD.

81. After Eylea's approval, Regeneron took over a significant share of the Wet AMD market (from its major competition, Avastin, Lucentis, and later Vabysmo) and appeared to generate hundreds of millions in revenue from its sales of Eylea. Indeed, Defendants announced in November 2012, "on the back of [Regeneron's] highly successful launch [of Eylea], the company expects to become profitable for the first time in 2012."

82. As a result, investors understood that the Company's financial success was dependent on sales of Eylea. Indeed, Defendants repeatedly emphasized in the Company's Annual Reports that Regeneron had become "substantially dependent on the success of Eylea" as sales of Eylea represented a substantial portion of Regeneron's revenues. For example, for the year ended December 31, 2022, Eylea's net product sales in the United States represented 51% of Regeneron's total revenue. Further, for the full year of 2022, Eylea commanded nearly 50% of the general Wet AMD drug category and 75% of the branded Wet AMD category, generating $6.3 billion in revenue for Defendants.

83. To distribute its drugs, including Eylea, Regeneron almost exclusively sells its products to two distributors, Besse and McKesson Corporation ("McKesson"). According to Regeneron's February 5, 2025 Form 10-K, on a combined basis, in 2024, the sales to these two distributors, Besse and McKesson, accounted for 74% of Regeneron's total gross product revenue for all drugs. These distributors then sell Eylea (and later, Eylea HD) to the customers, i.e., the Retina Practices that treat the patient with the drug. Importantly, Retina Practices then seek reimbursement of the drug from the appropriate insurer. As explained below, Retina Practices typically sought reimbursement from Medicare.

### B. Relevant Industry Background

#### 1. Medicare Part B and CMS Regulations

84. Because Wet AMD medications are more frequently used among the elderly population, a significant portion of Eylea and Eylea HD purchased by Retina Practices are reimbursed under Medicare, which provides health insurance coverage for people aged sixty-five or older (as well as for people with certain disabilities or afflictions). *See* 42 U.S.C. §§ 1395 et seq. However, the reporting of such reimbursement is highly regulated by rigid industry codes and federal laws that mandate what pharmaceutical companies must report to accurately reflect the sales price of their drugs.

85. Medicare is funded by the federal government and administered by the Centers for Medicare and Medicaid Services ("CMS"), part of the United States Department of Health and Human Services. Medicare Part B[10] primarily covers outpatient medical services and physician-administered prescription drugs and biologicals, including injectable drugs used to treat Wet AMD, such as Eylea and Eylea HD.

86. Medicare Part B pays Retina Practices a statutorily determined reimbursement rate for physician-administered drugs that is set at 106% of the drug's reported average sales price, or ASP. *See* 42 C.F.R. § 414.904.

87. To determine the reimbursement payment, CMS requires drug manufacturers—here, Regeneron—to report the ASP on a quarterly basis to allow Retina Practices to be reimbursed for their Eylea purchases.[11] Importantly, CMS requires drug manufactures, like Regeneron to

[10] The Medicare program consists of four parts: A, B, C, and D.

[11] Indeed, Defendants' Annual Reports repeatedly state that "Medicare Part B pays for such drugs under a payment methodology based on the average sales price of the drugs. Manufacturers, including us, are required to report average sales price information to CMS on a quarterly basis."

include in their reported ASP all price concessions, including "volume discounts, prompt pay discounts, cash discounts, free goods that are contingent on any purchase requirement, chargebacks, and rebates" as well as any "other price concessions . . . that would result in a reduction of the cost to the purchaser." 42 U.S.C. § 1395w–3a(c)(3); *see* 42 C.F.R. § 414.804(a)(2).

### 2. Retina Practices Seek Reimbursement Under Medicare B

88. Medicare reimburses Retina Practices under what is known as the "buy-and-bill model." Retina Practices first buy the drug (either from the manufacturer directly or through a third-party distributor), then store and manage the inventory, and then administer the medication to the patient. To get reimbursed, Retina Practice then bills CMS using an assigned J-Code for the drug. A J-Code is a medical billing code that doctors and insurers, including CMS, use to process claims and reimburse providers correctly. Each drug has a unique, assigned J-Code that allows Retina Practices to get reimbursed accurately and promptly by Medicare and other insurers.

89. To determine the size of the reimbursement that CMS pays Retina Practice, it first receives and analyzes ASP reports that manufacturers, like Regeneron, submit. Then, CMS reimburses the Retina Practices directly for the ASP of the drug plus a 6% add-on payment based on the ASP. This 6% effectively constitutes the Retina Practice's profit.

90. In most cases, reimbursements for Wet AMD drugs, such as Eylea, therefore make up a significant portion of a Retina Practice's total revenue and profits. Since the profit for any given drug is the difference between the price paid by Retina Practices to purchase the drug and the reimbursement received from CMS (or other insurers), the higher reimbursement the Retina Practices receive for a specific drug, the greater the profit the Retina Practices generate. Therefore, many Retina Practices prefer drugs that offer greater reimbursement, which in turn contributes to greater revenue and profits.

### C. Defendants Devised the Illegal Credit Card Fee Reimbursement Scheme to Gain a Competitive Advantage in the Wet AMD Market

91. Because of their two decades' experience in the pharmaceutical industry as well as their parallel familiarity with the Wet AMD market, Defendants understood the economics of that market. Indeed, Defendants knew that: (i) Medicare reimbursement of buy-and-bill drugs, like Eylea, is a significant portion of any given Retina Practices' total revenue; (ii) Retina Practices monitored and tracked the spread (the difference between the actual purchase price and the Medicare reimbursement), or profit, on buy-and-bill drugs like Eylea; (iii) Retina Practices selected which Wet AMD drugs to buy based in part on which drug provided the greatest profit; (iv) Retina Practices preferred to use credit cards to pay for their purchases; and (v) Eylea's competitors, Avastin and Lucentis, charged a credit card processing fee **through the distributors** (i.e., unlike Regeneron, these competitor companies **did not** foot the bill for credit card fees).

92. Defendants knew that distributors charged Retina Practices a credit card fee when purchasing Wet AMD drugs, and therefore, made the business decision to pay the distributor the credit card fee on behalf of the Retina Practice so they, the customers, could use a credit card without a fee. Indeed, Defendants hired a consultant that interviewed Retina Practices, and based on feedback from Retina Practices, the research presentation showed Defendants that "[t]he ability to order using credit cards was seen as important" to Retina Practices and that "[t]he ability to take advantage of [] credit card rewards is very important to [Retina Practices] and you may find that true for many." DOJ ¶ 83, Ex. 34, at slide 3 (filed under seal). These findings from the consultant were consistent with other in the DOJ Complaint, that some practices received "cash back" benefits accounting for close to $450,000 in just a single year. *Id.* ¶ 57.

93. Therefore, Defendants reached agreements with Regeneron's distributors, telling them not to charge customers a fee if they purchased Eylea with a credit card, but instead,

instructed the distributors to bill Regeneron. This effectively (i) lowered Retina Practices' cost of purchasing Eylea (since credit card fees are, on average, around 2% or more of the total purchase price), while (ii) still allowing Retina Practices access to cash back credit card rewards.

94. Critically, Defendant Schleifer personally sanctioned the Credit Card Fee Reimbursement Scheme, which existed before and continued into the Class Period. In August 2012, Defendant Fenimore requested Defendant Schleifer's approval of credit card fee reimbursements "so that [Regeneron] can efficiently process the fees payable to Besse and the other distributors." DOJ ¶ 60, Ex. 10 (filed under seal). In support of his request, Defendant Fenimore explained, in relevant part, that "[t]he distributors also pass through credit card fees incurred *when physicians pay for EYLEA with their credit cards*." *Id.* (emphasis in original). In response, Defendant Schleifer responded that the "suggested approach makes good sense. I approve." *Id.*

95. The Credit Card Fee Reimbursement Scheme, created by Defendants soon after they launched Eylea, continued into the Class Period. Indeed, with Defendant Schleifer's express approval, the Credit Card Fee Reimbursement Scheme remained standard practice at Regeneron for years. For instance, a 2017 internal memorandum referred to the reimbursement as "standard practice since 2012." DOJ ¶ 61, Ex. 11 (filed under seal). Further, the memorandum stated that future payments to distributors' purchase orders "*are not required to be approved by the CEO*" because "*an approval memo has documented the CEO's approval for the appropriate POs to be established and approved in accordance with the terms of the individual agreements*." *Id.* (emphasis in original).

96. Similarly, Defendant Schleifer received a draft approval memorandum regarding "2021 Distributor & Specialty Pharmacy PO Approvals (EYLEA)." DOJ ¶ 61, Ex. 12, at 1 (filed

under seal). The memorandum again referred to the "standard practice since 2012" under which "the Commercial team and the Strategic Sourcing Department has [sic] operated under the rules of an *approved memo . . . .*" *Id.* (emphasis in original). The memorandum also included projected credit card fees for each of the primary distributors. For example, Besse **charged Regeneron over $56 million in fees** based on a 2.10% credit card processing fee, and McKesson **charged Regeneron over $25 million in fees** based on a 1.79% credit card fee. *Id.* at 4.

97. Moreover, distributors Besse and McKesson provided Defendants with monthly invoices itemizing the credit card fees on a purchase-by-purchase basis, documenting the customer, amount of Eylea purchased, and the credit card fee percentage. For instance, a December 2019 invoice from Besse shows Regeneron owed Besse a total of over $4.7 million in December 2019. DOJ ¶ 63, Ex. 14, at 2 (filed under seal). Likewise, a spreadsheet, titled "McKesson Specialty CC Fees Analysis – V2.xlsx" and circulated by Regeneron internally, showed that from July 2016 to March 2017, Regeneron reimbursed McKesson for over $9.5 million in credit card fees on over $387 million in Eylea sales. *Id.* ¶ 64, Ex. 15 (filed under seal).

98. The Credit Card Fee Reimbursement Scheme made Eylea more profitable for Retina Practices in three main ways. First, because Defendants paid the credit card fee for the Retina Practices, the Retina Practices effectively paid less for Eylea than they would have had to otherwise. Second, the Retina Practices received substantial credit card bonuses, including cash back rewards, from using their credit card—further reducing the effective cost to purchase Eylea. Third, as explained below, the Credit Card Fee Reimbursement Scheme gave Retina Practices a higher reimbursement for each purchase of Eylea because Defendants did not report the reimbursement as a price concession.

### D. Defendants Knowingly Violated Federal Law by Not Reporting the Credit Card Fee Reimbursements as Price Concessions

99. Defendants should have reported the Company's credit card reimbursements to CMS as a "price concession" because Defendants effectively reduced Retina Practices' cost of purchasing Eylea by paying the credit card fees on their behalf—meaning the credit card reimbursements were a discount for customers.

100. Defendants attempted to get around reporting the credit card fee reimbursements by disguising them as bona fide service fees ("BFSFs"), which are not "price concessions" that need to be deducted from the ASP. Under the relevant regulations, a BFSF means:

> [F]ees paid by a manufacturer to an entity, that [(i)] represent fair market value for [(ii)] a bona fide, itemized service actually performed on behalf of the manufacturer that [(iii)] the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and [(iv)] that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.

42 C.F.R. § 414.802. BFSFs, such as distribution fees paid to the distributors, are not considered price concessions and do not reduce the ASP.

101. As detailed below, Defendants not only failed to establish adequate internal controls over the evaluation of BFSFs but also conveniently ignored the Company's own auditor's express finding that the payment of credit card fees were not BFSFs—and thus should have reported by Regeneron as price concessions, which would have reduced Eylea's ASP. Instead, Defendants chose to report the payments as BFSFs so that Defendants could keep Eylea's ASP stable and ensure it would not decline as much as their competitors' ASPs, whose manufacturers reported all price concessions. This stability made Eylea a more financially compelling selection for Retina Practices.

102. Accordingly, because Defendants failed to report the credit card fee payments as price concessions, Defendants knowingly submitted false ASP reports to CMS that inflated the ASP of Eylea.

#### 1. Defendants Knew that Credit Card Fee Reimbursements Were Not BFSFs

103. Defendants knew that the credit card fee reimbursement was a price concession and not a BFSF. In fact, in 2019, Defendants retained Deloitte to audit their reporting of BFSFs, and Deloitte found that the payments to the distributors for reimbursing customers' credit card processing fees were not BFSFs. *See* DOJ ¶¶ 98, 102, 107.

104. Specifically, Deloitte provided Regeneron with a "BFSF Grid" and in a column titled "**TYPE OF SERVICE COULD BE BFSF?**" Deloitte wrote "**No**" in the row for credit card fees. *Id.* ¶ 98, Ex. 42, at '081 (filed under seal). Additionally, Deloitte's "BFSF Grid" noted "N/A" under the column titled "SERVICES REGENERON WOULD PERFORM?" *Id.* ¶ 102, Ex. 42, at '081. Finally, the "BFSF Grid" entered "N/A" under the column titled "NOT PASSED THROUGH?" for the credit card fees. *Id.* ¶ 107, Ex. 42, at '081.

105. Even absent Deloitte's explicit findings, Defendants knew or should have known that their payments of credit card processing fees were not BFSFs based on the factors laid out in the definition of BSFSs.

106. <u>First</u>, with respect to BFSFs' second factor, Defendants knew that the payments of credit card fees were not a bona fide, itemized service performed on behalf of Regeneron to facilitate the distribution of Eylea. *See* Section IV(C), *supra*. Instead, here, the only effect of the payments was to reduce the costs of purchasing Eylea for Retina Practices (and thereby induce them to select Eylea) on behalf of the Retina Practices and not to compensate the distributors for performing any services (i.e., distributing the drugs) on Regeneron's behalf. *Id.*

107. Second, with respect to BFSFs' third factor, Defendants knew that absent a separate service agreement, the Company did not have to perform the service of causing distributors to waive Retina Practices' credit card processing fees. *Id.* Had Defendants not paid for the credit card fees, Retina Practices would have paid a higher price to use credit cards for their Eylea purchases or used a different payment method, just as Retina Practices did when they purchased Lucentis. *Id.*

108. Third, with respect to BFSFs' fourth factor, Defendants knew Regeneron passed these payments to Retina Practices in two ways: (i) the lower, subsidized prices customers paid when they used credit cards to purchase Eylea from distributors (since they did not have to pay the fee), and (ii) the cash back and credit card rewards customers received from their Eylea purchase. *Id.* In other words, Defendants' Credit Card Fee Reimbursement Scheme was no different than Regeneron or distributors directly paying customers to cover the higher costs they would have otherwise incurred, or if distributors deducted the credit card fees from Retina Practices' Eylea purchase.

### 2. Defendants Failed to Establish Adequate Internal Controls over the Evaluation of BFSFs

109. Defendants' apparent failure to follow the Company's own internal BFSF evaluation standard operating procedures ("BFSF SOPs"), which expressly set forth the four-step process Defendants needed to conduct before concluding any fee qualified as a BFSF, confirmed their knowledge that the credit card fee reimbursements were not BFSFs.

110. The BFSF SOPs describe "Regeneron['s] . . . control, processes and methodology pertaining to its determination of whether a proposed fee constitutes a Bona Fide Service Fee [] for . . . Average Sales Price []. . . ." and require each service fee to be evaluated against the four-part BFSF definition by CMS:

> In order to be treated as a BFSF, the service being evaluated must (1) be a bona fide, itemized service that is actually performed on behalf of the manufacturer; (2) be a service Regeneron would otherwise perform or contract for in the absence of the service arrangement; (3) represent fair market value (FMV); and (4) not be passed on in whole or in part to a client or customer of any entity or any other third party.

DOJ ¶ 108, Exs. 41 & 42, at § 5.4.1.1 (filed under seal).

111. Yet, Defendants never followed their own procedures nor established sufficient controls over validating their evaluation of BFSFs. Defendants instead ignored the BFSF four-step test to summarily conclude that "credit card fees [are] BFSFs for the calculation of ASP." *Id.* ¶ 109, Ex. 43, at 23 (filed under seal).

112. For example, the DOJ complaint alleges that in May 2016, Alicia Pantaleo ("Pantaleo"), Regeneron's Vice President of Accounting Operations and Assistant Controller, "did not perform any BFSF analyses to substantiate Regeneron's 'conclusion' prior to approving ['Regeneron's ASP assumptions, including its treatment of credit card fees as BFSFs']." *Id.* ¶ 110. Shockingly, in February 2018, Pantaleo asked Deloitte, "did we ever do anything on credit card fees to substantiate that they were BFSF?" *Id.* ¶ 111, Ex. 44 (filed under seal).

### 3. To Keep Eylea's ASP and Reimbursements Stable, Defendants Did Not Report Credit Card Payments as Price Concessions

113. Despite knowing that the payment of credit card transaction fees was not a BFSF and failing to establish adequate controls over the Company's evaluation and validation of BFSFs, Defendant reported the reimbursements as BFSFs, not price concessions, allowing Defendants to avoid a decline in Eylea's ASP and maintain a stable ASP as a differentiating factor in drug selection for Retina Practices.

114. In general, buy-and-bill drugs, like Eylea and Lucentis, often face downward pricing pressure on their ASP when manufacturers of competing drugs begin to offer more price concessions. This, in turn, reduces ASP and purchase price, which thereby serves to increase

Retina Practices' spread between reimbursement rate and the amount the customers pay to purchase the drug. As ASP continues to decline, the manufacturer is forced to offer more price concessions to maintain the spread for Retina Practices.

115. Therefore, to out-compete similar Wet AMD drugs, like Lucentis, Defendants understood that by intentionally failing to report as "price concessions" Regeneron's payment of Retina Practices' credit card fees, Defendants avoided declines in Eylea's ASP. This, of course, led to more favorable reimbursement rates for Retina Practices and therefore increased the profit Retina Practices earned on each Eylea injection. In full, the Credit Card Fee Reimbursement Scheme made Eylea a far more financially appealing drug to purchase than Regeneron's competitor's products.

116. Regeneron understood the significance of BFSF determinations to physician reimbursement rates. For instance, in February 2013,[12] IPN, a division of AmerisourceBergen Corporation (Besse's parent corporation), gave a presentation to Regeneron titled "IPN - Regeneron Partnership" that explained:

> Pharmaceutical manufacturers are required to report to [CMS] the [ASP] of products they sell. ASP is then used by CMS to calculate reimbursement rates for providers that purchase these products. As a result, what is included or excluded in ASP has a direct effect on physician reimbursement rates. Congress and CMS have expressly stated that certain fees paid by manufacturers to third parties may be excluded from ASP ***so long as these fees constitute bona fide service fees***.

DOJ ¶ 114, Ex. 45, at slide 24 (emphasis in original and filed under seal).

117. Moreover, IPN explicitly warned Regeneron that paying certain types of fees "*will likely result in lower reimbursement for the entire physician market*." *Id.* at slide 25 (emphasis in

[12] Defendants Schleifer and Fenimore were CEO and Vice President, Financial Planning & Analysis of the Company, respectively, at that time. Defendant Landry later joined the Company in September 2013 as CFO.

original). This presentation effectively gave Defendants the roadmap they used to orchestrate the illegal Credit Card Fee Reimbursement Scheme and evade regulatory scrutiny by the DOJ (at least for a while). Indeed, in violation of the federal law, Defendants disguised the payment of credit card fees as BFSFs, not price concessions, which would not lower Eylea's ASP, so that Defendants could offer a higher reimbursement rate to Retina Practices.

118. Accordingly, Regeneron falsely characterized its credit card-related payments as BFSFs to keep Eylea's ASP stable and decline less. Defendants even marketed Eylea's ASP as more stable than Lucentis's ASP. *See* DOJ ¶¶ 116-22. For instance, the DOJ Complaint alleges that "Regeneron marketed that it did not offer reportable price concessions in order to keep Eylea's ASP stable." *Id.* ¶ 116.

### 4. The DOJ Caught on to the Defendants' Scheme

119. Ultimately, Defendants' illegal Scheme also drew the scrutiny of the DOJ. For example, on August 5, 2021, Defendants disclosed for the first time in the Company's Form 10-Q:

> In June 2021, the Company received a CID [Civil Investigative Demand] from the U.S. Department of Justice pursuant to the federal False Claims Act. The CID states that the investigation concerns allegations that the Company (i) violated the False Claims Act by paying kickbacks to distributors and ophthalmology practices to induce purchase of EYLEA, including through discounts, rebates, credit card fees, free units of EYLEA, and inventory management systems; and (ii) inflated reimbursement rates for EYLEA by excluding applicable discounts, rebates, and benefits from the average sales price reported to CMS. The CID covers the period from January 2011 through June 2021. The Company is cooperating with this investigation.

120. Although this disclosed that Regeneron was being investigated, it did not disclose to investors that Defendants had been engaging in the illegal Credit Card Fee Reimbursement Scheme for more than a decade and **continued to do so during the Class Period**, or that a key

driver of Eylea's success was the illegal Credit Card Fee Reimbursement Scheme and not its purportedly superior clinical profile, as Defendants repeatedly assured investors.

121. Specifically, according to the DOJ Complaint and State Intervenor Complaint,[13] Defendants continued submitting false ASP reports for Eylea in both 2023 and part of 2024, i.e., during the Class Period. *See* DOJ ¶ 131; SIC ¶¶ 92-107. At the very same time, Defendants misled investors by repeatedly attributing Eylea's success to its purportedly superior profile and failing to disclose material facts about the source of Eylea's success—namely, that the Credit Card Fee Reimbursement Scheme provided Eylea a significant competitive advantage and was a substantial reason behind much of Eylea's sales and market share success.

**E. Defendants Misled Investors about the Source of Eylea's Success**

122. In light of the apparent success of Eylea, Defendants repeatedly bragged that Eylea's seemingly dominant performance in the Wet AMD space was attributable to the drug's "profile" compared to Eylea's competitors. A drug's profile is simply its overall picture and qualities—including how well it works (its effectiveness), how safe it is, and how easy it is to use.

123. For instance, before the Class Period, during the March 16, 2022 Barclays Global Healthcare Conference, an analyst asked Defendant McCourt about how Regeneron could withstand competition in the Wet AMD market. Defendant McCourt responded that Eylea could fend off competition because it was a superior product, stating:

> Since EYLEA entered the marketplace, it has been proven to have this remarkable efficacy profile against multiple indications. It's become the gold standard of treatment. And that's why today, EYLEA in the market has about 50% of market share. Low cost, unapproved Avastin has about 35% and then all the branded

[13] The "State Intervenor Complaint" refers to the intervenor complaint, Dkt. No. 203, filed by the State of Maine, the State of Nebraska, the State of Ohio, the State of Oregon, and the State of Wyoming in the DOJ Action, attached hereto as Exhibit D and cited as "SIC ¶ __" herein.

> products together, a number in the teens. So, this is a remarkable profile, efficacy and safety.

124. Based on these statements, and others alike, the market believed that Eylea's purportedly strong profile drove its success, and that profile set it apart from similar medications. For example, before the start of the Class Period, on August 3, 2021, Evercore ISI Research noted: "Eylea has ~70% of the branded VEGF market, due to its strong safety and efficacy profile."

125. However, unbeknownst to investors, Defendants concealed from the market that Defendants had been engaging in the illegal Credit Card Fee Reimbursement Scheme to create a competitive edge for Eylea. Indeed, Defendants misled investors about the source of Eylea's success throughout the Class Period.

126. For example, on May 4, 2023, the first day of the Class Period, an analyst asked Defendant McCourt a question about the pressure Eylea faced in light of the Wet AMD market's competitive landscape. Defendant McCourt answered by (falsely) insisting that Eylea's success came from its profile, stating "there's been a low-cost alternative, very low-cost alternative for a very, very long time, ***but it was [Eylea's] product profile that made the difference for prescribers and patients***."

127. Similarly, on June 14, 2023, during the Goldman Sachs Global Healthcare Conference, Defendant McCourt continued to conceal the Credit Card Fee Reimbursement Scheme as the true source of Eylea's success. In response to an analyst's question about how Eylea would manage competitive and pricing pressure going forward, Defendant McCourt stated: "***what I would assure you is that the clinical profile of EYLEA is what has allowed for this very robust performance over 12 years in the marketplace***."

128. These statements were false and misleading because they attributed Eylea's success to its clinical profile while omitting the material fact that Eylea's apparently robust present

performance (as well as its ostensible financial success over the past 12 years) resulted from Defendants' ongoing and illegal Credit Card Fee Reimbursement Scheme. Specifically, Defendants knew that Retina Practices chose Eylea because of the significant financial incentives, which Eylea's competitors could not match (as opposed to Eylea's clinical or product profile as Defendants repeatedly touted).

129. Based on Defendants' false and misleading statements, analysts believed that Eylea's profile was the reason behind its financial success. For example, on June 27, 2023, Cowen Research noted, "To date, retinal specialists still look to Eylea . . . for its impact on visual acuity, its safety profile, and the reduced burden of frequent injections. Management is optimistic that Eylea will retain its majority share for years to come." Similarly, on September 22, 2023, Cowen Research again emphasized, "Eylea Is Holding Steady Despite Vabysmo's Launch . . . There is high physician interest, supported by positive experiences with Eylea[]'s safety and efficacy profile."

**F. Faced with Eylea's Looming Patent Expiration, Defendants Scrambled to Release Eylea HD**

130. In addition to the undisclosed Credit Card Fee Reimbursement Scheme, Eylea's market exclusivity barred biosimilars, whose efficacy and composition had no clinical difference from Eylea, from entering the Wet AMD market at much lower prices.

131. However, as mentioned above, Eylea's market exclusivity was set to expire in November 2023.[14] Thus, Defendants knew they needed a new drug that could quickly assume Eylea's market share in the Wet AMD market before the biosimilars entered the market.

[14] On October 21, 2022, Regeneron was granted a pediatric exclusivity for Eylea, which extended the market exclusivity for Eylea by an additional six months through May 17, 2024.

Therefore, Defendants rushed to roll out a new drug, Eylea HD, the successor of Eylea, even though internal research showed several problems that would negatively impact its launch.

**1. Eylea HD Was Meant to Take Over for Eylea**

132. In 2019, Regeneron announced that the Company was advancing a high-dose formulation of Eylea, Eylea HD, which would enter clinical trials later that year. Indeed, Regeneron's plan for Eylea HD was to eventually replace Eylea and strengthen Eylea's competitiveness in the face of new entrants, like Vabysmo. According to FE-1, Eylea HD was pitched as a product to take the leadership position or continue the existing leadership position of Regeneron in the retina space. FE-1 continued to explain that the Company was planning for Eylea and Eylea HD continuing that position with Eylea HD replacing Eylea in the long run.

133. Both Defendants and the market understood the critical importance of Eylea HD. For example, in July 2020, Bernstein Research noted that "[i]f successful, HD Eylea will allow Regeneron to hold onto a significant portion of the franchise when the biosimilars come in and give it some protection against the branded competitors."

134. Similarly, in September 2022, Wolfe Research explained the "intent of [Eylea HD] has been to (a) blunt the impact of Eylea biosimilars that are likely to begin launching in mid-2024 by converting as many patients as possible from today's dose (2mg) to a new, higher dose (8mg); and (b) fend off new competition from Roche's Vabysmo, a new, competing drug that launched earlier in 2022, that is seeing good uptake."

135. Defendants also admitted in the Company's FY 2023 Form 10-K, "If we are successful in commercializing EYLEA HD, we expect that our dependence on EYLEA HD will grow relative to our historical dependence on EYLEA."

**2. Defendants Rushed Eylea HD to Market**

136. Prior to Eylea HD's launch, Defendants retained an external consultant, ZS Associates ("ZS"), to conduct market research on Eylea HD. This research identified serious problems that if not addressed would adversely impact Eylea HD's demand. Notably, these included the lack of a permanent J-Code, unavailability of pre-filled syringes, and lack of dosing frequency flexibility.

137. Indeed, based on research conducted by ZS and other consulting firms, FE-10 explained that early market research had predicted the issues with the adoption of Eylea HD. FE-10 added that the lack of demand for Eylea HD was captured in the market research and that the Company had been aware of the outcomes of the market research for years.

138. Specifically, FE-10 recalled seeing market research prior to Eylea HD's launch and that the research included insight into the ramifications of a temporary J-Code, not coming in a pre-filled syringe, how expensive Eylea HD is, and lacking a "Q4W1" label.[15] FE-10 continued to explain that doctors do not know how frequently a patient will require a dosage and had concerns about if they would be reimbursed if they needed to administer doses more frequently than the label allowed. Indeed, to be reimbursed using a temporary J-code, Retina Practices had to jump through additional hoops, including submitting myriad supporting documents, such as the brand, dosage, and reason for administration.

139. Despite knowing these problems identified by ZS' and others' early market research, Defendants still rushed Eylea HD to the market before Eylea's market exclusivity ran out.

[15] "Q4W1" or Q4W is primarily used as an abbreviation in medical and pharmacological contexts to mean "every four weeks."

140. On August 18, 2023, FDA finally approved Eylea HD for the treatment of patients with Wet AMD.[16] Per the terms of this approval, Eylea HD could be administered every four weeks for the first three months (the "loading dose), followed by every eight to 16 weeks. In contrast, for Eylea, after the same loading dose, it could be administered as frequently as every four weeks if needed.

141. Moreover, because of less frequent dosing, the pricing of each injection of Eylea HD is higher than that of Eylea, at $2,625.00 per injection, or per vial, as compared to $1,850 per injection for Eylea. According to Regeneron, when used as indicated, for patients, the annualized list price of Eylea HD is anticipated to be in the range of, or lower than, Eylea. However, for Retina Practices, Eylea HD's less frequent and inflexible dosing made the drug less profitable to prescribe because, as explained earlier, Retina Practices would administer Eylea HD less frequently and therefore receive fewer Medicare reimbursements.

### G. Several Problems Harmed the Success of Eylea HD's Launch

142. Defendants launched Eylea HD on August 18, 2023. Immediately, the problems identified by Regeneron's market research and explained above—such as (i) the unavailability of a permanent J-Code, (ii) the unavailability of pre-filled syringes, and (iii) the lack of dosing flexibility—led to significant problems with the uptake of Eylea HD among Retina Practices.

#### 1. A Temporary J-Code Led to Lower Demand from Retina Practices

143. The two-month delay in receiving Eylea HD's FDA approval caused further delays in obtaining a permanent J-Code. Indeed, Eylea HD did not have a permanent J-Code at launch and thus had to rely on a temporary one. This turned physicians away from ordering or prescribing

---

[16] Although Defendants anticipated receiving FDA approval for Eylea HD on June 27, 2023, the approval was delayed when the FDA issued a Complete Response Letter to Regeneron due to an ongoing review of inspection findings at a third-party filler that was responsible for filling the vials with Eylea HD solution.

Eylea HD because using a temporary J-Code could delay or prevent Retina Practices from receiving reimbursement for their Eylea HD purchases.

144. Multiple FEs confirmed Retina Practices' unwillingness to purchase Eylea HD due to the lack of a permanent J-Code. For example, according to FE-10, the adoption of Eylea HD was slow because of the temporary J-Code the product launched with. Similarly, according to FE-8, doctors' offices had concerns about reimbursement stemming from Eylea HD's temporary J-Code following issues with Syfovre,[17] concerns around what dosages would be reimbursed, and what patients it could be reimbursed for. FE-8 recalled confusion from offices on prescribing Eylea HD to patients with Medicare Advantage and not being reimbursed if the patient did not have additional coverage.

145. Similarly, FE-2 recalled that the change in approval date delayed the uptake of Eylea HD in terms of adoption by physicians and patients. FE-2 noted that a lot of practices will not administer drugs with temporary J-codes due to issues experienced by other drugs with temporary J-codes in the past.

**2. The Lack of Pre-Filled Syringes Caused Lower Demand for Eylea HD**

146. In addition, as predicted by Defendants' internal market research, the unavailability of pre-filled syringes significantly dampened Retina Practices' interest in Eylea HD after the launch.

---

[17] Syfovre is a medication used to treat geographic atrophy, a severe form of AMD. According to FE-8, the launch of Eylea HD was coming on the tail of the "Syfovre trainwreck," an eye drug used to treat a different indication than Eylea HD that is made by Apellis. FE-8 continued to explain that several Regeneron employees had joined Apellis for Syfovre's launch and had told physicians that it would be reimbursed. FE-8 recalled that there were widespread issues with offices unable to be reimbursed and were left responsible for expenses incurred, including a clinic which had approximately $1,000,000 in fees not reimbursed.

147. Without pre-filled syringes, physicians would need to spend more time preparing the injections, significantly decreasing injection volume and resulting revenue for the Retina Practice. For example, FE-10 explained that the time to fill a syringe and additional complications that the process can create does have a considerable impact on the revenue of retina practices. FE-10 explained that injection volume is built into the business model for physicians.

148. Similarly, FE-8 recalled hearing similar sentiments expressed during trips across the country. Specifically, FE-8 continued to say that Eylea HD not coming in a pre-filled syringe was another issue that was noted.

149. Indeed, these accounts are corroborated by a 2019 study by retinal physicians which found that the delivery of Wet AMD medication from pre-filled syringes can lead to a 40% reduction in office preparation time, offering clinical efficiency.[18] In turn, this reduction in preparation time allows Retina Practices to treat more patients per day, leading to more copays and thus more revenue for the practice. Therefore, because of the diminished revenues associated with Eylea HD's lack of pre-filled syringes, Retina Practices were reluctant to purchase Eylea HD.

**3. Eylea HD's Longer and Inflexible Dosing Frequency Drove Away Retina Practices**

150. Based on their market research for Eylea HD, Defendants knew that Eylea HD's longer and inflexible dosing frequency would dissuade Retina Practices from using Eylea HD, leading to lower demand for Eylea HD. Indeed, FE-2 explained that doctors were not interested in administering more frequent doses of Eylea HD when they could instead continue similar dosage frequencies with the cheaper and proven Eylea 2mg.

---

[18] *Prefilled Syringe Delivery of Intravitreal Anti-VEGF Medications*, Retinal Physicians (March 1, 2019), https://retinalphysician.com/issues/2019/march/prefilled-syringe-delivery-of-intravitreal-anti-vegf-medications/.

151. Specifically, according to FE-1, Eylea HD could be administered only in eight-, twelve-, or sixteen-week intervals, where Vabysmo had the flexibility to be administered in four-week intervals if needed. FE-1 continued to explain that while Vabysmo may not be a better drug than Eylea HD, Vabysmo had label flexibility following the loading dose, which was a strength and a differentiating point in the market.

152. Likewise, this lack of flexible dosing frequency also concerned doctors and patients from a clinical perspective. For example, FE-8 explained that doctors were not comfortable with going so many weeks between doses as was required with Eylea HD. FE-8 further explained that once vision is gone, it's gone and there were concerns from doctors and patients about the amount of time between injections.

**H. Following Eylea HD's Launch, Defendants Saw Internal Data and Reports That Showed Weak Demand for Eylea HD**

153. Immediately after Eylea HD's launch, multiple FEs confirmed that Defendants, including Defendants Schleifer, Landry, and Fenimore, reviewed internal reports and analysis that showed weaker demand for and sales of Eylea HD.

154. In fact, within weeks after Eylea HD's launch, Defendants had already internally sounded the alarm due to lack of demand for the drug. For example, FE-8, who was a Reimbursement Business Manager, recalled that well before the fourth quarter of 2023, Regeneron's leadership, including everyone from the CEO down to first line managers, had already begun panicking about Eylea HD's performance.

155. Indeed, according to FE-8, sales performance of Eylea HD got so bad that Defendant Schleifer was calling physicians personally in FE-8's market. FE-8 knew this because a doctor from a retina practice in her region told FE-8 that Schleifer had called him directly and asked, "why aren't you using Eylea HD?"

156. Moreover, multiple FEs who reviewed internal sales reports recalled that the reports consistently showed poor demand and sales for Eylea HD. According to FE-7, she received weekly sales reports with figures for the entire country. She was aware Eylea HD was not performing through her review of sales reports, which began shortly after the product's launch through July 2024. Specifically, FE-7 observed "a lot" of territories with zero vials shipped and some territories only had "a few" vials shipped.

157. Sales representatives of Eylea HD were also having trouble meeting their sales quotas. For example, FE-2, who reviewed internal sales data on the Company's internal analytics platform, Navigator, explained that she worked on selling Eylea HD for two quarters prior to her departure from Regeneron and she didn't even get close to meeting her quotas and achieved only 50-70% of her goal.

158. Subsequently, the FEs confirmed that Defendants' internal demand forecasting reflected Eylea HD's weak sales performance. For example, FE-10 explained that her team was responsible for producing demand forecasting at an account level during her tenure. According to FE-10, the forecasts her team produced were always adjusted downwards and rarely went up. FE-10 further explained that the forecasts were constantly adjusting and that she discussed these figures with the Finance Team.

159. In fact, Defendants, including Defendants Fenimore and Landry, reviewed and discussed Eylea HD's abysmal sales performance during internal meetings. For example, according to FE-3, who attended monthly Accounting Department meetings, it was apparent that sales were not materializing and that widespread adoption was not there throughout her tenure. FE-3 explained that beginning in late 2023 through early 2024 disappointment around the

performance of Eylea HD began to materialize at the Company. FE-3 further recalled performance noticeably declining by mid-2024.

160. Similarly, FE-4 attended a monthly Accounting Department meeting, which ran for approximately 90-minutes and consisted of approximately 20 speakers from the various accounting functions. FE-4 explained that the meetings included historical reviews of performance of various products and packets were distributed to attendees in advance to review. FE-4 continued to explain that comments and concerns in reference to the various areas were discussed.

161. According to FE-4, current CFO Chris Fenimore attended the meetings in his capacity as the Senior Vice President, Controller, and following his elevation to CFO, Fenimore attended the meetings more regularly than Landry had previously. FE-4 recalled that the meetings were led by an individual from the Accounting Department and former CFO Robert Landry occasionally attended the meetings.

162. According to FE-4, the performance of Eylea HD was discussed during these monthly meetings and the numbers were not impressive and the rollout of Eylea HD was going slower than expected. FE-4 recalled that there was disappointment in Eylea HD's performance throughout her tenure and this began to build up in late 2023 going into early 2024.

### I. To Hide the Lack of Demand for Eylea HD, Defendants Engaged in Backdoor Deals and Unethical Sales Practices

163. Well aware that Eylea HD's launch was not successful—as it experienced weak physician demand due to the lack of a permanent J-Code, the unavailability of pre-filled syringes, and the lack of dosing frequency flexibility, *see* Sections IV(F)-(H), *supra*—Defendants tried to create the appearance of demand by (i) meeting with private equity-owned Retina Practices to unload Eylea HD in bulk and (ii) directing Eylea HD's sales representatives to engage in unethical, even borderline illegal, sales tactics to dump Eylea HD.

### 1. Defendants Made Backdoor Deals to Hide Low Demand

164. Alarmed by weak demand for Eylea HD, Defendants flew around the country, executing clandestine deals with private equity-owned Retina Practices to purchase Eylea HD in bulk (often at the end of the quarter) to create a false appearance of demand, even if physicians were hardly prescribing any Eylea HD. Specifically, unbeknownst to investors, Defendants' undisclosed deals with private equity-owned Retina Practices led these practices to place bulk orders for Eylea HD from the distributors.

165. Indeed, Defendants were so desperate to generate these deals that Defendant Schleifer, as CEO of the Company, personally engaged in activities that normally are undertaken by the sale department, like hopping on private jets at the end of 2023 to visit clients to try to sell Eylea HD to private equity-owned Retina Practices.

166. For example, FE-6 explained that physicians made it "clear" early on that the interest in Eylea HD was not there and the Company then turned to Private Equity Practices to make deals utilizing "strong-arm tactics." FE-6 was informed that senior leadership, including Defendants Schleifer and McCourt, visited several large private equity-owned retina practices. FE-6 recalled that current Vice President, Customer Engagement Paige White met with FE-6's large Private Equity customer, American Vision Partners in Arizona.

167. As a result, FE-6 recalled the difficulty in selling Eylea HD but as the end of the year approached, she began to hear from colleagues about Schleifer, McCourt, and other high-level employees getting on jets and taking meetings with Private Equity groups. FE-6 explained that the Company needed to make numbers going into the new year and the deals being struck with Private Equity groups was like putting a band-aid over a bullet hole. FE-6 further recalled attending meetings about Eylea HD where it was apparent the Company needed to hit sales numbers for investors and "the street."

168. FE-3 explained that the sales forecasts were moving targets and often dependent on if large buyers were going to make purchases towards the ends of quarters.

169. Similarly, FE-7 explained that shortly after the launch of Eylea HD and through the end of her tenure—approximately from August 2023 through February 2025—she heard of employees including Clark, White, current Executive Director Marketing, Emmanuel Hamon, current Senior Director Market Access Strategy, Eric Goldstein, and current Executive Vice President and Head of Commercial, Marion McCourt taking private jets to meet with prospective customers.

170. FE-2 recalled being informed that leadership, including current Vice President, Ophthalmology Commercial Business Unit Kevin Clark and current Executive Vice President and Head of Commercial Marion McCourt visited Private Equity Practices, such as Retina Consultants of America (RCA) and Prism, over the holiday period of 2023 and made a huge push to get sales for the year-end figures.

171. According to FE-6, the deals were coming in with "crazy" buying patterns. Specifically, immediately after these flights, FE-6 recalled the "next thing you know" there is news of an order of 1,000 or 4,000 or 5,000 vials. FE-6 explained that the Company was putting pressure on these organizations to make large purchases with the caveat that the private equity-owned Retina Practices maintained the right to return product.

172. Indeed, as FE-6 explained, the Company's approach of making Private Equity groups make large purchases persisted through the first six months following the launch of Eylea HD—i.e., August 18, 2023 through February 18, 2024—and more likely through the first year after launch.

173. Moreover, because private equity owned Retina Practices frequently purchased in high volume, they held significant leverage in negotiating for better pricing or rebates with Regeneron. Indeed, in order to convince the private equity owned Retina Practices to purchase bulk orders of Eylea HD, Defendants gave them large rebates that were unavailable to other customers.[19]

174. Similarly, FE-2 explained that most Medical Specialists were meeting 40-80% of their goals, the few Medical Specialists in markets with large Private Equity Practices were meeting over 100% of their goals. Specifically, FE-2 explained that Regeneron targeted Private Equity Practices to try to achieve big end of year figures because of the rebate programs offered to them based on the tens of thousands of units they ordered per quarter, which assisted the Company in inflating sales figures.

175. For example, FE-2 explained that larger practices purchased enough volume to hit rebates. Similarly, FE-3 recalled that the Company was "trying to move product" and participated in incentivizing customers through discounts and other means.

### 2. Defendants Pushed Unethical Sales Practices to Try to Make Up for Low Eylea HD Demand

176. As the demand gap continued to worsen, Eylea HD sales could not solely be sustained by Defendants' behind-the-doors deals with private equity-owned Retina Practices. Consequently, Defendants resorted to directing sales representatives to sell Eylea HD at any cost, even if the sales representatives were on the verge of breaking the law. Specifically, FEs confirmed that Defendants directed Reimbursement Managers who had access to sensitive patient PHI to

---

[19] Rebates are types of financial incentives where the customer (here, Retina Practices) pay full price up front for a product and the seller (here, Regeneron) gives part of the money back—either as cash, credit, or a discount on future purchases.

assist in selling Eylea HD. Defendants' direction to engage in these undisclosed sales practice blatantly overstepped the boundaries set by the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), which prohibits the use or disclosure of PHI for marketing purposes without explicit written authorization from patients.

177. For example, FE-8 explained that leadership now wanted Reimbursement Managers "out in front" saying "everything is fine" regarding reimbursements. According to FE-8, because she had access to patient PHI she should not have been asked to assist in making sales. However, according to FE-8, although Reimbursement Team members are supposed to be removed from the sales process and handle reimbursements only after a physician has decided to prescribe a drug, the Reimbursement Team members were now asked to instruct physicians about reimbursement prior to a determination to purchase and use Eylea HD. FE-8 explained that if she was caught by the Inspector General, she could face a $250,000 fine, be barred from the industry, and receive jailtime.

178. Likewise, FE-6 recalled that employees on the Reimbursement Team were tasked with taking on sales functions despite the potential legality around those employees also having access to patients' PHI. FE-6 continued to say that some Reimbursement Team employees who pushed back on these added responsibilities were let go from the Company.

179. Sales representatives were also directed to lie about Eylea HD's reimbursement so that doctors would be more prone to purchasing them. FE-8 explained that doctors wanted four months for a new drug and when she informed them that they would not be reimbursed on that schedule she was told not to tell them that. FE-8 noted that she refused, as did another Reimbursement Manager from the Northeast Region, who elected to retire instead of participating in the practices that were being asked of her.

### J. Weak Eylea HD Demand Led to Inventory Build-Ups

180. Not only did Defendants internally observe weak demand and sales for Eylea HD, but distributors and Retina Practices also saw signs of poor uptake of Eylea HD. As discussed below, several former employees of large private equity-owned Retina Practices observed weak demand for Eylea HD. Critically, these FEs attributed many of the problems Defendant knew about to the weak demand for Eylea HD.

181. Retina Practices, including RCA, one of the largest private equity-owned Retina Practices, observed that the longer injection interval had made Eylea HD a less profitable drug. For example, FE-5 recalled that in 2024, she attended budgeting meetings, where the negative impact of Eylea HD was discussed. FE-5 continued to say that during these meetings, she and her colleagues discussed the fact that Eylea HD required fewer injections than legacy Eylea and therefore contributed to a loss of revenue for RCA.

182. Similarly, FE-9, who worked at AVP, another private equity-owned Retina Practices, recalled that overall Eylea HD wasn't super popular with physicians and this was reflected in the numbers she was reviewing regarding demand figures. Moreover, according to FE-9, AVP did not want to hold a ton of stock of drugs with temporary J-Codes in case CMS changed the coverage. Therefore, FE-9 explained that AVP learned a lesson at this time and scaled back their purchasing of Eylea HD for fear of having too much inventory on hand.

183. Further, FEs attributed Eylea HD's lack of pre-filled syringes to Eylea HD's weak demand. FE-9 recalled representatives from Regeneron coming to give trainings to teach physicians how the syringes for Eylea HD worked. According to FE-9, during these trainings representatives from Regeneron did not inform physicians that Eylea HD did not come in a pre-filled syringe. FE-9 continued to say that this detail contributed to the "perfect storm" that led to AVP "quickly" hearing about adoption problems. FE-9 recalled that the failure to communicate

that the drug did not come in a pre-filled syringe created a "big operational issue" which was furthered by the requirement to have special tools.

184. Therefore, although Defendants were able to conceal the lack of demand for Eylea HD for a short time through the undisclosed deals with private equity-owned Retina Practices, these practices were stuck with excess inventory due to the lack of physician demand.

185. Indeed, as confirmed by the FEs, the lack of demand for Eylea HD caused Retina Practices to accumulate substantial inventory that they could not unload, or to significantly cut back on their purchases. For instance, FE-5 recalled that there were definitely huge build ups of Eylea and Eylea HD inventory at RCA and that there was more than enough product to satisfy demand. FE-5 continued to explain that the inventory buildup was millions of dollars' worth more than what was needed and there was never a point where they were unable to meet demand.

186. RCA's reluctance to purchase more Eylea HD and substantial inventory build-up reflected Eylea HD's demand that was much weaker than what Defendants repeatedly touted to the investing public throughout the Class Period.

187. Similarly, poor demand for Eylea HD drove AVP to significantly cut back on their purchase of Eylea HD. FE-9 explained that Eylea HD was not performing as expected, both in terms of rebates and usage and as a result AVP slowed way down on purchases, which was a big concern internally. FE-9 continued to say that she had direct conversations with the Purchasing Team and the decision to pull back on purchasing occurred pretty quickly after Eylea HD launched. FE-9 further explained that AVP knew demand for Eylea HD was not there shortly after launch and pulled back on purchases in the first quarter of 2024. FE-9 added that the Purchasing Team at AVP was responsible for forecasting purchases. According to FE-9 there was a regular stream

of communications internally at AVP about the lack of usage of Eylea HD. FE-9 continued to say that eventually they reverted back to *Vabysmo* after the launch of Eylea HD launch did not go well.

**K. Defendants Misled the Market about Eylea HD's Demand**

188. Throughout the Class Period, Defendants publicly and repeatedly touted the strong demand for Eylea HD, leading investors to believe Retina Practices (and the doctors that worked there) had strong demand for the product and that patients were having positive experiences switching from Eylea to Eylea HD.

189. For example, during the November 2, 2023 earnings call for Third Quarter 2023, Defendant Schleifer stated that "[s]tarting with EYLEA HD, which is off to a great start. We launched in late August, shortly following FDA approval, and recorded $43 million of net product sales in the final six weeks of the quarter, which compares favorably to recent launches in the retinal disease category. Importantly, ***revenues were driven by strong initial demand*** with multiple reorders by distributors before the end of the quarter."

190. Later in the same call, Defendant McCourt stated, "***Early launch indicators have been very positive. Physician enthusiasm was extremely high prior to EYLEA HD launch*** and that ***interest has translated into early use in a broad range of patient types*** across wet AMD and diabetic eye disease." Defendant McCourt also noted that, "***[w]e are seeing switches from EYLEA, as you would expect . . . I can share with you that we have seen a high conversion rate from practices ordering EYLEA HD samples and then subsequently placing orders*** of commercial products through commercial channels."

191. However, these statements were false and misleading because Defendants knew that demand was not strong, nor was there a high conversion rate to Eylea HD, and the Company's sales of Eylea HD were substantially driven by undisclosed deals with private equity-owned Retina Practices.

192. Based on Defendants' false and misleading statements, however, analysts were convinced that Eylea HD's sales were backed by strong initial physician demand for the product. For example, on November 2, 2023, J.P. Morgan Research raised their forecast for Eylea HD because "early trends are encouraging with use across a range of patients and with the company quickly building payer access for the drug."

193. Additionally, on February 2, 2024, Regeneron issued a press release regarding its Fourth Quarter and Full Year 2023 Financial and Operating Results. During the earnings call on the same day, in discussing Eylea HD's financial results, Defendant McCourt touted the physician demand for Eylea HD, stating: "In January, we announced fourth quarter combined US EYLEA HD and EYLEA net product sales of $1.46 billion. ***In its first full quarter, EYLEA HD net product sales were $123 million, based on growing demand and positive early physician experience***."

194. Similarly, this statement was also false and misleading because Defendants knew that there was little physician demand for Eylea HD and that much of Eylea HD's sales and demand were driven by unsustainable bulk purchases by private equity-owned Retina Practices as a result of Defendants' secret deals.

195. Following Defendants' false and misleading statements, analysts believed that Eylea HD was performing well in the field with both doctors and patients, and remained confident that Eylea HD's purportedly strong demand would continue to drive sales growth. For example, on February 2, 2024, Morgan Stanley Research echoed Defendants' assurance that "they are seeing strong adoption of the product across various patient types (recalcitrant, switch and naïve)."[20]

[20] A naïve patient refers to an individual who has never received a specific treatment. A recalcitrant patient refers to an individual whose condition resists standard treatment. A switch patient refers to an individual who switched from legacy Eylea to Eylea HD.

Similarly, Goldman Sachs Research emphasized that "[m]anagement reiterated their confidence on the Eylea HD launch, noting strong demand (across recalcitrant, switch and naive patients)."

### L. Truth Began to Emerge Through a Series of Partial Disclosures While Defendants Continued to Mislead Investors

196. Although Defendants led investors to believe that Eylea and Eylea HD had significant financial success because they were superior products, investors began to learn the truth about the source of their success through a series of partial corrective disclosures, revealing: (i) Defendants' illegal Credit Card Fee Reimbursement Scheme had been a significant driver of Eylea's sales and demand for years; and (ii) the true demand for and sales of Eylea HD were weaker than what Defendants led the market to believe and were propped up by Defendants' bulk deliveries of Eylea HD to private equity-owned Retina Practices, which as revealed by Defendants' announcements, eventually led to inventory drawdowns at the distributors.

#### 1. The DOJ Complaint Revealed Defendants' Credit Card Fee Reimbursement Scheme on April 10, 2024

197. On April 10, 2024, after the market closed, the DOJ announced that it had filed a complaint against Defendants for violating the Federal False Claims Act (the "FCA"). The FCA implicates anyone who: "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."[21] 31 U.S.C. § 3729(a)(1).

198. According to the DOJ, Regeneron fraudulently manipulated Medicare reimbursement for Eylea by knowingly failing to report **hundreds of millions of dollars** in price concessions provided to drug distributors in the form of reimbursed credit card fees. As a result,

---

[21] Under the FCA, the terms "knowing" and "knowingly" mean that a person, with respect to information: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).

the DOJ alleges that Regeneron greatly inflated the ASP of Eylea to Medicare over many years and "**enhanced its revenues**" through this unlawful practice.

199. On this news, the price of Regeneron's common stock declined by $31.50, or 3.36%, over two consecutive trading days to close at $904.70 on April 12, 2024.

200. The market immediately linked the stock price decline to the revelation of the undisclosed Credit Card Fee Reimbursement Scheme and raised concerns over what it could mean for Regeneron's sales of Eylea. For example, on the same day, UBS Research noted, "Wednesday eve's announcement that the DOJ is filing a complaint against REGN has seen pressure on the stock (down 3.5% since announced)."

201. Critically, analysts also began to question whether Regeneron's undisclosed Credit Card Fee Reimbursement Scheme might have contributed to much of the commercial success of Eylea and could soon materially lower Eylea's sales and demand once Defendants were forced to terminate the Credit Card Fee Reimbursement Scheme. For instance, on April 11, 2024, Wolfe Research noted:

> The greater potential threat is that heightened DOJ scrutiny might **force a change in how REGN does business**, which comes at a critical time for Eylea . . . . Because of this, the question arises, **will REGN change its ways and stop reimbursing for credit card fees**? If it does, then it **takes away this advantage** relative to ROG [Roche], effectively . . . **leveling the playing field** between these two competitors. . . . It is not clear what happens from here, but it's not hard to understand why this elevated scrutiny on REGN's commercial practices **can't be totally dismissed**.

202. Similarly, on April 16, 2024, UBS Research cautioned that,

> Because the **primary investor concern post the [DOJ] complaint is whether REGN is continuing to allow credit card processing/reimbursement** (to be clear - it is the distributers taking the credit card payments) - **if not, the concern is it would make the Eylea franchise less competitive** (though the complaint is actually about the calculation of ASP vs. the practice of allowing/reimbursing credit card payments).

203. However, investors did not know the full truth regarding the source of Eylea's success and Regeneron's stock price remained artificially inflated even after this news because Defendants continued to conceal from investors the extent to which the success of Eylea, i.e. its sales, demand, and market share, relied on the Credit Card Fee Reimbursement Scheme. *See* Sections IV(C)-(D), *supra*.

204. Indeed, Defendants assured the market that the DOJ's allegations were "meritless" and that the DOJ Complaint would not impact how Regeneron did business and Eylea's sales and demand would remain intact. Specifically, on April 15, 2024, Regeneron issued a media statement, pledging that "***[t]he filing of this lawsuit will not change our practices with respect to reimbursement of credit card fees incurred by our distributors***" and insisting that "***[r]eimbursing credit card service fees to distributors is not a price concession and does not affect EYLEA's price***."

205. After Regeneron's April 15, 2024 media statement, analysts echoed Defendants' false assurance and were confident that Eylea's sales and demand would remain unaffected. For example, on April 17, 2024, Raymond James noted that "[g]iven Regeneron's strident stance in their statement following the disclosure of the complaint, the expert thought it would be surprising if they were to waver on pricing strategy at this point." Likewise, on April 16, 2024, UBS Research concluded that "[c]redit card practice unlikely changed post False Claims Act complaint."

### 2. Defendants Continued to Conceal the True Source of Eylea's Success

206. Following their assurance that Regeneron "will not change our practices with respect to reimbursement of credit card fees incurred by our distributors," Defendants continued to conceal that the credit card fee reimbursement was fueling Eylea's success. Specifically, on August 1, 2024, during the earnings call for Second Quarter 2024, an analyst asked about whether

the DOJ Action was responsible for lower volumes and lower prices for Eylea. Specifically, the analyst asked:

> I have a question on EYLEA and this DOJ investigation into the marketing practices that emerged since April, where they assert that you guys violate the False Claims Act. Can you provide an update on kind of what happens from here. And specifically in the interim and out of prudence, has Regeneron changed any of its marketing practices since April? And is that having any impact even on prescribers? **I asked because on slide 6 you mentioned "other market dynamics" that resulted in lower volumes and lower price. I'm just wondering what those were.**

207. Defendant Schleifer answered: "***There's nothing in the marketplace related to this lawsuit. And frankly, we think, there's nothing to this lawsuit. And we have not changed our practice, and we intend to fight it vigorously***. And I think once you see our papers in court, you'll get a much better understanding of that."

208. However, this statement was false and misleading because Defendants knew that enhanced scrutiny from the DOJ would change the Company's "practices with respect to reimbursement of credit card fees." Specifically, Defendants knew that reporting the credit card fee reimbursements as price concessions would reduce the net selling price of Eylea and eliminate Eylea's substantial financial incentives—such as receiving higher reimbursements from Medicare and no credit card fees—that gave Eylea a competitive advantage and improperly induced Retina Practices to purchase Eylea over its competitors.

209. Based on Defendants' misstatements, analysts believed that regardless of the outcome of the DOJ Action, Eylea would hold onto its sales and market share based on its purportedly superior "profile" that distinguished Eylea from competitors. For example, on the same day, Wolfe Research commented, "[w]e asked whether ongoing DOJ investigation (since April) has compelled REGN to change its marketing practices as the dispute continues - REGN says it hasn't, and it continues to defend itself."

### 3. Defendants Disclosed Lagging Eylea and Eylea HD Sales on October 31, 2024

210. On October 31, 2024, before the market opened, Regeneron filed its Forms 8-K and 10-Q, announcing financial results for Third Quarter 2024 that were below expectations for both Eylea and Eylea HD. Specifically, the press release stated in pertinent part:

> Total EYLEA HD and EYLEA net product sales in the U.S. increased 3% in the third quarter of 2024 compared to the third quarter of 2023. . . . Net product sales of EYLEA in the third quarter of 2024 were adversely **impacted by a lower net selling price** compared to the third quarter of 2023. **In addition, third quarter 2024 total EYLEA HD and EYLEA net product sales were favorably impacted by approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD** at the end of the third quarter of 2024 compared to the end of the second quarter of 2024, partially offset by lower wholesaler inventory levels for EYLEA.

211. Additionally, both Eylea and Eylea HD sales figures were below expectations. Specifically, Eylea's quarterly sales were $1,145 million, falling 7% quarter-over-quarter and 21% year over year, and Eylea HD's quarterly sales declined quarterly sales were only $392 million, missing consensus estimates of $415 million to $425 million.

212. Following this news, the price of Regeneron's common stock declined 9.2%, a reduction of $84.59 per share, in a single day.

213. Defendants' disclosures about Eylea and Eylea HD's disappointing and declining sales and Eylea's lower net selling price revealed new information and/or were the foreseeable consequences of the material risks previously concealed by Defendants' false and misleading statements and omissions regarding both Eylea and Eylea HD.

214. Specifically, with respect to Eylea, Defendants' disclosure of the decline in Eylea's net selling price began to reveal to the market that Defendants' illegal Credit Card Fee Reimbursement Scheme had a material impact on the demand for and sales of Eylea. While assuring the market that Defendants would not change the Company's "practices with respect to

reimbursement of credit card fees," the declining net selling price for Eylea revealed that Defendants began to report the credit card reimbursement payments as price concessions, which in turn, drove down Eylea's ASP and net selling price.

215. Indeed, if Eylea reported the credit card fee reimbursements as price concessions (which they were required to do), that would necessarily lower the ASP they reported to CMS. At the same time, this change would also lower the net selling price for Eylea because Regeneron was required to deduct any "applicable provisions for rebates, chargebacks, and discounts; distribution-related fees; and other sales-related deductions," therefore including any price concessions, from the net product sales to calculate the net selling price.

216. Analysts' coverage revealed that the market was reacting to news of Eylea's declining net selling price. For example, Morgan Stanley Research noted the net product sale of Eylea in third quarter of 2024 "were adversely impacted by a lower net selling price compared to 3Q23." Similarly, Jefferies Research echoed similar concerns about the decline in Eylea's net product sales, noting "US Eylea revs [revenue] were slightly below consensus by $13mn (1.1%)."

217. With respect to Eylea HD, analysts connected Defendants' announcement of poor sales to the Company's declining share price. For instance, on the same day, Morgan Stanley Research pointed out, "REGN shares traded down -9% on 10/31 (vs. S&P500 -2%) following a 3Q miss for HD Eylea."

218. Analysts were alarmed by the lower-than-expected Eylea HD's sales, especially considering there was positive inventory news (which otherwise would have suggested strong demand). For example, on the same day, Wells Fargo reported, "**Eylea HD fell short of expectations**. Eylea HD sales of $392M represent 29% growth q/q and are -5% below cons est of $414M. **This is despite a positive inventory dynamic** . . . . The HD miss could be a concern for

investors as REGN faces a tougher challenge after the recent launch of the first biosimilar, which AMGN notes is underway and getting a lot of interest from providers."

219. Analysts also became skeptical about their projections for Eylea HD's demand. Specifically, Raymond James cautioned, "The company had messaged the potential for a slower Eylea HD quarter, but **the miss on Eylea HD compounded by commentary of a $40M stocking tailwind on the quarter raised real questions on the pace of the launch** relative to competitor Vabysmo and in the face of imminent 2mg Eylea biosimilar entrance from Amgen."

220. Still, Regeneron's stock price remained artificially inflated after this news because Defendants continued to conceal from investors the full truth regarding (i) the true demand for and sales of Eylea HD and (ii) a substantial reason for Eylea's success was Defendants' reliance on the illegal Credit Card Fee Reimbursement Scheme, not its profile, and consequently, once Defendants had to terminate the Credit Card Fee Reimbursement Scheme, Eylea's sales and demand would continue to decline.

221. For example, following this news, Defendants assured the market, among other things, the demand for Eylea HD remained strong and was driven by strong patient adoption. Specifically, Regeneron's Form 8-K stated: "EYLEA HD was approved by the FDA in August 2023 and ***net product sales in the third quarter of 2024 were driven by the transition of patients from other anti-VEGF products, including EYLEA*** " and "***third quarter 2024 total EYLEA HD and EYLEA net product sales were favorably impacted by approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD at the end of the third quarter of 2024 compared to the end of the second quarter of 2024***."

222. However, these statements were false and misleading because Defendants knew that the main driver behind the strong net product sales and $40 million increase in wholesaler

(i.e., distributor) inventory levels were Defendants' secret deals with private equity-owned Retina Practices, and not strong patient adoption or demand. *See* Sections IV(I)-(J), *supra*.

223. Indeed, this was important to investors because higher inventory levels from the wholesalers, i.e., the distributors, could be a good or bad sign for Eylea HD demand. If the distributors increased inventory levels because of strong customer demand, that could be a positive sign because it reflected that the distributor stocked up to meet high customer demand. If, however, distributors maintained higher inventory levels only because of one-time large bulk sales to private equity-owned Retina Practices (who were given deals to accept large orders of Eylea HD), and demand from physicians and other Retina Practices remained low, that would be a warning sign for future demand.

224. Defendants' statements led investors to believe that the distributors had high levels of inventory because of strong physician demand. However, this was not true. In reality, as a result of Defendants' deals with private equity-owned Retina Practices, distributors increased their inventory levels only to fulfill the bulk orders of Eylea HD from these Retina Practices. Unbeknownst to investors, though, the distributors would not order more Eylea HD after fulfilling its orders to the private equity-owned Retina Practices, and the private equity-owned Retina Practices did not have the physician or patient demand necessary to satisfy the inventory they had purchased.

225. As intended, Defendants' misstatements and omissions concealed from the market the lack of demand for Eylea HD, as analysts reiterated their confidence in Eylea and Eylea HD. For instance, on the same day, Cowen Research was led to believe that Eylea HD's demand remained robust, stating, "management remains confident in the clinical profile of Eylea and Eylea

HD. Specifically the company noted that patients on Eylea are currently converting to Eylea HD as the product has demonstrated a superior clinical profile."

#### 4. Defendants Revealed Worsening Financial Results for Eylea HD on January 13, 2025

226. On January 13, 2025, before market opened, Defendants released a Form 8-K, announcing preliminary financial results for its Fourth Quarter and Full Year 2024. Specifically, Regeneron reported disappointing results for Eylea HD, which were well below analysts' expectations:

> [EYLEA and EYLEA HD] achieved 1% year-over-year growth by reaching $6 billion in aggregate U.S. net product sales for the year and $1.5 billion in aggregate U.S. net product sales for the fourth quarter of 2024, despite increasing competition. EYLEA HD U.S. net product sales were $305 million in the fourth quarter of 2024.

227. Additionally, for the full year, Defendants disclosed that Eylea HD experienced "lower wholesaler inventory levels." Indeed, as discussed in Sections IV(I)-(J), *supra*, due to the lack of demand for Eylea HD, the bulk purchases by private equity-owned Retina Practices led to mounting inventory that these practices could not unload. Because of the excess inventory, these practices ceased ordering Eylea HD from the distributors. Consequently, as the demand from physicians and other Retina Practices for Eylea HD remained low, distributors did not restock the drug, leading to a decrease in inventory levels at the distributors.

228. The announcement of Eylea HD's below-expectation sales and "lower wholesaler inventory levels" revealed new information and/or material risks concealed by Defendants' false and misleading statements concerning the strong demand for Eylea HD, which were primarily driven by Defendants' undisclosed deals with private equity-owned Retina Practices to purchase Eylea HD in bulk.

229. Immediately after the pre-market announcement, the price of Regeneron's common stock dropped $27.64 per share, or 3.97%, to open at $669.24 per share on January 13, 2025 from a closing price of $696.88 per share on the previous trading day, January 10, 2025. Then, on January 14, 2025, the price of Regeneron's common stock continued to decline 3.6%, or $26.03 per share, to close at $690.87 per share.

230. Analysts started connecting the lower wholesaler inventory levels to a lack of demand for Eylea HD. For example, on the same day, Evercore ISI cautioned, "Eylea HD prelim 4Q24 numbers surprised to the downside putting up a relatively dismal $305M (-22% QoQ) in 4Q24 US sales vs consensus $416M. **There was some unquantified level of adverse inventory impact, but this is likely to raise questions about Eylea [HD]**." Likewise, J.P. Morgan Research began to question the demand for Eylea HD, noting: "We will look for more color during today's presentation at the JPM Healthcare conference, but **it appears Eylea HD sales have effectively plateaued** (after adjusting for inventory)."

231. Still, the Company' stock price remained artificially inflated. As of this date, the full truth and the true extent of the risks concealed by Defendants' false and misleading statements, fraudulent conduct, and scheme to defraud, had not been fully revealed nor materialized. Indeed, investors had not learned about the full extent and magnitude of the low physician demand for Eylea and Eylea HD.

### M. Defendants Reveal the Full Truth About the Lack of Demand on April 29, 2025

232. On April 29, 2025, Defendants held an earnings call to discuss the Company's financial results for the first quarter of 2025, ended March 31, 2025. During the earnings call, Defendants disclosed that for the first quarter of 2025, "EYLEA HD and EYLEA, combined US net sales were $1.04 billion, down 30% sequentially, **primarily reflecting lower wholesaler**

**inventory levels for both products**, which declined during the quarter to the normal range, as well as continued competitive pressures."

233. Further, Defendants revealed for the first time that physician demand for Eylea HD was not strong, stating: "[i]n aggregate, **sequential physician unit demand for EYLEA HD and EYLEA declined by 11%**." With respect to Eylea, Defendants disclosed that "first quarter 2025 US net sales for Eylea were $736 million, . . . down 38% compared to the fourth quarter of 2024[,]" "primarily due to lower wholesaler inventory levels, **lower physician demand**, as well as increased competition." Worse, Eylea's "**physician unit demand decreased by 14% sequentially** with the balance of the decline primarily attributable to lower wholesale inventory levels, which ended the quarter in the normal range."

234. As a result of these revelations, the price of Regeneron's stock dropped $41.95, or 6.87%, from a closing price of $610.86 per share on the prior trading day down to $568.91 per share on April 29, 2025.

235. Critically, analysts finally made the connections between the Credit Card Fee Reimbursement Scheme and Eylea's abysmal sales, understanding that Defendants had been concealing from investor that the enhanced scrutiny from the DOJ would change the Company's "practices with respect to reimbursement of credit card fees."

236. For instance, on May 1, 2025, Bank of America explained, "What could be more impactful in our view is if the DOJ lawsuit compels a change in how REGN does business . . . REGN has told us previously it continues to reimburse such fees while this dispute is ongoing. If it were to stop, it could potentially level the playing field with competitors, at a critical time when REGN is trying to switch 'standard dose' (SD) Eylea to the newer 'high dose' (HD) formulation."

237. Indeed, the risks had materialized, as Cowen Research similarly noted the cliff drop in Eylea sales and demand, "The total Q1 Eylea franchise US sales of $1.04B slightly missed consensus by 12%. Total franchise sales decreased 30% on a sequential basis, while physician unit demand decreased sequentially by 11%."

238. Further, the market reacted quickly to the new information concerning the weak demand for Eylea and Eylea HD and was caught off guard by the magnitude of the steep decline in Eylea and Eylea HD's sales. For instance, on the same day, RBC Capital Market Research were surprised, stating "Eylea numbers . . . missed meaningfully despite significantly lowered expectations (Eylea/HD $736M/$307M, vs. $861M/$327M cons.)." Citi noted, "[w]hile it was widely expected that Eylea and HD would have a tough 1Q, results were lower than expectations with Eylea-std dose US $736M (-$90M) and Eylea-HD US $307M (-$21M) both missing."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

239. Throughout the Class Period, Defendants made numerous materially false and misleading public statements and omissions including in investor earnings calls, press releases and SEC filings.[22] These false and misleading statements and omissions generally fall into three categories: (i) the drivers of financial success for Eylea; (ii) demand for and sales of Regeneron's newly launched drug, Eylea HD; and (iii) the accuracy and reliability of the Company's financial reporting, as certified by Defendants ("SOX Certifications") under the Sarbanes-Oxley Act of 2002 ("SOX").

---

[22] Lead Plaintiff alleges that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Regeneron's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

### 1. May 4, 2023 – Q1 2023 Financial Results

240. On May 4, 2023, Regeneron announced financial results for First Quarter 2023. During the earnings call on the same day, in response to an analyst question about the pressure faced by Eylea and competitive landscape in the Wet AMD market, Defendants continued to mislead the market about Eylea's source of success. Specifically, Defendant McCourt stated:

> But I just want to share and remind all that, in the anti-VEGF category, what really is rewarded is product profile. And as we look at a product like EYLEA that launched and was a game changer in the category, ***that was its profile, not being the least costly, there's been a low-cost alternative, very low-cost alternative for a very, very long time, but it was the product profile that made the difference for prescribers and patients***.

241. Defendant McCourt's statement above in ¶ 240 was false and misleading because Defendants knowingly omitted material information that Regeneron had achieved Eylea's results through the illegal Credit Card Fee Reimbursement Scheme, which was a substantial reason why Retina Practices chose Eylea over its competitors. *See* Sections IV(C)-(D), *supra*.

242. As discussed above, Defendants made the business decision to pay the distributor the credit card fee on behalf of the Retina Practices so they, the customer, could use a credit card without a fee, knowing it would give Eylea an advantage over competitors. *Id*. Defendants knew that distributors charged Retina Practices a credit card fee when purchasing Wet AMD drugs and Retina Practices factored in credit card fees and cash back benefits when purchasing drugs. Therefore, Defendants reached agreements with Regeneron's distributors, telling them not to charge customers a fee if they purchased Eylea with a credit card, but instead, instructed the distributors to bill Regeneron. This effectively (i) lowered Retina Practices' cost of purchasing Eylea (since credit card fees are, on average, around 2% or more of the total purchase price), while (ii) still allowing Retina Practices access to cash back and credit card rewards.

243. Critically, Defendant Schleifer personally sanctioned the Credit Card Fee Reimbursement Scheme, which existed before and continued into the Class Period. In August

2012, Defendant Fenimore requested Defendant Schleifer's approval of credit card fee reimbursements "so that [Regeneron] can efficiently process the fees payable to Besse and the other distributors." DOJ ¶ 60, Ex. 10. In support of his request, Defendant Fenimore explained, in relevant part, that "[t]he distributors also pass through credit card fees incurred *when physicians pay for EYLEA with their credit cards*." *Id.* (emphasis added by the DOJ). In response, Defendant Schleifer responded that the "suggested approach makes good sense. I approve." *Id.*

244. The Credit Card Fee Reimbursement Scheme, created by Defendants soon after they launched Eylea, continued into the Class Period. Indeed, with Defendant Schleifer's express approval, the Credit Card Fee Reimbursement Scheme remained standard practice at Regeneron for years. For instance, a 2017 internal memorandum referred to the reimbursement as "standard practice since 2012." DOJ ¶ 61, Ex. 11. Further, the memorandum stated that future payments to distributors' purchase orders "*are not required to be approved by the CEO*" because "an approval memo has documented the CEO's approval for appropriate POs to be established and approved in accordance with the terms of the individual agreements." *Id.* (emphasis in original).

245. Similarly, Defendant Schleifer received a draft approval memorandum regarding "2021 Distributor & Specialty Pharmacy PO Approvals (EYLEA)." DOJ ¶ 61, Ex. 12, at 1. The memorandum again referred to the "standard practice since 2012" under which "the Commercial team and the Strategic Sourcing Department has [sic] operated under the rules of an *approved memo . . . .*" *Id.* (emphasis in original). The memorandum also included projected credit card fees for each of the primary distributors. For example, Besse **charged Regeneron over $56 million in fees** based on a 2.10% credit card processing fee, and McKesson **charged Regeneron over $25 million in fees** based on a 1.79% credit card fee. *Id.* at 4.

246. According to the DOJ Complaint and State Intervenor Complaint, Defendants continued to inflate Eylea's ASP and submit false ASP reports for Eylea in both 2023 and part of 2024, i.e., during the Class Period. *See* DOJ ¶ 131; SIC ¶¶ 92-107.

247. Moreover, Defendants intentionally refused to report the credit card reimbursements as "price concessions." The BFSF SOPs describe "Regeneron['s] . . . control, processes and methodology pertaining to its determination of whether a proposed fee constitutes a Bona Fide Service Fee [] for . . . Average Sales Price []. . . ." and requires each service fee to be evaluated against the four-part BFSF definition by CMS:

> In order to be treated as a BFSF, the service being evaluated must (1) be a bona fide, itemized service that is actually performed on behalf of the manufacturer; (2) be a service Regeneron would otherwise perform or contract for in the absence of the service arrangement; (3) represent fair market value (FMV); and (4) not be passed on in whole or in part to a client or customer of any entity or any other third party.

DOJ ¶ 108, Exs. 41 & 42, at § 5.4.1.1.

248. Yet, Defendants never followed their own procedures nor established sufficient controls over validating their evaluation of BFSFs. Defendants instead ignored the BFSF four-step test to summarily conclude that "credit card fees [are] BFSFs for the calculation of ASP." *Id.* ¶ 109, Ex. 43, at 23.

249. For example, the DOJ complaint alleges that in May 2016, Alicia Pantaleo, Regeneron's Vice President of Accounting Operations and Assistant Controller, "did not perform any BFSF analyses to substantiate Regeneron's 'conclusion' prior to approving ['Regeneron's ASP assumptions, including its treatment of credit card fees as BFSFs']." *Id.* ¶ 110. Accordingly, as alleged by the DOJ Complaint, Defendants submitted hundreds of millions of dollars in false claims to Medicare. *Id.* at ¶ 129.

250. Defendants' illegal and unsustainable Credit Card Fee Reimbursement Scheme allowed Regeneron to keep Eylea's ASP stable and induced physicians to purchase Eylea over competing drugs. Indeed, Defendants marketed Eylea's ASP to Retina Practices as more stable than Lucentis's ASP. *See* DOJ ¶¶ 116-22. For instance, the DOJ Complaint alleges that "Regeneron marketed that it did not offer reportable price concessions in order to keep Eylea's ASP stable." *Id.* ¶ 116. As a result, Retina Practices chose Eylea because it made them more money, and not because Eylea had a superior "product profile" as Defendants' publicly stated. *See* Sections IV(C)-(D), *supra*.

251. Indeed, in an internal presentation,[23] Regeneron calculated "Cost Recovery per Vial"[24] for Eylea, Avastin, and Lucentis, showing that customers had an $80 "Cost Recovery per Vial" for Eylea, not including any credit card rewards or cash back, compared to $20 for Avastin and $39 for Lucentis. In other words, Defendants knew their Credit Card Fee Reimbursement Scheme—which kept Eylea's ASP higher than it should have been—would mean that Retina Practices would receive more profit if they purchased Eylea.

**Q2 2016, Current Day, Practice Economics**

| Product | WAC | Physician Purchase Price[1] | Max Rebate[2] | Physician Net Cost w/ Discount & Rebate[3] | Q216 Medicare Payment (ASP +4.3%) Sequestration[4] | Cost Recovery per Vial |
|---|---|---|---|---|---|---|
| EYLEA | $1850 | $1850 | - | - | $1930 | **$80** |
| Lucentis 0.5 | $1950 | $1862 | - | - | $1901 | **$39** |
| Lucentis 0.3 | $1170 | $1117 | - | - | $1140 | **$23** |
| Avastin | $67 | $50 | - | - | $70 | **$20** |

[23] Defendants Schleifer, Fenimore, and Landry were CEO, Vice President, Financial Planning & Analysis, and CFO of the Company, respectively, at that time.

[24] "Cost Recovery per Vial" refers to the amount of profit Retina Practices expect to receive after subtracting the purchase cost from the Medicare reimbursement.

DOJ ¶ 54, Ex. 7, at slide 5 (filed under seal). Similarly, a September 2018 presentation sent to Defendant Schleifer, titled "EYLEA provider Discounting and Pricing Strategy" noted "Research confirmed that cost recovery is a key factor in practice decision making in light of limited perceived clinical differentiation in anti-VEGF . . . Majority of physicians receive credit card points on anti-VEGF purchases, limiting the appeal of discounts[.]" DOJ ¶ 89, Ex. 40, at slide 11 (filed under seal).

**2. June 14, 2023 – Goldman Sachs Global Healthcare Conference**

252. On June 14, 2023, during the Goldman Sachs Global Healthcare Conference, Defendant McCourt continued to conceal the Credit Card Fee Reimbursement Scheme as the true source of Eylea's success. In particular, Defendant McCourt stated: "But through that, what I would assure you is that ***the clinical profile of EYLEA is what has allowed for this very robust performance over 12 years in the marketplace***."

253. Defendant McCourt's statement above in ¶ 252 was false and misleading for the reasons set forth in ¶¶ 241-51. Specifically, Defendant McCourt attributed Eylea's success over the last 12 years to Eylea's "clinical profile," while knowingly omitting material information that Regeneron had achieved Eylea's results through the illegal Credit Card Fee Reimbursement Scheme, which was a key reason why Retina Practices choose Eylea over its competitors. *See* ¶¶ 241-51, *supra*.

**3. November 2, 2023 – Q3 2023 Financial Results**

254. On November 2, 2023, a few months after Regeneron released Eylea HD, Regeneron announced its financial results for Third Quarter 2023. On a conference call with analysts later that day, Defendants issued materially false and misleading statements about the demand for Eylea HD and its competitive advantage.

255. Specifically, during the call, Defendant Schleifer said the Eylea HD launch was "off to a great start" and attributed the Company's sales to purportedly strong demand. Specifically, Defendant Schleifer stated:

> [W]e launched in late August, shortly following FDA approval, and recorded $43 million of net product sales in the final six weeks of the quarter, which compares favorably to recent launches in the retinal disease category. ***Importantly, revenues were driven by strong initial demand*** with multiple reorders by distributors before the end of the quarter.

256. Later in the same call, Defendant McCourt too touted Eylea HD's launch, stating Defendants had observed "***very encouraging early signals for EYLEA HD***." Defendant McCourt further attributed Eylea HD's sales to strong physician demand, stating:

> We were excited to rapidly launch EYLEA HD in late August following its US approval. And total net sales for the quarter were $43 million. ***Early launch indicators have been very positive. Physician enthusiasm was extremely high prior to EYLEA HD launch***. And that ***interest has translated into early use in a broad range of patient types*** across wet AMD and diabetic eye disease.

257. Defendant McCourt also noted that, "***[w]e are seeing switches from EYLEA, as you would expect*** . . . ***I can share with you that we have seen a high conversion rate from practices ordering EYLEA HD samples and then subsequently placing orders*** of commercial products through commercial channels."

258. Defendants' statements above in ¶¶ 255-57 were false and misleading because they led investors to believe that Eylea HD's purportedly successful launch was driven by high demand and "physician enthusiasm," when in reality, Eylea HD's launch was a failure due to several problems know to Defendants. Moreover, Defendants' statements above in ¶¶ 255-57 were false and misleading for failing to disclose that much of Eylea HD's sales and demand were driven by unsustainable bulk purchases by private equity-owned Retina Practices as a result of Defendants' secret deals.

259. Specifically, Defendants knew that Eylea HD's launch was not successful because it experienced a slower adoption rate and weaker demand among the Retina Practices due to problems such as the unavailability of a permanent J-Code, the unavailability of pre-filled syringes, and the lack of dosing frequency flexibility. *See* Sections IV(F)(2), IV(G), *supra*. Indeed, Defendants saw internal, contemporaneous data that directly contradicted their misstatements concerning the demand for Eylea HD. *See* Section IV(H), *supra*.

260. According to multiple FEs, the Individual Defendants frequently attended meetings, where the Individual Defendants reviewed and discussed Eylea HD's abysmal performance. For example, according to FE-3, who attended monthly Accounting Department meetings, it was apparent that sales were not materializing and that widespread adoption was not there throughout her tenure. FE-3 explained that beginning in late 2023 through early 2024 disappointment around the performance of Eylea HD began to materialize at the Company. FE-3 further recalled performance noticeably declining by mid-2024.

261. Similarly, according to FE-4, current CFO Chris Fenimore attended the meetings in his capacity as the Senior Vice President, Controller. FE-4 recalled that the meetings were led by an individual from the Accounting Department and former CFO Robert Landry occasionally attended the meetings. According to FE-4, the performance of Eylea HD was discussed during these monthly meetings and the numbers were not impressive and the rollout of Eylea HD was going slower than expected. FE-4 recalled that there was disappointment in Eylea HD's performance throughout her tenure and this began to build up in late 2023 going into early 2024.

262. FE-4 explained that the meetings included historical reviews of performance of various products and packets were distributed to attendees in advance to review. FE-4 continued to explain that comments and concerns in reference to the various areas were discussed.

263. In fact, following Eylea HD's launch, several of the FEs reviewed sales reports that consistently reflected poor demand and sales. *See* Section IV(H), *supra*. For example, according to FE-7, she received weekly sales reports with figures for the entire country. She was aware Eylea HD was not performing through her review of sales reports, which began shortly after the product's launch through July 2024. Specifically, FE-7 observed "a lot" of territories with zero vials shipped and some territories only had "a few" vials shipped.

264. Sales representatives of Eylea HD were also having trouble meeting their sales quotas. For example, FE-2, who reviewed internal sales data on the Company's internal analytics platform, Navigator, explained that she worked on selling Eylea HD for two quarters prior to her departure from Regeneron and she didn't even get close to meeting her quotas and achieved only 50-70% of her goal.

265. Subsequently, the FEs confirmed that Defendants' demand forecasting reflected Eylea HD's weak sales performance. For example, FE-10 explained that her team was responsible for producing demand forecasting at an account level during her tenure. According to FE-10, the forecasts her team produced were always adjusted downwards and rarely went up. FE-10 further explained that the forecasts were constantly adjusting and that she discussed these figures with the Finance Team.

266. Moreover, within weeks after Eylea HD's launch, Defendants had already sounded the alarm on the lack of demand for the drug. For example, FE-8, who was a Reimbursement Business Manager, recalled that well before the fourth quarter of 2023, Regeneron's leadership, including everyone from the CEO down to first line managers, had already begun panicking about Eylea HD's performance. Moreover, according to FE-8, the sales performance of Eylea HD got so bad that current CEO Leonard Schleifer was calling physicians personally in FE-8's market.

FE-8 knew this because a doctor from a retina practice in her region told FE-8 that Schleifer had called him directly and asked, "why aren't you using Eylea HD?"

267. Several FEs also confirmed that Eylea HD experienced a slow adoption rate and weak demand among Retina Practices due to previously known problems with Eylea HD, such as the unavailability of a permanent J-Code, the unavailability of pre-filled syringes, and lack of dosing frequency flexibility. *See* Section IV(G), *supra*.

268. For example, according to FE-10, the adoption of Eylea HD was slow because of the temporary J-Code the product launched with. Similarly, according to FE-8, doctors' offices had concerns about reimbursement stemming from Eylea HD's temporary J-Code following issues with Syfovre, concerns around what dosages would be reimbursed, and what patients it could be reimbursed for. FE-8 recalled confusion from offices on prescribing Eylea HD to patients with Medicare Advantage and not being reimbursed if the patient did not have additional coverage.

269. Similarly, FE-9, who worked at AVP, another private equity-owned Retina Practices, recalled that overall Eylea HD wasn't super popular with physicians and this was reflected in the numbers she was reviewing regarding demand figures. Moreover, according to FE-9, AVP did not want to hold a ton of stock of drugs with temporary J-Codes in case CMS changed the coverage. Therefore, FE-9 explained that AVP learned a lesson at this time and scaled back their purchasing of Eylea HD for fear of having too much inventory on hand.

270. Further, FE also attributed Eylea HD's lack of pre-filled syringes to Eylea HD's weak demand. FE-9 recalled representatives from Regeneron coming to give trainings to teach physicians how the syringes for Eylea HD worked. According to FE-9, during these trainings representatives from Regeneron did not inform physicians that Eylea HD did not come in a pre-filled syringe. FE-9 continued to say that this detail contributed to the "perfect storm" that led to

AVP "quickly" hearing about adoption problems. FE-9 recalled that the failure to communicate that the drug did not come in a pre-filled syringe created a "big operational issue" which was furthered by the requirement to have special tools.

271. Without pre-filled syringes, physicians would need to spend more time preparing the injections, significantly decreasing injection volume and resulting revenue for Retina Practices. For example, FE-10 explained that the time to fill a syringe and additional complications that the process can create does have a considerable impact on the revenue of retina practices. FE-10 explained that injection volume is built into the business model for physicians.

272. Similarly, FE-8 recalled hearing similar sentiments expressed during trips across the country. Specifically, FE-8 continued to say that Eylea HD not coming in a pre-filled syringe was another issue that was noted.

273. Additionally, based on their market research for Eylea HD, Defendants knew that Eylea HD's longer and inflexible dosing frequency would dissuade Retina Practices from using Eylea HD, leading to lower demand for Eylea HD. Indeed, FE-2 explained that doctors were not interested in administering more frequent doses of Eylea HD when they could instead continue similar dosage frequencies with the cheaper and proven Eylea 2mg.

274. According to FE-1, Eylea HD could be administered only in eight-, twelve-, or sixteen-week intervals, where Vabysmo had the flexibility to be administered in four-week intervals if needed. FE-1 continued to explain that while Vabysmo may not be a better drug than Eylea HD, Vabysmo had label flexibility following the loading dose, which was a strength and a differentiating point in the market.

275. Likewise, this lack of flexible dosing frequency also concerned doctors and patients from a clinical perspective. For example, FE-8 explained that doctors were not comfortable with

going so many weeks between doses as was required with Eylea HD. FE-8 further explained that once vision is gone, it's gone and there were concerns from doctors and patients about the amount of time between injections.

276. Similarly, FE-5 recalled that in 2024, she attended budgeting meetings, where the negative impact of Eylea HD was discussed. FE-5 continued to say that during these meetings, she and her colleagues discussed the fact that Eylea HD required fewer injections than legacy Eylea and therefore contributed to a loss of revenue for RCA.

277. Finally, Defendants knew their statements touting Eylea HD's physician demand and sales were false and misleading because Defendants artificially inflated the demand for and sales of Eylea HD by (i) meeting with private equity-owned Retina Practices to manufacture Eylea HD sales and (ii) directing Eylea HD's sales representatives to engage in unethical, even borderline illegal, sales tactics to dump Eylea HD. *See* Section IV(I), *supra*.

278. Indeed, Defendants were so desperate to generate these deals that Defendant Schleifer, who is the CEO of Regeneron and not a salesman, hopped on private jets at the end of 2023 to visit clients and try to sell Eylea HD to private equity-owned Retina Practices.

279. For example, FE-6 explained that physicians made it "clear" early on that the interest in Eylea HD was not there and the Company then turned to Private Equity Practices to make deals utilizing "strong-arm tactics." FE-6 was informed that senior leadership, including Defendants Schleifer and McCourt, visited several large private equity-owned retina practices. FE-6 recalled that current Vice President, Customer Engagement Paige White met with FE-6's large Private Equity customer, American Vision Partners in Arizona.

280. As a result, FE-6 recalled the difficulty in selling Eylea HD but as the end of the year approached, she began to hear from colleagues about Schleifer, McCourt, and other high-

level employees getting on jets and taking meetings with Private Equity groups. FE-6 explained that the Company needed to make numbers going into the new year and the deals being struck with Private Equity groups was like putting a band-aid over a bullet hole. FE-6 further recalled attending meetings about Eylea HD where it was apparent the Company needed to hit sales numbers for investors and "the street."

281. Likewise, FE-7 explained that shortly after the launch of Eylea HD and through the end of her tenure—approximately from August 2023 through February 2025—she heard of employees including Clark, White, current Executive Director Marketing, Emmanuel Hamon, current Senior Director Market Access Strategy, Eric Goldstein, and current Executive Vice President and Head of Commercial, Marion McCourt taking private jets to meet with prospective customers.

282. FE-2 recalled being informed that leadership, including current Vice President, Ophthalmology Commercial Business Unit Kevin Clark and current Executive Vice President and Head of Commercial Marion McCourt visited Private Equity Practices, such as Retina Consultants of America (RCA) and Prism, over the holiday period of 2023 and made a huge push to get sales for the year-end figures.

283. According to FE-6, the deals were coming in with "crazy" buying patterns. Specifically, immediately after these flights, FE-6 recalled the "next thing you know" there is news of an order of 1,000 or 4,000 or 5,000 vials. FE-6 explained that the Company was putting pressure on these organizations to make large purchases with the caveat that the private equity-owned Retina Practices maintained the right to return product.

284. Indeed, as FE-6 explained, the Company's approach of making Private Equity groups make large purchases persisted through the first six months following the launch of Eylea

HD—i.e., August 18, 2023 through February 18, 2024—and more likely through the first year after launch.

285. Moreover, because private equity owned Retina Practices frequently purchased in high volume, they held significant leverage in negotiating for better pricing or rebates with Regeneron. Indeed, to convince the private equity owned Retina Practices to purchase bulk orders of Eylea HD, Defendants gave them large rebates that were unavailable to other customers.

286. Similarly, FE-2 explained that most Medical Specialists were meeting 40-80% of their goals, the few Medical Specialists in markets with large Private Equity Practices were meeting over 100% of their goals. Specifically, FE-2 explained that Regeneron targeted Private Equity Practices to try to achieve big end of year figures because of the rebate programs offered to them based on the tens of thousands of units they ordered per quarter, which assisted the Company in inflating sales figures.

287. For example, FE-2 explained that larger practices purchased enough volume to hit rebates. Similarly, FE-3 recalled that the Company was "trying to move product" and participated in incentivizing customers through discounts and other means.

288. Moreover, sales of Eylea HD were so poor that Defendants also resorted to directing sales representatives to sell Eylea HD at any cost, even if the sales representatives were on the verge of breaking the law. Specifically, FEs confirmed that Defendants directed Reimbursement Managers who had access to sensitive patient PHI to assist in selling Eylea HD. Defendants' direction to engage in these undisclosed sales practices blatantly overstepped the boundaries set by the Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), which prohibits the use or disclosure of PHI for marketing purposes without explicit written authorization from patients.

289. For example, FE-8 explained that leadership now wanted Reimbursement Managers "out in front" saying "everything is fine" regarding reimbursements. According to FE-8, because she had access to patient PHI she should not have been asked to assist in making sales. However, according to FE-8, although Reimbursement Team members are supposed to be removed from the sales process and handle reimbursements only after a physician has decided to prescribe a drug, the Reimbursement Team members were now asked to instruct physicians about reimbursement prior to a determination to purchase and use Eylea HD. FE-8 explained that if she was caught by the Inspector General, she could face a $250,000 fine, be barred from the industry, and receive jailtime.

290. Likewise, FE-6 recalled that employees on the Reimbursement Team were tasked with taking on sales functions despite the potential legality around those employees also having access to patients' PHI. FE-6 continued to say that some Reimbursement Team employees who pushed back on these added responsibilities were let go from the Company.

291. Sales representatives were also directed to lie about Eylea HD's reimbursement so that doctors would be more prone to purchasing them. FE-8 explained that doctors wanted four months for a new drug and when she informed them that they would not be reimbursed on that schedule she was told not to tell them that. FE-8 noted that she refused, as did another Reimbursement Manager from the Northeast Region, who elected to retire instead of participating in the practices that were being asked of her.

292. Indeed, as confirmed by the FEs, the lack of demand for Eylea HD caused Retina Practices to accumulate substantial inventory that they could not unload or to significantly cut back on their purchases. *See* Section IV(J), *supra*. For instance, FE-5 recalled that there were definitely huge build ups of Eylea and Eylea HD inventory at RCA and that there was more than enough

product to satisfy demand. FE-5 continued to explain that the inventory buildup was millions of dollars' worth more than what was needed and there was never a point where they were unable to meet demand.

293. RCA's reluctance to purchase more Eylea HD and substantial inventory build-up reflected Eylea HD's demand that was much weaker than what Defendants repeatedly touted to the investing public throughout the Class Period.

294. Similarly, poor demand for Eylea HD drove AVP to significantly cut back on their purchase of Eylea HD. FE-9 explained that Eylea HD was not performing as expected, both in terms of rebates and usage and as a result AVP slowed way down on purchases, which was a big concern internally. FE-9 continued to say that she had direct conversations with the Purchasing Team and the decision to pull back on purchasing occurred pretty quickly after Eylea HD launched. FE-9 further explained that AVP knew demand for Eylea HD was not there shortly after launch and pulled back on purchases in the first quarter of 2024. FE-9 added that the Purchasing Team at AVP was responsible for forecasting purchases. According to FE-9 there was a regular stream of communications internally at AVP about the lack of usage of Eylea HD. FE-9 continued to say that eventually they reverted back to *Vabysmo* after the launch of Eylea HD launch did not go well.

**4. November 15, 2023 – Jefferies London Healthcare Conference**

295. On November 15, 2023, Defendant Landry was interviewed at the Jefferies London Healthcare Conference. Defendant Landry discussed the demand for Eylea HD noting, "***EYLEA HD, which I'm sure we'll get into, we had a strong quarter.*** We were very happy with the quarter. ***It was true demand.*** It was $43 million. It was above consensus. Certainly above what VABYSMO, our competitor, did. We were on the market for six weeks. I think it was the third week of August that we launched. So it was proud."

296. Defendant Landry's statements above in ¶ 295 were false and misleading because they led investors to believe that Eylea HD's "strong quarter" was driven by "true demand" for Eylea HD, when in reality, there was little demand from physicians or patients, and much of Eylea HD's sales and demand were driven by unsustainable bulk purchases by private equity-owned Retina Practices who were given significant incentives to make large purchases. *See* ¶¶ 258-94, *supra*.

297. Given Defendants' false and misleading statements concerning Eylea HD's demand and sales, on November 27, 2023, J.P. Morgan reiterated its "OW [over-weight]" rating, noting that "following a strong start so far, we see the Eylea HD launch gaining further momentum over the coming quarters and this should stabilize the Eylea franchise and protect the product from both branded and eventual biosimilar competition."

**5. February 2, 2024 – 4Q and Full Year 2023 Financial Results**

298. On February 2, 2024, Regeneron issued a press release regarding its Fourth Quarter and Full Year 2023 financial results. The press release highlighted "[f]ull year 2023 revenues increased 8% to $13.12 billion versus full year 2022" supported by Eylea and Eylea HD sales, reporting "full year 2023 U.S. net sales for EYLEA HD and EYLEA were $5.89 billion."

299. During a conference call with investors and analysts later that day, Defendant McCourt touted Eylea and Eylea HD's market share, stating the "efficacy and safety profile" of Eylea and Eylea HD led to its dominant market position. Specifically, Defendant McCourt stated that "[i]n the fourth quarter, ***EYLEA HD and EYLEA together secured 49% of the anti-VEGF category share***, despite increasing competition and changing market dynamics," and expressly attributed "***[t]his share gain . . . [to] the differentiated efficacy and safety profile of our medicines***."

300. Defendant McCourt's statements above in ¶ 299 touting the market share gain by Eylea and Eylea HD were false and misleading because they omitted material information that (i) Defendants had achieved Eylea's market share gain through the illegal Credit Card Fee Reimbursement Scheme, which was a substantial reason why physicians choose Eylea over its competitors and (ii) that Defendants' secret deals with private equity-owned Retina Practices to purchase Eylea HD in bulk drove Eylea HD's market share gain. *See* ¶¶ 241-51, 258-94, *supra*.

301. Further, during the same earnings, in discussing Eylea HD's financial results, Defendant McCourt stated: "In January, we announced fourth quarter combined US EYLEA HD and EYLEA net product sales of $1.46 billion. ***In its first full quarter, EYLEA HD net product sales were $123 million, based on growing demand and positive early physician experience***."

302. A TD Cowen analyst then asked about "accelerating the rate of conversion of patients from other agents to EYLEA HD." In response, Defendant McCourt falsely stated that Regeneron was successfully switching patients from Eylea to Eylea HD. Specifically, Defendant McCourt responded:

> So as I mentioned, ***we're very encouraged by the early performance of EYLEA HD in the market, and a number of factors early are driving that success***. ***First, it's the clinical data*** . . . As we look to the future, physicians will build upon their early experiences. And as I mentioned, that experience is coming from conversion patients from branded agents broadly . . . And certainly, ***the experience in market to date with EYLEA HD had been very favorable for physicians.*** And that is, probably, the most important, those differentiating characteristics of the product.

303. Defendant McCourt's statements above in ¶¶ 301-02 were false and misleading because they led investors to believe that Eylea HD's demand was backed by strong physician demand and repeated prescription, when in reality, Eylea HD's problems known to Defendants caused significantly lower demand for the drug. *See* ¶¶ 258-94, *supra*. Further, Defendants' statements above in ¶¶ 301-02 were false and misleading for failing to disclose that much of Eylea

HD's sales and demand were driven by unsustainable bulk purchases by private equity-owned Retina Practices as a result of Defendants' secret deals. *See* ¶¶ 258-94, *supra*.

**6. April 15, 2024 – Media Statement**

304. On April 15, 2024, in response to the DOJ Complaint, Defendants issued a media statement, stating that "***[t]he filing of this lawsuit will not change our practices with respect to reimbursement of credit card fees incurred by our distributors***" and insisting that "***[r]eimbursing credit card service fees to distributors is not a price concession and does not affect EYLEA's price***."

305. Defendants' statements above in ¶ 304 were false and misleading because they led investors to believe that the filing of the DOJ Complaint would not impact their practice of reimbursing Retina Practices' credit card fees and omitted material information that Regeneron had achieved Eylea's results through the illegal Credit Card Fee Reimbursement Scheme, which was a substantial reason why physicians choose Eylea over its competitors. *See* ¶¶ 241-51, *supra*. Indeed, Defendants knew that enhanced scrutiny from the DOJ would change their "practices with respect to reimbursement of credit card fees." *Id*. Specifically, Defendants knew that reporting the credit card fee reimbursements as price concessions would reduce the net selling price of Eylea and eliminate Eylea's substantial financial incentives—such as receiving higher reimbursements from Medicare and no credit card fees—that gave Eylea a competitive advantage and improperly induced retina practices to purchase Eylea over its competitors. *Id*. Thus, any change to Defendants' "practices with respect to reimbursement of credit card fees" would necessarily lower Eylea's sales and demand. *Id*.

**7. May 2, 2024 – 1Q 2024 Financial Results**

306. On May 2, 2024, Regeneron issued a press release regarding its First Quarter 2024 Financial and Operating Results. That same day, during Regeneron's conference call with

investors and analysts, Defendant McCourt stated, "To-date, most EYLEA HD patients are being switched from existing medicines, most notably EYLEA and faricimab, and we are also seeing an increase in treatment-naïve patients. ***For the quarter, EYLEA HD and EYLEA together secured 45% of the anti-VEGF category share***."

307. Defendant McCourt's statement above in ¶ 306 touting Eylea and Eylea HD's market share was false and misleading because it omitted material information that (i) Defendants had achieved Eylea's market share gain through the illegal Credit Card Fee Reimbursement Scheme, which was a substantial reason why physicians choose Eylea over its competitors and (ii) that Defendants' secret deals with private equity-owned Retina Practices to purchase Eylea HD in bulk drove Eylea HD's market share gain. *See* ¶¶ 241-51, 258-94, *supra*.

308. Based on Defendants' false and misleading statements, analysts believed that Eylea and Eylea HD's market share were in fact attributable to Eylea's profile and Eylea HD's strong demand. For example, on the same day, Bernstein Research noted, "REGN 1Q24 results missed by 2% on topline and 6% on EPS, but the solid performance of Eylea HD and ~45% VEGF category share are reassuring as we look ahead." Similarly, Cowen Research highlighted that "Eylea HD posted a great result and the overall franchise maintained its 45% category share."

**8. August 1 2024 – 2Q 2024 Financial Results**

309. On August 1, 2024, Regeneron issued a press release regarding its financial results for Second Quarter 2024. During a call with investors and analysts later that day, when another analyst asked:

> EYLEA and this DOJ investigation into the marketing practices that emerged since April, where they assert that you guys violate the False Claims Act. Can you provide an update on kind of what happens from here. And specifically in the interim and out of prudence, has Regeneron changed any of its marketing practices since April? And is that having any impact even on prescribers? I asked because on slide 6 you mentioned 'other market dynamics' that resulted in lower volumes and lower price. I'm just wondering what those were.

310. Defendant Schleifer responded, "***There's nothing in the marketplace related to this lawsuit. And frankly, we think, there's nothing to this lawsuit. And we have not changed our practice, and we intend to fight it vigorously.*** And I think once you see our papers in court, you'll get a much better understanding of that."

311. Defendant Schleifer's statement above in ¶ 310 was false and misleading because it led investors to believe that the filing of the DOJ Complaint would not impact their practice of reimbursing Retina Practices' credit card fees and omitted material information that Regeneron had achieved Eylea's results through the illegal Credit Card Fee Reimbursement Scheme, which was a substantial reason why physicians choose Eylea over its competitors. *See* ¶¶ 241-51, *supra*. Indeed, Defendants knew that enhanced scrutiny from the DOJ would change their "practices with respect to reimbursement of credit card fees." *Id*.

312. Moreover, during the same call, Defendants continued to issue materially false and misleading statements about the demand for Eylea HD and the (supposed) success of the launch.

313. Defendant Schleifer stated, "***We are encouraged that, despite increased competition in the anti-VEGF space, we have achieved a strong EYLEA HD launch trajectory*, *while maintaining our category-leading combined EYLEA HD and EYLEA market share of 45%.***"

314. Defendant Schleifer's statement above in ¶ 313 touting Eylea and Eylea HD's market share was false and misleading because it omitted material information that (i) Defendants had achieved Eylea's market share gain through the illegal Credit Card Fee Reimbursement Scheme, which was a substantial reason why physicians choose Eylea over its competitors and (ii) that Defendants' secret deals with private equity-owned Retina Practices to purchase Eylea HD in bulk drove Eylea HD's market share position. *See* ¶¶ 241-51, 258-94, *supra*.

315. Defendant McCourt furthered the perception that physicians and patients were excited about EYLEA HD:

> ***The breadth and depth of EYLEA HD prescribing continues to grow with utilization across a broad range of patients, including a treatment-naïve population, which has doubled since last quarter***. ***Physicians are also increasingly switching patients to EYLEA HD from other anti-VEGF treatments based on positive early treatment experiences***. And these switch patients, early real-world data indicate that treatment intervals are being extended with EYLEA HD. EYLEA HD's durability, along with the same trusted efficacy, visual acuity and safety as EYLEA represents a meaningful improvement for patient lives and greater efficiency for physician practices. ***The number of physician offices ordering EYLEA HD during the second quarter increased by more than 50% compared to the prior quarter. We believe this suggests prescriber confidence in EYLEA HD's clinical profile*** as well as in reimbursement now that the permanent J-Code has been well established . . . .

316. Defendant McCourt's statements above in ¶ 315 were false and misleading because they led investors to believe that Eylea HD had strong physician and patient demand, when in reality, Eylea HD's launch was not successful due to several problems known to Defendants. *See* ¶¶ 258-94, *supra*. Further, Defendants' statements above in ¶ 315 were false and misleading for failing to disclose that much of Eylea HD's sales and demand were driven by unsustainable bulk purchases by private equity-owned Retina Practices as a result of Defendants' secret deals. *Id*.

**9. October 31, 2024 – Q3 2024 Financial Results**

317. On October 31, 2024, Regeneron held a conference call with investors and analysts to discuss the Company's operations and its financial results for the third quarter of 2024. During the call, Defendant McCourt stated, "In the first year since launch, ***positive physician and patient experience has propelled EYLEA HD to achieve billion-dollar brand status.*** With additional growth catalysts expected in 2025, our team is focused on helping even more patients benefit from EYLEA HD."

318. Further, in Regeneron's Form 8-K, filed on the same day, Defendants stated: "EYLEA HD was approved by the FDA in August 2023 and ***net product sales in the third quarter***

***of 2024 were driven by the transition of patients from other anti-VEGF products, including EYLEA, as well as new patients naïve to anti-VEGF therapy***."

319. Defendants' statements above in ¶¶ 317-18 were false and misleading because they led investors to believe that Eylea HD had strong physician and patient demand, when in reality, Eylea HD's launch was not successful due to several problems known to Defendants. *See* ¶¶ 258-94, *supra*. Further, Defendants' statements above in ¶¶ 317-18 were false and misleading for failing to disclose that much of Eylea HD's sales and demand were driven by unsustainable bulk purchases by private equity-owned Retina Practices as a result of Defendants' secret deals. *Id*.

320. Similarly, Defendants announced: "***third quarter 2024 total EYLEA HD and EYLEA net product sales were favorably impacted by approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD at the end of the third quarter of 2024 compared to the end of the second quarter of 2024***."

321. Defendants' statement above in ¶ 320 was false and misleading because it led investors to believe that Eylea HD had strong physician and patient demand, when in reality, Eylea HD's launch was not successful due to several problems known to Defendants. *See* ¶¶ 258-94, *supra*. Further, Defendants' statement above in ¶ 320 was false and misleading for failing to disclose that Eylea HD's increase in wholesaler inventory levels was substantially driven by unsustainable bulk purchases by private equity-owned Retina Practices as a result of Defendants' secret deals. *Id*.

### 10. Defendants Executed Fraudulent SOX Certifications Concerning the Company's Internal Controls

322. In connection with each quarterly and annual report Regeneron filed with the SEC during the Class Period, Defendants Schleifer and either Fenimore or Landry signed SOX Certifications to certify Regeneron's quarterly and annual reports filed with the SEC. Pursuant to

Sections 302 and 906 of SOX, Defendants Schleifer, Fenimore, and Landry certified that they had designed and evaluated effective internal and disclosure controls over financial reporting, which assured the reliability of financial reporting, and that the financial statements fairly and accurately presented the financial condition of the Company.

323. For example, in connection with Regeneron's Forms 10-K filed on February 5, 2024 and February 5, 2025, Defendants Schleifer and either Fenimore or Landry each certified, *inter alia*, as follows:

> ***Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***; . . .
>
> ***The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***
>
> ***(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***
>
> ***(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting***.

324. Defendants Schleifer and either Fenimore or Landry also signed identical SOX Certifications in connection with the Company's Form 10-Qs filed on August 8, 2023, November 2, 2023, May 2, 2024, August 1, 2024, October 31, 2024, and April 29, 2025.

325. The SOX Certifications referenced above were materially false and misleading when made because Regeneron, in fact, did not have effective internal controls in place because these internal controls failed to flag what the auditing firm, Deloitte, told Defendants in 2019, and what DOJ has alleged: that the credit card fee reimbursement was **not** a legitimate BFSF. *See* Section IV(D)(2), *supra*. Specifically, Deloitte wrote "**No**" in response to a question about whether the "Credit Card Fees" could be considered BFSF under "CMS['s] Four Part [BFSF] Test." DOJ ¶ 98, Ex. 42, at '081. According to Regeneron's own BFSF SOP, the test for whether a service is a BFSF or a price discount (or concession) is an either/or evaluation: "to determine if the fee is for a type of service that **could be a BFSF or rather is a price concession or discount**." *Id.* ¶ 92.

326. In other words, Deloitte told Defendants that the credit card fee payments were not BFSFs. This means (based on Regeneron's own BFSF SOP) that the fees **must** be price concessions or cash discounts and should have been reported as such. And this makes sense because unlike necessary fees such as shipping costs, credit card related fees are not necessary or useful for the "efficient distribution" of the product.[25]

327. Critically, in addition to Defendants' disregard for Deloitte's explicit findings, Defendants also failed to follow the Company's BFSF SOP and, instead, blindly approved the credit card fee reimbursements as BFSFs. For example, the DOJ complaint alleges that in May 2016, Pantaleo "did not perform any BFSF analyses to substantiate Regeneron's 'conclusion' prior to approving ['Regeneron's ASP assumptions, including its treatment of credit card fees as

---

[25] CMS Guidance clarifies that the agency "interprets these [BFSF] elements . . . . to encompass any reasonably necessary or useful services of value to the manufacturer that are associated with the *efficient distribution* of drugs." Medicare Program; Revisions to Payment Policies, Five-Year Review of Work Relative Value Units, Changes to the Practice Expense Methodology Under Physician Fee Schedule, and Other Changes to Payment Under Part B, 71 Fed. Reg. at 69,668.

BFSFs']." DOJ ¶ 110. Shockingly, in February 2018, Pantaleo asked Deloitte, "did we ever do anything on credit card fees to substantiate that they were BFSF?" *Id.* ¶ 111, Ex. 44.

328. Notably, as the court in the related *qui tam* matter explained, Regeneron executives were aware that the credit card reimbursement fees were price discounts: "[a]s the [DOJ] complaint alleges, Regeneron's customers themselves understood the [credit card fee] reimbursements as 'discount[s]' *and so did Regeneron executives*.'" *United States ex rel. Nunnelly v. Regeneron Pharms. Inc.*, 780 F. Supp. 3d 336, 346 (D. Mass. 2025). These fees were substantial—totaling more than $250 million between 2012 and 2021 and the Credit Card Fee Reimbursement Scheme continued throughout the Class Period from 2023 to 2025.

329. In light of the above, Defendants Schleifer's, Fenimore's, and Landry's SOX Certifications where they disclosed "[1] [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information," and "[2] [a]ny fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting" were not true because Defendants Schleifer, Fenimore, and Landry were aware of a long running Credit Card Fee Reimbursement Scheme to defraud CMS and the federal government, and improperly induced Retina Practices to purchase Eylea over its competitors. Indeed, Defendants were not merely aware of the undisclosed and illegal Credit Card Fee Reimbursement Scheme, they specifically **approved it**. *See* ¶¶ 241-51, *supra*; Section IV(C), *supra*.

## VI. LOSS CAUSATION/ECONOMIC LOSS

330. Defendants' misstatements and omissions, as alleged herein, directly and proximately caused the economic loss (i.e., damages) under the federal securities laws suffered by Lead Plaintiff and the Class. Throughout the Class Period, Defendants made materially false and

misleading statements and omissions, and engaged in a scheme to defraud investors. Defendants' misstatements and omissions artificially inflated and/or artificially maintained the price of Regeneron common stock and operated as a fraud and deceit on the Class. During the Class Period, Lead Plaintiff and the Class purchased Regeneron common stock at artificially inflated and/or artificially maintained prices, whereby Regeneron's common stock reached as high as $1,201.76 per share on August 27, 2024, and were damaged thereby when the price of Regeneron common stock declined when the truth was revealed and/or the risks concealed by Defendants' misrepresentations and omissions materialized.

331. As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below, investors incurred billions of dollars in losses.

332. The declines in the price of Regeneron common stock during this period, including the price declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

333. Each decline in the price of Regeneron common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

334. The market for Regeneron common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 632,818 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Regeneron's common stock traded at artificially inflated and/or artificially maintained prices. Lead Plaintiff and other Class members purchased Regeneron common stock relying upon

the integrity of the market relating to Regeneron common stock and suffered economic losses as a result thereof.

335. The timing and magnitude of the declines in Regeneron common stock evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

336. Specifically, Defendants made false and misleading statements and omissions regarding (i) the true source of Eylea's success; and (ii) Eylea HD's demand and sales. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Regeneron's common stock dropped significantly.

337. As described below, Regeneron's misrepresentations and omissions were revealed to the market through a series of four corrective disclosures and/or materializations of concealed risk, from April 10, 2024 through April 29, 2025, inclusive. It was not until the final corrective disclosure and/or materialization of concealed risk on April 29, 2025 that the full truth was known to the market, such that there was no longer any artificial inflation and/or artificial maintenance in Regeneron's stock price attributable to the fraud.

**A. April 10, 2024 – First Partial Corrective Disclosure/Materialization of the Risk**

338. On April 10, 2024, after the market closed, the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when the DOJ announced that it had filed a complaint under the FCA against Defendants.

339. According to the DOJ, Regeneron fraudulently manipulated Medicare reimbursement for its drug, Eylea, by knowingly failing to report hundreds of millions of dollars

in price concessions provided to drug distributors in the form of reimbursed credit card fees. As a result, DOJ averred that Regeneron greatly inflated the ASP of Eylea to Medicare over many years and "**enhanced its revenues**."

340. The filing of the DOJ Complaint, which revealed to the market for the first time that Defendants' Credit Card Fee Reimbursement Scheme was illegal and could have been a key source of Eylea's success, was the foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning Eylea's sales, demand, and market share, which Defendants claimed was the result of a superior "product profile," when in reality, they were primarily fueled by Regeneron's illegal Credit Card Fee Reimbursement Scheme.

341. As a direct and proximate results of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Regeneron's common stock declined by $31.50, or 3.36%, over two consecutive trading days to close at $904.70 on April 12, 2024.

342. The market immediately linked the stock price decline to the revelation of the undisclosed Credit Card Fee Reimbursement Scheme. For example, on the same day, UBS Research noted, "Wednesday eve's announcement that the DOJ is filing a complaint against REGN has seen pressure on the stock (down 3.5% since announced)."

343. Critically, analysts also began to question whether Regeneron's undisclosed Credit Card Fee Reimbursement Scheme might have contributed to much of the commercial success of Eylea and could soon materially lower Eylea's sales and demand once Defendants were forced to terminate the Credit Card Fee Reimbursement Scheme. For instance, on April 11, 2024, Wolfe Research noted:

> The greater potential threat is that heightened DOJ scrutiny **might force a change in how REGN does business**, which comes at a critical time for Eylea . . . . Because of this, the question arises, **will REGN changes its ways and stop reimbursing for credit card fees**? If it does, then it **takes away this advantage** relative to ROG, effectively . . . **leveling the playing field** between these two competitors. . . . It is not clear what happens from here, but it's not hard to understand why this elevated scrutiny on REGN's commercial practices can't be totally dismissed.

344. Similarly, on April 16, 2024, UBS Research cautioned that,

> Because the **primary investor concern post the complaint is whether REGN is continuing to allow credit card processing/reimbursement** (to be clear - it is the distributers taking the credit card payments) - if not, the **concern is it would make the Eylea franchise less competitive** (though the complaint is actually about the calculation of ASP vs. the practice of allowing/reimbursing credit card payments).

345. However, Regeneron's stock price remained artificially inflated after this news because Defendants continued to conceal from investors the extent to which the demand for and sales of Eylea relied on the undisclosed Credit Card Fee Reimbursement Scheme and to assure the market, among other things, that the DOJ's allegations were "meritless" and that the demand for and sales of Eylea would remain unaffected.

346. Specifically, on April 15, 2024, Regeneron issued a media statement, pledging that "The filing of this lawsuit will not change our practices with respect to reimbursement of credit card fees incurred by our distributors" and insisting that "Reimbursing credit card service fees to distributors is not a price concession and does not affect EYLEA's price."

347. Despite their initial skepticism, after Regeneron's April 15, 2024 media statement, analysts echoed Defendants' optimism and were confident that the DOJ Complaint was just "cost of doing business" in the pharmaceutical industry and that Eylea's sales and demand would remain unaffected.

348. For example, on April 17, 2024, Raymond James noted that "Given Regeneron's strident stance in their statement following the disclosure of the complaint, the expert thought it

would be surprising if they were to waver on pricing strategy at this point." Likewise, on April 16, 2024, UBS Research concluded that "Credit card practice unlikely changed post False Claims Act complaint."

### B. October 31, 2024 – Second Partial Corrective Disclosure/Materialization of the Risk

349. On October 31, 2024, before the market opened, further elements of relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when Regeneron filed its Forms 8-K and 10-Q, announcing disappointing financial results for both Eylea and Eylea HD in Third Quarter 2024. Specifically, the press release stated in pertinent part:

> Total EYLEA HD and EYLEA net product sales in the U.S. increased 3% in the third quarter of 2024 compared to the third quarter of 2023. . . . Net product sales of EYLEA in the third quarter of 2024 were adversely **impacted by a lower net selling price** compared to the third quarter of 2023. **In addition, third quarter 2024 total EYLEA HD and EYLEA net product sales were favorably impacted by approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD** at the end of the third quarter of 2024 compared to the end of the second quarter of 2024, partially offset by lower wholesaler inventory levels for EYLEA.

350. Additionally, Eylea's quarterly sales were $1,145 million, falling 7% quarter over quarter and 21% year over year; and Eylea HD's declined quarterly sales were only $392 million, missing consensus estimates of $415 million to $425 million.

351. The October 31, 2024 announcement concerning Eylea and Eylea HD's below-expectation and declining sales and Eylea's lower net selling price, were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning (i) the true demand for and sales of Eylea HD, which were inflated by Defendants' secret deals with private equity-owned Retina Practices to purchase Eylea HD in bulk and (ii)

Eylea's sales, demand, and market share, which were fueled by Regeneron's illegal Credit Card Fee Reimbursement Scheme.

352. Specifically, with respect to Eylea, Defendants' disclosure of the decline in Eylea's net selling price began to reveal to the market that Defendants' illegal Credit Card Fee Reimbursement Scheme had a material impact on the sales of Eylea. While assuring the market that Defendants would not change the Company's "practices with respect to reimbursement of credit card fees," the declining net selling price for Eylea showed that Defendants began to report the credit card reimbursement payments as price concessions, which in turn, drove down Eylea's ASP and net selling price.

353. Indeed, if Eylea reported the credit card fee reimbursements as a price concession (which they were required to do), that would necessarily lower the ASP they reported to CMS. At the same time, this change would also lower the net selling price for Eylea because Regeneron was required to deduct any "applicable provisions for rebates, chargebacks, and discounts; distribution-related fees; and other sales-related deductions," therefore including any price concessions, from the net product sales to calculate the net selling price.

354. That same day, as a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Regeneron's common stock declined 9.2%, a reduction of $84.59 per share, bringing the share price down to $838.20 per share.

355. The announcement caught the market by surprise, and analysts quickly connected the news to the Company's declining share price. For instance, on the same day, Morgan Stanley Research pointed out, "REGN shares traded down -9% on 10/31 (vs. S&P500 -2%) following a 3Q miss for HD Eylea."

356. With respect to Eylea HD, the increase in wholesaler inventory levels baffled analysts because if the demand for Eylea HD was as robust as Defendants had touted, the increase in inventory should have resulted in higher sales for Eylea HD. For example, on the same day, Raymond James cautioned, "The company had messaged the potential for a slower Eylea HD quarter, but **the miss on Eylea HD compounded by commentary of a $40M stocking tailwind on the quarter raised real questions on the pace of the launch** relative to competitor Vabysmo and in the face of imminent 2mg Eylea biosimilar entrance from Amgen."

357. Likewise, Wells Fargo reported, "**Eylea HD fell short of expectations**. . . . **This is despite a positive inventory dynamic**. . . . The HD miss could be a concern for investors as REGN faces a tougher challenge after the recent launch of the first biosimilar, which AMGN notes is underway and getting a lot of interest from providers." Finally, Bernstein Research noted, "The fact that HD came in light **despite what appears to have been a >$40M benefit** from the channel suggests that Street expectations need a bit of a reset."

358. For Eylea, analysts also attributed the spiraling net selling price to the decline in sales. For example, Morgan Stanley Research also noted the net product sale of Eylea in third quarter of 2024 "were adversely impacted by a lower net selling price compared to 3Q23." Specifically, Morgan Stanley Research was disappointed as Eylea's quarterly sales were "7% below our $1,226mn." Similarly, Jefferies Research echoed similar concerns about the decline in Eylea's net product sales, noting "US Eylea revs [revenue] were slightly below consensus by $13mn (1.1%)."

359. Still, Regeneron's stock price remained artificially inflated after this news because Defendants continued to conceal from investors the true demand for and sales of Eylea HD and that Eylea's success was fueled by an illegal Credit Card Fee Reimbursement Scheme.

Specifically, investors did not fully understand that (i) the demand for Eylea HD was significantly overstated by Defendants' undisclosed deals with private equity-owned Retina Practices to purchase Eylea HD in bulk; and (ii) a substantial reason for Eylea's success was Defendants' reliance on the illegal Credit Card Fee Reimbursement Scheme, not its profile, and consequently, once Defendants had to terminate the Credit Card Fee Reimbursement Scheme, Eylea's sales and demand would decline.

360. Moreover, Defendants continued to falsely assure the market that, among other things, the demand for Eylea HD was robust. For example, in the Company's Form 8-K, filed on the same day, Defendants stated: "EYLEA HD was approved by the FDA in August 2023 and ***net product sales in the third quarter of 2024 were driven by the transition of patients from other anti-VEGF products, including EYLEA, as well as new patients naïve to anti-VEGF therapy***" and "***third quarter 2024 total EYLEA HD and EYLEA net product sales were favorably impacted by approximately $40 million as a result of higher wholesaler inventory levels for EYLEA HD at the end of the third quarter of 2024 compared to the end of the second quarter of 2024***."

361. As intended, Defendants' misstatements and concealment assuaged the market's concern about Eylea and Eylea HD's underperformance. For instance, on the same day, Truist Securities emphasized, "Eylea's differentiated profile allowing unprecedented durability/lower frequency of injections and anatomical benefits is touted among retinal specialists." Likewise, Cowen Research wrote, "Despite the likely launch of Pavblu, management remains confident in the clinical profile of Eylea and Eylea HD. Specifically, the company noted that patients on Eylea are currently converting to Eylea HD as the product has demonstrated a superior clinical profile."

### C. January 13, 2025 – Third Partial Corrective Disclosure/Materialization of the Risk

362. On January 13, 2025, before the market opened, further elements of relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were partially revealed and/or partially materialized when Regeneron released a Form 8-K, announcing preliminary financial results for Fourth Quarter and Full Year 2024. Specifically, Regeneron reported disappointing results for Eylea HD, which were well below analysts' expectations:

> [EYLEA and EYLEA HD] achieved 1% year-over-year growth by reaching $6 billion in aggregate U.S. net product sales for the year and $1.5 billion in aggregate U.S. net product sales for the fourth quarter of 2024, despite increasing competition. EYLEA HD U.S. net product sales were $305 million in the fourth quarter of 2024.

363. Additionally, for the full year, Defendants disclosed that Eylea HD suffered from "lower wholesaler inventory levels." Indeed, due to the lack of demand for Eylea HD, the bulk purchases by private equity-owned Retina Practices led to mounting inventory that these practices could not unload. Because of the excess inventory, these practices ceased ordering Eylea HD from the distributors. Consequently, as demand for Eylea HD remained low, distributors did not restock the drug, leading to a decrease in inventory levels at the distributors.

364. The January 13, 2025 announcement concerning Eylea HD's below-expectation sales and lowered wholesaler inventory levels were foreseeable consequences of, and within the zone of risk concealed by, Defendants' misrepresentations and omissions concerning the true demand for and sales of Eylea HD.

365. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, immediately after the pre-market corrective disclosure, the price of Regeneron's common stock dropped $27.64 per share,

or 3.97%, to open at $669.24 per share on January 13, 2025 from a closing price of $696.88 per share on the previous trading day, January 10, 2025. Then, on January 14, 2025, the price of Regeneron's common stock continued to decline 3.6%, or $26.03 per share, to close at $690.87 per share.

366. Indeed, due to sharp decline in wholesaler inventory levels, analysts started to realize that the lower wholesaler inventory levels likely indicated a lack of demand for Eylea HD. On the same day, Evercore ISI cautioned, "Eylea HD prelim 4Q24 numbers surprised to the downside putting up a relatively dismal $305M (-22% QoQ) in 4Q24 US sales vs consensus $416M. **There was some unquantified level of adverse inventory impact, but this is likely to raise questions about Eylea [HD]**." Further, J.P. Morgan Research echoed negative sentiment from other analysts, noting: "We will look for more color during today's presentation at the JPM Healthcare conference, but **it appears Eylea HD sales have effectively plateaued (after adjusting for inventory)**."

367. Additionally, Citi pointed out that one of the reasons for the Eylea HD 4Q miss was that "switches from Eylea to Eylea-HD were below their expectations," as the market started to learn that Defendants' previous statements about physician demand and patient conversion from Eylea to Eylea HD were not true.

368. Still, the Company' stock price remained artificially inflated. As of this date, the full truth and the true extent of the risks concealed by Defendants' false and misleading statements, fraudulent conduct, and scheme to defraud, had not been fully revealed nor materialized. Indeed, investors had not learned about the full extent and magnitude of the low physician demand for Eylea and Eylea HD.

369. In particular, with respect to Eylea, because of Defendants' reliance on the illegal Credit Card Fee Reimbursement Scheme, following the DOJ Complaint, Defendants knew that enhanced scrutiny from the DOJ would change the Company's "practices with respect to reimbursement of credit card fees." Defendants knew that reporting the credit card fee reimbursements as price concessions would reduce the net selling price of Eylea and eliminate Eylea's substantial financial incentives—such as receiving higher reimbursements from Medicare and no credit card fees—that gave Eylea a competitive advantage and improperly induced Retina Practices to purchase Eylea over its competitors. Thus, any change to Defendants' "practices with respect to reimbursement of credit card fees" would necessarily lower Eylea's sales and demand.

**D. April 29, 2025 – Final Corrective Disclosure/Materialization of the Risk**

370. On April 29, 2025, before the market opened, the remaining elements of the relevant truth and foreseeable risks concealed by Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or fully materialized when Regeneron released its Forms 8-K and 10-Q, announcing financial results for its first quarter of 2025, ended March 31, 2025. In the Form 10-Q, Defendants again disclosed that Eylea's net product sales were negatively impacted by "a lower net selling price."

371. In addition, during the earnings call held on the same day, Defendants disclosed that for the first quarter of 2025, "EYLEA HD and EYLEA, combined US net sales were $1.04 billion, down 30% sequentially, primarily reflecting lower wholesaler inventory levels for both products, which declined during the quarter to the normal range, as well as continued competitive pressures." Moreover, "**[i]n aggregate, sequential physician unit demand for EYLEA HD and EYLEA declined by 11%**." Defendants added that Eylea and Eylea HD's market share had declined to 41%.

372. With respect to Eylea, Defendants disclosed that "first quarter 2025 US net sales for Eylea were $736 million, down 39% compared to the first quarter of last year, and down 38% compared to the fourth quarter of 2024[,]" "primarily due to lower wholesaler inventory levels, lower physician demand, as well as increased competition." Worse, Eylea's "physician unit demand decreased by 14% sequentially with the balance of the decline primarily attributable to lower wholesale inventory levels, which ended the quarter in the normal range."

373. With respect to Eylea HD, sales in the first quarter of 2025 were $307 million and were flat on a sequential basis. Further, compared to the fourth quarter of 2024, Eylea HD physician unit demand only grew by 5%, which "was offset primarily by a modest wholesaler inventory drawdown." In other words, as a result of the worsening demand for Eylea HD, private equity-owned Retina Practices stopped ordering more Eylea HD so that they could digest the mounting inventory, caused by Defendants' deals to unload bulk deliveries of the drug. As a result, distributors quickly pulled back on purchasing the drug from Regeneron and saw no need to restock the drug.

374. Following the April 29, 2025 announcement, investors finally learned the full truth about Eylea HD's sales and demand, which were artificially inflated by unsustainable purchases from private equity-owned Retina Practices, and the true extent to which Eylea relied on the Credit Card Fee Reimbursement Scheme to sustain its sales, demand, and market share.

375. As a direct and proximate result of this final corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Regeneron's stock dropped $41.95, or 6.87%, from a closing price of $610.86 per share on the prior trading day down to $568.91 per share on April 29, 2025.

376. Indeed, through Eylea's sharp decline in demand, sales, and market share, analysts finally made the connection between the Credit Card Fee Reimbursement Scheme and Eylea's abysmal sales, understanding that Defendants had been concealing from investors that the enhanced scrutiny from the DOJ would change the Company's "practices with respect to reimbursement of credit card fees."

377. For instance, on May 1, 2025, Bank of America explained, "What could be more impactful in our view is if the DOJ lawsuit compels a change in how REGN does business . . . REGN has told us previously it continues to reimburse such fees while this dispute is ongoing. If it were to stop, it could potentially level the playing field with competitors, at a critical time when REGN is trying to switch 'standard dose' (SD) Eylea to the newer 'high dose' (HD) formulation."

378. Indeed, the risks had materialized, as Cowen Research noted the steep decline in Eylea sales and demand, "The total Q1 Eylea franchise US sales of $1.04B slightly missed consensus by 12%. Total franchise sales decreased 30% on a sequential basis, while physician unit demand decreased sequentially by 11%." Similarly, Citi emphasized that, "Eylea-US sales were negatively impacted by a) competitive pressure, b) loss of market share to Avastin and c) lower net selling price."

379. Further, the magnitude of the steep decline in Eylea and Eylea HD's sales and demand surprised analysts. For instance, on the same day, RBC Capital Market Research were surprised "Eylea numbers . . . missed meaningfully despite significantly lowered expectations (Eylea/HD $736M/$307M, vs. $861M/$327M cons.)." Further, Citi noted, "[w]hile it was widely expected that Eylea and HD would have a tough 1Q, results were lower than expectations with Eylea-std dose US $736M (-$90M) and Eylea-HD US $307M (-$21M) both missing . . . ."

380. Specifically, with respect to Eylea, Evercore ISI added that "the magnitude of Eylea 2mg's US miss ($736M act vs $826M cons) may further rattle investors, indicating numbers have not come down enough." Similarly, Wells Fargo were shocked by Eylea's performance, stating, "Eylea miss confirms reset needed. . . . The decline is more than anticipated although we expected a decline in standard dose due to a combination of patient assistance funding shortage, inventory dynamics, seasonality and continued biosimilar-driven erosion." Likewise, Wolfe Research echoed the same disappointment and attributed "the miss" to "a lower net selling price."

381. With respect to Eylea HD, Goldman Sachs Research noted: "Eylea HD revenue of $307mn was also below Street estimates (GSe of $340mn vs. consensus of $327mn)." Guggenheim Securities also called out Eylea HD's below-expectation performance: "Eylea HD sales were roughly flat Q/Q at $307MM (well below our $370MM estimate), which continues to face competitive pressures and have a slower-than-anticipated rollout."

## VII. ADDITIONAL INDICIA OF SCIENTER

382. The Individual Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Regeneron's materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in Section V, *supra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws. In addition to the specific facts alleged above, the Individual Defendants' scienter is further evidenced by the following facts.

### A. The Individual Defendants Closely Monitored and Were Involved in the Minutia of Eylea and Eylea HD

383. The Individual Defendants maintained a close grip on every aspect of Regeneron's business, including approving Regeneron's initiatives connected to Eylea and Eylea HD, monitoring and reviewing metrics concerning the sales and demand for Eylea and Eylea HD, and promoting and selling Eylea HD after its release in August 2023.

384. Defendant Schleifer has led the Company for over 35 years and is one of the longest-serving CEOs in the United States. For instance, as alleged in the DOJ Complaint, and as detailed in Sections IV(C)-(D), *supra*, Defendant Schleifer personally sanctioned and was intimately involved in the Credit Card Fee Reimbursement Scheme.

385. Moreover, as alleged by multiple FEs, Defendant Schleifer, along with Defendant McCourt, personally spoke with representatives to Retina Practices and private equity-owned Retina Practices to convince them to purchase Eylea HD although there was no real demand for the drug. *See* Sections IV(H)-(I), *supra*. For example, FE-8, who was a Reimbursement Business Manager, recalled that well before the fourth quarter of 2023, Regeneron's leadership, including everyone from the CEO down to first line managers, had already begun panicking about Eylea HD's performance. Further, according to FE-8, the sales performance of Eylea HD "got so bad" that current CEO Leonard Schleifer was calling physicians personally in FE-8's market. FE-8 knew this because a doctor from a retina practice in her region told FE-8 that Schleifer had called him directly and asked, "why aren't you using Eylea HD?"

386. Similarly, FE-6 recalled the difficulty in selling Eylea HD but as the end of the year approached, she began to hear from colleagues about Schleifer, McCourt, and other high-level employees "getting on jets" and taking meetings with Private Equity groups. Immediately, following these meetings, FEs would see new orders for Eylea HD.

387. Defendants Landry, Fenimore, and McCourt closely monitored the financials of Eylea and Eylea HD. *See* Section IV(H), *supra*. For example, according to FE-4, she attended a monthly Accounting Department meeting, which ran for approximately 90-minutes and consisted of approximately 20 speakers from the various accounting functions. FE-4 explained that the meetings included historical reviews of performance of various products and packets were distributed to attendees in advance to review. FE-4 continued to explain that comments and concerns in reference to the various areas were discussed. Specifically, FE-4 recalled that the meetings were led by an individual from the Accounting Department and former CFO Robert Landry occasionally attended the meetings. According to FE-4, current CFO Chris Fenimore attended the meetings in his capacity as the Senior Vice President, Controller, and following his elevation to CFO, Fenimore attended the meetings more regularly than Landry had previously.

388. According to FE-3, who attended monthly Accounting Department meetings, it was apparent that sales were not materializing and that widespread adoption was not there throughout her tenure. FE-3 explained that beginning in late 2023 through early 2024 that disappointment around the performance of Eylea HD began to materialize at the Company. FE-3 further recalled performance noticeably declining by mid-2024.

389. Moreover, in addition to her trips to meet with private equity-owned Retina Practices, Defendant McCourt also paid close attention to all aspects of the Eylea HD's rollout. For instance, during the Third Quarter 2023 earnings call on November 2, 2023, Defendant McCourt stated: "But we will continue to be very much watching uptake of EYLEA HD, taking very responsible and appropriate and thoughtful measures on pricing." Similarly, during the TD Cowen Healthcare Conference on March 4, 2025, McCourt: "We certainly will keep close watch into all the factors I mentioned related to EYLEA HD and EYLEA."

**B. Documents Obtained by the DOJ and the Court's Findings in the DOJ Action Are Indicative of Scienter**

390. On April 29, 2025, the court in *United States v. Regeneron Pharmaceuticals, Inc.* denied Defendants' motion to dismiss, finding, among other things, that the DOJ Complaint sufficiently alleged scienter.[26] *See Nunnelly*, 780 F. Supp. 3d at 336. Specifically, the court held that "[a]s the [DOJ] complaint alleges, Regeneron's customers themselves understood the [credit card fee] reimbursements as 'discount[s]' and so did Regeneron executives." *Id.* at 364. The court also concluded that "Regeneron knowingly failed to deduct the credit card fee reimbursements from Eylea's ASP in order to gain a competitive advantage." *Id.* at 348. Because of the substantial similarity of the definition and pleading requirement of scienter between the FCA and the PSLRA, the court's findings support scienter.

391. Moreover, the court found that (i) Defendants knew that Retina Practices' selection of Wet AMD drugs was based on their profitability; (ii) Defendants knew that by reimbursing credit card processing fees without including it in Regeneron's ASP calculations, Regeneron was able to stabilize Eylea's ASP, increase profitability for prescribing Eylea, and nudge physicians to prescribe Eylea more frequently; and (iii) both the customers and Regeneron understood the reimbursement of credit card processing fees to constitute a "discount" and not a BFSF.

392. In reaching this conclusion, the court substantially relied on the DOJ Complaint's particularized allegations and exhibits. For instance, Robert Besse, then Vice President of Operations at Besse, in an email to employees at Besse, wrote that Robert Davis, then Regeneron's Executive Director and Head of Trade, Reimbursement & Managed Markets, informed him a customer "called the CEO at Regeneron [Defendant Schleifer] to complain that [Besse] [was] not

[26] The fact that Regeneron is a repeat offender further supports scienter. *See, e.g.*, *United States v. Regeneron Pharms. Inc.*, No. 20-11217-FDS (D. Mass.).

giving him a discount and [was] coding his credit cards wrong." Exhibit C, attached hereto; *see Nunnelly*, 780 F. Supp. 3d at 342.

393. The DOJ Complaint also references many documents that support Defendants' ongoing knowledge about the Credit Card Fee Reimbursement Scheme, which continued into the Class Period. *See* Sections IV(C)-(D), *supra*.

394. For example, Defendant Schleifer understood the importance of the use of credit cards to Retina Practices. For example, a September 2018 presentation sent to Defendant Schleifer, titled "EYLEA provider Discounting and Pricing Strategy" noted "Research confirmed that cost recovery is a key factor in practice decision making in light of limited perceived clinical differentiation in anti-VEGF . . . Majority of physicians receive credit card points on anti-VEGF purchases, limiting the appeal of discounts[.]" DOJ ¶ 89, Ex. 40, at slide 11.

395. Further, Defendant Schleifer personally sanctioned the Credit Card Fee Reimbursement Scheme, which existed before the Class Period and continued into the Class Period. *See* Section IV(C), *supra*. According to the DOJ Complaint, in August 2012, Defendant Fenimore requested Defendant Schleifer's approval of the credit card fee reimbursements "so that [Regeneron] can efficiently process the fees payable to Besse and the other distributors." DOJ ¶ 60, Ex. 10. In support of his request, Defendant Fenimore explained, in relevant part, that "[t]he distributors also pass through credit card fees incurred *when physicians pay for EYLEA with their credit cards*." *Id.* (emphasis added by the DOJ). In response, Defendant Schleifer responded that the "suggested approach makes good sense. I approve." *Id.* Defendant Schleifer's express approval and the scope and duration of the Credit Card Fee Reimbursement Scheme (more than a decade) support a strong inference of scienter.

### C. Eylea and Eylea HD Were Critical to Regeneron's Financial Success

396. The Individual Defendants' knowledge, or reckless disregard, of (i) the fact that since its launch, Eylea's demand and competitive position were primarily sustained by Defendants' illegal Credit Card Fee Reimbursement Scheme and (ii) the true demand for Eylea HD can be inferred because these facts were critical to the financial success of Regeneron.

397. As noted by analysts from CFRA, "Eylea has been, by far, REGN's greatest commercial asset by sales." Indeed, since 2011, Regeneron has become "substantially dependent on the success of Eylea" as the sale of Eylea represents a substantial portion of Regeneron's revenues. For the year ended December 31, 2022, Eylea net product sales in the United States represented 51% of Regeneron's total revenue, and for the three months ended March 31, 2023, Eylea net product sales in the United States represented 45% of total revenue.

398. As the successor of Eylea, Eylea HD was also critical to Regeneron during the Class Period. Defendants envisioned Eylea HD to be the "new standard of care in the anti-VEGF category." According to FE-1, Eylea HD was pitched as a product to take the leadership position or continue the existing leadership position of Regeneron in the retina space. FE-1 continued to explain that the Company was planning for Eylea and Eylea HD continuing that position with Eylea HD replacing Eylea in the long run.

399. The market also understood the importance of Eylea HD. For example, in September 2022, Wolfe Research explained the "intent of [Eylea HD] has been to (a) blunt the impact of Eylea biosimilars that are likely to begin launching in mid-2024 by converting as many patients as possible from today's dose (2mg) to a new, higher dose (8mg); and (b) fend off new competition from Roche's Vabysmo, a new, competing drug that launched earlier in 2022, that is seeing good uptake." Defendants also admitted in the Company's FY 2023 Form 10-K, "If we are successful in commercializing EYLEA HD, we expect that our dependence on EYLEA HD will

grow relative to our historical dependence on EYLEA." In 2024, the aggregate Eylea HD and Eylea net product sales in the United States represented 42% of Regeneron's total revenues.

400. Further, since its launch, Eylea HD has quickly replaced much of Eylea's sales. For example, in 2024, Eylea HD represented 20% of the aggregate Eylea HD and Eylea U.S. net product sales. Then, for the first quarter of 2025, the percentage of sales contributed by Eylea HD rose to 29%.

401. Given the importance of Eylea and Eylea HD, which represented a significant portion of the Company's total revenue, to Regeneron's financial success, the Individual Defendants' knowledge or reckless disregard of (i) Defendants' reliance on the Credit Card Fee Reimbursement Scheme to sustain the demand and competitive position of Eylea and (ii) the true demand for Eylea HD can be readily inferred.

### D. Defendants' Statements, Including Their SOX Certifications, Support a Strong Inference of Scienter

402. As alleged herein, during the Class Period, Defendants spoke at length—often in response to direct questions from analysts—about the demand, sales, market share, and success of Eylea and Eylea HD—demonstrating that Defendants were aware of or, at the very least, were reckless in not knowing of the true demand for and sales of Eylea HD and the Credit Card Fee Reimbursement Scheme that were primarily responsible for driving the demand for and success of Eylea. *See* Section V, *supra*. Accordingly, Defendants violated the federal securities laws by speaking about these topics and failing to fully disclose all relevant material information while doing so. In the alternative, if Defendants spoke about these issues and did not investigate beforehand, then they were actionably reckless in doing so.

403. During multiple earnings call and analyst conferences, Defendants repeatedly touted Eylea's "profile" as the key contributing factor for Eylea's success, demand, sales, and

market share, yet failed to disclose the actual source of that success: the illegal Credit Card Fee Reimbursement Scheme. For example, on May 4, 2023, during the earnings call for the first quarter of 2023, in response to an analyst question about the pressure faced by Eylea and competitive landscape in the Wet AMD market, Defendant McCourt stated:

> But I just want to share and remind all that, in the anti-VEGF category, what really is rewarded is product profile. ***And as we look at a product like EYLEA that launched and was a game changer in the category, that was its profile, not being the least costly, there's been a low-cost alternative, very low-cost alternative for a very, very long time, but it was the product profile that made the difference for prescribers and patients.***

404. Similarly, during the November 2, 2023 earnings call with analysts, Defendant Schleifer touted Eylea HD's strong sales and demand, stating that "[s]tarting with EYLEA HD, which is off to a great start. We launched in late August, shortly following FDA approval, and recorded $43 million of net product sales in the final six weeks of the quarter, which compares favorably to recent launches in the retinal disease category. ***Importantly, revenues were driven by strong initial demand*** with multiple reorders by distributors before the end of the quarter."

405. Then, on February 2, 2024, during an earnings call with investors and analysts, Defendant McCourt noted that "[i]n the fourth quarter, ***EYLEA HD and EYLEA together secured 49% of the anti-VEGF category share***, despite increasing competition and changing market dynamics," and expressly attributed "***[t]his share gain . . . [to] the differentiated efficacy and safety profile of our medicines***."

406. Further, on August 1, 2024, during the earnings call announcing the financial results for the second quarter of 2024, an analyst asked:

> I have a question on EYLEA and this DOJ investigation into the marketing practices that emerged since April, where they assert that you guys violate the False Claims Act. Can you provide an update on kind of what happens from here. And specifically in the interim and out of prudence, has Regeneron changed any of its marketing practices since April? And is that having any impact even on prescribers?

> I asked because on slide 6 you mentioned "other market dynamics" that resulted in lower volumes and lower price. I'm just wondering what those were.

407. While acknowledging the Credit Card Fee Reimbursement Scheme, Defendant Schleifer failed to disclose the Credit Card Fee Reimbursement Scheme's material impact on Eylea's success and responded: "***There's nothing in the marketplace related to this lawsuit. And frankly, we think, there's nothing to this lawsuit. And we have not changed our practice, and we intend to fight it vigorously.*** And I think once you see our papers in court, you'll get a much better understanding of that."

408. Defendants' repeated assurances to investors about the demand for and sales of Eylea HD and references to Eylea's "profile" as the key differentiator between Eylea and its competitors, yet failing to mention the illegal Credit Card Fee Reimbursement Scheme demonstrate that Defendants either knew that (i) the demand for Eylea HD was weak and its sales were not sustainable because of the bulk purchases by private equity-owed Retina Practices and (ii) the real key differentiator for Eylea was the Credit Card Fee Reimbursement Scheme, or at the very least were reckless in not knowing or investigating that this was the case. In either scenario, there is a strong inference that Defendants made these statements with scienter.

409. Additionally, during the Class Period, Defendants Schleifer, Fenimore, and Landry signed and executed multiple SOX Certifications under Sections 302 and 906 of the Sarbanes-Oxley Act attached in each of the Company's Form 10-Ks and 10-Qs, which contained materially false and misleading statements and financials, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

410. The SOX Certifications under Section 302 stated that Defendants Schleifer, Fenimore, and Landry were "responsible for establishing and maintaining disclosure controls and

procedures" and evaluated and presented "the effectiveness of [Regeneron's] disclosure controls and procedures." In turn, Defendants Schleifer, Fenimore, and Landry attested that "th[e] report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

411. Similarly, in the SOX Certifications under Section 906, Defendants Schleifer, Fenimore, and Landry attested that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

412. By signing the SOX Certifications, Defendants Schleifer, Fenimore, and Landry acknowledged that they had access to and reviewed Regeneron's financial data as well as the materially false and misleading statements set forth above.

413. Contrary to Defendants Schleifer, Fenimore, and Landry's SOX Certifications, as explained in Sections IV(C)-(J), *supra*, Defendants knew or recklessly disregarded the true demand for Eylea HD and that the Credit Card Fee Reimbursement Scheme that was a substantial reason behind Eylea's success.

414. Had Defendants Schleifer, Fenimore, and Landry actually conducted the evaluations required, they would have discovered the material errors contained within their public statements. Accordingly, Defendants Schleifer, Fenimore, and Landry knew, or at the very least, were severely reckless in not knowing of the facts which rendered their public statements materially false and misleading.

## VIII. CLASS ACTION ALLEGATIONS

415. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded Class A common stock of Regeneron during the period from May 4, 2023 through April 28, 2025, inclusive. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director, and/or control person of Regeneron during the Class Period and members of their immediate families; (iv) any firm, trust, corporation, or other entity in which any excluded person has or had a controlling or beneficial interest; (v) Regeneron's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

416. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Regeneron's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Regeneron shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Regeneron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

417. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

418. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

419. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Regeneron;

(c) whether, and to what extent, the market price of Regeneron common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d) whether Defendants acted with the requisite level of scienter;

(e) whether Defendants Schleifer, Fenimore, Landry, and McCourt were controlling persons of Regeneron; and

(f) whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

420. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

421. To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Regeneron common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Regeneron common stock;

(e) Lead Plaintiff and other members of the Class purchased Regeneron common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f) Regeneron common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) according to the Company's SEC Form 10-Q filed on February 4, 2025, the Company had approximately 234,173,416 shares outstanding as of the date of the filing, demonstrating a very active and broad market for Regeneron common stock;

(h) Regeneron filed periodic public reports with the SEC;

(i) Regeneron regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures;

(j) Regeneron was followed by several securities analysts employed by major brokerage firms including Goldman Sachs Research, Morgan Stanley Research, J.P. Morgan Research, and Wolfe Research, which wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k) unexpected material news about Regeneron was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l) there were market makers for Regeneron's shares during the Class Period.

422. As a result of the foregoing, the market for Regeneron common stock promptly digested current information regarding Regeneron from publicly available sources and reflected such information in Regeneron's share price. Under these circumstances, all persons and entities who purchased or otherwise acquired Regeneron common stock during the Class Period suffered similar injuries through their purchases of Regeneron common stock at artificially inflated prices and the presumption of reliance applies.

423. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Regeneron common stock.

424. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Regeneron common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

425. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Regeneron's business, Lead Plaintiff is entitled to a presumption of

reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

426. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

427. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, the demand for and sales of Eylea HD, which was artificially inflated by unsustainable bulk purchases from private equity-owned Retina Practices and Defendants' and the true extent to which Eylea relied on the Credit Card Fee Reimbursement Scheme to sustain its demand and sales.

428. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, or the forward-looking statement was authorized or approved by an executive officer of Regeneron who knew that the statement was false when made.

## XI. CONTROL PERSON ALLEGATIONS

429. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

430. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Regeneron during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

431. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Regeneron's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

432. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Regeneron's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Regeneron common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

433. The Individual Defendants are liable as primary participants in a fraudulent scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Regeneron common stock during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) concerning Eylea and Eylea HD.

434. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Regeneron, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XII. CAUSES OF ACTION

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against Defendant Regeneron and the Individual Defendants)**

435. Lead Plaintiff repeats, incorporates, and realleges every allegation contained above as if fully set forth herein.

436. This Count is asserted on behalf of all members of the Class against Defendants Regeneron, Schleifer, Fenimore, Landry, and McCourt for violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

437. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged here in: (i) deceive the investing public, including Lead Plaintiff and the Class; and (ii) artificially manipulate the price of Regeneron common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Regeneron common stock at artificially inflated prices.

438. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged here in and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

439. As set forth above, Defendants made their false and misleading statements omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Regeneron common stock during the Class Period.

440. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Regeneron common stock, Lead Plaintiff and other members of the Class purchased Regeneron common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Regeneron common stock at such artificially inflated price. As set forth herein, when the true facts were subsequently disclosed, the price of Regeneron common stock declined precipitously, and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Regeneron common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

441. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 10 (b) of the Exchange Act and SEC Rule 10b-5(a) and (c) (Against Defendant Regeneron and the Individual Defendants)

442. Lead Plaintiff repeats and re-alleges every allegation set forth above as if fully set forth herein.

443. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Lead Plaintiff needs not to allege in this Court nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

444. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including

Lead Plaintiff and the Class; (ii) artificially inflate the price of Regeneron common stock; and (iii) cause Lead Plaintiff to purchase Regeneron common stock at artificially inflated prices.

445. In furtherance of this unlawful plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with their purchases of Regeneron common stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

446. Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding Regeneron's illegal and improper Credit Card Fee Reimbursement Scheme as set forth herein.

447. Lead Plaintiff and the Class reasonably relied upon the integrity of the market in which Regeneron's common stock traded.

448. During the Class Period, Lead Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Lead Plaintiff and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Regeneron's common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

449. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Regeneron common stock during the Class Period.

450. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Lead Plaintiff and the Class

for damages suffered in connection with their purchases of Regeneron common stock during the Class Period.

**COUNT III**

**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

451. Lead Plaintiff repeats, incorporates, and realleges every allegation contained above as if fully set forth herein.

452. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of Section 20(a) of the Exchange Act.

453. The Individual Defendants had control over Regeneron and made the materially false and misleading statements and omissions on behalf of Regeneron within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

454. In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Regeneron, in turn, controlled the Individual Defendants and all of its employees.

455. By reason of such wrongful conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a) Determining that this action is a proper class action, and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel for the Class;

(b) Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Lead Plaintiff demands a trial by jury.

Dated: September 8, 2025

*<u>/s/ Michael P. Canty</u>*

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty
Michael H. Rogers
Nicholas D. Manningham
Kaicheng Yu

*<u>/s/ Serena P. Hallowell</u>*

**MOTLEY RICE LLC**
Serena P. Hallowell
800 Third Ave., Ste. 2401
New York, NY 10022
Telephone: (212) 577-0040

140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
mrogers@labaton.com
nmanningham@labaton.com
nyu@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

Facsimile: (212) 577-0054
shallowell@motleyrice.com

Joshua C. Littlejohn (*pro hac vice* forthcoming)
Ranee Saunders (*pro hac vice* forthcoming)
Vanessa A. Davis (admitted *pro hac vice*)
Neli Traykova (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jlittlejohn@motleyrice.com
rsaunders@motleyrice.com
vdavis@motleyrice.com
nhines@motleyrice.com

*Counsel for Proposed Lead Plaintiff and Proposed Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN & LEVINSON**
Robert D. Klausner (pro hac vice forthcoming)
Stuart Kaufman (pro hac vice forthcoming)
7080 Northwest 4th St.
Plantation, FL 33317
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Proposed Lead Plaintiff*