**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY RADTKE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> REGENERON PHARMACEUTICALS, INC., LEONARD S. SCHLEIFER, CHRISTOPHER FENIMORE, ROBERT E. LANDRY, and MARION MCCOURT <br><br> Defendants. | No. 25-cv-00145-MKV <br><br><br> Hon. Mary Kay Vyskocil <br><br> **ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED COMPLAINT**

H. Christopher Boehning
Audra J. Soloway
David P. Friedman
Daniel S. Sinnreich
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3289
Fax: (212) 492-0289
cboehning@paulweiss.com
asoloway@paulweiss.com
dfriedman@paulweiss.com
dsinnreich@paulweiss.com

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ....................................................................................................... 5

I.      The ASP Theory ......................................................................................................... 6

        A.      EYLEA's "Average Sales Price" and Credit Card Fee Reimbursements .............. 6

        B.      The DOJ Action Concerning EYLEA's ASP. ........................................................ 7

        C.      Alleged Misstatements and Corrective Disclosures About the ASP Theory .......... 8

II.     The HD Theory ........................................................................................................... 9

        A.      The HD Launch and the Alleged Misstatements About HD ................................. 9

        B.      The Alleged Corrective Disclosures about the HD Theory. ............................... 11

LEGAL STANDARD ............................................................................................................ 11

ARGUMENT ........................................................................................................................ 14

I.      Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the ASP
        Theory. ..................................................................................................................... 14

        A.      Plaintiff Fails to Plead Any Materially False or Misleading Statement. .............. 14

                1.  The ASP Statements Were Not Misleading. ............................................ 14

                2.  The DOJ Action Statements Were Not Misleading. ............................... 19

        B.      Plaintiff Fails to Plead a Strong Inference of Scienter for the ASP Theory. ........ 21

                1.  The SAC Fails to Plead Conscious Misbehavior or Recklessness. ........... 21

                2.  Plaintiff's Additional Scienter Allegations Are Routinely Rejected. ......... 24

                3.  A Non-Fraudulent Inference Is More Compelling. .................................. 25

        C.      Plaintiff Fails to Allege a Corrective Disclosure for the ASP Theory ................. 25

II.     Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the HD
        Theory. ..................................................................................................................... 27

        A.      Plaintiff Fails to Plead Any Materially False or Misleading HD Statement ......... 27

        B.      Plaintiff Fails to Plead a Strong Inference of Scienter for the HD Theory. .......... 32

**TABLE OF CONTENTS**
**(Continued)**

**Page**

      1.  The FE Allegations Fail to Support an Inference of Scienter. ........................ 32

      2.  A Non-Fraudulent Inference Is More Compelling .......................................... 35

   C.    Plaintiff Fails to Plead a Corrective Disclosure for the HD Theory. .................... 36

III.    Plaintiff Fails to State a Claim Under Section 10(b) and Rules 10b-5(a) and (c) ........... 37

IV.    Plaintiff Fails to State a Claim for Control Person Liability Under Section 20(a) ........... 37

CONCLUSION ...................................................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson* v. *Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)....................................................................................13, 31

*Afr.* v. *Jianpu Tech. Inc.*,
2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022).................................................................18

*Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*,
568 U.S. 455 (2013)........................................................................................................11

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020).......................................................................28, 33

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...............................................................................................5

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010).............................................................................19

*In re BHP Billiton Ltd. Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017)...............................................................................20

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)..........................................................................28, 29

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
506 F. App'x 32 (2d Cir. 2012) ......................................................................................19

*Born* v. *Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021).............................................................................27

*Buhrke Fam. Revocable Tr.* v. *U.S. Bancorp*,
726 F. Supp. 3d 315 (S.D.N.Y. 2024).......................................................................21, 37

*C.D.T.S.* v. *UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ................................................................12

*In re Canopy Growth Sec. Litig.*,
2024 WL 3445436 (S.D.N.Y. July 17, 2024) ..................................................................33

*City of Brockton Ret. Sys.* v. *Avon Prods., Inc.*,
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)................................................................35

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen.*
  *Holdings Corp.*,
  2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...........................................................21

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ..................................................................................15

*City of Providence* v. *Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................33

*City of Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*,
  412 F. Supp. 3d 206 (E.D.N.Y. 2019) ..............................................................31, 32

*Constr. Laborers Pension Tr. for S. California* v. *CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020) ...................................................................37

*Cox* v. *Blackberry Ltd.*,
  660 F. App'x 23 (2d Cir. 2016) ..............................................................................35

*Damri* v. *LivePerson, Inc.*,
  772 F. Supp. 3d 430 (S.D.N.Y. 2025) ...................................................................30

*Das* v. *Rio Tinto PLC*,
  332 F. Supp. 3d 786 (S.D.N.Y. 2018) ...................................................................23

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
  2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ........................................................24

*In re DRDGOLD Ltd. Sec. Litig.*,
  472 F. Supp. 2d 562 (S.D.N.Y. 2007) ...................................................................34

*ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase, Co.*,
  553 F.3d 187 (2d Cir. 2009) .....................................................................11, 12, 23

*Eden Alpha CI LLP* v. *Polished.com Inc.*,
  763 F. Supp. 3d 270 (E.D.N.Y. 2025) ...................................................................32

*Fila* v. *Pingtan Marine Enter. Ltd.*,
  195 F. Supp. 3d 489 (S.D.N.Y. 2016) ...................................................................26

*S.E.C.* v. *First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ................................................................................37

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Francesca's Holdings Corp. Sec. Litig.*,
2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ..................................................26, 36

*Frankfurt-Tr. Invest. Luxemburg AG* v. *United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)..................................................................21

*Gregory* v. *ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)................24

*Gross* v. *AT&T Inc.*,
2021 WL 9803956 (S.D.N.Y. Sept. 27, 2021), *aff'd*, 2022 WL 17587853 (2d
Cir. Dec. 13, 2022)..................................................................................35

*Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*,
2005 WL 736217 (S.D.N.Y. Mar. 30, 2005), *aff'd*, 159 F. App'x 317 (2d Cir.
2005) ........................................................................................22

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .......................................................34

*In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*,
859 F. Supp. 2d 572 (S.D.N.Y. 2012)..................................................................30

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)................................................................13, 21, 32

*Kasilingam* v. *Tilray, Inc.*,
2024 WL 4350118 (S.D.N.Y. Sept. 30, 2024)..................................................23, 37

*Kuriakose* v. *Fed. Home Loan Mortg. Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012).................................................................22

*Lentell* v. *Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)..............................................................................13

*In re Lihua Int'l, Inc. Sec. Litig.*,
2016 WL 1312104 (S.D.N.Y. Mar. 31, 2016) ......................................................21

*Long Miao* v. *Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)...................................................................28

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014).............................................................12, 17

v

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Marcu* v. *Cheetah Mobile Inc.*,
2020 WL 4016645 (S.D.N.Y. July 16, 2020) ...................................................................16, 18

*New York City Pub. Pension Funds* v. *Coupang, Inc.*,
2025 WL 2613650 (S.D.N.Y. Sept. 10, 2025)................................................................ *passim*

*In re Nokia Oyj Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006)..........................................................................13

*Novak* v. *Kasaks*,
216 F.3d 300 (2d Cir. 2000)................................................................................13, 22

*O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.*,
2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006) ....................................................................5

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)......................................................................................26

*Patel* v. *L-3 Commc'ns Holdings Inc.*,
2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)....................................................................34

*Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .........................................................................................12

*In re Pretium Res. Inc. Sec. Litig.*,
256 F. Supp. 3d 459 (S.D.N.Y. 2017)...........................................................................24

*In re PXRE Grp.*,
600 F. Supp. 2d 510 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009)..............................13

*Rehab. Ass'n of Va., Inc.* v. *Kozlowski*,
42 F.3d 1444 (4th Cir. 1994) ......................................................................................6

*Ret. Fund* v. *Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) .....................................................................................13

*Ret. Sys.* v. *YPF Sociedad Anonima*,
15 F. Supp. 3d 336 (S.D.N.Y. 2014)............................................................................26

*Ret. System of Gov't of the Virgin Islands* v. *Blanford*,
794 F.3d 297 (2d Cir. 2015).......................................................................................23

*Richman* v. *Goldman Sachs, Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)...........................................................................12

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Schaffer* v. *Horizon Pharma PLC*,
2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ..................................................................22

*In re Shanda Games Ltd. Sec. Litig.*,
128 F.4th 26 (2d Cir. 2025) ........................................................................................23

*United States ex rel. Sheldon* v. *Allergan Sales, LLC*,
24 F.4th 340 (4th Cir. 2022) .........................................................................................7

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021)........................................................................................20

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
531 F.3d 190 (2d Cir. 2008).......................................................................................12

*In re Teladoc Health, Inc. Sec. Litig.*,
2025 WL 886934 (S.D.N.Y. Mar. 21, 2025) ...................................................24, 32

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)............................................................................................12, 25

*Tongue* v. *Sanofi*,
816 F.3d 199 (2d Cir. 2016).......................................................................................18

*Villare* v. *Abiomed, Inc.*,
2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021)..........................................................19

*In re Walmart Inc. Sec. Litig.*,
151 F.4th 103 (3d Cir. 2025) ......................................................................................15

*Waters* v. *Gen. Elec. Co.*,
2020 WL 3910303 (S.D.N.Y. Sept. 29, 2010)..........................................................36

*Woolgar* v. *Kingstone Cos.*,
477 F. Supp. 3d 193 (S.D.N.Y. 2020)........................................................................33

**Statutes**

42 U.S.C. §§ 1395w(1)–(2), (3)................................................................................6

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 et seq. .................... *passim*

**Other Authorities**

17 C.F.R. § 240.10b-5................................................................................11, 14, 27

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

42 C.F.R. § 414.802 ..................................................................................................................6

42 C.F.R. § 414.804(a)(2)(ii) ..................................................................................................6

Federal Rule of Civil Procedure 9(b) ..............................................................................1, 11, 12

Federal Rule of Civil Procedure 12(b)(6) ...............................................................................1, 5

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 et seq. (the "PSLRA"), defendants Regeneron Pharmaceuticals, Inc. ("Regeneron" or the "Company"), Leonard S. Schleifer, Christopher Fenimore, Robert E. Landry, and Marion McCourt (the "Individual Defendants"), submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint (Dkt. No. 54, the "SAC") with prejudice.

## PRELIMINARY STATEMENT

Plaintiff, a Regeneron shareholder, claims that Defendants engaged in two wholly unrelated frauds by making misstatements about two flagship drugs developed by Regeneron. But despite its length—and multiple rounds of amendment—the SAC does not contain *facts* supporting either claimed securities fraud, much less meet the PSLRA's heightened pleading standards.

Regeneron develops, manufactures, and distributes life-changing medicines, including EYLEA® (aflibercept) ("EYLEA") and EYLEA HD® (aflibercept) 8mg ("HD")—prescription injections that treat several serious retinal diseases that cause blindness, including wet age-related macular degeneration ("Wet AMD"). The FDA approved EYLEA in 2011, and EYLEA has since generated billions of dollars in revenue. When this suit was first filed, Plaintiff alleged that Regeneron concealed that the "true source" of EYLEA's decade-long success was not the drug's "efficacy and safety," but rather Regeneron's judgments about how to account for its reimbursements of distributors' credit card processing fees in calculating EYLEA's average sales price ("ASP") reported to regulators. This "scheme" was supposedly "revealed" when, in 2024, DOJ issued a press release touting its False Claims Act ("FCA") action challenging Regeneron's ASP reporting, and the stock price declined (ever so slightly) (the "ASP Theory").

However, the DOJ press release was no "revelation." Regeneron had already disclosed DOJ's investigation years before the first alleged misstatement, and had disclosed DOJ's

1

intervention in the FCA action months before the alleged stock drop. In fact, DOJ *publicly* filed its FCA complaint nearly *two weeks before Plaintiff's alleged corrective disclosure*. But because *that* earlier filing led to a stock *increase*, the ASP Theory improperly hinges on DOJ's press release announcing what was already public.

Because it is well-established that a securities fraud claim cannot rest on republication of publicly available information, Plaintiff seized on other, unrelated stock drops and invented a new theory that fares no better. That theory concerns HD, a high-dose version of aflibercept launched in 2023. Plaintiff alleges that Defendants overstated the "strong initial demand" and "physician enthusiasm" for HD and engaged in large "bulk sales" to create an unsustainable "short-term appearance of demand." Plaintiff, however, does not cite *any* HD revenue that was over-reported and later corrected. Instead, the supposed "truth" was "revealed" when Regeneron reported disappointing HD sales in late 2024 and early 2025. Plaintiff attempts to convert this disappointment with HD sales into a second fraud claim (the "HD Theory").

Plaintiff does not plead the required elements of a securities fraud claim for ***either*** of these two unrelated theories, because the SAC does not identify particularized facts showing that (1) Defendants made misleading statements, (2) with fraudulent intent, that (3) caused Plaintiff's loss.

**ASP Theory.** **(1) No falsity.** Plaintiff cites four high-level statements describing EYLEA's "product profile" as its differentiating feature, and alleges that they concealed that Regeneron's accounting for credit card fee reimbursements in ASP reports was a "material" source of EYLEA's success. Nonsense. Defendants' statements say nothing about Regeneron's calculation of ASP. And Plaintiff pleads *no facts* supporting its allegation that Regeneron's credit card fee accounting was material to EYLEA sales or Regeneron's bottom line. To the contrary, Plaintiff admits that Regeneron reimbursed only $250 million in credit card fees in the first decade

2

after FDA approved EYLEA—*less than 1%* of EYLEA's U.S. net sales in that same period. Plaintiff also seizes on two statements describing Regeneron's intent to vigorously defend the DOJ lawsuit and its ASP calculations. But the SAC does not plead either are false: Regeneron *is* defending the DOJ lawsuit, and *has not* changed how it calculates ASP. And most of these statements are non-actionable because they are (a) opinions not alleged to have been subjectively disbelieved, such as that certain factors "made the difference" or contributed to a "very robust performance," and (b) classic immaterial puffery on which no reasonable investor relies.

**(2) No strong inference of scienter.** The crux of Plaintiff's scienter allegations is that certain Defendants allegedly knew that Regeneron did not deduct credit card fees from EYLEA's ASP. But this says nothing about whether any Defendant believed that practice to be wrong, and then intentionally deceived *shareholders* about it. That Defendants contemporaneously disclosed both the DOJ investigation and its decision to intervene fatally undermines any inference of intent to defraud shareholders. The non-fraudulent inference is far more compelling: that Defendants— who are not alleged to have *any* legally cognizable motive to deceive—believed that doctors prescribed EYLEA to elderly patients for more than a decade, generating billions in revenue for Regeneron, because the drug works (*i.e.*, it does have a differentiating product profile), and not because *Regeneron reimbursed its drug distributors' credit card fees*.

**(3) No corrective disclosures.** The SAC fails to properly plead a corrective disclosure for purposes of loss causation because none of the alleged corrective disclosures provided new information to the market. Plaintiff alleges that Regeneron's stock dropped 1.7% following a DOJ press release that merely "announced" the FCA complaint DOJ filed against Regeneron. But DOJ publicly filed its actual complaint *13 days earlier*, after which the stock price had *increased.* It is black-letter law that a "disclosure" of previously disclosed information is not a corrective

3

disclosure and cannot satisfy loss causation.  While Plaintiff alleges that a disclosure of slowing EYLEA growth in October 2024 was also corrective, the DOJ action—and thus the purportedly concealed ASP "scheme"—had been public for *months*, and the October 2024 disclosure said nothing whatsoever about ASP reporting and thus revealed no facts about the alleged "scheme."

**HD Theory.  (1) No falsity.**  Plaintiff challenges 13 statements in which Defendants said that "early signals" and "launch indicators" for HD were positive and that Regeneron was "encouraged" about HD's prospects.  These statements are allegedly false based on isolated anecdotes from low-level former employees ("FEs"), who purportedly recall weak enthusiasm for HD.  But no FE identifies *any* specific information that contradicts Defendants' statements about the HD rollout at the time they were made.  And although FEs "heard of" "secret" sales meetings between executives and "private-equity owned Retina Practices," Plaintiff fails to allege why Regeneron should not have private meetings with customers (or why it matters if customers are privately owned), much less how such meetings contradicted any public statement.  Like the ASP statements, nearly all of the challenged statements are not actionable because they are opinions and classic puffery—such as statements citing HD's "strong" trajectory and "high" enthusiasm.

**(2) No strong inference of scienter.**  Plaintiff relies entirely on low-level FEs to allege that Defendants intentionally deceived shareholders about their optimism for the HD launch.  But *no FE* claims to have met with or communicated *any* observations about HD sales to any Individual Defendant—much less suggests they were not genuinely optimistic about HD's launch.  Instead, the FEs merely recount rumors that Defendants traveled to physician groups to sell HD—*i.e.*, that these executives did their jobs.  The far more compelling inference is that Defendants—who are not alleged to have any cognizable motive to deceive and who transparently warned shareholders upfront about HD launch challenges—saw early indications of success in 2023, reported their

4

optimism to shareholders, and that later, in 2024, HD sales were disappointing.  That is not fraud.

**(3) No corrective disclosures.**  Although Plaintiff points to three quarterly reports that supposedly revealed "disappointing" HD sales, none satisfies loss causation because none revealed any of the supposed "secret meetings" or "backroom deals" underlying Plaintiff's made-for-litigation fraud theory.  And one disclosure cannot satisfy loss causation for the additional reason—obscured by Plaintiff's pleading—that it drove a 2.9% *stock increase* rather than a "loss."

Plaintiff has already amended the complaint twice, including after receipt of a pre-motion letter.  Further amendment would be futile and the Court should dismiss the SAC with prejudice.

STATEMENT OF FACTS

Regeneron develops, manufactures, and distributes life-changing medicines for serious diseases.  ¶¶ 8, 81.[1]  In 2011, Regeneron obtained FDA approval for EYLEA, a prescription injection that treats Wet AMD.  ¶¶ 8, 82.  Within a year of launch, EYLEA became Regeneron's most successful product and gained significant share of the Wet AMD market, ¶¶ 10, 84, with "a well-established efficacy and consistent safety profile from 16 pivotal trials."  Ex. 1 at 2.  In 2023, Regeneron launched HD, a high-dose version of aflibercept.  ¶¶ 4, 26, 144.

Dr. Schleifer is Regeneron's Co-Founder and CEO.  ¶ 63.  Fenimore is CFO and Landry was CFO prior to 2024.  ¶¶ 64, 65.  McCourt is EVP and Head of Commercial.  ¶ 66.

Plaintiff alleges that from May 4, 2023, to April 28, 2025 (the "Class Period"), Defendants misled investors by making 20 alleged misstatements, categorized for the Court in Exhibit 2.

---

[1] "¶ __" refers to SAC paragraphs. "Ex. __" refers to exhibits to the Declaration of David P. Friedman (pincites correspond to PDF pagination), which may be properly considered on a Rule 12(b)(6) motion to dismiss because they include documents the SAC quotes, cites, or references, as well as documents legally required to be filed with the SEC. *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court may take notice of the existence of publicly available materials and "widely known adjudicative facts not subject to reasonable dispute." *O'Keefe* v. *Ogilvy & Mather Worldwide, Inc.*, 2006 WL 3771013, at *1 (S.D.N.Y. Dec. 18, 2006).  Unless otherwise noted, all emphases are added and internal quotation marks and citations are omitted.

5

I.      **The ASP Theory**

A.      **EYLEA's "Average Sales Price" and Credit Card Fee Reimbursements.**

Because EYLEA treats the elderly, a portion of EYLEA purchases are reimbursed under Medicare. ¶ 87. EYLEA is a "buy-and-bill" drug, which means doctors typically buy it from a distributor and then bill Medicare after administering it to a patient. ¶¶ 15, 91. In general, Medicare determines reimbursement amounts using a statutory formula based on average sales price ("ASP"), which drug manufacturers like Regeneron must report quarterly to the Centers for Medicare and Medicaid Services ("CMS"). ¶¶ 15–16, 92. Regulations regarding drug price reporting "are among the most completely impenetrable texts within human experience." *Rehab. Ass'n of Va., Inc.* v. *Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994). Manufacturers calculate ASP by dividing total eligible U.S. sales of the drug in a quarter by the units of the drug sold that quarter. The statute requires subtracting from the numerator certain "price concessions" enumerated by Congress such as volume discounts, chargebacks, and rebates, which lower ASP. ¶¶ 16, 90; 42 U.S.C. §§ 1395w(1)–(2), (3). CMS also directs that "bona fide service fees" ("BFSF") should *not* be subtracted from the numerator in an ASP calculation. ¶ 104; 42 C.F.R. § 414.804(a)(2)(ii). BFSF are "fees paid by a manufacturer to an entity that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform . . . and that are not passed on . . . to a client or customer." 42 C.F.R. § 414.802. CMS has been reluctant to provide guidance on the scope of BFSF, recognizing that "because of the complexities of the marketplace," listing examples of BFSF would "raise[] further questions as to why some examples were included and some excluded from that list." Ex. 3 at 3.

Regeneron does not typically sell EYLEA directly to end customers, such as doctor's offices ("Retina Practices") that administer it to patients. ¶ 9. Instead, Regeneron contracts with distributors who in turn sell EYLEA to Retina Practices. *Id*. Some Retina Practices purchase

6

EYLEA from distributors using credit cards, for which the credit card issuers charge distributors processing fees (as they charge other merchants, *e.g.*, Target).  ¶ 13.  Regeneron entered into contracts in which it agreed to cover processing fees incurred by distributors when Retina Practices purchase EYLEA using credit cards.  *Id.*  Regeneron characterizes these fee reimbursements as both BFSFs and not price concessions, and thus does not deduct their value from EYLEA's ASP. ¶¶ 103–04.  Regeneron believes these fees reflect fair-market-value, itemized costs for credit card processing services performed on its behalf and incurred by distributors (i) that do not lower or otherwise affect the price paid by Retina Practices and (ii) that, absent the distributor's role, Regeneron would have to contract for and incur these services itself.  Ex. 4 at 3–13.

Regeneron has consistently disclosed the challenges and risks of ASP reporting, including that "[p]ricing and rebate calculations vary across products and programs are complex, and are often subject to interpretation by us, governmental or regulatory agencies, and the courts," and that "[c]ivil monetary penalties can be applied . . . if we are found to have made a misrepresentation in the reporting of our average sales price."  Ex. 5 at 5; Ex. 6 at 6; Ex. 7 at 6.  Regeneron also warned investors that "[p]harmaceutical companies have been investigated and/or prosecuted under [the FCA] for . . . *reporting to pricing services inflated average wholesale prices that were then used by federal programs to set reimbursement rates*."  Ex. 5 at 4; Ex. 6 at 5; Ex. 7 at 5.[2]

**B.    The DOJ Action Concerning EYLEA's ASP.**

In August 2021, Regeneron disclosed that it had received a civil investigative demand ("CID") from DOJ in June 2021 "concerning allegations that the Company (i) violated the False Claims Act by paying kickbacks to distributors . . . to induce purchase of EYLEA, including

---

[2] The Fourth Circuit has criticized the federal government for maintaining "strategic ambiguity" in its drug pricing regulations to "expand potential liability" by using enforcement actions, rather than rulemaking, to clarify the scope of those regulations.  *United States ex rel. Sheldon* v. *Allergan Sales, LLC*, 24 F.4th 340, 354, 356 (4th Cir. 2022).

through . . . credit card fees . . . ; and (ii) inflated reimbursement rates for EYLEA by excluding applicable discounts, rebates, and benefits from the average sales price reported to CMS." ¶ 123; Ex. 8 at 11. In November 2023, DOJ intervened into an action alleging that Regeneron violated the FCA by inflating its ASP reporting of EYLEA. Ex. 9. Regeneron disclosed this development to shareholders. *See* Ex. 10 at 14 ("On November 29, 2023, the U.S. Department of Justice informed the Company that it had filed a notice of partial intervention in this matter.").

The DOJ filed its complaint on March 28, 2024. Dkt. No. 54-1; Ex. 11 at ECF No. 58. The DOJ complaint alleges that Regeneron reimbursed distributors for credit card processing fees they incurred when purchasing physicians used credit cards; that Regeneron should have but did not treat those fee reimbursements as price concessions in its ASP reports; and that Regeneron thus submitted false ASP reports in violation of the FCA. Dkt. No. 54-1, ¶ 90. DOJ's complaint was publicly available when first filed on the court's public docket in unredacted form, and it was replaced on April 10, 2024, with a redacted version. Ex. 9; Ex. 11 at ECF Nos. 58-59, 68-69. The DOJ issued a press release on April 10 describing its previously filed complaint. ¶ 40; Ex. 12.

Regeneron has vigorously contested the DOJ lawsuit. On April 29, 2025, the district court denied Regeneron's motion to dismiss, finding that the DOJ "plausibly allege[d]" that Regeneron's credit card fee reimbursements should have been deducted from ASP as price concessions. ¶ 413; *Nunnelly*, 780 F. Supp. 3d at 336. Regeneron continues to dispute DOJ's claims and continues to treat credit card fee reimbursements as both BFSF and not price concessions today. Ex. 13 at 4 (Regeneron's Answer, dated July 23, 2025, stating that Regeneron "continues to pay" these fees based on its "treatment of credit card processing fees as bona fide service fees").

## C.    Alleged Misstatements and Corrective Disclosures About the ASP Theory

Plaintiff alleges that Defendants committed fraud in four statements attributing EYLEA's commercial success to its "clinical profile" and "efficacy and safety." ¶¶ 253, 266, 321, 328 (the

8

"ASP Statements"). According to Plaintiff, these statements concealed that the credit card fee reimbursement "[s]cheme" was a "material source" of EYLEA's success, ¶ 129, although the SAC pleads no facts about the *impact* of fee reimbursements on EYLEA sales. The "truth" was purportedly revealed on (1) April 10, 2024, when DOJ issued its press release about the earlier-disclosed DOJ Action, which purportedly drove declines of 1.7% on each of the next two trading days, and (2) on October 31, 2024, when Regeneron reported allegedly disappointing EYLEA and HD sales figures in 3Q24, followed by a 9.2% single-day stock drop. ¶¶ 223–25, 360, 363.

Plaintiff also challenges two statements defending Regeneron's approach to ASP calculations and stating the Company's intent to "vigorously" fight the DOJ Action and continue the practice. ¶¶ 326, 332 (the "DOJ Action Statements"). These statements purportedly concealed Regeneron's intent to change its ASP practice with respect to fee reimbursements. But Regeneron is in fact defending its practice in court, and the SAC does not allege that Regeneron did change its practice. Nor could it—Regeneron continues that practice today. The "truth" was supposedly revealed when Regeneron's 3Q24 results reflected a "lower net selling price" for EYLEA. ¶ 223.

## II.    The HD Theory

### A.    The HD Launch and the Alleged Misstatements About HD.

In 2019, Regeneron announced that it was advancing HD as a new high-dose version of aflibercept. ¶¶ 4, 25–26, 134, 144. The FDA approved HD on August 18, 2023, to be administered every four weeks for the first three months, and then every 8 to 16 weeks. ¶¶ 134, 142.

On November 2, 2023, Regeneron announced its 3Q23 financial results and said that HD's launch was "off to a great start." ¶¶ 268–69. During an earnings call, Dr. Schleifer stated that Regeneron "recorded $43 million of net product sales [for HD] in the final six weeks of the quarter, which compare[d] favorably to recent launches in the retinal disease category." ¶ 269. He further noted that "revenues were driven by strong initial demand with multiple reorders by distributors

before the end of the quarter." ¶ 269; Ex. 14 at 5. During the same call, McCourt stated that "[p]hysician enthusiasm was extremely high prior to EYLEA HD launch," that Regeneron was "seeing switches from EYLEA, as you would expect," and that prescribers were sharing "early reimbursement successes and positive physician experiences." ¶ 270; Ex. 14 at 9. McCourt also disclosed that Regeneron was "on track to have a permanent J-Code by April 1, 2024, which [they] anticipate will drive additional uptake." Ex. 14 at 9. A permanent J-Code, which went into effect on April 1 as projected, provides a medical billing code that Retina Practices and insurers need to process claims for reimbursement more quickly than a temporary J-Code. ¶¶ 29, 91, 140; Ex. 15 at 9.

On February 2, 2024, Regeneron reported $123 million in HD net product sales in 4Q23—HD's first full quarter on the market—"based on growing demand and positive early physician experience." ¶ 323; Ex. 16 at 10. During an earnings call that day, McCourt stated that "HD and EYLEA together secured 49% of the anti-VEGF [vascular endothelial growth factor] category share," due in part to "the differentiated efficacy and safety profile of our medicines." ¶ 321.

On May 2, 2024, Regeneron announced that 1Q24 net sales of HD "grew 63% sequentially to $200 million," noting that the "permanent J-Code has increased prescribers' reimbursement confidence." Ex. 15 at 9. McCourt reported that, for 1Q24, "HD and EYLEA together secured 45% of the anti-VEGF category share." ¶ 328.

On August 1, 2024, Regeneron announced on an earnings call that 2Q24 revenue grew 12%, year-over-year, to $3.55 billion, "primarily driven by sales of HD" in the U.S. and other factors. Ex. 17 at 5. McCourt also reported that the number of physician offices ordering HD during 2Q24 "increased by more than 50% compared to the prior quarter," and that Regeneron "believe[s] this suggests prescriber confidence in EYLEA HD's clinical profile" among other

factors.  ¶ 337.  Dr. Schleifer further noted that Regeneron's "efforts to bring an EYLEA HD prefilled syringe . . . remain a high priority," with a potential "launch by early 2025."  Ex. 17 at 5.

On October 31, 2024, Regeneron announced that HD net sales "grew 29% sequentially in the [third] quarter to $392 million."  Ex. 18 at 9; ¶ 340.  In November and December, McCourt and Fenimore disclosed that Regeneron was "aware of [the] interest" in an option for HD dosing every four weeks, rather than eight weeks, and that it would "continue to generate clinical data" and "work with FDA" on this issue.  Ex. 19 at 5; Ex. 20 at 4.

## B.    The Alleged Corrective Disclosures about the HD Theory.

The "truth" about HD demand was supposedly revealed in the Company's 3Q24 results, *supra* 11, and on two dates that postdate the filing of the original complaint in this case: the January 13, 2025 disclosure of Regeneron's 4Q24 results, which included purportedly disappointing HD sales and drove a 2.9% single-day ***gain***; and the April 29, 2025 disclosure of Regeneron's 1Q25 results, which allegedly included disappointing EYLEA and HD sales and drove a 6.87% single-day decline.  ¶¶ 50–52, 55; Ex. 21.  Although Plaintiff's HD Theory hinges on the claim that Regeneron's prior statements describing "strong initial demand" and "enthusiasm" were misleading, neither of these disclosures revealed that any earlier disclosures of HD's financial results were false—these disclosures simply reported on more recently-completed quarters.  *Id.*

## LEGAL STANDARD

To state a claim for a violation of Section 10(b) and Rule 10b-5(b), Plaintiff must allege, as relevant here: (1) a materially false or misleading statement by the defendant; (2) made with scienter; and (3) loss causation.  *Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*, 568 U.S. 455, 460–61 (2013).  The SAC fails adequately to plead these three essential elements.

**Falsity.**  Rule 9(b) and the PSLRA require a plaintiff to "state with particularity the circumstances constituting fraud," including by "specify[ing] each statement alleged to have been

11

misleading, and the reason or reasons why the statement is misleading." *ECA, Local 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase, Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Plaintiff must demonstrate with specificity that "the alleged statements were false *when they were made.*" *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 579 (S.D.N.Y. 2014) (emphasis in original). Plaintiff must also specifically identify "the omitted facts that are necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." *Kleinman* v. *Elan Corp. plc*, 706 F.3d 145, 152 (2d Cir. 2013). However, "revealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as what was revealed would not be so incomplete as to mislead." *Richman* v. *Goldman Sachs, Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012). Rather, there must be a close relationship between an alleged misstatement and any omitted facts; an "attenuated" relationship is insufficient. *See Plumber & Steamfitters Loc. 773 Pension Fund* v. *Danske Bank A/S*, 11 F.4th 90, 103 n.4 (2d Cir. 2021).

**Scienter.** The PSLRA and Rule 9(b) require that a complaint "state with particularity facts giving rise to a strong inference that the defendant acted with . . . a mental state embracing intent to deceive, manipulate, or defraud." *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). A "strong" inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* This inquiry is "inherently comparative" and requires the court to consider nonculpable explanations advanced by defendants. *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323–24 (2007). "Scienter must be separately pled and individually supportable as to *each defendant*; scienter is not amenable to group pleading." *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013). For a corporate defendant, plaintiff must plead scienter for "someone whose intent could be imputed to the corporation." *Dynex*, 531 F.3d at 195.

12

The required strong inference of scienter may be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  To plead motive, Plaintiff cannot rely on a general desire to boost the stock; it must allege a "concrete and personal benefit" specific to individual defendants (e.g., stock sales).  *Id.*  Where, as here, Plaintiff pleads no motive, "the strength of the circumstantial allegations [of conscious misbehavior or recklessness] must be correspondingly greater."  *Id.* at 142.  This requires particular factual allegations of defendants' "actual intent" or "state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak* v. *Kasaks*, 216 F.3d 300, 310, 312 (2d Cir. 2000).  It is not enough to allege a defendant "'ought to have known.'"  *In re PXRE Grp.*, 600 F. Supp. 2d 510, 535 (S.D.N.Y.), *aff'd*, 357 F. App'x 393 (2d Cir. 2009).  If "plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," *Dynex*, 531 F.3d at 196, and plead with specificity "*when* Defendants had the [information]," *In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006).

**Loss Causation.**  Under the PSLRA, the "subject of the fraudulent statement or omission" must be "the cause of the actual loss suffered."  *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).  Plaintiff must plead that Regeneron's "share price fell significantly after the truth became known through an express, corrective disclosure, or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson* v. *Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020).[3]

---

[3] While the Second Circuit has not determined whether the heightened pleading standard of the PSLRA applies to loss causation, courts, including the Ninth Circuit, have noted the pleading standard for loss causation is "heightened" in the Second Circuit.  *See Oregon Public Emps.' Ret. Fund* v. *Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).  Regardless of the standard the Court applies, Plaintiff's allegations fall short.

**ARGUMENT**

**I.   <u>Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the ASP Theory</u>**

Plaintiff's ASP Theory fails to state a claim because the alleged misstatements were not misleading:  Defendants had already disclosed the DOJ's investigation into the ASP practice and DOJ's decision to sue before it filed its FCA complaint.  And stating that EYLEA demand was driven by its clinical profile did not mislead investors that no other factors impacted demand.  The SAC also fails to plead a strong inference of scienter because it does not allege that any Individual Defendant intentionally deceived shareholders about the source of EYLEA's success—indeed, the SAC is silent as to any Individual Defendant's knowledge of contrary information.  Finally, the two alleged "corrective disclosures" corrected nothing:  the first disclosed already publicly available information and the second disclosed nothing about ASP, leaving Plaintiff without any corrective disclosure at all, and thus, no securities fraud claim.

**A.   Plaintiff Fails to Plead Any Materially False or Misleading Statement.**

1.   <u>The ASP Statements Were Not Misleading</u>.

Plaintiff challenges two statements from May and June 2023 in which McCourt attributed EYLEA's historical "robust performance" to the drug's "product profile."  ¶¶ 253, 266.  Plaintiff also challenges two statements from February and May 2024 in which McCourt quantified EYLEA's market share, in one instance attributing it to the "efficacy and safety profile of our medicines."  ¶¶ 321, 328.  Plaintiff does not allege that *any* facts in these statements were inaccurate—for instance, Plaintiff does not dispute that Regeneron "secured 49%" of the anti-VEGF market share in 4Q23.  ¶ 321.  Rather, Plaintiff contends that these statements misleadingly concealed the existence or impact of Regeneron's credit card processing fee reimbursements.

Plaintiff's claim fails at the outset because the supposed credit card reimbursement "scheme" was not concealed at all:  Regeneron disclosed DOJ's investigation into the practice in

14

August 2021, years before the Class Period began in May 2023.  And Regeneron disclosed DOJ's intent to file a complaint in February 2024, during the Class Period.  *Supra* 8.  These disclosures were sufficient; a company that discloses an investigation is not obligated to confess to underlying wrongdoing or speculate about the investigation's outcome.  *See In re Walmart Inc. Sec. Litig.*, 151 F.4th 103, 118–20 (3d Cir. 2025) (affirming dismissal where issuer disclosed it was "responding to subpoenas, information requests and investigations from governmental entities related to" opioids and could "provide no assurance as to the scope and outcome of these matters").

Plaintiff acknowledges Regeneron's disclosures—as it must—but insists they were inadequate because they failed to disclose the "magnitude" of the supposed scheme.  ¶ 124.  But the Second Circuit has expressly rejected the theory that companies must admit to the magnitude of a (purported) "scheme" that has not been charged, much less adjudicated.  *See City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014) (rejecting argument that disclosures were "materially incomplete inasmuch as they disclosed the DOJ investigation but concealed . . . the *magnitude* of UBS's exposure to liability").  And even if that theory were viable, Plaintiff alleges the "magnitude" was revealed by the DOJ complaint—which was publicly filed almost *two weeks before* the first alleged corrective disclosure.  *Supra* 8.  Plaintiff tries to avoid this pleading failure by alleging that Defendants' statements about EYLEA's "robust performance" nonetheless concealed that the credit card "[s]cheme" was a "material source" of EYLEA's success.  ¶ 266.  This argument fails for three principal reasons:

**First**, there are no particularized facts supporting the theory that credit card reimbursements were a "material source" of EYLEA's performance.  *See* ¶¶ 219, 266, 426.  There is not one factual allegation quantifying the financial impact of this alleged "scheme."  Instead, Plaintiff cherry-picks certain amounts that Regeneron reimbursed in credit card fees in years prior

to the Class Period, without alleging *how* those reimbursements affected EYLEA's performance. For example, Plaintiff cites memoranda purportedly showing distributors' fee invoices from "December 2019" and "July 2016 to March 2017," ¶ 101, and "projected credit card fees" for 2021, ¶ 100. There are no allegations that these amounts—all in years prior to the challenged statements—were responsible for anyone choosing EYLEA, much less incentivizing sufficient purchases to make this practice a "material source" of EYLEA's success. Likewise, Plaintiff asserts that from 2012 and 2021, Regeneron reimbursed over $250 million in credit card fees to distributors. ¶¶ 14, 96, 350. During that same period, however, EYLEA's U.S. net sales exceeded *$33 billion*. Ex. 22. In 2022 alone, EYLEA generated $6.3 billion in revenue. ¶ 85. The $250 million in alleged reimbursements to distributors over a 10-year period is too insignificant to plausibly suggest that the alleged "scheme" was a "material source" of EYLEA's success.[4]

Nor does Plaintiff identify any FEs familiar with the reimbursement practice, or internal data or documents tying reimbursements to EYLEA performance. *See Lululemon*, 14 F. Supp. 3d at 579 ("general allegations" insufficient absent "required specific factual allegations (by [FEs] or otherwise)"). Although Plaintiff describes three theoretical ways the alleged scheme *could* have benefitted Regeneron, ¶¶ 19–21, 102, it pleads no facts about how fee reimbursement *did* impact performance. This is dispositive. *See Marcu* v. *Cheetah Mobile Inc.*, 2020 WL 4016645, at \*5 (S.D.N.Y. July 16, 2020) ("[T]he Complaint does not include a single allegation about the significance of the click injection scheme . . . to [defendant's] overall revenues."); *New York City Pub. Pension Funds* v. *Coupang, Inc.*, 2025 WL 2613650, at \*15 (S.D.N.Y. Sept. 10, 2025)

---

[4] Plaintiff also cites emails—none involving any Individual Defendant—purportedly reflecting that it was a "big deal" for "several accounts" that a certain competitor's distributor charged more for credit card payments. ¶¶ 94, 255, citing SAC Ex. B. But nothing in those communications supports the claim that Regeneron's reimbursement scheme was a *material* driver of EYLEA's performance. In fact, the full context of the email undermines Plaintiff's theory, as it explains that Retina Practices could purchase directly from Regeneron's competitor without paying any credit card fee. *See* Ex. B at 4 ("Lucentis [D]irect does not charge the providers any more for paying with a credit card.").

16

(rejecting allegation that concealed pricing practices were true "driv[ers]" of growth where plaintiff failed to "plead that . . . pricing practices had a significant impact on Coupang's sales").

Plaintiff likewise cannot point to any disclosures revealing that credit card reimbursements were a "material source" of Eylea's success. Plaintiff alleges that the "truth" was "revealed" when the DOJ disclosed its civil complaint against Regeneron. ¶¶ 209–13. But that complaint—which predominately concerns conduct from before the Class Period—alleges that Regeneron's ASP calculations are inaccurate and noncompliant. *Supra* 8. It alleges nothing about the financial impact of the reimbursements to Regeneron, much less that any such impact was "material."

***Second***, even if Plaintiff adequately alleged that credit card reimbursements contributed materially to EYLEA's success (it does not), that still would not render any statement misleading. Defendants' statements concerning EYLEA are qualitative assessments that its "profile" "made the difference" and "allowed for this very robust performance." ¶¶ 253, 266. They do not claim that EYLEA's success was "purely" based on its profile—as Plaintiff erroneously claims, ¶ 233— or rule out that other factors also contributed to EYLEA's "difference" or "robust performance."

Judge Broderick's recent opinion in *Coupang* is directly on point. There, plaintiffs alleged that similar statements about commercial success—including that Coupang's "growth in retail sales" was "driven by a continual increase in product selection and additional offerings"—were misleading because Coupang's growth was actually driven by undisclosed, anticompetitive price-matching. 2025 WL 2613650, at *14. The court disagreed, finding that Coupang "did not, explicitly or implicitly, rule out other factors playing a role in generating revenue," and that given the "vagueness" of the statements, Coupang could *not* have "misled a reasonable investor by omitting to mention the alleged anticompetitive dealings." *Id*. at *15. "Without information about the true effect of the alleged anticompetitive conduct on [defendant]'s revenues," the court could

17

not determine whether any unstated factors for growth "played a minor role relative to the stated factors." *Id.*; *see also Marcu*, 2020 WL 4016645, at \*5 (rejecting argument that defendant "failed to reveal" that "ad fraud technique" contributed to growth because disclosures did not rule out other factors).

The same reasoning applies here. Defendants' vague statements that EYLEA's clinical profile "made the difference" did not rule out *other factors* contributing to performance, including facts about how it allegedly characterizes credit card processing fee reimbursements for regulatory purposes. *See also Afr.* v. *Jianpu Tech. Inc.*, 2022 WL 4537973, at \*9 (S.D.N.Y. Sept. 28, 2022) (statements like "Jianpu successfully captured the shift of user demand and achieved remarkable performance . . . were not specific enough to . . .trigger[] a duty to disclose" alleged related-party dealings). And Plaintiff's contention that Defendants suggested that EYLEA's clinical performance was "alone" or "purely" responsible for the drug's success, ¶¶ 12, 127, 233, is contradicted by its own SAC: Those terms appear nowhere in any Defendant's statements or Regeneron's disclosures. To the contrary, the actual disclosures make clear that it was the "*combination* of the clinical profile" and other factors that led to EYLEA's success. Ex. 24 at 6.

**Third**, most of the ASP Statements are non-actionable opinions and puffery. ¶¶ 253, 266, 321. An opinion statement is not actionable unless (i) "it is not honestly held," or (ii) it "omits facts about the speaker's basis for holding that view, and those facts conflict with what a reasonable investor would understand from the statement itself." *Coupang*, 2025 WL 2613650, at \*10 (cleaned up). Qualitative statements that certain factors "made the difference" or contributed to "very robust performance" are opinions. *See, e.g.*, *Tongue* v. *Sanofi*, 816 F.3d 199, 213–14 (2d Cir. 2016) (statement regarding "strong and robust treatment effect" is opinion). Plaintiff does not even attempt to allege facts demonstrating that Defendants subjectively *disbelieved* their opinions

18

about EYLEA's success.  Nor does Plaintiff plead facts about Defendants' bases for opining that EYLEA's profile "made the difference," much less identify any omitted facts that would render the stated belief misleading.  These opinions are thus not actionable.  *See Villare* v. *Abiomed, Inc.*, 2021 WL 4311749, at \*20 (S.D.N.Y. Sept. 21, 2021) (dismissing complaint containing "no specific allegations regarding Defendants' beliefs at the time the alleged statements were made").

The challenged statements are also not actionable because they are classic examples of immaterial non-actionable puffery.  *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 34 (2d Cir. 2012) (describing products as "market leading" was "mere commercial puffery"); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act Litig.*, 757 F. Supp. 2d 260, 314 (S.D.N.Y. 2010) (statement that company "significantly enhanced" capabilities was puffery).

### 2.  The DOJ Action Statements Were Not Misleading.

Plaintiff next challenges two statements Defendants made in April and August 2024, after disclosure of the DOJ Action, in which they reiterated Regeneron's belief that the credit card reimbursement practice was "not a price concession," and conveyed Regeneron's intent to "vigorously" fight the DOJ Action and continue the practice.  ¶¶ 326–32.  Plaintiff alleges that these statements misled investors to believe that "the DOJ Complaint would not impact [Regeneron's] practice of reimbursing Retina Practices' credit card fees," and the "truth" was revealed when Regeneron reported a decline in EYLEA sales in 2024 "impacted by a lower net selling price."  ¶¶ 223, 327, 333.  These statements are not misleading.

At the outset, Plaintiff's theory necessarily assumes that Regeneron changed its practice of reimbursing credit card fees.  But this is inaccurate—Regeneron continues to reimburse credit card fees and characterize them as BFSFs today.  *See* Ex. 13 at 4 (Regeneron's July 23, 2025 Answer, stating that it "continues to . . . treat[] credit card processing fees as bona fide service fees in [ASP]

19

calculations"). The SAC contains no particularized facts to the contrary. Plaintiff points *only* to a disclosure in Regeneron's 3Q24 10-Q, from October 2024, that EYLEA's net product sales were "adversely impacted by a lower net selling price," and speculates this must be due to Regeneron changing its credit card reimbursement practice. ¶ 223. But Plaintiff pleads no facts showing that the lower "net selling price"—which could be caused by a multitude of factors—reported in the 3Q24 10-Q was caused by a change in Regeneron's reimbursement practices. Notably, Plaintiff omits that Regeneron made the same disclosure of a "lower net selling price" for EYLEA in each quarterly filing dating back to August 2023 due to "increased competition" and "changing market dynamics," long before the DOJ Action, undermining the theory that this disclosure reflected a new development in 3Q24. *E.g.*, Ex. 10 at 6; Ex. 25 at 4. "[Plaintiff] may not cherry pick certain public statements for its complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021).

To the extent Plaintiff had actually alleged that Regeneron subsequently changed its fee reimbursement practice—and it has not—that would still not render these two challenged statements misleading. Defendants' statements of Regeneron's *intent* to continue the reimbursement practice and defend the DOJ Action (which it has done) are forward-looking statements protected by the PSLRA safe harbor, 15 U.S.C. § 78u–4(c)(1)(B), because Plaintiff fails to plead that they were uttered with "actual knowledge" of their falsity at the time the statements were made. *See, e.g.*, *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 84 (S.D.N.Y. 2017). Likewise, Defendants' *belief* that the reimbursements are not price concessions and that "there's nothing to" the DOJ Action are protected opinions similarly not alleged to be subjectively disbelieved—to the contrary, Regeneron continues to defend that legal position in the DOJ Action today. *See Coupang*, 2025 WL 2613650, at *18 (Coupang's denial that practices

20

violated Korean law was "unadorned statement of opinion about legal compliance" that was not actionable absent particular facts that "Coupang did not actually believe that fact"); *Buhrke Fam. Revocable Tr.* v. *U.S. Bancorp*, 726 F. Supp. 3d 315, 352 (S.D.N.Y. 2024) ("subjective views that an enforcement action was not 'warranted'" were protected opinion statements).[5]

### B.      Plaintiff Fails to Plead a Strong Inference of Scienter for the ASP Theory.

Plaintiff fails to plead the required strong inference of intent to defraud with particularity. Plaintiff does not even attempt to identify ***any motive*** to defraud investors.  There are no allegations that any Individual Defendant obtained any concrete and personal benefit from the alleged fraud. To the contrary, Regeneron's decision to repurchase over *$5.4 billion* of its own shares during the Class Period weighs *against* scienter:   the repurchases make no sense if Defendants were artificially inflating the stock.  *See Frankfurt-Tr. Invest. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 225 (S.D.N.Y. 2018) (share repurchases "negate" inference of scienter); Ex. 26.  Plaintiff's failure to plead any motive means "the strength of the circumstantial allegations [of recklessness or conscious misbehavior] must be correspondingly greater," *Kalnit*, 264 F.3d at 142, and the "uphill battle to plead a strong inference of scienter becomes that much steeper,"  *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings*, 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021).  Plaintiff's allegations fall far short of this high bar.

####           1.      The SAC Fails to Plead Conscious Misbehavior or Recklessness.

The SAC alleges that Defendants concealed that credit card fee reimbursements were the "material source" of EYLEA's success.  *E.g.*, ¶¶ 129, 426.  But there is not one well-pleaded fact in support of this theory, *supra* 15–17, much less that it was known to any Individual

---

[5] Plaintiff also alleges that Defendants' SOX certifications were false because Regeneron's internal controls failed to flag that credit card fee reimbursement was not a BFSF and should have been reported as a price concession.  ¶¶ 344–51.  But courts routinely dismiss allegations that SOX certifications are "false" where, as here, there are "no facts about what controls [defendant] employed or how they were inadequate"—beyond the existence of a government investigation.  *In re Lihua Int'l, Inc. Sec. Litig.*, 2016 WL 1312104, at *9 (S.D.N.Y. Mar. 31, 2016).

Defendant. Plaintiff does not identify *any* meetings where the sources of EYLEA's success was discussed. *See Schaffer* v. *Horizon Pharma PLC*, 2018 WL 481883, at *12 (S.D.N.Y. Jan. 18, 2018) (defendants' attendance at conference, with "few details about who was present and no details about when they were present or what was actually said . . . is insufficient to allege scienter"). Nor does Plaintiff identify *any* internal reports on the topic. *Novak*, 216 F.3d at 309. None of the FE allegations even concern the ASP Theory. There are no allegations where contradictory facts were communicated to any Individual Defendant, and scienter is thus not pleaded for the ASP Theory. *See Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*, 2005 WL 736217, at *4 (S.D.N.Y. Mar. 30, 2005) (no scienter pleaded where complaint "not only . . . fails to describe any documents, reports, or conversations that would give rise to an inference of scienter . . . [but also] alleges almost no supporting facts at all"), *aff'd*, 159 F. App'x 317 (2d Cir. 2005).

Plaintiff instead relies principally on the DOJ Action to support scienter. ¶¶ 413–18. But Regeneron *disclosed* that the DOJ was investigating this conduct even before the Class Period, which cuts *against* scienter. *See Kuriakose* v. *Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) ("It defies logic to conclude that executives who are seeking to perpetrate fraudulent information upon the market would make such fulsome disclosures."). Moreover, that lawsuit concerns whether Regeneron violated the FCA—it has no bearing on whether the Individual Defendants intended to defraud *shareholders* by concealing the "material source" of EYLEA's success. *See Nunnelly*, 780 F. Supp. 3d at 339.

Plaintiff also points to pre-Class Period "evidence" in the DOJ Action allegedly showing that certain Individual Defendants knew that Regeneron did not characterize credit card fee reimbursements as price concessions, and that the CEO "approved" this conduct in 2012. ¶¶ 98– 100. But where fraud is based on allegedly unlawful conduct, the "Individual Defendants'

22

approval" of the conduct cannot satisfy scienter absent allegations that Defendants *also knew* the conduct "was unlawful." *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018). Here, the SAC is devoid of allegations that Defendants believed the ASP practice was unlawful; to the contrary, Regeneron continues to defend it. *Supra* 8. In any event, knowledge of Regeneron's approach to reporting credit card fee reimbursements in ASP shows nothing about whether any Individual Defendant knew and concealed that EYLEA's success was driven not by its "product profile," but instead by the ASP practice, and so cannot support scienter as to the ASP Statements.[6]

Similarly, Plaintiff points to the motion to dismiss decision in the DOJ Action holding that the government adequately pleaded Regeneron's scienter under the FCA. ¶ 413. But whether the government adequately alleged that *Regeneron* intended to deceive *the government* about *EYLEA's ASP* has no bearing on whether *Individual Defendants* here intended to deceive *shareholders* about EYLEA's "*performance*." *See ECA*, 553 F.3d at 203 (no scienter for intent to defraud "other institutions" but not issuer's "own shareholders"). And Plaintiff's insistence that there is a "substantial similarity" between scienter pleading requirements under the FCA and PSLRA is wrong. ¶ 413. The PSLRA requires particular facts raising a *strong inference* that the *speaking individual* intended to *deceive shareholders*. *See Emps.' Ret. System of Gov't of the Virgin Islands* v. *Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). The FCA does not require a "strong inference" of scienter at the pleading stage. Moreover, none of the Individual Defendants are defendants in the DOJ Action; that ruling therefore sheds no light on the scienter of any individual who made alleged false statements here or whose intent could be imputed to Regeneron. *See In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 50 (2d Cir. 2025) (PSLRA requires "strong inference that someone

---

[6] Plaintiff's scienter allegations regarding SOX certifications fail for these same reasons, as "SOX certifications will not support an inference of scienter where, as here, a plaintiff does not allege that the defendants had contemporaneous awareness of falsity." *Kasilingam* v. *Tilray, Inc.*, 2024 WL 4350118 at *13 (S.D.N.Y. Sept. 30, 2024) (Vyskocil, J.).

whose intent could be imputed to the corporation acted with the requisite scienter").

### 2.    Plaintiff's Additional Scienter Allegations Are Routinely Rejected.

Absent well-pleaded facts, Plaintiff falls back on theories that are routinely rejected under the PSLRA.  Plaintiff points to the alleged misstatements themselves as evidence of intent because Individual Defendants supposedly "spoke at length" about EYLEA.  ¶¶ 425–28.  But speaking on a topic does not raise an inference that the speaker concealed adverse facts about the topic; Plaintiff inappropriately conflates falsity with scienter, which are two distinct elements of its claim.  *See Gregory* v. *ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 395 (S.D.N.Y.) ("[A]n inference of scienter does not follow from the mere fact of non-disclosure of relevant information."), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).  Plaintiff also conflates speaking "at length" with speaking "in detail" about a topic; none of Individual Defendants' high-level statements crediting EYLEA's success to its "profile" raises a strong inference that the speakers knew granular details about each factor contributing to its success, much less specific contradictory information.

Plaintiff also invokes the disfavored "core operations" doctrine, alleging that knowledge can be assumed because EYLEA was "critical" to Regeneron's success.  ¶¶ 420–22.  The Second Circuit and courts in this district have "expressed doubt as to whether the core operation doctrine has survived" the enactment of the PSLRA, which "requires facts supporting the scienter inference to be stated with particularity."  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 473–74 (S.D.N.Y. 2017) (collecting cases).  Even if core operations were a valid theory, "at best [it] constitutes supplemental support for alleging scienter but does not independently establish scienter."  *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. Mar. 30, 2021).  And even if EYLEA was a core operation, Plaintiff does not allege that *every factor* that contributes to EYLEA operations, including ASP calculations, is "so central . . . that knowledge of them can be inferred to fill the gap" in the SAC.  *In re Teladoc Health, Inc. Sec. Litig.*, 2025

WL 886934, at *10 (S.D.N.Y. Mar. 21, 2025) (even if "overall" subject were core operation, the "more specific subjects that are the basis of the misrepresentations" are not also core operations).

### 3. A Non-Fraudulent Inference Is More Compelling.

Under the PSLRA, the scienter analysis is comparative and holistic: the Court must weigh both the fraudulent and non-fraudulent inferences, and decide whether a fraudulent inference is more compelling. *Tellabs*, 551 U.S. at 323. Plaintiff's narrative is not compelling. Plaintiff insists that Defendants intended to deceive shareholders about its ASP practice by touting EYLEA's "profile," and that the "truth" came out when the DOJ announced its complaint. But Defendants had *already told investors* about the DOJ investigation and intent to sue. Plaintiff also insists that Defendants lied about the basis for EYLEA's success, but physicians had been prescribing EYLEA to their elderly patients for over a decade, generating billions of dollars in revenue and approximately 50% market share. It is absurd to assume, as Plaintiff does, that Defendants believed this demand was to capitalize on *fee reimbursements to drug distributors* who incurred processing fees when Retina Practices purchased EYLEA with credit cards. The far more compelling inference is that EYLEA's success and substantial market share *was* attributable to its "clinical profile," and that Defendants genuinely believed, and continue to believe, that their practices are proper and the DOJ's position is wrong (which is why Regeneron vigorously disputes it). Finally, Plaintiff not only identifies no benefit to Defendants from this alleged scheme, it elides the cost that renders it implausible—during the Class Period, Regeneron repurchased over *$5.4 billion* of its shares at prices that Defendants supposedly artificially inflated. *Supra* 21.

### C. Plaintiff Fails to Allege a Corrective Disclosure for the ASP Theory.

Plaintiff's claims must also be dismissed because it does not adequately allege a corrective disclosure, and thus loss causation. First, Plaintiff mistakenly alleges that on April 10, 2024, the DOJ disclosed its complaint concerning Regeneron's ASP practice. ¶ 40. That is wrong. The

25

DOJ complaint was publicly filed on Thursday, *March 28, 2024*, *supra* 8, and was not accompanied by a stock *drop*, but rather, an *increase*, by market close on Monday, April 1.[7]  Ex. 21.  The April 10 date that Plaintiff relies on is when DOJ issued a *press release* "announc[ing]" its complaint.  But that release summarized information that was already public, Ex. 12, and did not reveal anything *new* about the alleged misstatements, and so cannot satisfy loss causation.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010).[8]  Indeed, Plaintiff itself alleges that the market for Regeneron stock was "efficient at all relevant times" and "promptly digested current information regarding Regeneron from publicly available sources," ¶¶ 356, 445; based on Plaintiff's allegations, the market "promptly digested" the allegations in DOJ's complaint when it was publicly filed, and the April 10 release describing those allegations revealed nothing new to the market.  *See Fila* v. *Pingtan Marine Enter.*, 195 F. Supp. 3d 489, 496 (S.D.N.Y. 2016) (article summarizing publicly available information not corrective disclosure).[9]

Faced with this dispositive defect, Plaintiff alleges that release of Regeneron's 3Q24 financial results on October 31, 2024, which allegedly revealed disappointing sales for EYLEA because of a "lower net selling price," constitutes a separate corrective disclosure.  ¶¶ 4, 45.  But that was in no way a corrective disclosure with respect to the ASP Theory.  As discussed *supra* 20, Plaintiff pleads no facts showing that this "lower net selling price" was caused by a change in Regeneron's ASP reporting, and indeed Regeneron has not changed its practice.  And this disclosure did not "reveal[] to the market the falsity of the prior statements" about EYLEA's "clinical profile," nor provide any information about the DOJ Action, which was filed *seven*

---

[7] Markets were closed on March 29, 2024, in observation of Good Friday.

[8] One of the four alleged ASP Statements occurred on May 2, 2024, ¶ 328, post-dating the April 10 press release and rendering it impossible for even *that* non-corrective disclosure to correct anything in that alleged misstatement.

[9] Because Regeneron previously disclosed both the DOJ CID investigating this practice and its decision to sue Regeneron, *supra* 7-8, the filing of DOJ's complaint was also the "materialization of a known risk" that does not plead loss causation.  *Monroe Cnty. Emps.' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014).

*months* earlier. *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at \*19 (S.D.N.Y. Mar. 31, 2015). To the contrary, the October 2024 disclosure said nothing about ASP reporting or credit card fee reimbursements at all. At bottom, "Plaintiff[] . . . relies solely on Defendants' revelation of poor financial results and concomitant market dissatisfaction to allege loss causation. That is simply not enough." *Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 494 (S.D.N.Y. 2021).

## II.    Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the HD Theory

Plaintiff's new HD Theory fails to state a claim because it pleads no facts that any Individual Defendant had contemporaneous information inconsistent with any challenged statement about HD's launch. Plaintiff again offers *no motive* for the alleged fraud, relying solely on low-level FEs with no first-hand knowledge of contradictory information being conveyed to Individual Defendants. Finally, the alleged corrective disclosures merely revealed disappointing financial results—they said nothing about the alleged "backroom dealings" and "unethical sales practices" that Plaintiff claims were concealed, and therefore cannot support loss causation.

### A.    Plaintiff Fails to Plead Any Materially False or Misleading HD Statement.

Plaintiff challenges 13 statements after the HD rollout in August 2023 in which Defendants described "strong initial demand" and early "physician enthusiasm" for HD. ¶¶ 269–71, 317, 321, 323–24, 328, 335, 337, 339–40, 342. But Plaintiff does not allege that any sales numbers or other financials were misreported or had to be restated. Instead, Plaintiff alleges that each statement misled investors by concealing that "HD's launch was a failure due to several problems known to defendants," and that HD's early demand was, in fact, "driven by unsustainable bulk purchases by private equity-owned Retina Practices." *E.g.*, ¶¶ 272, 341. Like the ASP Statements, the HD Statements do not rule out that other factors apart from clinical profile contributed to HD's early success, which defeats Plaintiff's claim that the statements misled investors about the source of

27

demand.  *See supra* 17–18.  But the HD Theory also fails because the SAC relies exclusively on rumors and non-specific, undated recollections attributed to low-level FEs, and does not cite a single well-pleaded fact showing that the HD Statements were actually false or misleading.

**Launch problems.**  Plaintiff identifies three "launch problems" with HD that were supposedly concealed:  the "lack of a permanent J-Code, unavailability of pre-filled syringes, and lack of dosing frequency flexibility."  ¶¶ 28–30, 138, 144.  As discussed *supra* 10–11, each of these "problems" were transparently disclosed during the Class Period, and not concealed.[10]  The FE allegations about these "launch" issues are thus entirely consistent with Defendants' public statements.  Moreover, there are no well-pleaded facts explaining what (if any) impact they had on the HD launch or sales, so as to render any of the challenged HD Statements misleading.  The SAC points to FEs who worked in regional roles and vaguely recall unspecified "concerns about" the temporary J-Code, ¶ 146, that the lack of pre-filled syringes "can create" complications, ¶ 149, and that unspecified "physicians" preferred other drugs to HD because of dose flexibility, ¶¶ 147, 155–58.  But no FE specifies when these observations occurred, how long they lasted, or what impact (if any) they had on Company-wide HD sales.  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 525–26 (S.D.N.Y. 2020) (FE allegations insufficient where FEs had no access to company-wide data); *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 803 (S.D.N.Y. 2020) (FE allegations "unmoored in time" insufficient).  Plaintiff also points to FEs who recall unspecified "early market research" about these supposed issues "years" before launch, ¶¶ 138–140, 159, but provides no specifics about *what* the research said, *who* saw it, or *how* any issues actually impacted HD sales.  These types of allegations are inadequate.  *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp.

---

[10] *See, e.g.*, Ex. 14 at 9 (disclosing that Regeneron was "on track to have a permanent J-Code by April 1, 2024"); Ex. 17 at 5 (stating that Regeneron's "efforts to bring an [] HD prefilled syringe . . . remain a high priority,"); Ex. 19 at 5 (disclosing that the Company was "aware of [the] interest" in providing an option for HD dosing every four rather than eight weeks, and that Regeneron would "continue to generate clinical data" and "work with FDA" on this issue).

28

3d 711, 739 (S.D.N.Y. 2015) (disregarding FE allegations that fail to "allege the content of the reports, the date of the reports, or whether the Individual [] Defendants ever read the reports").

**Internal reports.** Plaintiff next alleges that "internal reports" showed weak HD sales, but does not identify *any actual reports*. The SAC instead cites vague recollections from FEs that "leadership" had "begun panicking" after the HD launch, ¶ 161, and "disappointment . . . began to materialize around the Company," ¶ 168, which are far too vague to support a fraud claim. *See BioScrip*, 95 F. Supp. 3d at 739. The few FEs that purportedly recall observing data provide *no facts* about any specific data, nor the Company-wide impact. FE-13, for instance, allegedly had "access" to "high level performance information" and recalled that "internal forecasts were reduced based on actual performance for at least two consecutive quarters" after HD's launch in 2023. ¶¶ 80, 166–67. But Plaintiff is required to plead *which* forecasts were reduced, for *what* periods or regions, by *how much*, or *how* this related to HD sales. *See BioScrip*, 95 F. Supp. 3d at 739. These vague allegations do not supply facts showing that any particular challenged statement was false when made. They are also irrelevant—the SAC raises no concerns with Regeneron's reported financials after HD's 2023 launch when these supposed observations of "disappointing" performance occurred, and makes no effort to connect them to supposedly "disappointing" results in late 2024/early 2025, when the fraud was supposedly "revealed."

**"Backroom" deals and "unethical" practices.** Finally, Plaintiff alleges that Defendants sought to hide weak HD demand through "backroom deals" and "unethical sales practices," which led to "unsustainable bulk purchases." ¶¶ 5, 33, 343. But there is once again not a single *factual allegation* supporting this theory. The SAC cites second-hand rumors from three low-level FEs who "heard of," "began to hear from colleagues," and were "informed" that executives met with "private-equity owned Retina Practices" to sell HD, sometimes taking a "private jet." ¶¶ 178–83.

29

As a threshold matter, these allegations must be disregarded because the FEs lack both first-hand knowledge and specifics about any meeting. *Damri* v. *LivePerson, Inc.,* 772 F. Supp. 3d 430, 450 (S.D.N.Y. 2025) (rejecting FE statements that "heavily consist of secondhand information").

More fundamentally, however, such allegations do not plead that any HD Statement is false. By referencing "unsustainable" or "bulk" sales, Plaintiff implies that Regeneron was engaged in some improper practice like channel-stuffing, *i.e.*, temporarily inflating sales to meet short-term revenue goals, while knowing the sales are not real. But no facts support any assertion that HD sales did not reflect actual demand. There are no allegations that any products were ever returned, or that any recorded revenue was ever restated. And despite all the noise about "secret" "meetings" and "deals," Plaintiff does not identify *any specific* deal, much less what was discussed or agreed to, or why confidential business negotiations are improper. The SAC *implies* there was something nefarious about selling HD to "private-equity" owned Retina Practices, but the fact that certain Retina Practices are owned by private equity does not make sales to them in any way improper. The SAC likewise suggests that Defendants induced purchases by offering such customers "rebates" and the "right of return," but does not identify or quantify *any* rebates or return rights, nor plead that Defendants offered anything different from what they offered other customers, or why such rebates and return rights would be improper. ¶¶ 173, 178, 182, 184–87.

Stripped of Plaintiff's rhetoric about "private equity" and "private jets," these allegations boil down to Defendants successfully selling large amounts of a new drug to major customers. That is not fraud—that is simply the Company's executives doing their job.[11] *See In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.,* 859 F. Supp. 2d 572, 578 (S.D.N.Y. 2012) (finding

---

[11] Because there are no factual allegations supporting the existence of "secret deals" or their impact on HD inventory levels, Plaintiff's theory that Defendants concealed that their HD inventory levels were "driven by unsustainable bulk purchases . . . as a result of Defendants' secret deals" likewise fails. *See* ¶¶ 342–43.

30

no "misleading statements" where company allegedly "failed to disclose that 'the true reasons behind [company's] financial performance were its . . . hyper-aggressive sales tactics'").

The SAC also relies on anecdotes from two employees of certain Regeneron *customers*, one of whom recalls that HD "wasn't super popular," and another of whom recalls a "build up" of HD inventory. ¶¶ 194–99. There are no allegations quantifying the significance of these customers to Regeneron or HD sales, much less ones connecting these isolated and qualitative anecdotes to the Company-wide HD rollout. These allegations thus fail to contradict public statements about HD demand and physician enthusiasm. *Supra* 9–11.

Finally, the SAC cites supposedly "unethical" sales practices, but facts supporting such allegations are almost non-existent. Two FEs vaguely explain that "Reimbursement Managers" were asked to assist with sales, which is supposedly against the rules, although the SAC doesn't explain which rules or why, nor how widespread this was. ¶¶ 188–90. And, FE-8 allegedly "was told" by someone—it is not clear who or when—to withhold information about a "new drug," and FE-7 recalls that Regeneron gave unspecified customers "incorrect reimbursement information." ¶¶ 191–92. Plaintiff does not specify the impact or timing of these alleged practices, which are not tied to any alleged misstatement and do not demonstrate any fraud.

**Opinion and puffery statements.** Much like the ASP Statements, the HD Statements are predominantly qualitative statements expressing opinions and judgment that, for example, demand and results were "strong," *e.g.*, ¶¶ 269, 317, 335, physician enthusiasm was "high," "positive," and "favorable," *e.g.*, ¶¶ 270, 323–324, 339, and Regeneron was "encouraged," *e.g.*, ¶¶ 324, 335. Plaintiff does not allege that any of these opinions were subjectively disbelieved, or identify any omitted facts about the bases for these opinions. *Supra* 18–19. These statements are also classic puffery. *See Abramson*, 965 F.3d at 173–74 (statements labeling results "encouraging" were

31

puffery); *City of Warren Police & Fire Ret. Sys.* v. *Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223 (E.D.N.Y. 2019) (statements about "strong, positive, and great" relationships were puffery).

**B.      Plaintiff Fails to Plead a Strong Inference of Scienter for the HD Theory.**

As with the ASP Theory, *supra* 21, Plaintiff does not attempt to identify *any motive* for the HD Theory, and therefore "the strength of the circumstantial allegations [of recklessness or conscious misbehavior] must be correspondingly greater." *Kalnit*, 264 F.3d at 142. To the extent Plaintiff relies on the same circumstantial allegations for the HD Theory as it does for the ASP Theory—including that Defendants supposedly discussed HD "at length" and that HD was a "core operation"—those theories fail for the same reasons discussed *supra* 24–25. The circumstantial allegations that are unique to the HD Theory, which are drawn entirely from low-level FEs who do not allege a single interaction or communication with any Individual Defendant, also fail.

1.      The FE Allegations Fail to Support an Inference of Scienter.

As discussed *supra* 28–31, the FE allegations are impermissibly vague and fail to establish *any facts* contradicting the challenged HD statements. But even if the FE allegations sufficiently pleaded that the HD Statements were false—and they do not—scienter is a separate inquiry: Plaintiff must plead facts connecting the FE allegations to specific Individual Defendants. Courts routinely dismiss securities fraud cases where, as here, no FEs communicated with senior management. *See, e.g.*, *Teladoc*, 2025 WL 886934, at *6 (no scienter where FE allegations did not sufficiently establish that senior management received contradicting information); *Eden Alpha CI LLP* v. *Polished.com Inc.*, 763 F. Supp. 3d 270, 297 (E.D.N.Y. 2025) ("The absence of any communication between the FEs and the Individual Defendants is fatal to Plaintiff's theory of scienter."). The FE scienter allegations fall generally into four categories, each insufficient:

**Isolated anecdotes not communicated to senior executives.** As discussed *supra* 28–31, the SAC relies on isolated anecdotes from (i) low-level, regional FEs who recall HD "launch

32

concerns," ¶¶ 146–67, (ii) FEs who were purportedly asked by unspecified personnel to engage in conduct they found unethical, ¶¶ 189–91, and (iii) individuals employed by Regeneron's customers who observed HD inventory "buildup" at some unspecified time before July 2024, ¶¶ 194–201. But there are no well-pleaded facts indicating that any of these individuals was in a position to observe Company-wide trends or practices. *AT&T/DirecTV Now*, 480 F. Supp. 3d at 526 ("[N]one of the [FEs] on whom Plaintiffs rely had a companywide view of AT&T's business"). In any event, these observations cannot support scienter because Plaintiff does not allege that these FEs communicated their observations or concerns to any Individual Defendant, nor that any Individual Defendant was otherwise aware of these supposed issues. *In re Canopy Growth Sec. Litig.*, 2024 WL 3445436, at *12–13 (S.D.N.Y. July 17 2024) (concluding that FE reports "[did] not support even a weak inference of scienter" when no FE alleged to have had contact with individual defendants); *Woolgar* v. *Kingstone Cos.*, 477 F. Supp. 3d 193, 237–38 (S.D.N.Y. 2020) (same).

**Unspecific and undated "data and reports."** Apart from a conclusory allegation that certain Individual Defendants "reviewed internal reports and analysis that showed weaker demand for and sales of Eylea HD," ¶160, the SAC contains *no factual allegations* supporting this inference. Instead, Plaintiff cites FEs who vaguely recall (i) that certain unspecified "forecasts" were "adjusted downwards" at an unspecified time, ¶ 165; (ii) that "high level" performance information reflected reduced internal forecasts "for at least two consecutive quarters" following HD's launch, ¶ 167; (iii) that "weekly sales reports" showed "a lot" of territories where "zero" or "a few" HD vials shipped at unspecified times, ¶ 163; and (iv) "early market research" that "predicted the issues with adoption of [] HD" years before its rollout, ¶¶ 138–40. These supposed "reports" cannot support scienter because there are no factual allegations describing *who* prepared

33

them, *when* they were prepared, *when* the FEs supposedly reviewed them, or *what* the data showed. *See City of Providence* v. *Aeropostale, Inc.*, 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013) ("sales data and reports" insufficient to support scienter absent allegations of "who prepared the reports, how frequently they were prepared, who reviewed them, and the issues discussed in the reports"). Nor does any FE allege that *any* of these reports were conveyed to or reviewed by senior management, rendering them useless for scienter. *Patel* v. *L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *10 (S.D.N.Y. Apr. 21, 2016) (no scienter where complaint did not specify what information was communicated to individual defendants); *In re DRDGOLD Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 572 (S.D.N.Y. 2007) (no scienter where complaint "fail[ed] to reference any actual reports reviewed by any specific individuals . . . on any specific dates").

**Unspecific meetings and "monitoring" financials.** Plaintiff relies on a former accountant's recollection that Regeneron's CFO would "occasionally" attend monthly accounting meetings where "various products" were discussed. ¶¶ 169–71. But the accountant does not recall *any* specific meeting, much less one attended by any Individual Defendant, much less one where HD demand was discussed. "Vaguely pleading that a 'senior executive' 'attended meetings' where some of the challenged practices were discussed . . . is insufficiently particular to satisfy the PSLRA." *Coupang*, 2025 WL 2613650, at *29; *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *18 (E.D.N.Y. Sept. 27, 2019) ("Plaintiff's allegation that [defendant] was 'in the room' where strategy discussions occurred is too vague to support an inference of scienter, as Plaintiff fails to identify when the alleged meetings occurred . . . what was said in the meetings, who said what, and whether [defendant] heard what was said."). Plaintiff nonetheless alleges that the mere existence of monthly accounting meetings somehow shows that certain Individual Defendants "closely monitored the financials of Eylea and Eylea HD." ¶¶ 410–11. But allegations

34

that Individual Defendants "monitored the sales" cannot establish scienter where, as here, "the Complaint fails to allege any particularized facts suggesting that defendants actually possessed information contradicting their public statements about the release of the [product]." *Cox* v. *Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016); *see City of Brockton Ret. Sys.* v. *Avon Prods.*, *Inc.*, 2014 WL 4832321, at *20 (S.D.N.Y. Sept. 29, 2014) (allegation that defendant reviewed "expense reports" insufficient absent facts showing he reviewed facts contradicting his statement).

**Defendants' alleged sales efforts.** Plaintiff alleges that some Individual Defendants must have known of the absence of "true" HD demand because they met with "private equity owned" Retina Practices and the CEO allegedly once called a doctor to promote HD. ¶¶ 179–87. Again, Plaintiff impermissibly relies on rumors of what FEs "heard," and there are no allegations about what happened at any meeting. *Supra* 29–30. More fundamentally, there is nothing wrong with executives meeting with significant customers to negotiate large sales of a new drug. Stripped of rhetoric about "private equity" and "private jets," this allegation boils down to executives doing their jobs and making sales. That does not support an inference of fraudulent intent. *See Gross* v. *AT&T Inc.*, 2021 WL 9803956, at *9 (S.D.N.Y. Sept. 27, 2021) ("Pushing representatives to sell does not, on its own and without more, suggest that [management] was encouraging or was aware of widespread fraud."), *aff'd*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022).

## 2.    A Non-Fraudulent Inference Is More Compelling.

Plaintiff asks the Court to infer that Defendants lied when expressing early optimism about the launch of a critical drug—which surpassed $1 billion in U.S. sales the year after its launch, and achieved record sales of $431 million in the most recent quarter, Ex. 27 at 4. As discussed *supra* 29–30, the Court should reject Plaintiff's allegations that Defendants knowingly concealed supposed "backroom deals" and unspecified "rebates"—which, without Plaintiff's pejorative rhetoric, describe negotiations by Regeneron to sell its product. The more compelling inference

35

is that Defendants engaged customers to promote Regeneron's new drug, that they did so to benefit Regeneron and its shareholders, and that the "disappointing" HD results reported in late 2024 and early 2025 are not evidence that Defendants' prior statements reporting positive "initial" demand were intended to defraud. Like with the ASP Theory, scienter is particularly difficult to infer when it would only cause Regeneron to buy back billions of its shares at inflated prices. *Supra* 21.

### C. Plaintiff Fails to Plead a Corrective Disclosure for the HD Theory.

Plaintiff seeks to recover for alleged drops following disclosure of Regeneron's 3Q24, 4Q24, and 1Q25 financial results. Like with the ASP Theory, none revealed any of the supposed "facts" underlying Plaintiff's HD Theory, such as "backroom deals," "unethical practices," "rebates," or any other alleged conduct. Rather, each disclosure simply "disclosed disappointing financials," which does not plead loss causation. *Francesca's*, 2015 WL 1600464, at *19.

*First*, while the 3Q24 results allegedly revealed disappointing HD sales, ¶ 45, Plaintiff does not allege that these results "reveal[] to the market the falsity of the prior statements" about "early" HD demand. *Francesca's*, 2015 WL 1600464, at *19.

*Second*, the alleged corrective disclosure before market-open on January 13, 2025 also reveals only allegedly disappointing 4Q24 HD results. ¶ 50. And it suffers another problem: Regeneron's stock price *increased 2.9%* on January 13. Ex. 21. Plaintiff attempts to generate a decline by measuring the difference from the close on January 10, the prior trading day, to the open on January 13—even though, for the other corrective disclosures, Plaintiff relies on purported declines over the next trading day (or days). ¶ 51. The SAC omits that the price closed *higher* at the close on January 13 than on January 10, which negates loss causation as a matter of law. *See Waters* v. *Gen. Elec. Co.*, 2020 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) (collecting cases).

Finally, the 1Q25 results, published on April 29, 2025, also purportedly revealed "disappointing" sales for EYLEA and HD. ¶¶ 52–54. Once again, however, "disappointing

36

results" alone cannot satisfy loss causation. *Supra* 27. And the disclosures of "modest" issues with inventory and physician demand in *1Q25* reveal nothing about the veracity of the challenged statements, the latest of which was made in October 2024—months before 1Q25 began. *Constr. Laborers Pension Tr. for S. California* v. *CBS Corp.*, 433 F. Supp. 3d 515, 537 (S.D.N.Y. 2020) ("It is well-established that an earlier statement is not somehow made misleading simply because it failed to foretell a . . . problem which later materialized.").

### III. Plaintiff Fails to State a Claim Under Section 10(b) and Rules 10b-5(a) and (c)

Count II of the SAC asserts "scheme liability" claims, alleging that Defendants defrauded investors through a "scheme" to "deceive the investing public" through credit card fee reimbursements and backroom deals and unethical practices. ¶¶ 465–76. These claims fail because Plaintiff fails to plead the existence of these supposed "schemes" or any Defendant's scienter for the reasons discussed *supra* 21–25, 32–36, nor that these "schemes" impacted Regeneron's share price separately from the misstatements that supposedly covered them up. *See Buhrke Family Rev. Tr.*, 726 F. Supp. 3d at 363 (dismissing scheme liability claim where plaintiffs "failed to plead scienter or any actionable misstatements," and failed to "detail any scheme separate and apart from their core misstatements theory").

### IV. Plaintiff Fails to State a Claim for Control Person Liability Under Section 20(a)

Control person claims against the Individual Defendants should be dismissed because Plaintiff fails to allege a primary violation of the Exchange Act, *Tilray, Inc.*, 2024 WL 4350118, at *15, and pleads no facts showing that any Individual Defendant culpably participated in the alleged fraud, *see S.E.C.* v. *First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

### CONCLUSION

Defendants respectfully submit that the SAC should be dismissed. Because Plaintiff has amended twice, and further amendment would be futile, dismissal should be with prejudice.

Dated:  November 17, 2025

Respectfully submitted,

_s/ Audra J. Soloway_

**PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP**

H. Christopher Boehning
Audra J. Soloway
David P. Friedman
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, New York 10019–6064
Tel: (212) 373–3289
Fax: (212) 492–0289
cboehning@paulweiss.com
asoloway@paulweiss.com
dfriedman@paulweiss.com
dsinnreich@paulweiss.com

_Counsel for Defendants_

38

**CERTIFICATION**

I hereby certify that the foregoing Memorandum of Law, exclusive of the caption, table of contents, table of authorities, and the signature block, is 37 pages, in accordance with the page limit requested by Defendants' Letter Motion for Leave to File Excess Pages, Dkt. 57, to which Plaintiff does not object.  I further certify that the foregoing Memorandum of Law complies with the formatting requirements set forth in Local Civil Rule 11.1.

*/s/ Audra J. Soloway*
Audra J. Soloway