# Exhibit 4

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* JULIANNE NUNNELLY and MATTHEW SHANKS<br><br>  Plaintiffs,<br><br>v.<br><br>REGENERON PHARMACEUTICALS, INC.,<br><br>  Defendant. | 1:20-cv-11401-PBS<br><br>Leave to file granted on 06/07/2024 |

**DEFENDANT REGENERON'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS**

pay with a credit card based on some combination of convenience, cash-back or other rewards, or keeping money in the bank during the payment cycle. But no one—not even Plaintiffs—has suggested that merely charging a single price regardless of payment method (without assessing a surcharge for paying with a credit card) constitutes a price concession when sales are made by manufacturers directly to purchasers. Nor could they, since charging customers a single cash-or-credit price regardless of payment method is the opposite of giving a select subset of customers a price concession. Nor have Plaintiffs suggested that manufacturers must—or even could—account for the varying rewards and benefits doctors receive for using credit cards in transactions with distributors. A manufacturer's decision to reimburse its distributors for the actual costs of processing credit card payments does not transform the credit card purchases into discounts or otherwise constitute a price concession. The reimbursement of costs actually incurred looks nothing like a price concession. That should end the matter.

**B. Reimbursing Distributors For Credit Card Processing Fees Is Not Remotely A "Price Concession."**

Even if there were some seventh form of price concession that manufacturers must include even in the absence of statutory direction or agency rulemaking, reimbursing distributors for the cost of credit card processing fees would not be it. That is because reimbursing distributors for the actual cost financial institutions charge them to process credit card transactions is not offering a "price concession." *See, e.g.*, *Concession*, Webster's Third New International Dictionary (2002) ("a reduction in price from the current price"); 3 Health Care Law Sourcebook § 447.502 ("discount or rebate"). To the contrary, Regeneron is reimbursing expenses that its distributors actually incur as part of the process of distribution (i.e., getting Regeneron's products to its customers) in order to charge a single price without concessions for cash, credit, check, or wire.

All of the statutorily enumerated categories, by contrast, result in a particular purchaser paying less per unit than what everyone else pays. A "volume discount" is a "price decrease based on a large-quantity purchase"; if you buy more than the average purchaser, you pay less per unit. *Volume Discount*, Black's Law Dictionary (11th ed. 2019). A "prompt pay discount" allows buyers in industries where buyers typically do not pay upfront to pay less per unit if they do. *See* 3 Health Care Law Sourcebook § 447.502. "Rebates" are per-unit "discount[s]" "given retrospectively." *Rebate*, Oxford English Dictionary Online, https://tinyurl.com/f68t44hv. A "free good contingent on any purchase requirement" gives buyers a right to obtain additional goods for no additional charge, reducing the price paid per item. A "chargeback" in this context refers not to reversing a transaction that a buyer did not actually intend, *see Charge-back*, Black's Law Dictionary (11th ed. 2019), but to the mechanism by which a manufacturer reimburses a distributor for a price concession the distributor extends to an end-purchaser on the manufacturer's behalf. *See* Cong. Budget Off., Pub. No. 2703, *Prescription Drug Pricing in the Private Sector* 13 n.27 (Jan. 2007), https://tinyurl.com/jnj4jdpp.[7] Finally, "cash discount" can mean one of two things—a discount for paying in cash,[8] or a discount for paying upfront (regardless of payment method)[9]—both of which reduce the price paid per item.

---

[7] *See generally City of Providence v. Barr*, 954 F.3d 23, 34 (1st Cir. 2020) ("[W]ords grouped in a list should be given related meaning." (citation omitted)).

[8] *See, e.g.*, 15 U.S.C. § 1666f.

[9] *See Cash Discount*, Black's Law Dictionary (11th ed. 2019) ("A reduction from the stated price if the bill is paid on or before a specified date."), *Cash Discount*, American Heritage Dictionary (5th ed. 2022) ("A reduction in the price of an item for sale allowed if payment is made within a stipulated period."); *Cash Discount*, Webster's Third New International Dictionary (1968) ("[A] discount granted in consideration of immediate payment or payment within a  prescribed time."); *see also Eby-Brown Co. v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 213 F. Supp. 2d 993, 1008 (W.D. Wis. 2001) (citing similar definitions).

Again, charging a single cash-or-credit price is the opposite of a price concession. And reimbursing the fees that financial institutions actually charge distributors to process credit card transactions is likewise nothing like a price concession. Rather, it is a reimbursement of actual expenses that facilitates maintaining a single cash-or-credit price charged to all doctors without concessions. Indeed, because processing credit card transaction fees actually costs money (just like shipping goods from point A to point B), reimbursing that cost simply ensures that physicians pay *the same price* no matter what payment method they use—as Plaintiffs themselves acknowledge. *See, e.g.*, Compl. ¶ 2 (alleging that Regeneron "pa[ys]" these "fees so that doctors and retina practices that purchase[] Eylea c[an] use credit cards at no additional cost"); *id.* ¶ 59 (similar). That readily explains why Congress did not include reimbursing credit card processing fees on the list—and it confirms why CMS's only regulatory intervention was to make clear that bona fide service fees should not be included in ASP, *infra* pp. 8, 21. After all, conduct that results in a single cash-or-credit price that customers pay regardless of payment method is not a concession that results in some purchasers paying a lower price based on payment method.

Perhaps recognizing this fundamental difficulty with their theory, Plaintiffs obliquely suggest that reimbursing credit card processing fees incurred by a distributor is akin to a "cash discount." *See* Compl. ¶¶ 75-76. But it is telling that Plaintiffs cannot actually bring themselves to assert that Regeneron offered a "cash discount." In reality, a credit card processing fee is an expense, not a price concession or anything like it, and charging customers a single cash-or-credit price is literally the opposite of a cash discount. *See Texaco, Inc. v. Hughes*, 572 F. Supp. 1, 7 (D. Md. 1982) (holding that credit card processing fees "are not cash discounts" under the Cash

Discount Act, but rather are "an 'extra' charge *imposed*" by financial institutions (emphasis added)).[10]

### C. Had Congress Wanted The Manufacturer's Average Sales Price To Account For Credit Card Rewards Earned By Purchasers, It Would Have Said So.

Finally, Plaintiffs try to salvage their allegations by suggesting that credit card reward programs change the calculus. *See, e.g.*, Compl. ¶¶ 2, 10, 54. They do not. The fact that financial institutions provide a service that is costly to sellers yet can result in rewards for purchasers has nothing to do with Regeneron (or distributors). Credit card rewards are beyond the control of a seller of a good, whether that seller is a pharmaceutical manufacturer or a pizza parlor. And the extent of the rewards vary from purchaser to purchaser. One customer may receive travel rewards, another 1% cash-back, another 2% cash-back but only on certain purchases, and another may earn nothing at all. When a pizza parlor charges a single cash-or-credit price, no one thinks they are, in fact, offering customers a range of different discounts just by allowing customers to pay with plastic. That is because, whatever the arrangement between customers and their credit card providers, the pizza parlor is not charging more than one price. The reality is no different with doctors purchasing EYLEA, and nothing in the ASP statute even remotely suggests that manufacturers must include in ASP the rewards that *some other party* offers for using that third party's product as a payment device. For good reason, as ASP is a calculation of a *manufacturer's* average *sales* price, and manufacturers neither offer credit card rewards in their sales nor have much (if any) visibility into who may or may not receive them and in what amounts.

---

[10] Furthermore, all the claims identified in the United States' complaint are from physicians in Massachusetts, *see* Compl. ¶ 131, which, as noted above, prohibits passing on credit card transaction fees to consumers. Not imposing an upcharge on customers *that is legally prohibited* cannot under any under any circumstance be considered a "discount," let alone a "cash discount."

It is no surprise, then, that not even Plaintiffs seem to think that merely allowing doctors to use credit cards (and receive rewards) to pay a single cash-or-credit price alone constitutes a price concession without regard to whether the transaction fees are reimbursed. And reimbursing fees actually incurred by distributors is not a price concession to the doctors. The amount of the reimbursed fees is different from the amount of the rewards earned by doctors—and neither amount represents a price concession that must be included in ASP.

## II. Credit Card Processing Fees Need Not Be Included In ASP For The Independent Reason That They Are Bona Fide Services Fees.

Plaintiffs' claims fail for yet another independent reason: Credit card processing fees are textbook bona fide service fees, such that they "are not considered price concessions." 42 C.F.R. § 414.804(a)(2)(ii). Under 42 C.F.R. § 414.802, "bona fide service fees" are "fees paid by a manufacturer to an entity, that [1] represent fair market value for a [2] bona fide, [3] itemized service [4] actually performed on behalf of the manufacturer [5] that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and that [6] are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug." Credit card processing fees plainly and unsurprisingly meet each of those criteria.

*1. Fair Market Value.* Plaintiffs do not dispute that when Regeneron reimburses credit card processing fees incurred by its distributors, Regeneron pays fair market value. Nor could they: Regeneron pays the "Actual Cost" of such fees. *See, e.g.*, Compl. Ex. 2 at 32.

*2. Bona Fide Service.* Plaintiffs allege that the service at issue is "pay[ing] distributors to accept credit cards without charging customers more" and contend that *that* fee is not bona fide. Compl. ¶ 95. That argument is doubly wrong. The actual service at issue is the one that financial institutions perform when they securely process credit card transactions. And both that service and the separate services Regeneron pays its distributors to perform are clearly bona fide.

21

As the United States' exhibits show, Regeneron pays its distributors a set distribution fee for services that include account setup, invoicing, and order processing. *See* Compl. Ex. 2 at 28. This distribution fee covers the services that Regeneron's distributors perform when they accept credit cards, including setting up the customer's account and billing the customer when they use a credit card. And *Plaintiffs agree* that these are all "bona fide distribution services." Compl. ¶ 94.

Regeneron separately pays distributors the "Actual Cost" of "Credit card fees *charged by bank/processing company*." Compl. Ex. 2 at 32 (emphasis added). Plaintiffs do not dispute that credit card processing is a bona fide service. Nor could they. The FDIC and IRS have consistently acknowledged the indisputable reality that banks and other financial institutions provide a valuable "service" to merchants and customers alike when they process credit card transactions.[11] Indeed, if financial institutions were not providing a valuable service when buyers swiped, then no one would pay the fee they impose. But financial institutions do charge to process credit card transactions for the simple reason that securely and expeditiously processing credit card transactions is enormously complicated, and enormously consequential for all parties. *Supra* p. 6.

Plaintiffs nonetheless seem to argue that these fees are not bona fide because *distributors* do not perform the service. *See* Compl. ¶ 94. But nothing in § 414.802 says that services must be performed by the distributor. Nor would such a limitation make sense. Bona fide services may be provided by many different entities, including the shippers that pick up EYLEA from a distributor and take it to a physician. *See* Compl. Ex. 2 at 34. Indeed, Plaintiffs *agree* that the distribution fee Regeneron pays distributors is bona fide, Compl. ¶ 94, and that fee *includes* shipping by

---

[11] As the FDIC has explained, credit card processing involves significant risk for financial institutions, including credit and liquidity risk. *See* FDIC Manual, *supra*, at 174. The IRS has likewise described card processing fees as fees that are charged "in connection with the services performed" by financial institutions. *See* Rev. Rul. 78-40, 1978-1 C.B. 136, at *1 (1978).

"express carrier"—a service provided by a third-party shipping company, not the distributor. Compl. Ex. 2 at 35 (Ex. E at 2(b)). There is no basis to distinguish between third-party-imposed shipping fees and third-party-imposed credit card processing fees. When Regeneron reimburses its distributors for the credit card processing fees they incur, it is paying for a bona fide service no less than when it reimburses distributors for other third-party-imposed costs like shipping fees.

*3. Itemized.* Plaintiffs do not dispute that credit card processing fees are itemized. That is because they indisputably are itemized. *See, e.g.*, Compl. Ex. 14 at 3 (invoice itemizing credit card processing fees).

*4. Actually Performed on Behalf of the Manufacturer.* Plaintiffs allege that the "service" of "acceptance of credit cards without a fee" was "performed on behalf of customers—not Regeneron." Compl. ¶¶ 96-97. Again, that is not a service Regeneron pays for; the service at issue is credit card processing. And that service is unquestionably performed by financial institutions for distributors on Regeneron's behalf.[12]

Accepting Plaintiffs' contrary theory would mean that even ordinary shipping fees are not "on behalf of the manufacturer." After all, Regeneron's distributors arrange for third-party shipping companies to take EYLEA from their warehouses and deliver it to physicians, and the shipping companies charge for that service. *See* Compl. Ex. 2 at 35 (Ex. E at 2(b)). There is no difference between that service (which enables Regeneron to get its products to customers) and the service financial institutions perform by processing credit card transactions involving EYLEA. Both are on Regeneron's behalf *because they enable Regeneron to get its products to customers*.

---

[12] To the extent Plaintiffs are arguing that any service that benefits Regeneron's customers is not "on behalf" of Regeneron, that is inconsistent with 42 C.F.R. § 414.802 (and common sense). The regulation asks only whether a service is performed on Regeneron's behalf, not whether it also benefits Regeneron's customers. That makes sense, as nearly any service performed in the process of getting a product to end-purchasers benefits both the manufacturer and its ultimate customers.

*5. That The Manufacturer Would Otherwise Perform (Or Contract For).* Plaintiffs allege that "Regeneron knew it did not have to perform or contract for the 'service' of causing distributors to waive costs to customers for using credit cards in order for Eylea to be distributed." Compl. ¶ 101. That again confuses the service at issue. Credit card processing is not free. So as long as Regeneron did not want to impose a surcharge for accepting credit cards, either Regeneron or its distributors would have to cover the processing fee as an expense (just as countless merchants across the country do). And since the distributors are the ones actually processing the transactions and incurring the expense on Regeneron's behalf, it makes perfect sense that Regeneron reimburses these expenses. But they are a quintessential expense that—absent the distributor's role—Regeneron would otherwise contract for.

The United States attached to its complaint a document showing that physicians purchased Lucentis, a competing drug, directly from the manufacturer (Genentech) *using credit cards*— showing that credit card processing is a crucial service that manufacturers contract for in this industry. *See* Compl. Ex. 38 at 23. Plaintiffs allege, moreover, that doctors would have continued to "use credit cards for their Eylea purchases" *even if* they had to pay a surcharge reflecting the cost of credit card processing, Compl. ¶ 101, underscoring that Regeneron would have contracted for credit card processing *even if* it sold directly to doctors and charged a surcharge for credit card transactions. Plaintiffs thus have not alleged—and could not plausibly allege—that Regeneron would not have contracted with financial institutions to provide credit card processing if Regeneron's distributors did not do so on Regeneron's behalf.

*6. Not Passed On.* CMS has directed that "the manufacturer may presume, in the absence of any evidence or notice to the contrary, that the fee paid is not passed on to a client or customer of any entity." 71 Fed. Reg. at 69,669. Plaintiffs do not allege, let alone point to any evidence,

24

that credit card processing fees were indeed passed on to physicians. Nor could they: The whole thrust of their claim is that Regeneron's reimbursement practice ensured that the fees *were not* passed on.

Plaintiffs nonetheless assert that "Regeneron knew its payments were passed on to customers in two ways: (1) the lower, subsidized prices customers paid when they used credit cards to purchase Eylea from distributors, and (2) the 'cash back' and credit card rewards Eylea customers received from those purchases." Compl. ¶ 104. That argument is contrary to the text of the regulation, which makes clear that the relevant question is whether the bona fide service fees are "passed on in whole or in part to a client or customer of an entity." 42 C.F.R. § 414.802. The question is *not* whether customers received some other benefit—i.e., paid "lower, subsidized prices"[13] (which they did not) or received "'cash back' and credit card rewards"—as a result of Regeneron's reimbursement practice. *Contra* Compl. ¶ 104. The question is whether the credit card processing fee *itself* was passed on to doctors. 42 C.F.R. § 414.802; *see, e.g.*, *United States ex rel. Streck v. Bristol-Myers Squibb Co.*, 2018 WL 6300578, at \*10 (E.D. Pa. Nov. 29, 2018) (analyzing whether the "fees at issue" were passed on). And here, it indisputably was not.

Once again, Plaintiffs appear to think there is something problematic about the fact that many physicians affirmatively prefer to use credit cards and that reimbursing processing fees incurred by distributors facilitates that preference. But the same could be said of any number of services and the bona fide fees that cover them. Doctors also prefer to get shipping at no additional charge—and a distributor that incurs actual expenses in supplying that service may be reimbursed by manufacturers without triggering a requirement that the manufacturer treat the costs of shipping

---

[13] In all events, and as explained at length above, Plaintiffs have not plausibly alleged that physicians who paid with a credit card paid a lower price. Plaintiffs themselves allege that Regeneron's distributors charged physicians the *same price* regardless of payment method.

as price concessions that must be included in (i.e., subtracted from) ASP. The result is no different when the reimbursed fees are credit card transaction fees, rather than shipping fees.

Unable to distinguish third-party-imposed credit card transaction fees from third-party-imposed shipping fees (and other textbook bona fide service fees), Plaintiffs insist that physicians benefit in a material and distinct way when they use credit cards to purchase prescription drugs. But this is neither secret nor nefarious—and it has nothing to do with price concessions or whether paying the cost of processing credit card transactions are bona fide service fees. Every day, millions of Americans seek reimbursement for expenses paid for by credit card without accounting for rewards or cash-back, and no one thinks that they are all committing mail or wire fraud. Yet if this Court were to hold that Regeneron *is* committing fraud by failing to account for credit card reward points secured by physicians in transactions with their credit card company (in which Regeneron has no direct involvement), then everyone who *is* a party to a credit card transaction and later seeks reimbursement for their expenses without accounting for any credit card rewards they may have received is a fraudster *a fortiori*. Accepting Plaintiffs' view would thus create traps for the unwary and put millions of Americans in legal jeopardy.[14]

If Congress wanted to deviate from the general understanding that businesses may set a single price for all purchasers, regardless of the form of payment, it could and should have said so. But nowhere in the ASP statute does Congress require manufacturers to account for fees charged by credit card companies or the rewards offered by those companies—things that have nothing to do with manufacturers (or their distributors). For the government to treat that unobjectionable practice as the basis for a massive FCA recovery is unjustified and fundamentally unfair. *See*

---

[14] To be sure, the ASP formula may be more complicated than the typical employer-reimbursement scheme. But that just underscores the necessity of providing clear guidance before deeming fraudulent (and the basis for essentially punitive liability) a common societal practice.

*Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 279 (2007) (rejecting treble-damages liability where "a fine, complex, detailed line separates activity that the [government] permits or encourages … from activity that the [government] must (and inevitably will) forbid"). The government had every opportunity to provide clear guidance on this matter. Having failed to do so, it should not be allowed to ambush Regeneron (or other manufacturers) with the theory that a common and unobjectionable practice is fraudulent.

In summary, when Regeneron reimburses credit card processing fees incurred by its distributors, it is not offering a discount or anything like it. It is simply *paying the cost of a service* performed by financial institutions that process credit card transactions. *Supra* pp. 6, 21-22. Regeneron reimburses credit card processing fees at cost, *see* Compl. Ex. 2 at 32, making distributors whole for a fee they incur when distributing Regeneron's products. Regeneron pays for many other services that are performed by distributors or third parties, ranging from account setup to returns to shipping. *Supra* pp. 5-6, 22-23. Credit card processing fees are no different, and are not price concessions.

## III. Regeneron's Interpretation Was At The Very Least Reasonable—And In This Context, A Reasonable Interpretation Cannot Be False Or Fraudulent.

The FCA does not impose liability unless a claim is "false or fraudulent." 31 U.S.C. § 3729(a)(1). And because something is neither false nor fraudulent unless it is untrue, the First Circuit (like many courts) has held that "statements as to conclusions about which reasonable minds may differ cannot be false," full stop, and thus cannot give rise to FCA liability. *Brigham & Women's Hosp.*, 678 F.3d at 87 (citation omitted). That standard applies here and makes this an easy case. Even if (contrary to all the arguments above) the Court disagrees with Regeneron about the *best* reading of the ASP statute and corresponding regulations, Regeneron's interpretation was

27

of the conspiracy"—which means that this claim too must be dismissed.  *United States ex rel. Leysock v. Forest Lab'ys, Inc.*, 55 F. Supp. 3d 210, 221 (D. Mass. 2014); *see also United States ex rel. Hagerty v. Cyberonics, Inc.*, 95 F. Supp. 3d 240, 270 (D. Mass. 2015) ("[C]onspiracy cannot be between the corporation and its officers and employees.").  That claim, therefore, fails as well.

## VII. Plaintiffs' Unjust Enrichment Claims Fail As A Matter Of Law.

The United States and the Intervening States allege unjust enrichment claims in addition to their FCA and state FCA claims.  These claims all fail because each Plaintiff has an adequate remedy at law—the FCA and its state analogues—and "a party with an adequate remedy at law cannot claim unjust enrichment."  *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017).  Judges in this District "routinely dismiss[] unjust-enrichment claims" when brought as a companion to an FCA suit.  *E.g.*, *United States v. Regeneron Pharms., Inc.*, 2023 WL 6296393, at *14 (D. Mass. Sept. 27, 2023) (doing so, and collecting cases).  This Court should do the same.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims should be dismissed with prejudice.

Dated:  July 18, 2024

Respectfully submitted,

REGENERON PHARMACEUTICALS, INC.

By its attorneys,

Paul D. Clement (admitted *pro hac vice*)
Matthew D. Rowen (admitted *pro hac vice*)
Kevin Wynosky (admitted *pro hac vice*)
CLEMENT & MURPHY, PPLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
matthew.rowen@clementmurphy.com
kevin.wynosky@clementmurphy.com

/s/ Katherine B. Wellington
Katherine B. Wellington (BBO No. 688577)
Gregory F. Noonan (BBO No. 651035)
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
(617) 371-1000
katherine.wellington@hoganlovells.com
gregory.noonan@hoganlovells.com

Gejaa T. Gobena (admitted *pro hac vice*)
Mitchell J. Lazris (admitted *pro hac vice*)
Emily M. Lyons (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth St. NW
Washington, D.C. 20004
(202) 637-5600
gejaa.gobena@hoganlovells.com
mitch.lazris@hoganlovells.com
emily.lyons@hoganlovells.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the Court's CM/ECF system on July 18, 2024 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Katherine B. Wellington*