**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFREY RADTKE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br>    vs. <br><br> REGENERON PHARMACEUTICALS, INC., LEONARD S. SCHLEIFER, CHRISTOPHER FENIMORE, ROBERT E. LANDRY, AND MARION MCCOURT <br><br> Defendants. | No. 1:25-cv-00145-MKV |

**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 4

    A.    Defendants Misrepresented the Reasons Behind Eylea's Success ......................... 4

    B.    Defendants Overstated Demand for Eylea HD ...................................................... 6

    C.    As the Truth Emerged, Investors Sustained Billions of Dollars in Losses ............ 10

LEGAL STANDARD ........................................................................................................ 11

ARGUMENT ..................................................................................................................... 14

I.      The SAC Adequately Pleads a Strong Inference of Scienter ................................. 14

    A.    The SAC Adequately Pleads Scienter Related to the Credit Card Scheme ........... 14

        1.    Factual Allegations from the DOJ Action Support Scienter ...................... 14

        2.    Context and Content of Defendants' Statements Support Scienter ........... 17

        3.    The Core Operations Doctrine Supports Scienter ..................................... 17

        4.    A Holistic Review of the Allegations Supports Scienter ........................... 18

    B.    The SAC Adequately Pleads Scienter Related to Eylea HD ................................. 19

        1.    FE Accounts Contribute to an Inference of Scienter ................................. 19

        2.    Plaintiff's Other Allegations Support Scienter ......................................... 23

        3.    A Holistic Review of the Allegations Supports Scienter ........................... 24

II.    The SAC Adequately Pleads Scheme Liability ................................................... 24

III.   The SAC Adequately Pleads Falsity and Materiality ........................................... 25

    A.    Defendants Misled Investors About Eylea's Success ........................................... 25

    B.    Defendants' Misstatements and Omissions Concealed Eylea HD's Slow
        Adoption Rate and Weak Demand ...................................................................... 31

IV.   The SAC Adequately Pleads Loss Causation ..................................................... 32

V.    The SAC Adequately Pleads Control-Person Liability Under § 20(a) .............................. 37

CONCLUSION ................................................................................................................. 37

i

## TABLE OF AUTHORITIES

**CASES**

*Abramson v. NewLink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ........................................................................................ 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................................... 12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................................... 12

*Boston Retirement System v. Alexion Pharmaceuticals, Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)............................................................................ 30

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .................................................................................... 36

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
750 F.3d 227 (2d Cir. 2014) .................................................................................. 32, 34

*City of Hialeah Employees' Retirement System v. Peloton Interactive, Inc.*,
153 F.4th 288 (2d Cir. 2025) ........................................................................ 12, 29, 32

*City of Hollywood Police Officers' Retirement System v. Henry Schein, Inc.*,
552 F. Supp. 3d 406 (E.D.N.Y. 2021) ........................................................................... 23

*City of Omaha Police & Fire Retirement System v. Evoqua Water Technologies Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) .................................................................... 19, 31

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ........................................................................................ 28

*City of Warren Police & Fire Retirement System v. World Wrestling Entertainment Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) ........................................................................... 24

*City of Westland Police & Fire Retirement System v. MetLife, Inc.*,
928 F. Supp. 2d 705 (S.D.N.Y. 2013) ........................................................................... 37

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)...................................................................................................... 33

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ........................................................................................ 29

*Employees' Retirement System of Government of the Virgin Islands v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ........................................................................................ 12

*Fila v. Pingtan Marine Enterprise Ltd.*,
195 F. Supp. 3d 489 (S.D.N.Y. 2016) ........................................................................... 33

*Freudenberg v. E*Trade Financial Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................................... 21, 35

*Galvstar Holdings, LLC, DSB v. Harvard Steel Sales, LLC*,
722 F. App'x 12 (2d Cir. 2018) .................................................................................... 11

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) ............................................................................................ 26

*Gimpel v. The Hain Celestial Grp., Inc.*,
  156 F.4th 121 (2d Cir. 2025) ................................................................................... passim

*Hildene Capital Management, LLC v. Friedman, Billings, Ramsey Grp., Inc.*,
  2012 WL 3542196 (S.D.N.Y. Aug. 15, 2012) .......................................................... 19

*In re Avon Securities Litigation*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ..................................................... 17, 21

*In re Citigroup Inc. Securities Litigation*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) ...................................................................... 24

*In re Coventry Healthcare, Inc. Securities Litigation*,
  2011 WL 1230998 (D. Md. Mar. 30, 2011) ............................................................ 32

*In re Evolus Inc. Securities Litigation*,
  2024 WL 4306786 (S.D.N.Y. Sept. 26, 2024) ........................................................ 30

*In re Gentiva Securities Litigation*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...................................................................... 29

*In re Grand Jury Subpoenas Returnable December 16, 2015*,
  871 F.3d 141 (2d Cir. 2017) ...................................................................................... 37

*In re Mylan N.V. Securities Litigation*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ......................................................... 24

*In re Omega Healthcare Investors, Inc. Securities Litigation*,
  563 F. Supp. 3d 259 (S.D.N.Y. 2021) ...................................................................... 35

*In re Omnicom Group, Inc. Securities Litigation*,
  597 F.3d 501 (2d Cir. 2010) ...................................................................................... 33

*In re Sadia, S.A. Securities Litigation*,
  643 F. Supp. 2d 521 (S.D.N.Y. 2009) ...................................................................... 15

*In re Solucorp Industries, Ltd. Securities Litigation*,
  2000 WL 1708186 (S.D.N.Y. Nov. 15, 2000) ......................................................... 37

*In re STMicroelectronics N.V. Securities Litigation*,
  2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025) ........................................................ 31

*In re Synchrony Financial Securities Litigation*,
  988 F.3d 157 (2d Cir. 2021) ................................................................................ 11, 12

*In re Teva Securities Litigation*,
  671 F. Supp. 3d 147 (D. Conn. 2023) ................................................................. 26, 27

*In re Vale S.A. Securities Litigation*,
  2017 WL 1102666 (S.D.N.Y. Mar. 23, 2017) ......................................................... 14

*In re Vivendi, S.A. Securities Litigation*,
  838 F.3d 223 (2d Cir. 2016) ........................................................................... 13, 32, 37

*In re Walmart Inc. Securities Litigation*,
151 F.4th 103 (3d Cir. 2025) ................................................................................................ 27

*Institutional Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) ................................................................................................. 17

*Kuriakose v. Federal Home Loan Mortgage Corp.*,
897 F. Supp. 2d 168 (S.D.N.Y. 2012) ................................................................................. 14

*Litwin v. Blackstone Group, L.P.*,
634 F.3d 706 (2d Cir. 2011) ................................................................................................. 29

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
797 F.3d 160 (2d Cir. 2015) ................................................................................................. 14

*Lorenzo v. Securities & Exchange Commission*,
587 U.S. 71 (2019)................................................................................................................ 13

*Menaldi v. Och-Ziff Capital Management Group LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016) ................................................................................. 27

*Merritt v. Molecular Partners AG*,
2024 WL 495140 (S.D.N.Y. Feb. 5, 2024)........................................................................... 27

*Miller v. Brightstar Asia, Ltd.*,
2023 WL 8432856 (S.D.N.Y. Dec. 5, 2023) ....................................................................... 16

*New York City Public Pension Funds v. Coupang, Inc.*,
2025 WL 2613650 (S.D.N.Y. Sept. 10, 2025)...................................................................... 28

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000) ................................................................................................. 20

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019) .................................................................................... 29

*Oklahoma Firefighters Pension & Retirement System v. Six Flags Entertainment Corp.*,
58 F.4th 195 (5th Cir. 2023) ................................................................................................. 23

*Ontario Teachers' Pension Plan Board v. Teva Pharmaceutical Industries Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019)................................................................................... 33

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019) ................................................................................................. 31

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) ........................................................................................ 12, 13, 25

*Puddu v. 6D Global Technologies, Inc.*,
2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ................................................................ 27, 28

*Roofers Local No. 149 Pension Fund v. Amgen Inc.*,
751 F. Supp. 3d 330 (S.D.N.Y. 2024) ................................................................................. 27

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024) ...................................................................... 15, 17, 35

iv

*Securities & Exchange Commission v. Rio Tinto plc*,
2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ......................................................................... 31

*Sharette v. Credit Suisse International*,
127 F. Supp. 3d 60 (S.D.N.Y. 2015) ...................................................................................... 13

*Sheet Metal Workers Local 32 Pension Fund v. Terex Corp.*,
2018 WL 1587457 (D. Conn. Mar. 31, 2018) ........................................................................ 22

*Sherman v. Abengoa, S.A.*,
156 F.4th 152 (2d Cir. 2025) .................................................................................................. 15

*Siverls-Dunham v. Seung Huen Lee*,
2006 WL 510504 (S.D.N.Y. Feb. 27, 2006) ........................................................................... 25

*Sjunde AP-Fonden v. General Electric Co.*,
2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023) ....................................................................... 36

*Sjunde AP-Fonden v. Goldman Sachs Group, Inc.*,
545 F. Supp. 3d 120 (S.D.N.Y. 2021) .................................................................................... 19

*Solomon v. Sprint Corp.*,
2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) .......................................................................... 12

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ............................................................................. 18

*Swanson v. Interface, Inc.*,
2022 WL 2003990 (E.D.N.Y. June 6, 2022) .......................................................................... 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................................................ 13

*United States ex rel. Nunnelly v. Regeneron Pharmaceuticals, Inc.*,
780 F. Supp. 3d 336 (D. Mass. 2025) ..................................................................................... 16

*Villella v. Chemical & Mining Co. of Chile Inc.*,
2017 WL 1169629 (S.D.N.Y. Mar. 28, 2017) ........................................................................ 29

*Washtenaw County Employees Retirement System v. Celera Corp.*,
2012 WL 3835078 (N.D. Cal. Sept. 4, 2012) ......................................................................... 23

*Waters v. General Electric Co.*,
2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010) ....................................................................... 36

*zCap Equity Fund LLC v. LuxUrban Hotels Inc.*,
2025 WL 2097951 (S.D.N.Y. July 25, 2025) ......................................................................... 18

**REGULATIONS**

17 C.F.R. § 240.10b-5(a) .............................................................................................................. 25

17 C.F.R. § 240.10b-5(c) .............................................................................................................. 25

42 C.F.R. § 414.802 ..................................................................................................................... 16

## GLOSSARY OF DEFINED TERMS

Unless otherwise noted, all defined terms are the same as used in the Complaint.

| TERM | DEFINITION |
|---|---|
| ASP | Average Sales Price |
| Avastin | An Eylea competitor drug manufactured by Genentech |
| BFSFs | Bona Fide Service Fees |
| buy-and-bill model | A healthcare system where a provider purchases specialty drugs or devices, administers them to a patient, and then bills the patient's insurer for the product and associated services. This model gives providers control over the medication's life cycle, from procurement to administration, which can improve inventory management and patient outcomes. However, it also requires the provider to handle the financial risk of purchasing drugs upfront and managing potential delays in reimbursement. |
| CID | Civil Investigative Demand |
| CMS | Centers for Medicare & Medicaid Services |
| Complaint or SAC | Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 54); References to "¶_" are to paragraphs in the Complaint. |
| DOJ | U.S. Department of Justice |
| DOJ Complaint | United States' Complaint in Intervention Against Regeneron Pharmaceuticals, Inc. filed on March 28, 2024, in the action *United States of America v. Regeneron Pharmaceuticals, Inc.*, No. 1:20-cv-11401 (D. Mass. July 24, 2020). |
| Eylea | A prescription eye injection used to treat wet age-related macular degeneration |
| Eylea HD | A high-dose form of Eylea |
| FCA | False Claims Act |
| FDA | U.S. Food and Drug Administration |
| FE(s) | Former Employee(s) |
| HIPAA | Health Insurance Portability and Accountability Act of 1996. A federal law that protects sensitive patient health information and ensures the portability of health insurance coverage. |
| J-Code | A code used by CMS to bill for a wide variety of drugs administered by injection, infusion, or inhalation, as well as other non-orally administered medications. J-Codes ensure standardized, accurate billing for these services by linking a specific drug to its billing unit. |
| Lucentis | An Eylea competitor drug manufactured by Genentec and Novartis |
| Mem. | References to "Mem. _" are to pages of the Memorandum of Law in Support of Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 59). |
| SOP | Standard Operating Procedure |
| PE Firm(s) or Practices | Private Equity Firm(s) or Practices |
| PHI | Protected Health Information |

| TERM | DEFINITION |
|---|---|
| Prism | A Chicago-based private equity firm |
| RCA | Retina Consultants of America |
| Retina Practice(s) | Any physician or doctor's office that treated patients with Wet AMD, including retina surgeons, injecting ophthalmologists, and their practices. ¶9 n.3. |
| SOX Certification | The personal certification of financial reports by top executives as required by the Sarbanes-Oxley Act (SOX), and professional certifications for individuals that validate expertise in SOX compliance. |
| Vabysmo | A competitor drug to Eylea HD manufactured by Genentech |
| Wet AMD | An advanced form of age-related macular degeneration ("AMD") characterized by the rapid growth of abnormal, fragile blood vessels beneath the retina. These vessels leak blood or fluid into the macula, a part of the retina, leading to rapid and severe central vision loss. Symptoms include distorted vision, blurry spots, and difficulty seeing colors. |
| ZS or ZS Associates | A management consulting and technology firm that helps companies improve sales, marketing, and business strategy. |

**PRELIMINARY STATEMENT**

This case arises from Defendants' false and misleading statements and other deceptive conduct concerning Regeneron's flagship drug, Eylea, and its successor Eylea HD. During the Class Period, Defendants publicly touted the ostensible reasons these drugs constituted a successful franchise: in the case of Eylea, Defendants highlighted its supposedly superior "*clinical*" and "*product profile*"; for Eylea HD, Defendants bragged of apparent "*strong initial demand*" from physicians. Investors would later learn, however, that these and other claims were only part of the story, and that certain unethical, undisclosed, and in some cases illegal business practices materially contributed to Eylea's and Eylea HD's (supposed) success. When the truth was finally revealed through a series of disclosures, investors suffered billions in losses.

Plaintiff acknowledges Eylea is a useful drug to treat age-related macular degeneration (or Wet AMD) and other eye diseases, and that sales of the drug have generated significant revenues for Regeneron. Where the parties disagree is on the accuracy of information provided to investors as to *how* Eylea and Eylea HD sales were achieved before and during the Class Period. As the DOJ has alleged and as recounted in the SAC, to help achieve Eylea sales, Defendants relied on an undisclosed and unethical scheme to incentivize doctors to prescribe Eylea over competitor therapies. Specifically, Regeneron paid millions of dollars to middle-man distributors—who ultimately sell Eylea to Retina Practices—to ensure that physicians received cash back rewards from credit card purchases of the drug without incurring costly credit card processing fees.

Defendants imply the cash back rewards were merely a minor perk and therefore not material to Eylea sales. This ignores, however, that avoiding credit card processing fees combined with cash back benefits made it significantly more profitable for doctors to prescribe Eylea rather than competing drugs. This fact is confirmed by *the Company's own internal documents*. For example, only *one year* of Eylea purchases generated cash back rewards of $746,272 and

$445,000, respectively, for two Retina Practices alone. Other internal Regeneron documents show that the Individual Defendants knew of the importance of credit card rewards to Retina Practices, and that Eylea generated 2 to 3 times more profit (cost recovery per vial) than competitor drugs. These undisclosed benefits mattered to doctors and helped drive Eylea's success.

Notably, the credit card scheme had far-reaching implications beyond cash back benefits to physicians. As the DOJ has alleged, Defendants' practice artificially inflated Eylea's ASP, a CMS metric tied to price reporting that ensures the federal government reimburses drugs at fair market value, which in turn gave higher reimbursements to Retina Practices that prescribed Eylea. CMS requires that *all* rebates and price concessions be included in ASP reporting. However, in what features prominently in the DOJ's description of the alleged scheme, Regeneron never reported the 2% credit card processing payments to CMS, causing the federal government to overpay hundreds of millions of dollars to Retina Practices in Eylea reimbursements.

For their part, Defendants contend investors knew about the "DOJ's investigation" and "intent to sue." Mem. 1, 25. This is a classic truth-on-the-market defense that rarely, if ever, is determinative at the pleading stage. But even if Regeneron made a *pro forma* disclosure about the existence of the DOJ's *investigation*, investors were not aware of key details of the scheme necessary to assess the full nature and extent of the regulatory risk, including that: (1) Regeneron's CEO, Defendant Schleifer, personally approved the practice; (2) Regeneron's auditor, Deloitte, advised that the credit card payments "***COULD [NOT] BE***" BFSFs [i.e., bona fide service fees] and therefore constituted reportable price concessions; (3) internal documents showing the magnitude of the cash benefits paid to physicians and the importance of these benefits to doctors; and (4) the inflated ASP resulted in CMS making hundreds of millions of dollars in overpayments.

Defendants further assert that they "genuinely believed, and continue to believe, that their

2

practices are proper and the DOJ's position is wrong." Mem. 25. Once again, however, this affirmative defense cannot be decided on the pleadings and, critically, ignores that the SAC identifies several facts disputing the reasonableness of Defendants' "genuine" belief, including that the DOJ, competitors, and *Regeneron's own auditor* did not view the payments as a BFSF. At bottom, discovery is necessary to determine whether Defendants' belief was reasonable.

The SAC offers similarly compelling indicia of fraud connected to sales of Eylea HD. Defendants sought to play up the "strong" early demand for the drug in their public statements while behind the scenes, FEs confirm that Defendants were aware of and concerned about weak demand from the start. Defendants attempted to hide this weak demand using various undisclosed tactics, including pushing bulk sales to large Retina Practices in exchange for special rebates and terms, including the ability to return unused products. Ultimately, these efforts proved unsuccessful, and the market learned that demand for Eylea HD was challenged from the outset. Defendants dismiss these and other allegations as "vague" and based on "anecdotes from low-level former employees." But that is not the standard. As the Second Circuit recently held in *Gimpel v. The Hain Celestial Grp., Inc.*, when, as here, "[FE] allegations, which we treat as true for present purposes, contradict [defendant]'s public statements attributing its financial success to factors such as strong demand and downplaying [other] issues," dismissal is not appropriate. 156 F.4th 121, 147 (2d Cir. 2025).

The SAC also adequately alleges loss causation, as it establishes a causal link between the alleged misstatements and losses caused by four corrective disclosures. For example, Defendants challenge the first corrective disclosure, on April 10, 2024, arguing the DOJ's announcement that it had filed a complaint against Regeneron "revealed nothing new to the market." However, contemporaneous analyst reports—which Defendants conveniently overlook—demonstrate that

the market understood for the first time that the credit card scheme contributed to Eylea's sales and demand. For the other corrective disclosures, Defendants argue that statements concerning lower-than-expected sales for Eylea and Eylea HD are insufficient because "disappointing financial results" are not corrective events. But, Defendants misstate the SAC, which links each "disappointing" result for Eylea and Eylea HD to Defendants' previous false and misleading statements, which is all that is required at this stage.

Defendants' motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.      Defendants Misrepresented the Reasons Behind Eylea's Success

Regeneron, a biotechnology company that manufactures and commercializes medicines, obtained FDA approval in 2011 for Eylea, a prescription eye injection used to treat Wet AMD. ¶8. The FDA granted Regeneron market exclusivity rights for twelve years, which prevented competitors from introducing generic alternatives until 2023. *Id.* Eylea rapidly became Regeneron's most successful and commercially significant product. ¶10. During the Class Period, Defendants repeatedly told investors about how the "***product***" and "***clinical***" "***profile***" were the drivers of Eylea's success: "***there's been a low-cost alternative ... for a very, very long time but it was [Eylea's] product profile that made the difference for prescribers and patients***." ¶253; *see* ¶266.[1]

Although Defendants publicly attributed Regeneron's market dominance to Eylea's superior clinical profile, unbeknownst to investors, for years Defendants had orchestrated an illegal and unethical scheme to bolster sales of the drug by inducing Retina Practices to purchase and prescribe Eylea over competitor drugs by allowing the Retina Practices to use credit cards to

---

[1] For the Court's convenience, Exhibit A lists Defendants' alleged misstatements from the SAC, together with corresponding SAC references addressing falsity.

4

purchase Eylea without incurring a credit card fee. ¶¶11-13. Defendants knew Retina Practices preferred using credit cards for drug purchases to earn cashback and other card benefits. ¶¶13, 94-96.[2]

To address the added costs of credit card processing fees, Defendants told middlemen distributors not to charge Retina Practices these fees when they purchased Eylea and instead to seek reimbursement for the fees from Regeneron. ¶¶13, 95. This proved to be a wildly lucrative arrangement for Retina Practices (*see e.g.*, ¶14), as they received hundreds of millions of dollars in credit card "cashback" benefits, among other benefits. Defendants knew that manufacturers of competitor drugs—like Avastin and Lucentis—refused to reimburse for credit card processing fees for purchases through distributors, setting Regeneron apart as the only market participant willing to engage in the practice. ¶96. Indeed, between 2012 and 2021, Regeneron paid Besse (a large distributor) more than $250 million in credit card processing fees. *Id.*

Regeneron's payments to distributors had significant legal implications because these payments were not disclosed to CMS as "price concessions" as CMS regulations require which, in turn, impacted the Medicare reimbursement rate that CMS paid for Eylea. ¶¶16, 90. As background, Medicare reimburses Eylea sales under a "buy-and-bill model"—after purchasing the drug, a medical practice will store the inventory and later administer the medication to patients. ¶¶15, 91. To determine the reimbursement rate, CMS regulations require manufacturers to report an ASP that reflects all drug discounts and "price concessions." ¶¶16, 90-93. CMS then reimburses physicians for the ASP plus 6%, effectively capping the medical providers' profit at 6%. ¶92.

Significantly, Regeneron never reported to CMS that it paid physicians' costly credit card

---

[2] To confirm that credit card fees and awards were important to physicians, Defendants hired a consultant that interviewed Retina Practices and informed Regeneron that "[t]he ability to order using credit cards was seen as *important*" to Retina Practices and "[t]he ability to take advantage of [] credit card rewards is *very important* to [Retina Practices] and you may find that true for many." ¶96 (emphasis added).

processing fees. ¶¶16, 21, 40. This artificially inflated Eylea's ASP, causing CMS to reimburse Retina Practices at a higher rate than would have been paid had the payments been reported, and effectively increasing Retina Practices' profit margins. ¶¶21, 106, 211. According to the DOJ, Eylea's inflated ASP cost CMS hundreds of millions of dollars in overpayments to Retina Practices. ¶¶3, 6, 21, 40, 124, 211, 361. Equally problematic, Regeneron's CEO, Defendant Schleifer, expressly approved the practice, which had been "standard practice" at the Company since 2012. ¶¶98-100. Attempting to rationalize their scheme, Defendants claimed the processing fees were BFSFs, a recognized exception under the ASP regulations. ¶104. Yet, Regeneron's auditor concluded otherwise in 2019, telling Regeneron: "**No**": reimbursing customers' credit card processing fees was the "**TYPE OF SERVICE [THAT] COULD [NOT] BE BFSF**." ¶¶107-08. Yet, Defendants neither changed the practice nor corrected their investor reporting.

The illegal and unethical practice eventually attracted the DOJ's attention. ¶123. In June 2021, the DOJ initiated an investigation into allegations that Regeneron paid kickbacks to distributors and engaged in practices designed to induce Eylea purchases. *Id*. The investigation also focused on Regeneron's alleged manipulation of reimbursement rates by omitting applicable discounts, rebates, and benefits from the ASP reported to CMS. *Id.* Underscoring the long-standing and systemic nature of Regeneron's misconduct, the inquiry spanned a decade covering the sale of Eylea since its launch—January 2011 to June 2021. *Id*.

On April 29, 2025, the court in the DOJ action denied Defendants' motion to dismiss, finding the agency had sufficiently alleged Regeneron's scienter and that "Regeneron knowingly failed to deduct the credit card fee reimbursements from Eylea's ASP in order to gain a competitive advantage." ¶413. The DOJ action is currently proceeding in discovery.

**B.    Defendants Overstated Demand for Eylea HD**

Hoping to address the fact that Eylea would lose market exclusivity due to patent expiration

in November 2023, Defendants developed Eylea HD, a high-dose form of Eylea that Defendants hoped would prolong the Eylea franchise. ¶¶25-26, 134. To evaluate how Eylea HD would likely fare after its initial launch, Defendants internally retained ZS Associates, and other consulting firms, to conduct market research. ¶¶27-29, 138-39. These firms identified several critical issues that would likely negatively affect demand for Eylea HD, including limited dosing flexibility, the absence of prefilled syringes, high cost, lack of a "Q4W1" label, and the absence of a permanent J-Code. ¶¶29, 33, 138-139, 140, 144-46. Most concerning for physicians, however, was the lengthy gaps of time between injections, which raised concerns about patient safety and permanent vision loss. ¶¶28, 140, 143, 152-54, 158-59, 289-93. Physicians also found it less financially lucrative because fewer injections resulted in fewer office visits. ¶¶28, 143, 155.

Unwilling to change course, Defendants forged ahead with the launch of Eylea HD on August 18, 2023, downplaying to investors many of these known issues. ¶¶133, 138-44. For example, a few months after Eylea HD's release, Defendants stated that Eylea HD "*revenues were driven by strong initial demand*," that the Company saw "*very encouraging early signals for EYLEA HD*," and that "*Physician enthusiasm was extremely high prior to EYLEA HD launch*." ¶¶269-70. Weeks later, Defendant Landry was even more positive: "*EYLEA HD ... had a strong quarter…. It was true demand*." ¶317.

These statements were false. As ZS and others had foretold, Eylea HD suffered from low demand from the outset. ¶144. Numerous FEs provided details about these issues. For example, FE-1 explained that Eylea HD was only approved to be administered in eight-, twelve-, or sixteen-week intervals, where Vabysmo (a competitor drug) had the flexibility to be administered in four-week intervals if needed. ¶153. FE-1 observed that Vabysmo's label flexibility following the loading dose was a strength and a differentiating point in the market. ¶153. The inflexible dosing

concerns were clinical and financial. ¶¶28, 140, 143, 155. FE-8 explained that "once vision is gone, it's gone and there were concerns from doctors and patients about the amount of time between injections." ¶154. Off-label dosage also had risks—FE-10 explained "doctors do not know how frequently a patient will require a dosage" so they were concerned about reimbursement "if they needed to administer doses more frequently than the label allowed." ¶140.

Eylea HD similarly drew resistance from Retina Practices because it was not available as a prefilled syringe, which meant practices had to spend more time preparing the injection. ¶¶148-51. FE-10 explained "that the time to fill a syringe and additional complications that the process can create does have a considerable impact on the revenue of retina practices." ¶149. For example, a 2019 article in *Retinal Physician* reported that prefilled syringes provide a 40% reduction in office preparation time. ¶151 & n.19. Finally, multiple FEs confirmed that the unavailability of a permanent J-Code caused concerns because it could delay or prevent Retina Practices from receiving reimbursement. ¶¶145-47.

Eylea HD's lack of flexibility made it unprofitable for Retina Practices, leading the few who tried it to revert to original Eylea. ¶155. For example, FE-11, a Medical Specialist in New York City, recalled that three major institutions in her territory—NYU Langone, Columbia, and New York Eye and Ear— lost money any time they purchased Eylea HD. *Id*. From daily conversations, FE-11 learned that physicians viewed Eylea HD's differences from Eylea as negatives. ¶156. In fact, FE-11 explained approximately 75% of her accounts that used Eylea "tried" Eylea HD, but "none" switched to Eylea HD. ¶157. FE-13 corroborated that Regeneron found it "incredibly challenging" to convert Eylea users to Eylea HD. ¶280.

Eylea HD's challenges, and lack of profitability for physicians, almost immediately translated to weak demand for Eylea HD. ¶¶160-71. Defendants were aware of this from internal

8

reports and analysis that they reviewed. *Id*. FE-8 recalled that Regeneron's leadership was "panicking" about Eylea HD's performance well before the fourth quarter of 2023 (i.e., soon after the August 2023 launch); in fact, a doctor in FE-8's region told her that "Schleifer had called him directly and asked, 'why aren't you using Eylea HD?'" ¶¶161-62.

Multiple FEs with access to internal reports recalled that they consistently showed weak demand and sales for Eylea HD, Defendants' internal demand forecasting reflected the weak sales performance, and the lack of sales was frequently discussed during internal meetings. ¶¶163-71. FE-13—who had access to Regeneron's internal "Performance Dashboard"—recalled that "following the launch of Eylea HD in August 2023, internal forecasts were reduced based on actual performance for at least two consecutive quarters." ¶¶280-81.

To mask the lack of "***true demand***," ¶317, Defendants made desperate, unsustainable, and unethical sales deals, ¶¶172-74, 184, 188, 191-92, while outwardly touting the success of the launch to investors, ¶¶201-08. For example, Defendants pushed PE Practices to make large, bulk purchases in return for significant financial incentives—such as rebates and the right to return the product if sales did not materialize. ¶¶33, 173, 175-79, 182-86. This perceived solution was short-lived as it left PE Practices with more product than needed. ¶¶198-200.

Several FEs confirmed these issues and Defendants' involvement in these deals. For example, FE-6 recalled that by year-end 2023, she learned senior leadership, including Defendants Schleifer and McCourt, visited several PE Practices and explained "deals being struck with private equity groups was like putting a band-aid over a bullet hole." ¶302. The Company's approach with PE Practices persisted through the first six months following the launch of Eylea HD—i.e., August 18, 2023, through February 18, 2024—and more likely through the first year after launch. ¶183. FE-2 also recalled being informed that Company leadership, including McCourt and the current

9

VP, Ophthalmology Commercial Business Unit, Kevin Clark, visited PE Practices, such as RCA and Prism, over the 2023 holidays and "made a huge push to get sales for the year-end figures." ¶¶176, 299. FE-5 recalled that RCA experienced "huge build ups of Eylea and Eylea HD inventory" (millions of dollars more than was needed). ¶199. FE-5 also recalled "she attended budgeting meetings where the negative impact of Eylea HD was discussed." ¶295.

When selling Eylea HD in bulk to PE Practices failed to make up for the shortfall in demand, Defendants resorted to other illegal and unethical sales tactics, including requiring employees who worked as reimbursement managers—and who had access to patient health information—to start selling. ¶¶188-90. Under HIPAA, the use or disclosure of PHI for marketing purposes without explicit written authorization from patients is prohibited. ¶188. FE-6 explained that some reimbursement employees who "pushed back on" "taking on sales functions" were let go. ¶190. Additionally, sales representatives were directed to misrepresent Eylea HD's reimbursement so that physicians would be more inclined to prescribe the drug. ¶¶191-92.

In sum, as slow adoption rates and weak demand persisted, Regeneron's "panick[ed]" leadership, ¶407, resorted to a host of illegal, unethical, and unsustainable tactics to temporarily mask those problems. Meanwhile, Defendants misled investors by falsely proclaiming Eylea HD's "***strong initial demand***," ¶202, "***growing demand and positive early physician experience***," ¶206, "***[p]hysician enthusiasm***," ¶203, "***high conversion rate***," ¶203, and "***true demand***," ¶317.

### C.    As the Truth Emerged, Investors Sustained Billions of Dollars in Losses

On April 10, 2024, the DOJ announced legal action against Regeneron, alleging that the Company fraudulently manipulated Medicare reimbursements for Eylea. ¶¶40, 210-11. On this news, Regeneron common stock declined by $31.50, or 3.36%, over two consecutive trading days. ¶212. As investors and analysts digested the news and questioned the potential impact on Eylea's future sales, Regeneron's leadership swiftly dismissed the concerns, publicly labeling the DOJ's

10

allegations as "meritless." ¶¶41-42, 217. Meanwhile, Company management continued to conceal the fact that the credit card processing and ASP scheme had been a material driver of Eylea's commercial success. ¶¶41-43.

While reassuring the market that the DOJ action lacked merit, Regeneron was forced to reveal on October 31, 2024, that Eylea sales had been negatively affected by a lower net selling price, and that Eylea HD sales had missed internal guidance. ¶¶45-49. On this news, Regeneron common stock fell 9.2%, a reduction of $84.59 per share. ¶46. The situation worsened on January 13, 2025, when the Company reported further disappointing results for Eylea HD prior to the market's open, falling well short of analysts' expectations. ¶¶50-51. Regeneron common stock dropped $27.64 per share, or 3.97%, to open at $669.24 per share on January 13, 2025, and continued to decline 3.6%, or $26.03 per share, into January 14, 2025, to close at $690.87 per share. ¶51.

The truth fully emerged on April 29, 2025, when Regeneron revealed continued underperformance for both Eylea and Eylea HD, and finally admitted to weak demand for Eylea HD. ¶¶52-54. In response, Regeneron's stock price plunged to $568.91 per share, or 6.87%. ¶55. In all, Regeneron common stock declined by more than 38% compared to the fourth quarter of 2024, resulting in billions of dollars in losses for investors. ¶394.

## LEGAL STANDARD

Securities fraud claims under § 10(b) of the Exchange Act are subject to the heightened pleading requirements of the Federal Rule of Civil Procedure ("FRCP") 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021). Nevertheless, at this stage of litigation, "fact-finding outside of the allegations is not proper." *Galvstar Holdings, LLC, DSB v. Harvard Steel Sales, LLC*, 722 F. App'x 12, 17 (2d Cir. 2018). The Court must "accept all factual claims in the complaint as true

11

and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).[3] Moreover, courts "must be careful not to mistake heightened pleading standards for impossible ones." *Synchrony*, 988 F.3d at 161. Indeed, a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To state a claim under § 10(b) and Rule 10b-5(b), a plaintiff must allege the defendants "(1) made misstatements or omissions of material fact [falsity], (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025). To state a claim for scheme liability, Plaintiff must allege: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

**SCIENTER.** Allegations of motive are not required as "[s]cienter may be established by showing either conscious misbehavior or recklessness." *Solomon v. Sprint Corp.*, 2022 WL 889897, at *5 (S.D.N.Y. Mar. 25, 2022). "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.'" *Blanford*, 794 F.3d at 306.

---

[3] Unless otherwise indicated, all internal citations have been omitted.

When evaluating scienter, a court must "accept all factual allegations in the complaint as true" and determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Instead, an inference of scienter is "strong" when it is "at least as compelling" as any plausible "opposing inference one could draw from the facts alleged." *Id.* at 310.

**SCHEME.** "Unlike the better-known subsection (b), these subsections [(a)-(c)] do not require the defendant to make a misstatement or omission; they require only deceptive conduct." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). As the Supreme Court has emphasized, "[t]hese provisions capture a wide range of conduct" and can include "conduct involving false or misleading statements." *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79, 81 (2019).

**FALSE OR MISLEADING STATEMENTS.** "'The test for whether a statement is materially misleading under Section 10(b)' is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.'" *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016). Additionally, so-called "half-truths"—literally true statements that create a materially misleading impression—will support claims for securities fraud. *See Gimpel*, 156 F.4th at 143. To allege falsity, a plaintiff need only plead facts "sufficient to support a *reasonable belief* as to the misleading nature of the statement or omission." *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 89 (S.D.N.Y. 2015).

13

LOSS CAUSATION. The burden of pleading loss causation "is not a heavy one" as it "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). "[T]here is no heightened pleading standard" for loss causation—a plaintiff need only plead "declines in [a company]'s stock price following [the company]'s negative disclosures" to "me[e]t the pleading standard." *Gimpel*, 156 F.4th at 151.

## ARGUMENT

### I.    THE SAC ADEQUATELY PLEADS A STRONG INFERENCE OF SCIENTER

#### A.    The SAC Adequately Pleads Scienter Related to the Credit Card Scheme

##### 1.    Factual Allegations from the DOJ Action Support Scienter

Defendants contend the DOJ action cannot support scienter because they disclosed the investigation and that this "fulsome disclosure," Mem. 22, cuts against scienter. However, Defendants' cursory statements about the investigation are "measurably more opaque" than those in the case they rely on in which defendants' disclosures "cover[ed] everything from detailed credit characteristics to extensive risk assessments." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012). Indeed, in disclosing the mere existence of an investigation, Defendants said nothing about the magnitude of the risk associated with Regeneron's failure to report hundreds of millions of dollars in reimbursed credit card fees as price concessions and that Regeneron's out-of-pocket costs related to the scheme far exceeded $250 million. *See* ¶¶40, 123-24. *See also In re Vale S.A. Sec. Litig.*, 2017 WL 1102666, at *27 (S.D.N.Y. Mar. 23, 2017) (rejecting similar argument). For example, the disclosure says nothing about how Defendants internally considered the credit card scheme "very important" to physicians, ¶96, that Defendant Shleifer approved it, ¶¶98-100, or that Regeneron's own auditor advised Defendants that the practice was not a BFSF, ¶¶107-08.

14

Defendants further attempt to undermine reliance on the DOJ action by arguing that the FCA alleges Regeneron defrauded the government, while Plaintiff alleges Regeneron defrauded its shareholders. Mem. 23. The unremarkable observation that an FCA claim is different from a PSLRA claim does not negate the settled principle that a plaintiff "may rely on factual allegations or reports incorporated in complaints from other proceedings." *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 157 (2d Cir. 2025). The factual allegations responsibly drawn from the DOJ Complaint bolster the strong inference that Defendants acted with scienter.

As Defendants pointedly ignore, Plaintiff alleges that in 2019, "Defendants retained Deloitte to audit their reporting of BFSFs, and Deloitte found that the payments to the distributors for reimbursing customers' credit card processing fees were not BFSFs." ¶107. Despite Deloitte's findings, Defendants did not change their practices—choosing instead to knowingly submit false claims to boost sales of Eylea. ¶117. Further, "there is considerable authority for the proposition that a company's failure to follow an internal policy can form the basis for an inference of recklessness." *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 532 (S.D.N.Y. 2009). Here, more than just ignoring Deloitte, Plaintiff alleges that Defendants failed to follow their own SOP's and the Company "did not perform any BFSF analyses … prior to approving ['Regeneron's ASP assumptions, including its treatment of credit card fees as BFSFs].'" ¶¶116, 259.[4]

The SAC also alleges specific facts about the Individual Defendants' awareness of the fraudulent practice—Schleifer approved the credit card scheme at Fenimore's request in 2012—and that this has been standard practice for the Company almost since Eylea's launch. ¶256. The

---

[4] Defendants Schleifer, Fenimore, and Landy signed multiple SOX Certifications attached to Regeneron's Form 10-Ks and 10-Qs, affirming the accuracy of financial reporting and the disclosure of all fraud. ¶¶345–46. However, Regeneron did not have effective internal controls in place because they failed to flag what their auditor told Defendants in 2019—that the credit card scheme was not a legitimate BFSF, ¶¶107-08—and similarly failed to adhere to their own BSFS SOPs, ¶¶116, 259. These "poor internal controls support an inference of scienter." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 321 (S.D.N.Y. 2024) (citing cases).

SAC further alleges that Defendants knew throughout the Class Period that "cost recovery is a key factor in practice decision making in light of limited perceived clinical differentiation in anti-VEGF," which contradicts their repeated statements that Eylea's "*product*" and "*clinical*" "*profile*" is what generated Eylea's market share. *Compare* ¶¶265, 417, *with, e.g.*, ¶¶128-29. Based on those allegations, the district court in the DOJ action found "Regeneron knowingly failed to deduct the credit card fee reimbursements from Eylea's ASP in order to gain a competitive advantage." ¶413 (quoting *United States ex rel. Nunnelly v. Regeneron Pharms., Inc.*, 780 F. Supp. 3d 336, 348 (D. Mass. 2025)). Even if the scienter standard under the FCA and the PSLRA differ in part, it does not change that the allegation supports an inference of scienter here under the Court's holistic review.

Defendants ask the Court to find—on the pleadings and as a matter of law—that despite failing to comply with Regeneron's BFSF policy and Deloitte telling them that the credit card reimbursements were not BFSFs, Defendants "genuinely believed" their conduct was lawful. Mem. 22, 25. Defendants' "good faith" defense is premature at this stage. "The question of a party's good faith (or lack thereof) is often a fact-intensive one, 'which generally cannot be resolved on the pleadings or without first granting an adequate opportunity for discovery.'" *Miller v. Brightstar Asia, Ltd.*, 2023 WL 8432856, at *4 (S.D.N.Y. Dec. 5, 2023).

That Defendants continue to defend the practice does not help them. Mem. 23. The district court in the DOJ action found "these [credit card] reimbursements do not qualify as a 'bona fide, itemized service actually performed on behalf of the manufacturer.'" 780 F. Supp. 3d at 347 (quoting 42 C.F.R. § 414.802). In the face of a judicial decision (and their own auditor's prior advice) to the contrary, Defendants' "egregious refusal to see the obvious, or to investigate the doubtful" is not evidence of a good faith belief but rather support for an inference of recklessness.

16

*Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996).[5]

### 2.    Context and Content of Defendants' Statements Support Scienter

Defendants downplay their statements, arguing Plaintiff conflates falsity with scienter, and a statement's length with its detail, Mem. 24. This mischaracterizes the law and deprives the statements of context. The "content and context" of a defendant's own words constitute "the most powerful evidence of scienter." *Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).

The SAC alleges Defendants made multiple statements crediting Eylea's market share and ability to withstand low-cost competitors to its superiority as a product, a point they knew was particularly relevant to investors as the end of Regeneron's market exclusivity approached. ¶¶125-29. Indeed, many of the statements were in direct response to analysts' inquiries. ¶¶128-29. Given their repeated statements on these key issues of investor and analyst focus, the reasonable inference is either that Defendants had "access to information regarding [the subject of the misstatements], or that [D]efendants were recklessly indifferent to the truth or falsity of their ... statements and never bothered to investigate [them]." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019). "If, on the other hand, [Defendants] didn't monitor these topics but made definitive statements as if they did, they still might have been reckless." *Dentsply Sirona Inc.*, 732 F. Supp. 3d at 319.

### 3.    The Core Operations Doctrine Supports Scienter

Similarly unpersuasive is Defendants' effort to trivialize "the commonsense assumption that executives are likely to know more about things central to their business." *Stadium Cap. LLC*

---

[5] Defendants also repeatedly argue that Plaintiff has not alleged that they "intended to deceive shareholders." Mem. 4, 22-23, 25. But this assertion overlooks the concept of reckless conduct, i.e., that Defendants knew or should have known their statements were false, which Plaintiff has alleged here. *See Gimpel*, 156 F.4th at 147 ("defendants' knowledge of facts or access to information contradicting their public statements" supports a finding of recklessness).

*v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024).[6]

Defendants' argument that "ASP calculations" are not part of Regeneron's "core operations," Mem. 24-25, misstates the issue. The question is whether the credit card scheme, designed to increase Eylea sales, was "central to their business" such that it can be assumed that management had knowledge of it. Here, Defendants repeatedly informed investors that Regeneron was "substantially dependent on the success of Eylea" because a substantial portion of its total revenue came from Eylea. ¶85. Considering the essential role of Eylea sales in Regeneron's viability, common sense compels the inference that as executives, the Individual Defendants remained informed of Company strategies employed to bolster sales. *See zCap Equity Fund LLC v. LuxUrban Hotels Inc.*, 2025 WL 2097951, at *22 (S.D.N.Y. July 25, 2025) ("[T]he AC alleges that [the strategy] was central to Lux Urban's business model. That undermines any inference that top executives ... were unaware of the true state of negotiations with the four hotels."). That the core operations doctrine applies here is evident considering the Individual Defendants' *direct involvement* with approving and initiating the practice, ¶256, in violation of its SOPs, ¶¶113-15, 349, and ultimately receiving Deloitte's opinion that it the payments were not BFSFs, ¶¶107, 108, 117.

### 4.    A Holistic Review of the Allegations Supports Scienter

Viewed holistically, the SAC allegations establish a strong inference of scienter, forming a compelling narrative of how Defendants recognized that the credit card scheme could make the difference in a highly competitive market. Not wanting to reveal that Eylea's market share was grounded in part on financially incentivizing prescribers while defrauding CMS, Defendants kept

---

[6] Defendants downplay the "core operations" as "disfavored" in the Second Circuit. Not so. The Second Circuit, and district courts therein, have allowed "that the doctrine 'can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently,'" *Gimpel*, 156 F.4th at 148 n.19.

the role of the credit card scheme under wraps, instead lauding the profile of the drug. Defendants further ignored Regeneron's own BFSF SOPs and the findings of Deloitte in excluding the reimbursements from its government reported ASP—and they misled the public about their knowledge of the illegality of their actions and the measure of threat from the DOJ lawsuit.

Defendants' counter-narrative relies mainly on assuming their "genuine belief" in the product profile and the legality of their actions. However, the credit card scheme has been standard procedure from the year of Eylea's release, and Defendants knew it set their drug apart from other similar Wet AMD drugs and that it was "very important" to physicians, ¶96, and therefore the only basis for this "genuine belief" would be reckless ignorance. In any event, at this juncture of the case, "good faith and reasonable beliefs are questions of fact not appropriate for resolution as a matter of law." *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey Grp., Inc.*, 2012 WL 3542196, at *8 (S.D.N.Y. Aug. 15, 2012).[7]

### B.    The SAC Adequately Pleads Scienter Related to Eylea HD

#### 1.    FE Accounts Contribute to an Inference of Scienter

The accounts of numerous former employees readily confirm Defendants' involvement in the fraudulent scheme, enhancing the inference of scienter. "As a general matter, courts consider and take as true the statements of such witnesses at this stage, even when applying the heightened standards of Rule 9(b) and the PSLRA." *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405 (S.D.N.Y. 2020) (citing *Novak v. Kasaks*, 216 F.3d 300,

---

[7] Defendants further claim that because the Company's repurchase of shares during the Class Period negates scienter. Mem. 21. "Such logic is inapplicable here, where Plaintiff pleads scienter based on conscious misbehavior or recklessness." *Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 146 (S.D.N.Y. 2021). That reasoning has instead been applied "when plaintiffs attempt to plead scienter based on defendants' motive and opportunity to commit fraud." *Id.* Furthermore, as Defendants admit, "physicians had been prescribing EYLEA to their elderly patients for over a decade, generating billions of dollars in revenue and approximately 50% market share." Mem. 25. Confident in the longevity of the fraud, Defendants may have had no concern the inflated stock would fall. Thus, the balance of inferences clearly favors Plaintiff.

19

314 (2d Cir. 2000)). Multiple FEs support the inference that Individual Defendants knew about the issues the Eylea HD launch faced and the disappointing response to the launch at a time when they were simultaneously boasting the promise and success of Eylea HD. For example, FE-10, who worked on the Brand and Marketing Operations Team during the Class Period, explained that early market research predicted the issues with the adoption of Eylea HD.[8] ¶140. ZS Associates identified dosing inflexibility, absence of prefilled syringes, and the lack of permanent J-Code as concerns for physicians. ¶¶28-29.

Post-launch results mirrored the research, with physicians' disinterest uniform across the country. For example, FE-11 was a Medical Specialist covering most of New York City, while FE-6 worked as a Medical Specialist in the Southwest. ¶¶73, 78. Both faced difficulty selling Eylea HD, with FE-6 explaining physicians had made it "clear" early on that the interest in Eylea HD was not there, ¶179, and FE-11 noting 75% of accounts "tried" Eylea HD, but not a single account switched over, ¶292. Similarly, FE-9, who worked for a PE Practice, AVP, observed the immediate feedback from physicians was negative, ¶196, and AVP's decision to pull back on purchasing Eylea HD occurred soon after launch, ¶200.

Negative numbers following the HD launch bore out Company-wide. FE-4, a Staff Accountant, ¶71, attended monthly Accounting Department meetings where the unimpressive numbers for Eylea HD and its disappointing rollout were discussed. ¶275. Defendant Fenimore attended those meetings in his capacity as SVP, Controller, ¶169, and continued to attend with some regularity as CFO, ¶170. Similarly, FE-13 worked in Regeneron's Customer Insights &

---

[8] Defendants incorrectly assert that they "transparently disclosed" these issues. They *mentioned* they were "on track to have a permanent J-Code by April 1, 2024," Mem. Ex. 14 at 9, "tracking towards a potential prefilled syringe launch by early 2025," Mem. Ex. 17 at 5, and that they were "aware of that interest" in shorter dosing intervals but noted those "recalcitrant patients" were "a smaller percentage of the market," Mem. Ex. 19 at 5. None of those statements inform the public (who lacked Regeneron's market research data) of what Defendants knew *before* the launch—that those deficiencies are particularly troubling to physicians and ultimately deterred adoption.

Analytics group starting Summer 2023 and throughout the Class Period, which gave her access to "high level" performance information including forecasted sales versus how actual performance was tracking. ¶166. She observed that in August 2023, internal forecasts were reduced based on actual performance for at least two consecutive quarters, ¶280, and during the quarterly, ad hoc, and Town Hall meetings she attended, the team responsible for Eylea HD discussed how it was "not doing well." ¶281.

These and other FE allegations reflect a pattern that Defendants could not have been ignorant to unless they were acting with reckless indifference to the truth. Defendants nevertheless urge the Court to disregard these allegations, pointing to non-existent requirements that the FEs hold positions entitling them to direct contact with executives. Mem. 32. But "[t]he notion that the [FE]s cannot be believed because none had direct contact with any individual Defendant is contrary to law." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21. Similarly unavailing is Defendants' derision of the FEs as "low level"[9] and "regional." That FEs "'emanate from several geographic areas' and 'span different levels of the Company hierarchy' ... further support[s] a scienter finding." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010).

Furthermore, the allegations outlining the Individual Defendants' reactions show they knew Eylea HD demand was low. Defendants argue that "there is nothing wrong with executives meeting with significant customers to negotiate large sales of a new drug," Mem. 35, but this misconstrues the SAC. That the CEO of a multi-billion-dollar company would call a specific retina practice to ask why they were not using Eylea HD, ¶162, at a time when internal data showed low sales, raises the inference that even as he touted the success of Eylea HD to investors, he knew the

---

[9] Defendants are incorrect that the FEs are all "low-level." *See, e.g.*, ¶72 (FE-5 joined RCA as a Senior Accountant and was promoted in October 2023 to Senior Financial Analyst); ¶74 (FE-7 held a Senior Managerial Role in the Commercial Operations Division at Regeneron); ¶79 (FE-12 worked primarily as a Senior Medical Specialist for Regeneron during the Class Period).

Eylea HD launch was failing. He was not alone. As FE-12 reported, McCourt and other senior Regeneron members visited her biggest client, one of the largest Retina Practices in the Midwest, on multiple occasions. ¶298. FE-2, FE-6, and FE-7 corroborated these reports with similar statements about McCourt and other executives jetting off to visit PE Practices over the holiday period of 2023, ¶299, McCourt and Schleifer visiting several large PE Practices, ¶¶301, 302, and McCourt working to "flood distribution channels to pad sales" by offering a large Retina Practice a "big rebate," ¶301.[10] These allegations, considered in context with the allegations that the Company's internal data showed low demand and sales, support the inference that the Individual Defendants knew demand was weak and sought to conceal that truth by personally calling customers and offering incentives to large customers.

When the attempt to triage the shortfall in demand with bulk sales to PE Practices failed, Defendants turned to more unscrupulous sales tactics, including requiring employees that should be firewalled from sales based on their access to patient health information to start selling. ¶¶188-89. Additionally, sales representatives were directed to misrepresent Eylea HD's reimbursement information so that physicians would be more inclined to prescribe the drug. ¶¶191-92. That the FEs corroborate each other on such points further supports a strong inference of scienter. *See, e.g.*, *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at \*7 (D. Conn. Mar. 31, 2018) (claims supported by "multiple CWs who worked at the company").

Ultimately, Defendants' contention that allegations from all thirteen FEs are too vague or removed to bear on scienter requires a more exacting standard than required. An FE "does not need to be a fly on every relevant wall—or directly deliver every relevant presentation—to plead

---

[10] Although "[o]ffering ... concessions is a common practice," if "the company made misleading statements about, for example, the company's financial success ... without disclosing its reliance on channel stuffing" then the statement can give rise to securities fraud. *Gimpel*, 156 F.4th at 136-37.

allegations supporting an inference of scienter." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 216 n.18 (5th Cir. 2023). Rather, testimony like this should be credited when it "provide[s] critical background information about the company's operations." *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012).

### 2.    Plaintiff's Other Allegations Support Scienter

Defendants fail to make any other meaningful challenge to Plaintiff's scienter allegations pertaining to HD sales. They merely offer the cursory statement that "[t]o the extent Plaintiff relies on the same circumstantial allegations for the HD Theory[11] as it does for the ASP Theory [i.e., the credit card scheme]—including that Defendants supposedly discussed HD 'at length' and that HD was a 'core operation'—those theories fail for the same reasons discussed." Mem. 32.

However, the allegations are not the same. Defendants made statements specifically addressing Eylea HD, celebrating its release, and praising the response by physicians and resulting demand. *E.g.* ¶¶269-70, 323-24, 335, 337. "[T]he repeated representations made, compared to the factual material concerning the actual state of the [launch], leads to an inference that, at a minimum, [Defendants] acted recklessly in making such statements." *City of Hollywood Police Officers' Ret. Sys. v. Henry Schein, Inc.*, 552 F. Supp. 3d 406, 416 (E.D.N.Y. 2021).

Understandably, Defendants do not challenge the conclusion that the launch of Eylea HD was a core operation of the Company. Indeed, the importance of the Eylea HD launch in the face of the biosimilars' threat is undeniable. Defendants hoped to position their new product so "dependence on EYLEA HD will grow relative to [Regeneron's] historical dependence on EYLEA." ¶137. "It requires no stretch of the imagination to infer that, due to their positions at the company and the importance of [Eylea HD] to [Regeneron]'s operations, Defendants 'knew facts

---

[11] Notably, Defendants' assuming Plaintiff's reliance on the same allegations undercuts their thesis that Plaintiff has pled "two unrelated theories." Mem. 2.

or had access to information suggesting that their public statements' about [Eylea HD's success] 'were not accurate'" and were, therefore, misleading. *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*12 (S.D.N.Y. Mar. 28, 2018).

### 3.    A Holistic Review of the Allegations Supports Scienter

A holistic review of the allegations yields the inference that Defendants knew about prescribers' concerns with Eylea HD, but released the drug anyway. Then faced with the reality of physician disinterest, Defendants tried to plug the sales gaps with bulk purchases from large PE Practices—an unsustainable effort that ultimately failed. Nevertheless, Defendants consistently assured the public of the purportedly strong demand Eylea HD enjoyed from the start. "This incongruity between word and deed establishes a strong inference of scienter." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010). The alternative inference Defendants propose is to review the same allegations and not find fraud. Mem. 36. But at this stage of litigation, the Court "draws all reasonable inferences in plaintiff's favor, and is prohibited from engaging in any fact finding of its own." *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020)

"Further tilting the balance in the Plaintiff['s] favor, moreover, is the *importance* of this alleged fraud to [Regeneron]." *Gimpel*, 156 F.4th at 148. Eylea HD sales were so important that Regeneron's CEO was calling on Retina Practices to improve the numbers. ¶¶162, 301; *see also* ¶¶299, 301-02 (McCourt and executives visiting Retina Practices). This supports the inference that Defendants knew of the facts on the ground, but misled investors by telling them the opposite.

## II.    THE SAC ADEQUATELY PLEADS SCHEME LIABILITY[12]

In addition to disseminating false and misleading statements (*see* discussion *infra* Part III),

---

[12] Defendants did not challenge the scheme claims in their premotion letter, ECF No. 50, despite the Court's rules that the premotion letter should "summariz[e] the grounds for the proposed motion," *Individual Rules of Practice of Hon.*

the SAC sufficiently alleges that Defendants engaged in a long-running "scheme ... to defraud," 17 C.F.R. § 240.10b-5(a), by engaging in an "act, practice, or course of business [that] operate[d] … as a fraud or deceit," 17 C.F.R. § 240.10b-5(c). Relying on internal Company documents and DOJ allegations, Plaintiff alleges a credit card scheme—an "act, practice, or course of conduct" that deceived investors (and the federal government). The SAC's allegations include details about when the scheme took place, Defendants' actual knowledge of the practice (and in the case of Schleifer, express *approval* of the practice, ¶¶98-100), and specific allegations about the scheme itself: Defendants boosted Eylea sales through hundreds of millions of dollars in improper benefits flowing to Retina Practices in the form of cash back rewards (made possible by payments from Regeneron to distributors), ¶¶12-14, benefits that Defendants knew were "very important" to physicians, ¶96. While Defendants contend the payments are legitimate BFSFs, this (subjective) belief is belied by the DOJ allegations, competitors, Regeneron's own SOPs, and the Company's outside auditor. ¶¶105, 107-08, 116, 259, 413. Nothing more is required at this stage. *See Plumber & Steamfitters*, 11 F.4th at 105 ("To maintain a 10b-5(a) or (c) claim, a plaintiff must specify 'what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.'").

III.   **THE SAC ADEQUATELY PLEADS FALSITY AND MATERIALITY**

A.   **Defendants Misled Investors About Eylea's Success**

Despite knowing their illicit credit card scheme contributed to demand for Eylea, Defendants made repeated statements about how its "***profile***" was the driver of that success: "***there's been a low-cost alternative … for a very, very long time but it was [Eylea's] product***

---

*Mary Kay Vyskocil*, § 4, Part A, point I (July 17, 2020). Thus, they have waived the issue and should not be permitted to address it in their motion to dismiss. *See Siverls-Dunham v. Seung Huen Lee*, 2006 WL 510504, at *3 (S.D.N.Y. Feb. 27, 2006).

*profile that made the difference for prescribers and patients*." ¶253; *see* ¶266 ("*[T]he clinical profile of EYLEA is what has allowed for this very robust performance over 12 years in the marketplace*."). Defendants' statements touting Eylea's source of success were false and misleading because they omitted the material fact that Defendants had grown Eylea's market position in part through the credit card scheme—an illegal, unethical, and unsustainable business practice. When the practice was eventually uncovered by the DOJ and Regeneron was faced with legal action, Defendants assured investors that the DOJ's allegations are "meritless." ¶¶41–42, 217. In response, Defendants mainly focus on the materiality of the statements, claiming the market was already aware of their scheme and that Plaintiff fails to quantify the impact of the scheme. Both arguments fail.

*First*, Defendants effectively offer two "truth on the market"[13] arguments, pointing to their SEC filing and the DOJ filing its complaint as evidence that the public already knew about their reimbursement practices and that the DOJ was pursuing the matter. Mem. 7-8, 14. However, because "[t]he truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000), "[c]ourts routinely reject similar arguments at the motion to dismiss stage," *Teva*, 671 F. Supp. 3d at 197-98.

Moreover, and substantively, these purported "disclosures" fail to show that "'the corrective information' that was 'conveyed to the public' was done so 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.'" *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *7 (S.D.N.Y. Mar.

---

[13] Though studiously avoiding using the term, Defendants' arguments boil down to "a truth-on-the-market defense" which "rest[s] on the premise that [if the] disclosures revealed information already known to the market ... [they] could not have negatively affected the market." *Teva*, 671 F. Supp. 3d 147, 197 (D. Conn. 2023).

30, 2021). In other words, Regeneron's *pro forma* statements in the Company's SEC filings about the investigation omitted critical details about the long-running credit card scheme, the impact it was having on Eylea sales, and the hundreds of millions of dollars in alleged overpayments made by the government. *See Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 584 (S.D.N.Y. 2016) (finding actionable speaking about investigations but not speaking in an accurate/complete manner); *Teva*, 671 F. Supp. 3d at 213 ("speaking on the veracity of the allegations triggered a duty to disclose the alleged misconduct").

Relying on a Third Circuit decision, *In re Walmart Inc. Securities Litigation*, Defendants argue they were "not obligated to confess to underlying wrongdoing or speculate about the investigation's outcome." Mem. 15. However, the defendants in *Walmart* stated they could offer "no assurance as to the scope and outcome of these matters and no assurance as to whether its business, financial condition or results of operations w[ould] not be materially adversely affected." 151 F.4th 103, 119 (3d Cir. 2025). Here, Defendants went beyond mere neutrality—they assured the market that the DOJ investigation posed no risk to the business and even characterized the lawsuit as "meritless." ¶¶42-43. "[O]nce Defendants chose to speak on the subject of the [investigation and lawsuit], their failure to adequately inform investors regarding the true extent of [their] potential liability violated a clear duty to disclose." *Roofers Loc. No. 149 Pension Fund v. Amgen Inc.*, 751 F. Supp. 3d 330, 354 (S.D.N.Y. 2024).

As to Defendants' other truth-on-the-market argument, that the "magnitude" of the credit card scheme was revealed when the DOJ *filed* its complaint on PACER, Mem. 14—a platform unknown to many investors—also fails because a filing on PACER cannot, as a matter of law, be said to be "widely known." *See Merritt v. Molecular Partners AG*, 2024 WL 495140, at *4 (S.D.N.Y. Feb. 5, 2024) (finding investors can be charged "with knowledge of information that is

27

'widely known,' [but] it cannot do so for information that is 'merely available'"). Indeed, the mere public availability of a court filing does not render its contents "widely known" or made with a "sufficient" "degree of intensity and credibility,'" *6D Glob. Techs*, 2021 WL 1198566, at *7, such that it is immediately known to investors.[14]

Defendants, relying on *New York City Public Pension Funds v. Coupang, Inc.*, argue that their statements were not misleading because they never claimed the drug profile was the sole source of Eylea's success. Mem. 17. But their reliance is misplaced as the *Coupang* court found the company's statements "did not, explicitly or implicitly, rule out other factors playing a role in generating revenue." 2025 WL 2613650, at *15 (S.D.N.Y. Sept. 10, 2025). Defendants also try to reshape their statements, arguing they made similarly vague assertions by attributing Eylea's success to a "'*combination* of the clinical profile' and other factors." Mem. 18. But, when read in full, that statement credits "the combination of the clinical profile, the proven safety as physicians had experience and it being the product that offered such an effective, safe an important alternative." Mem. Ex. 24 at 6. As such, that statement, like the others alleged in the SAC, falsely attributed Eylea's success to its "profile," while still failing to mention that the undisclosed credit card scheme also drove Eylea sales, rendering those incomplete statements false and misleading.

***Second***, Defendants argue that the "$250 million in credit card fees" Regeneron secretly paid on behalf of Retina Practices could not, as a matter of law, have been "a 'material source' of [Eylea's] success." Mem. 16. As an initial matter, "materiality is a fact-intensive inquiry more appropriate for summary judgment or trial." *Okla. Firefighters Pension & Ret. Sys. v. Lexmark*

---

[14] Defendants contend that, as in *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), they had no obligation to disclose the "magnitude" of potential wrongdoing. But, in *UBS* the misconduct had occurred well before the DOJ and SEC investigations and in that context the court held there was no duty to disclose uncharged and unadjudicated wrongdoing. This case involves specific, detailed statements, ¶¶125-29, and an ongoing, undisclosed scheme persisting through the Class Period—serving as a material driver of sales, not mere historical conduct.

*Int'l, Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019). Indeed, "materiality is a mixed question of law and fact," such that dismissal on this ground is appropriate only when the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009).

Against this backdrop, Defendants insist that Plaintiff must quantify the impact of the credit card scheme to allege materiality, but this sidesteps the actual inquiry—"whether the defendants' representations, taken together and in context, would have misled a reasonable investor."[15] *Peloton Interactive*, 153 F.4th at 295. A plaintiff can "sufficiently plead[] with particularity" without "quantify[ing] the effect." *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 368 (E.D.N.Y. 2013). Plaintiff has alleged a scheme that for years paid Retina Practices—the gatekeepers to Eylea prescriptions—hundreds of millions of dollars.

Defendants belittle the $250 million figure, noting that it represents only a fraction of revenue from Eylea sales. Setting aside payments of one-quarter of a *billion* dollars to one distributor is a substantial figure to glibly toss aside, the total amount of money reimbursed to all of Regeneron's Eylea distributors is likely far greater. ¶¶95-96. More importantly, Defendants ignore that the SAC alleges that they knew cash back rewards were "very important" to Retina Practices. ¶96. The far more compelling inference from these and other well-pled facts is that Defendants viewed the credit card scheme as important because it directly led to more Eylea sales,

---

[15] Additionally, Defendants wholly ignore the concept of qualitative materiality. In *Litwin v. Blackstone Group, L.P.*, the Second Circuit rejected a district court's undue focus on quantifying the effect of an undisclosed development on a particular business segment and instead held that "a court must consider 'both "quantitative" and "qualitative" factors in assessing an item's materiality,' and that consideration should be undertaken in an integrative manner." 634 F.3d 706, 717 (2d Cir. 2011). Here, Defendants' fraud directly affected the Company's ability to comply with regulatory requirements. *See Villella v. Chem. & Mining Co. of Chile Inc.*, 2017 WL 1169629, at *12 (S.D.N.Y. Mar. 28, 2017) (holding failure to account for bribery payments representing "0.5% of … average annual income" was material to investors given impact on stock price and company's reputation).

and not some other benign reason.

In any event, the SAC also alleges that Eylea's "Cost Recovery per Vial" and details regarding how the credit card scheme kept Eylea's ASP higher than it should have been—meaning Retina Practices received more profit from selecting Eylea than if they purchased a competitor drug. ¶265. Similarly, the SAC identifies a September 2018 presentation sent to Schleifer, noting "Research confirmed that cost recovery is a key factor in practice decision making in light of limited perceived clinical differentiation in anti-VEGF ... Majority of physicians receive credit card points on anti-VEGF purchases, limiting the appeal of discounts." *Id.* In sum, the SAC details a fraudulent scheme, which began the year of Eylea's launch and, by design, helped Eylea dominate the market through undisclosed and improper benefits—facts that a reasonable investor would undoubtedly consider significant in making investment decisions.

***Third***, Defendants' argument that the statements are "non-actionable opinions and puffery" ignores the context in which Defendants made them. The SAC alleges Defendants omitted material facts about how Eylea came to dominate the market for Wet AMD by failing to disclose the scheme orchestrated to bribe physicians. "[S]tatements which speak specifically about the source of a company's financial or other success are misleading when they fail to disclose illegal or unethical conduct *that is a source of that success*." *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 121 (D. Conn. 2021) (emphasis added). And examined in context, Defendants' false and misleading statements regarding Eylea's ability to fend off competitors convey certainty about the drivers of Eylea's performance and are presented as statements of fact that Defendants *knew* were false. Even "pollyannaish statements couched as rosy corporate-speak may be actionable if they contradict facts known to a defendant." *In re Evolus Inc. Sec. Litig.*, 2024 WL 4306786, at \*22 (S.D.N.Y. Sept. 26, 2024).

### B. Defendants' Misstatements and Omissions Concealed Eylea HD's Slow Adoption Rate and Weak Demand

After launching Eylea HD, Defendants soon realized physicians were reluctant to prescribe the new drug based on the troubles that their market research predicted. Nevertheless, Defendants concealed the dismal market response by repeatedly, and falsely, assuring the public of positive and "*encouraging*" responses from physicians resulting in "*strong*" and "*growing demand*." *E.g.*, ¶¶269-70, 323-24. These statements placed physician response and demand for Eylea HD directly at issue and falsely claimed positive results contrary to the known facts. They are therefore actionable.

*First*, while Defendants maintain that Regeneron's financials were not misstated or restated, Mem. 27, that fact is of no consequence to the analysis. *See Sec. & Exch. Comm'n v. Rio Tinto plc*, 2019 WL 1244933, at \*19 (S.D.N.Y. Mar. 18, 2019) (finding lack of restatement did not defeat claim of inaccurate accounting "[t]o hold otherwise would shift to accountants the responsibility that belongs to the courts" (alteration in original)).

*Second*, Defendants' main challenge to falsity is by attacking the credibility of the FEs. "As a general matter, courts consider and take as true the statements of such witnesses at this stage, even when applying the heightened standards of Rule 9(b) and the PSLRA." *Evoqua Water Techs.*, 450 F. Supp. 3d at 405. Indeed, credibility challenges are premature at the pleading stage. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 812 (2d Cir. 2019) ("[C]redibility determinations [are] not permissible at any stage before trial."); *In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at \*4 (S.D.N.Y. Sept. 15, 2025) ("[W]hether these former employees will prove to be credible and percipient sources is not at issue at this stage of the litigation."). The FEs convey details that are directly at odds with Defendants' "definitive statement" and therefore falsity "cannot be resolved at this stage of the litigation, when [the Court] must accept all factual claims

31

in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Peloton Interactive*, 153 F.4th at 300. While Defendants claim that the FE accounts are too vague or generalized, this misstates Plaintiff's allegations and the relevant standard. Whether confidential witness statements support a plaintiff's claim turns on whether the allegations have "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Gimpel*, 156 F.4th at 129. As discussed *supra*, Part I.B.1, the SAC details the FEs' roles, tenure, and access to relevant information, demonstrating they were "in the position" to know the information attributed to them.

**Third**, Defendants contend the challenged statements are merely "qualitative statements expressing opinions" or "classic puffery." Mem. 31. Once again, Defendants ignore that they repeatedly highlighted the strong, growing, and encouraging demand for Eylea HD. *See, e.g.*, ¶¶269-70, 317. And as noted previously, "[w]hile mere puffery is insufficient to state [a] claim of securities fraud, public statements must be consistent with reasonably available data and should not misrepresent existing facts." *In re Coventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, at *12 (D. Md. Mar. 30, 2011). The statements at issue fell far short on both fronts.

## IV.    THE SAC ADEQUATELY PLEADS LOSS CAUSATION

The SAC pleads four corrective disclosures, each resulting in declines in Regeneron's stock price, and establishes the causal link between the alleged misstatements and investors' losses.[16] This is all that is required at this stage.

---

[16] Loss causation may be shown by alleging either that (i) "the market reacted negatively to a corrective disclosure of the fraud," or (ii) "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014). So long as there exists a connection "between the plaintiff's investment loss and the information misstated or concealed by the defendant ..., loss causation is established." *Vivendi*, 838 F.3d at 261.

### 1.    The April 10, 2024 DOJ Announcement

On April 10, 2024, after the market closed, the DOJ announced it had filed a complaint against Defendants for violations of the FCA. ¶¶360-61. The DOJ announcement publicly stated that the credit card scheme had "**enhanced [the Company's] revenue**," thereby informing investors for the first time that the scheme was a material source of Eylea's financial success. ¶361. On this news, Regeneron's stock price declined 3.36% over a two-day period. ¶363. *See Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 173-74 (D. Conn. 2019) (loss causation pled via news revealing true source of company's financial success).

Defendants argue this announcement "revealed nothing new to the market" because the DOJ filed its complaint days earlier, on March 28. Mem. 25-26. As an initial matter, Defendants point to nothing to suggest the market was aware of the DOJ Complaint before the DOJ announcement, nor has Plaintiff's research shown that any analysts discussed the DOJ Complaint prior to April 10, 2024. It is highly unlikely that most investors (or analysts) have log-in access to PACER and Defendants cite no authority suggesting otherwise.[17] Moreover—and critically—the April 10th DOJ announcement contained significant new and material information not addressed in the DOJ Complaint: namely the DOJ's statement that Defendants' scheme inflated Regeneron's revenue, ¶361, a fact that resulted in a decline in Regeneron's stock price.[18]

Notably, analysts linked the DOJ's announcement to the decline, ¶¶364-66, with Wolfe Research expressing concern that Regeneron will "**change[] its ways and stop reimbursing for credit card fees**" which would "**take[] away this advantage ... [and] level[] the playing field**

---

[17] For that reason, Defendants' citation to *Fila v. Pingtan Marine Enterprise Ltd.*, 195 F. Supp. 3d 489 (S.D.N.Y. 2016), is inappropriate. There, the alleged corrective disclosure was an article summarizing the Company's Forms 10-K and 10-Q and thus revealing no new information to the market. *Id.* at 496-97. In contrast, the DOJ announcement incorporated information from court filings that were not readily available to the investing public.

[18] Defendants inaptly rely on *In re Omnicom Group, Inc. Securities Litigation*, 597 F.3d 501 (2d Cir. 2010), a summary judgment decision based on a full discovery record. At this stage, all that is required is "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

between ... competitors." ¶365; *see also* ¶366 (UBS reporting "**investor concern**" that DOJ's action "**would make the Eylea franchise less competitive**").[19]

### 2. The October 2024 Financial Results

On October 31, 2024, investors further learned the partial truth both about the source of Eylea's success and the true state of the Eylea HD launch.

*First*, with respect to Eylea, Defendants disclosed that Eylea's quarterly sales fell 7% quarter over quarter and 21% year over year and attributed the decline to "**a lower net selling price** compared to the third quarter of 2023." ¶¶371-72. Eylea's lower sales and declining net selling price revealed that, contrary to Defendants' statements, the DOJ action changed how the Company did business. ¶374. Thus, "the *subject* of the fraudulent statement or omission"—i.e., Defendants' statements that they would not change their practices (¶¶326, 332)—"was the cause of the actual loss suffered."[20] *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020).

Defendants argue that this disclosure cannot establish loss causation because Regeneron has not changed its practice. Mem. 26. But this does nothing to address the issue. First, Defendants' self-serving assertion is contrary to the SAC's allegations, which at most creates an issue of fact inappropriate for disposition on a motion to dismiss. *See Carpenters*, 750 F.3d at 235. Second, and more importantly, what matters in pleading loss causation is what investors understood from the disclosure. *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 267 (S.D.N.Y.

---

[19] Defendants argue Regeneron's prior disclosure of a DOJ *investigation* made its credit card scheme a fully "known risk" to the market, Mem. 26 n.9, but these generic statements were not made with the same "degree of intensity and credibility sufficient to counter-balance [Defendants' misrepresentations] effectively" that the DOJ's announcement it had filed an *actual lawsuit* accusing Regeneron of FCA violations had. *See*, *e.g.*, *Gimpel*, 156 F.4th at 142.

[20] Defendants argue that the October 31, 2024 disclosure did not reveal new information to the market. Mem.20, 26. However, just because Regeneron disclosed a lower net selling price for some unrelated reasons in the past does not change the fact that, as alleged in the SAC, the October 31, 2024 disclosure was the first time Regeneron disclosed a lower net selling price following the DOJ Complaint.

2021) (loss causation pled when "the market reacted negatively to the revelation that that prior disclosure had been false"). Here, the market specifically linked disclosures of declining Eylea performance and lower net selling price to the DOJ action and understood the disclosures to reveal that Regeneron would likely be forced to change how it conducts business. *See supra* Part IV.1. That is sufficient to plead loss causation at this stage.

*Second*, with respect to Eylea HD, Regeneron revealed Eylea HD's quarterly sales "were only $392 million, missing consensus estimates of $415 million to $425 million." ¶372. This alerted the market to the fact that the demand for Eylea HD was not nearly as strong as Defendants had claimed, contributing to Regeneron's 9.2% stock price decline. ¶376.

Defendants argue that this news "simply 'disclosed disappointing financials,' which does not plead loss causation." Mem. 27, 36. Defendants' categorical approach is "misguided" as the SAC similarly links "disappointing earnings" to Defendants' misrepresentations. *See Dentsply Sirona Inc.*, 732 F. Supp. 3d at 324. Specifically, lower than expected Eylea HD sales surprised the market given Defendants' previous statements lauding the (i) strength of the Eylea HD launch, and (ii) physician demand. For example, analysts at Raymond James cautioned "the miss on Eylea HD ... raised real questions on the pace of the launch."  ¶378. Therefore, the SAC adequately alleges loss causation for the October 31, 2024 disclosure because it directly revealed (part of) the truth about the Company's condition. *See E\*Trade*, 712 F. Supp. 2d at 202 ("[T]he 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'").

### 3.    The January 2025 Financial Results

On January 13, 2025, before the market opened, Defendants announced that Eylea HD's sales had declined by a staggering 22% quarter-over-quarter and missed consensus estimates by

$111 million. ¶¶384, 388. On this news, which further revealed the true extent of the weak demand for Eylea HD, Regeneron's stock price opened $27.64 per share (or 3.97%) lower than the prior trading day's closing price and declined another $26.03 (or 3.6%) the following day. ¶387.

Defendants argue that because Regeneron's stock price increased by 2.9% during the trading day on January 13, 2025, that "negates loss causation as a matter of law." Mem. 36. At this stage, however, a stock price increase the day of the corrective disclosure "is not fatal to plaintiff's case" if the stock price fell the day after the disclosure. *Swanson v. Interface, Inc.*, 2022 WL 2003990, at *3 (E.D.N.Y. June 6, 2022). Here, analysts reacted negatively to the news on January 13, 2025, reporting that "**it appears Eylea HD sales have effectively plateaued (after adjusting for inventory)**."[21] ¶¶387-89. The very next day, as the market fully digested the news, Regeneron's stock price continued to decline.[22] *Id.* Nothing further is required at this stage. *See Gimpel*, 156 F.4th at 151.

### 4.    The April 2025 Financial Results

On April 29, 2025, Regeneron disclosed that Eylea and Eylea HD's combined sales were "down 30% sequentially" and that "**sequential physician unit demand**" for Eylea and Eylea HD had "**declined by 11%**," which the Company attributed to "a lower net selling price" and "lower physician demand." ¶¶392-94. These disclosures revealed the falsity of Defendants' prior statements touting demand for Eylea HD and the extent to which Regeneron had relied on the illegal credit card scheme to drive sales of Eyela. ¶394. In response, Regeneron's stock price fell 6.87%. ¶397. Again, analysts directly linked the results to the risks concealed by Defendants'

---

[21] Courts in this District routinely find that an event window of at least two days can be appropriate. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939, at *16 (S.D.N.Y. Sept. 28, 2023); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 96 (S.D.N.Y. 2015).

[22] *Waters v. General Electric Co.* is distinguishable because the defendants there "disclosed the entire truth of the allegedly fraudulently concealed statements on October 1" and no new information was leaked to the market to cause the stock drop on the next day. 2010 WL 3910303, at *8 n.6 (S.D.N.Y. Sept. 29, 2010). Further, the plaintiffs there did not cite to any analyst reports reacting negatively to the disclosure on the first day. *See id.* at 8.

36

fraud. ¶¶399-403.

Defendants do not directly challenge this final corrective disclosure as to the Eylea statements.[23] Mem. 25-27. Instead, they challenge this disclosure only as to the Eylea HD statements, arguing that "'disappointing [financial] results' *alone* cannot satisfy loss causation." Mem. 36-37 (emphasis added). However, analysts readily connected Regeneron's poor sales and lower net selling price to the "DOJ lawsuit" and the Company's "reimbursement of credit card fees. ¶399. Moreover, Defendants admitted on April 29, 2025 that "**physician unit demand for EYLEA HD and EYLEA declined by 11%**." ¶393. These and other allegations "demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered." *Vivendi*, 838 F.3d at 261.

## V.    THE SAC ADEQUATELY PLEADS CONTROL-PERSON LIABILITY UNDER § 20(A)

Defendants' argument that Plaintiff's Section 20(a) claims should be dismissed also fails. *See* Mem.37. As discussed, Plaintiff adequately pleads predicate Section 10(b) claims. Defendants claim Plaintiff fails to show culpable participation, Mem.37, but, alleging the "power and influence to cause ... fraudulent conduct" suffices. *In re Solucorp Indus., Ltd. Sec. Litig.*, 2000 WL 1708186, at *7 (S.D.N.Y. Nov. 15, 2000). Plaintiff alleges Defendants "participated in the alleged primary conduct" and "that is sufficient to state a claim for control person liability." *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013).

### CONCLUSION

For all the reasons above, Defendants' motion should be denied in its entirety.

---

[23] Accordingly, Defendants have waived the right to challenge final disclosure as to the Eylea statements in their reply brief. *See*, *e.g.*, *In re Grand Jury Subpoenas Returnable Dec. 16, 2015*, 871 F.3d 141, 147 (2d Cir. 2017).

Dated: December 5, 2025

/s/ Michael P. Canty _____

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty
Michael R. Rogers
Nicholas D. Manningham
Kaicheng Yu
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
mrogers@labaton.com
nmanningham@labaton.com
nyu@labaton.com

*Counsel for Lead Plaintiff and*
*Co-Lead Counsel for the Class*

/s/ Serena P. Hallowell _____

**MOTLEY RICE LLC**
Serena P. Hallowell
800 Third Ave., Ste. 2401
New York, NY 10022
Telephone: (212) 577-0040
Facsimile: (212) 577-0054
shallowell@motleyrice.com

Joshua C. Littlejohn (admitted *pro hac vice* )
Ranee Saunders (admitted *pro hac vice*)
Vanessa A. Davis (admitted *pro hac vice*)
Neli Traykova Hines (admitted *pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
jlittlejohn@motleyrice.com
rsaunders@motleyrice.com
vdavis@motleyrice.com
nhines@motleyrice.com

*Counsel for Lead Plaintiff and*
*Co-Lead Counsel for the Class*

**KLAUSNER, KAUFMAN, JENSEN**
 **& LEVINSON**
Robert D. Klausner (pro hac vice forthcoming)
Stuart Kaufman (pro hac vice forthcoming)
7080 Northwest 4th St.
Plantation, FL 33317
Telephone: (954) 916-1202
bob@robertdklausner.com
stu@robertdklausner.com

*Additional Counsel for Lead Plaintiff*

38

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing Memorandum of Law, excluding the parts of the document exempted by Local Rule 7.1(c) (caption, table of contents, table of authorities, signature blocks, and certificates of counsel), is 37 pages long, in accordance with this Court's Order Granting Plaintiff's Motion for Leave to File Excess Pages, Dkt. 66.

December 5, 2025.

*s/Serena P. Hallowell*
Serena P. Hallowell