**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JEFFREY RADTKE, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>  vs.<br><br>REGENERON PHARMACEUTICALS, INC., LEONARD S. SCHLEIFER, CHRISTOPHER FENIMORE, ROBERT E. LANDRY, and MARION MCCOURT<br><br>             Defendants. | No. 25-cv-00145-MKV<br><br><br>Hon. Mary Kay Vyskocil<br><br>**ORAL ARGUMENT REQUESTED** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO
DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

H. Christopher Boehning
Audra J. Soloway
David P. Friedman
Daniel S. Sinnreich
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
Tel: (212) 373-3289
Fax: (212) 492-0289
cboehning@paulweiss.com
asoloway@paulweiss.com
dfriedman@paulweiss.com
dsinnreich@paulweiss.com

**TABLE OF CONTENTS**

**Page(s)**

ARGUMENT ............................................................................................................................... 1

I.      Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the ASP
Theory. ............................................................................................................................. 1

      A.      Plaintiff Fails to Plead Any Materially False or Misleading Statement. ................ 1

      B.      Plaintiff Fails to Plead a Strong Inference of Scienter for the ASP Theory. .......... 5

      C.      Plaintiff Fails to Allege a Corrective Disclosure for the ASP Theory. ................... 8

II.     Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the HD
Theory. ........................................................................................................................... 11

      A.      Plaintiff Fails to Plead Any Materially False or Misleading HD Statement......... 11

      B.      Plaintiff Fails to Plead a Strong Inference of Scienter for the HD Theory. ........... 13

      C.      Plaintiff Fails to Allege a Corrective Disclosure for the HD Theory. ................... 15

CONCLUSION ......................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)..................................................................12, 13

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014)....................................................................................2

*Das* v. *Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018).....................................................................6

*DoubleLine Cap. LP* v. *Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018).....................................................................5

*Gimpel* v. *Hain Celestial Grp., Inc.*,
156 F.4th 121 (2d Cir. 2025) ................................................................................13

*Gluck* v. *Hecla Mining Co.*,
657 F. Supp. 3d 471 (S.D.N.Y. 2023).....................................................................2

*Huey* v. *Anavex Life Scis. Corp.*,
2025 WL 1707581 (S.D.N.Y. June 18, 2025) ....................................................8, 15

*Marcu* v. *Cheetah Mobile Inc.*,
2020 WL 4016645 (S.D.N.Y. July 16, 2020) ........................................................4

*Merritt* v. *Molecular Partners AG*,
2024 WL 495140 (S.D.N.Y. Feb. 5, 2024)..............................................................9

*N.Y.C. Pub. Pension Funds* v. *Coupang, Inc.*,
2025 WL 2613650 (S.D.N.Y. Sept. 10, 2025).....................................................3, 4

*In re New Energy Sys. Sec. Litig.*,
66 F. Supp. 3d 401 (S.D.N.Y. 2014).......................................................................9

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)...........................................................................1, 8, 9

*Puddu* v. *6D Glob. Techs., Inc.*,
2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) .........................................................9

*Ret. Sys.* v. *Nokia Corp.*,
2011 WL 7158548 (S.D.N.Y. Sept. 6, 2011)...........................................................7

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Ret. Sys.* v. *Peloton Interactive, Inc.*,
  153 F.4th 288 (2d Cir. 2025) ....................................................................................12

*Sapssov* v. *Health Mgmt. Assocs., Inc.*,
  608 F. App'x 855 (11th Cir. 2015) ..............................................................................9

*Steppacher* v. *Alfi, Inc.*,
  2022 WL 1115049 (S.D. Fla. Apr. 13, 2022) ...............................................................9

*In re STMicroelectronics N.V. Sec. Litig.*,
  2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025)............................................................12

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................................................................5

*In re Teva Securities Litigation*,
  671 F. Supp. 3d 147 (D. Conn. 2023)........................................................................2, 3

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir.
  2014) ...........................................................................................................................7

*In re Walmart Inc. Sec. Litig.*,
  151 F.4th 103 (3d. Cir. 2025) ......................................................................................3

*zCap Equity Fund LLC* v. *LuxUrban Hotels Inc.*,
  792 F. Supp. 3d 407 (S.D.N.Y. 2025).........................................................................7

**Statutes**

Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 et seq. ...................................5, 6, 11

**Other Authorities**

17 C.F.R. § 240.10b-5.........................................................................................................1, 11

90 C.F.R. §§ 32352, 49266 ......................................................................................................6

Federal Rule of Civil Procedure 9(b).........................................................................................11

iv

Plaintiff's opposition concedes dispositive facts and ignores binding authority. Plaintiff's implausible claims that the success of two of Regeneron's flagship drugs was secretly driven by credit card processing fee reimbursements and vague "bulk" (but real) sales must be dismissed.

The ASP Theory can be quickly disposed of: While Plaintiff initially claimed that DOJ's announcement that it had sued Regeneron for excluding credit card fee reimbursements from ASP reporting "revealed" Defendants' fraud, Plaintiff now concedes that the DOJ's lawsuit was publicly filed nearly *two weeks* earlier. The later press release is merely a "journalistic characterization of previously disclosed" information that "does not constitute a corrective disclosure," dooming Plaintiff's fraud claim. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010). As discussed below, Plaintiff also fails to plead that Defendants' high-level statements attributing EYLEA's success to its "clinical profile" were misleading, or that any Defendant knew and concealed contrary facts about the source of EYLEA's success.

The HD Theory fares no better. It rests entirely on Plaintiff's allegation that Defendants overstated "physician enthusiasm" for HD after its launch, but Plaintiff concedes that Defendants did not misreport HD sales or other financials, and alleges no *facts* contradicting Defendants' statements about the initial demand for HD. Plaintiff's opposition instead doubles down on vague anecdotes from FEs that no Individual Defendant is alleged to have known—a dispositive pleading defect confirmed by at least *nine* cases cited in Defendants' brief that Plaintiff simply ignores.

The SAC fails to plead falsity, scienter, and any corrective disclosures for both fraud theories. The Court should dismiss the SAC with prejudice.

## ARGUMENT

**I.**      <u>**Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the ASP Theory.**</u>

     **A.**      **Plaintiff Fails to Plead Any Materially False or Misleading Statement.**

Plaintiff argues that Defendants falsely stated that EYLEA's clinical profile "made the

1

difference" while concealing that the alleged credit card fee "scheme" was the source of EYLEA's "market dominance." Opp. 4, 25–26.[1] But Defendants' motion established that (i) nothing was "concealed" because Regeneron disclosed the DOJ's investigation and (ii) Plaintiff pleads no facts about the impact of the credit card practice on EYLEA sales, nor that it "made the difference." Mot. 15–19. Plaintiff's opposition concedes that Regeneron disclosed the DOJ investigation, that EYLEA's profile *did* drive its success, and that Defendants never said EYLEA's profile was the *only* driver. Opp. 1, 25–30. Faced with those concessions, Plaintiff's falsity arguments flounder.

*First*, Plaintiff casts Defendants' disclosures about the DOJ investigation as a "truth on the market defense." Opp. 26. But courts routinely dismiss securities fraud cases at the pleading stage where defendants show that the "information that the plaintiffs assert should have been disclosed" was, in fact, disclosed. *Gluck* v. *Hecla Mining Co.*, 657 F. Supp. 3d 471, 490 (S.D.N.Y. 2023).

Plaintiff also insists that Regeneron's explicit disclosures that the DOJ was investigating its payment of "credit card fees" and "inflated reimbursement rates for EYLEA" were inadequate because Defendants did not confess to "critical details" of the "scheme" or its "magnitude." Opp. 14, 26–27. But the Second Circuit rejected that argument in *City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*, 752 F.3d 173, 182 (2d Cir. 2014), holding that once a company discloses an investigation, it need not disclose the "magnitude" of the risk or "confess[]" to "uncharged, unadjudicated wrongdoing."[2] Indeed, Plaintiffs cite *In re Teva Securities Litigation*, which relied on *UBS* and held that a disclosure that regulators had "initiated investigations into [its] sales and marketing practices" was adequate and that "[a]sking for more would create a new obligation that does not find support in the law." 671 F. Supp. 3d 147, 213

---

[1] "¶ __" refer to SAC paragraphs. "Ex. __" refer to exhibits to the Declaration of David P. Friedman (pincites correspond to PDF pagination). All emphases are added and internal quotation marks and citations are omitted.
[2] Plaintiff seeks to distinguish *UBS* because the misconduct there "occurred well before the . . . investigations," Opp. 28 n.14, but that is wrong: plaintiffs claimed UBS was "engaged in an ***ongoing*** tax evasion scheme." 752 F.3d at 184.

2

(D. Conn. 2023). Plaintiff tries to distinguish these cases—including *In re Walmart Inc. Sec. Litig.*, 151 F.4th 103 (3d. Cir. 2025)—by arguing that those defendants offered "no assurances as to the scope and outcome" of investigations, whereas here Defendants supposedly "assured the market that the DOJ investigation posed no risk." Opp. 27. This is wrong: Regeneron warned that the "outcome" of the DOJ investigation was "uncertain" and could have a "material impact[]" on Regeneron's "financial position, results of operations, and future cash flows." Ex. 8 at 4, 11; *see* Ex. 28 at 3 (similar disclosure on risks of "ultimate outcome" of DOJ Action).

*Second*, Plaintiff asks the Court to ignore its admitted failure to plead facts showing that credit card reimbursements *were* a "material source" of EYLEA's success. Opp. 26, 28–29. Plaintiff cites case law evaluating the materiality of alleged misstatements, but the pleading failure here is one of *falsity*, not materiality. The SAC's theory is that Defendants' statements concealed that fee reimbursements were a "material source" of EYLEA's success. ¶¶ 129, 266. Plaintiff's failure to support this theory with facts requires dismissal because, "[w]ithout information about the true effect of the alleged . . . conduct on [defendant's] revenues, it is difficult to determine whether the implication of [defendants'] statements . . . was misleading or not." *N.Y.C. Pub. Pension Funds* v. *Coupang, Inc.*, 2025 WL 2613650, at *15 (S.D.N.Y. Sept. 10, 2025).

Relying solely on allegations from the DOJ complaint, Plaintiff stresses that Regeneron reimbursed the "substantial figure" of $250 million to one (of two) distributors over a ten-year period, Opp. 29, but ignores that this is a tiny fraction of EYLEA's $33 billion in U.S. net sales during the same period. Mot. 16. Plaintiff also argues, citing documents from years before the Class Period appended to the DOJ complaint, that Defendants "knew" that "cash back rewards" and "cost recovery" were "very important" to some customers. Opp. 29–30. But allegations of "importan[ce]" to unspecified customers cannot cure the fundamental failure to plead facts

3

showing that EYLEA's success was *not* driven by its clinical profile. *Marcu* v. *Cheetah Mobile Inc.*, 2020 WL 4016645, at \*5 (S.D.N.Y. July 16, 2020) (dismissing complaint that did not "include a single allegation about the significance of the click injection scheme . . . [to] overall revenues").

*Third*, Plaintiff concedes that statements about a product's success are not misleading if they do not "rule out other factors playing a role."[3]  Opp. 28; Mot. 17–18.  Instead, Plaintiff argues—without quoting or citing any actual statement—that the challenged statements ruled out other contributing factors.  *See* Opp. 28, 30.  But Defendants' statements that EYLEA's profile "made the difference" and drove its performance do not rule out other factors contributing to its success.  *See Coupang*, 2025 WL 2613650, at \*14–15 (dismissing where issuer likewise identified specific performance drivers without saying they were the "sole" or "only" drivers).

*Fourth*, Plaintiff concedes that three of the ASP Statements are opinions, and does not allege facts that Defendants (i) disbelieved their opinions about EYLEA's clinical profile or (ii) omitted facts about their "basis for holding that view."  Opp 30; Mot. 18–19.  The opinions are therefore not actionable.  Plaintiff also insists that these challenged statements were not puffery because they "convey[ed] certainty about the drivers of EYLEA's performance," Opp. 30, but the statements conveyed no such certainty and did not rule out other contributing factors.  *Supra* 4.

*Finally*, Plaintiff's opposition **does not respond** to Defendants' arguments that the two DOJ Action Statements were not misleading because they are protected forward-looking statements and opinions, and because Plaintiff's theory is based on the false premise that Defendants changed their fee reimbursement practices.  Mot. 19–20.  Plaintiff has waived any arguments about these statements by failing to address them in opposition, and they must be dismissed.  *DoubleLine Cap. LP* v. *Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018) (collecting cases).

---

[3] To be clear, Regeneron does not concede that its reimbursement of credit card fees, or the desire to earn credit card rewards, was a driver of EYLEA sales at all.

**B.      Plaintiff Fails to Plead a Strong Inference of Scienter for the ASP Theory.**

Plaintiff fails to plead a strong inference of scienter because it does not allege that any Individual Defendant possessed a motive to defraud or knew that reimbursements were the "material source" of EYLEA's success.  Mot. 21.  Plaintiff's opposition concedes the former and tries to sidestep the latter largely by relying on the DOJ Action, but the DOJ Action does not allege—and the court there never suggested—that any Regeneron executive spoke with fraudulent intent when attributing EYLEA's performance to its clinical profile.

**No Motive.**  Plaintiff concedes that it does not plead any motive to defraud investors.  Opp. 19 n.7.  This *raises* Plaintiff's pleading burden.  Mot. 21.  Plaintiff also admits that Regeneron repurchased *$5.4 billion* of its shares while allegedly inflating them, but asks the Court to ignore this, since it is not pursuing a "motive" theory.  Opp. 19 n.7.  That is wrong.  Share repurchases and the lack of motive factor into the holistic balancing analysis required by *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), and weigh strongly against scienter.  Mot. 21, 25.

**No Conscious Misbehavior or Recklessness.**  Plaintiff does not dispute the SAC's failure to allege particularized facts demonstrating that any Individual Defendant learned information contradicting public statements about the "material source[s]" of EYLEA's success.  Mot. 21–22.

Instead, Plaintiff points principally to the DOJ Action to support scienter.  As Plaintiff admits, however, the inquiries under the FCA and the PSLRA are different.  Opp. 15–16.  The DOJ Action concerns whether *Regeneron* wrongfully inflated EYLEA's ASP in non-public reports to the *government*.  Those allegations say nothing about whether Regeneron's *senior executives* intended to deceive *shareholders* when discussing the "material source" of EYLEA's success.  Mot. 22–24.  That Defendants also warned investors about the DOJ investigation, Opp. 14, undermines any inference that Defendants intended to conceal the ASP dispute from shareholders, Mot. 14.  And that these disclosures allegedly did not convey the "magnitude" of the risk or details

of the investigation, Opp. 14, is irrelevant, *supra* 2.

Plaintiff also points to pre-Class Period allegations from the DOJ Action purporting to show that Defendants were "aware[]" that Regeneron did not characterize credit card fee reimbursements as price concessions in ASP calculations. Opp. 15–16. These allegations are irrelevant to Defendants' knowledge of whether their statements about EYLEA demand were inaccurate, which is the proper scienter inquiry. But even if the Court considers these allegations, the law is clear that "awareness" of conduct cannot establish scienter absent allegations that Defendants knew the conduct "was unlawful." *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 814 (S.D.N.Y. 2018). There are no such allegations in the SAC. Mot. 22–23. Indeed, CMS recently *proposed* and then *withdrew* a rule that would have *for the first time* characterized credit card fees as price concessions, reinforcing the conclusion that Regeneron's legal position on its calculation of ASP is sound. *See* 90 C.F.R. §§ 32352, 49266 (2025). Plaintiff dismisses this argument as a "good faith defense." Opp. 16. But the PSLRA requires the Court to weigh competing inferences when analyzing scienter, and the more compelling inference is that Defendants—who promptly disclosed, and continue to defend, the DOJ investigation, and have not changed their ASP practices, *see infra* 10; ¶ 399—believe their actions are lawful and that the DOJ is wrong.

Plaintiff relies heavily on the allegation that in 2019 Deloitte "provided Regeneron" with something called a "BFSF Grid," which purportedly had a column titled "TYPE OF SERVICE COULD BE BFSF?", and, under that column, the word "No" in a row for "credit card fees." Opp. 15; ¶ 108. It does not appear Plaintiff has actually seen this "grid," which is sealed in the DOJ Action, and which Plaintiff misrepresents. For instance, Plaintiff repeatedly states—without any basis—that this grid reflected the "findings" of Regeneron's "auditor." *E.g.*, Opp. 14–16. But the DOJ complaint states that in this context, Deloitte was "a consultant," which, among other things,

6

assisted Regeneron with government price reporting, *not* an outside auditor reviewing Regeneron's financial statements. DOJ Compl. ¶¶ 98, 106–107, 111. And in the DOJ Action, Regeneron disputes that Deloitte so advised Regeneron. Ex. 29 at 3. This type of confusion is precisely why courts reject theories based on "uncorroborated allegations embedded in a complaint in another action," particularly where, as here, Plaintiff has not independently analyzed (or even seen) the materials underlying those allegations and relies on them for an entirely different purpose. *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *17 n.17 (S.D.N.Y. Sept. 28, 2012), *aff'd*, 752 F.3d 173 (2d Cir. 2014). In any event, this allegation cannot support scienter because the SAC does not plead particularized facts about the "grid," including why it was prepared; who reviewed it; when they reviewed it; or how they weighed the information. Mot. 33–34.[4]

Plaintiff's remaining circumstantial allegations fare no better. Plaintiff cannot infer scienter from the alleged misstatements because high-level statements "credit[ing] Eylea's market share" to its "superiority as a product," Opp. 17, do not support an inference that the speakers knew about—much less concealed—the topic at hand: the alleged impact of ASP reporting of credit card reimbursements on EYLEA sales. *See City of Roseville Emps.' Ret. Sys.* v. *Nokia Corp.*, 2011 WL 7158548, at *10 (S.D.N.Y. Sept. 6, 2011). And the core operations doctrine does not help Plaintiff where that same topic is not alleged to be central to Regeneron's business. Mot. 24–25.[5]

**Holistic Balancing.** Finally, Plaintiff offers a "narrative" for why Regeneron would reimburse distributors' credit card fees, but asks the Court to disregard Defendants' opposing narrative as an improper "question[] of fact." Opp. 18–19. Plaintiff misunderstands the inquiry,

---

[4] Plaintiff also insists "Defendants failed to follow their own [Standard Operating Procedures]" for evaluating BFSF, but points solely to an allegation that a single, non-Defendant VP did not perform this analysis "prior to approving [ASP assumptions]" in 2016. Opp. 15; ¶ 116. The SAC pleads no facts about this employee or her purported failure, and this allegation sheds no light on what any Individual Defendant knew about the factors driving EYLEA's success.
[5] This case bears no resemblance to *zCap Equity Fund LLC* v. *LuxUrban Hotels Inc.*, 792 F. Supp. 3d 407 (S.D.N.Y. 2025), where the CEO and CFO *personally negotiated* four agreements and falsely claimed they were signed.

which requires inferences to be holistically weighed.  The correct question is why Defendants—who lacked any cognizable motive—would deceive *shareholders* by touting EYLEA's "clinical profile," all while disclosing the DOJ inquiry into ASP and repurchasing $5.4 billion of purportedly inflated shares.  Indeed, it is absurd to infer that Defendants believed EYLEA's decade-long success was attributable to reimbursing distributors' credit card fees, rather than its effectiveness in treating serious diseases, Mot. 25; Opp. 1 ("Eylea is a useful drug to treat age-related macular degeneration").  The far more compelling inference is that Defendants *did* attribute EYLEA's success to its "clinical profile" and did not intend to deceive shareholders.

C.      **Plaintiff Fails to Allege a Corrective Disclosure for the ASP Theory.**

**April 10, 2024 "Disclosure".**  Defendants showed that the DOJ press release issued on April 10, 2024 did not constitute a corrective disclosure.  Mot. 25–26.  Plaintiff admits that the DOJ complaint was publicly filed on March 28, 2024, when the stock price *increased.*  "[P]laintiffs cannot show loss causation at the pleading stage when a company's stock price went up." *Huey* v. *Anavex Life Scis. Corp.*, 2025 WL 1707581, at *7 (S.D.N.Y. June 18, 2025).  Yet Plaintiff nonetheless insists that the "truth" about the impact of the fee reimbursements was revealed only by the April 10 press release.  Opp. 10, 33.  But the press release did not contain new information—it simply summarized the allegations in the earlier, publicly filed complaint.  Ex. 12; Dkt. 54-1.  Under controlling Second Circuit law, a "journalistic characterization of previously disclosed" information "does not constitute a corrective disclosure." *Omnicom*, 597 F.3d at  512.

To avoid *Omnicom,* Plaintiff argues that the press release disclosed "new and material information" not in the DOJ complaint, namely, that credit card fee reimbursements "enhanced [the Company's] revenue."  Opp. 33.  That is wrong: the DOJ complaint alleged that fee reimbursements "ensured steady—and inflated—Medicare reimbursement rates," and "unjustly enrich[ed] Regeneron." *See* DOJ Compl. ¶¶ 11, 15; *id.* ¶ 146 (seeking "a full accounting of all

8

revenues . . . incurred by Regeneron . . . based on inflated reimbursed rates").[6]  Plaintiff thus fails to identify any new and allegedly corrective information in the press release.[7]

Plaintiff next speculates that the market may not have been "aware" of the DOJ complaint because it required PACER "log-in access" and so was "not readily available."  Opp. 33.  To plead loss causation, however, Plaintiff must allege a stock drop loss caused by *new* and *corrective* information.  *Omnicom*, 597 F.3d at 512–13.  Courts routinely address this legal requirement without analyzing whether and how quickly the market absorbs new information.  *See* Mot. 26 (citing *Omnicom* and *Pingtan*).  In any event, it is *Plaintiff* who alleges that the market for Regeneron stock was "efficient" and "promptly digested" information "from publicly available sources."  ¶¶ 356, 445.  PACER is plainly public, and Plaintiff identifies no support for an efficient market carve-out for generally accessible websites that require log-in credentials.  That is because there is none.  The Eleventh Circuit, for example, held that a report summarizing facts "that had existed in publicly accessible court dockets" did not qualify as a "corrective disclosure" because the underlying information "was easily obtainable."  *Sapssov* v. *Health Mgmt. Assocs., Inc.*, 608 F. App'x 855, 863 (11th Cir. 2015); *see also Steppacher* v. *Alfi, Inc.*, 2022 WL 1115049, at *5 (S.D. Fla. Apr. 13, 2022) ("[A] corrective disclosure cannot be based only on [previously] publicly available information such as . . . filings available on a public docket in a legal proceeding.").[8]  Accordingly, the DOJ press release cannot constitute a corrective disclosure.

**October 31, 2024 "Disclosure".**  Plaintiff argues that Regeneron's October 31, 2024

---

[6] Plaintiff also argues that the press release informed investors that these reimbursements were "a material source of EYLEA's financial success," Opp. 33 (citing ¶ 361), but neither the press release nor ¶ 361 say any such thing.

[7] That *Omnicom* was a "summary judgment" decision, Opp. 33 n.18, does not diminish its import—its holding was purely legal.  Courts thus routinely rely on *Omnicom* to dismiss securities fraud claims on loss causation grounds at the pleading stage.  *See, e.g.*, *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 406 (S.D.N.Y. 2014).

[8] Plaintiff's cited cases did not involve public court filings and are inapposite.  *Puddu* v. *6D Glob. Techs., Inc.*, 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021), involved news articles defendants "*expressly downplayed*," which "perverted the corrective information" by "undermining [its] reliability."  And *Merritt* v. *Molecular Partners AG*, involved Securities Act claims *that do not require loss causation*.  2024 WL 495140, at *3 (S.D.N.Y. Feb. 5, 2024).

financial results somehow revealed that "the DOJ action changed" its ASP calculations, citing only the disclosure of a "lower net selling price" for EYLEA for the quarter. Opp. 34. But there are no well-pleaded facts suggesting that the lower net selling price had anything to do with ASP calculations, much less that it revealed the "true" source of EYLEA's success. Plaintiff attempts to create a causal link by claiming this was the "first time Regeneron disclosed a lower net selling price following the DOJ complaint." Opp. 34 n.20. That is wrong: Regeneron publicly reported a "lower net selling price" for EYLEA on August 1, 2024—after the DOJ complaint—and in *every* quarterly filing since August 2023. Mot. 20, 26.[9] This disclosure was not unique and did not provide any new information about Regeneron's ASP practices. Plaintiff asserts that "what matters . . . is what investors understood from the disclosure," Opp. 34–35, but Plaintiff cites no analyst or market commentary connecting the disclosure to the DOJ Action or ASP calculations.

Plaintiff's premise is also wrong because Regeneron *never* disclosed any change in its treatment of credit card fees when calculating ASP. Mot. 19–20. Plaintiff calls this an improper factual dispute, Opp. 34, but the SAC concedes this "theory" is based solely on speculation rather than factual allegations. *E.g.*, ¶ 375 (". . . *if* EYLEA reported the credit card fee reimbursements as a price concession . . . . this change would also lower the net selling price."). Indeed, Plaintiff's speculation not only ignores public filings in the DOJ Action, which plainly say that Regeneron has *not* changed this practice, Ex. 13 at 4, but a May 2025 analyst report *cited in the SAC* which (correctly) states that Regeneron "*continues* to reimburse [credit card] fees while the [DOJ Action] is ongoing," and speculates about what might happen "*if it were to stop*." ¶ 399.

**April 29, 2025 "Disclosure".** The disclosure in Regeneron's April 29, 2025 financial results about a "lower net selling price" for EYLEA during 1Q25 is not alleged to be corrective

---

[9] *See* Ex. 10 at 6; Ex. 25 at 4; Ex. 30 at 4; Ex. 31 at 4; Ex. 32 at 4; Ex. 33 at 4; Ex. 34 at 4; Ex. 35 at 4.

10

for the same reasons. Opp. 36–37.[10]  Strangely, Plaintiff cites the May 1, 2025 analyst report that says nothing about "net selling price" and, as noted above, specifically says that Regeneron has *not* changed its practice. ¶ 399.  This *undermines* Plaintiff's loss causation theory.[11]

## II.    Plaintiff Fails to State a Section 10(b) and Rule 10b-5(b) Claim for the HD Theory.

### A.    Plaintiff Fails to Plead Any Materially False or Misleading HD Statement.

The SAC pleads no facts contradicting the 13 HD Statements conveying positive "early signals" and "launch indicators" for HD.  Mot. 4.  Plaintiff argues that these statements hid weak demand for HD, but the opposition concedes Plaintiff's failure to allege any misstated financials or that any of the reported HD sales figures were false.  Opp. 31.  This concession is key:  Plaintiff's theory is that Defendants overstated demand for HD by engaging in "unsustainable" sales tactics, ¶¶ 341–43, but they cannot point to *any evidence* that Defendants overstated demand.

Plaintiff's opposition relies instead on anecdotes from FEs who worked in regional, low-level roles to claim that HD demand was "weak."  Opp. 9.  Plaintiff argues that Defendants "attack[] the credibility of the FEs," which is "premature at the pleading stage."  *Id.*  This completely misconstrues Defendants' brief and the pleading standard.  The problem with the SAC is not that the FEs lack "credibility."  It is that the FEs' anecdotes lack the particularity required by the PSLRA and Rule 9(b), and do not contradict any challenged statement.  For example:

- FE-10 recalls unspecified "market research" prior to HD's launch that included "insight into the ramifications" of HD's temporary J-Code, pre-filled syringes, and flexible dosing.  ¶ 140.

- FE-8 alleges that "leadership" began "panicking about [] HD's performance" by 4Q23.  ¶ 161.

- FE-3 recalls "disappointment" about HD "began to materialize" around the same time.  ¶ 168.

---

[10] Defendants did not "waive" this argument.  Opp. 37 n.23.  Defendants argued that the April 2025 disclosure merely "revealed disappointing sales for *EYLEA* and HD," which "cannot satisfy loss causation."  Mot. 36–37.

[11] Plaintiff argues that the ASP reporting practice *itself* sufficiently pleads "scheme" liability, Opp. 24–25, but fails to plead that it was done "in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  The only "scheme" in the SAC is the alleged misstatements.  Contrary to Plaintiff's baseless waiver suggestion, Opp. 24 n.12, Defendants' pre-motion letter summarized in detail why those alleged misstatements are not fraudulent.  Dkt. 50.

These allegations all suffer from the same defects: they allege no facts about what this research said or whether its "ramifications" materialized, who "panicked" or was "disappointed" and why, and how these vague observations contradicted any public statement. Tellingly, Defendants' brief cited substantial case law rejecting FE allegations at the pleading stage for precisely the same deficiencies. Mot. 28–31. ***Plaintiff does not address any of it***. Opp. 31–32.[12]

Plaintiff also argues that the HD Statements omitted that HD sales were "unsustainable" and driven by secret "backroom deals." ¶¶ 5, 207. At the outset, this argument fails because the sales were not "unsustainable"—HD sales not only surpassed *$1 billion* in the first year after launch, but also reached a high of *$431 million* in the most recent quarter alone. Mot. 35–36. In any event, Plaintiff's argument relies on second-hand accounts from three FEs who "heard of," "began to hear from colleagues," and were "informed" that executives met with "private-equity owned Retina Practices" to sell HD. Opp. 9–10, 21–22; ¶¶ 177–83. But FE allegations based on hearsay cannot support a fraud claim. Mot. 29–30. And more importantly, Plaintiff admits that offering concessions such as rebates to large customers is a common business practice, Opp. 22 n.10, not fraud. *See* Mot. 30–31. While Plaintiff alleges that *one* customer was offered a "big rebate," Opp. 22; ¶ 301, Plaintiff does not allege that it differed from rebates offered in the past, much less explain why it was improper. Nor does Plaintiff allege that any HD sales were illegitimate, any HD products were ever returned, or any revenue was subsequently adjusted. Mot. 30. Plaintiff's claim that Defendants knew these sales were "unsustainable" thus has no factual support whatsoever. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566

---

[12] Plaintiff's cases are distinguishable. *In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *3 (S.D.N.Y. Sept. 15, 2025), involved an FE who had directly "called out" the CEO "for misleading investors by stating that demand and growth . . . were on the rise, when the opposite was true." And *City of Hialeah Emps.' Ret. Sys.* v. *Peloton Interactive, Inc.*, 153 F.4th 288, 295–296, 300 (2d Cir. 2025), involved "numerous" FE statements—including a former senior director of supply-chain management—that *directly contradicted* a statement about company inventory.

(S.D.N.Y. 2004) ("[O]ffering incentives to meet goals, aggressive or not, is not suspect when . . . real products [were] shipped to real customers who then paid with real money.").[13]

Finally, Plaintiff does not dispute that most HD Statements are opinions, or argue those opinions were subjectively disbelieved or otherwise false.  Mot. 31; Opp. 32.  Nor does Plaintiff distinguish case law holding that similar statements about "encouraging" results were immaterial puffery.  Mot. 31–32.  These pleading failures independently require dismissal.

**B.    Plaintiff Fails to Plead a Strong Inference of Scienter for the HD Theory.**

Again lacking motive, Plaintiff fails to plead with particularity that Individual Defendants intended to deceive shareholders about "strong initial demand" and "enthusiasm" for HD.  Mot. 32.  Plaintiff has no response to the showing that (i) there are no allegations linking any FEs' vague anecdotes about HD to Individual Defendants, Mot. 33, and, (ii) despite FEs relaying rumors about Individual Defendants meeting with large Retina Practices, there is nothing nefarious about meeting with large customers to sell a new drug, Mot. 35.

*First*, Plaintiff relies on the following FE allegations, none of which plead particular facts about any Individual Defendant's knowledge or intent when speaking about HD:

- FE-10's recollection that "early market research predicted . . . issues."  Opp. 20; ¶ 139.[14]

- Two regional "Medical Specialists" (out of 15,000 employees) who purportedly had difficulty selling HD.  Opp. 20; Ex. 35 at 5.  One recalls vaguely that interest was "not there," ¶ 179, and one recalls that none of her accounts "switched" to HD during an unspecified period, ¶ 292.

- An "accountant" who attended unspecified meetings where unspecified, but apparently "unimpressive," "numbers . . . were discussed."  Opp. 20; ¶ 275.

---

[13] This case is nothing like *Gimpel* v. *Hain Celestial Grp., Inc.*, 156 F.4th 121 (2d Cir. 2025), where defendants allegedly inflated reported financials by improperly recognizing revenue—misconduct the company later admitted by filing restated financials. *Id.* at 132–33.  Plaintiff does not allege HD sales were misstated.  *Gimpel* also involved particularized allegations from senior manager FEs, who recounted details about the artificial sales, including *when* they occurred, to *which* distributors, *what* "off-contract" concessions were offered, and *how much* product was returned. *Id.* at 130, 140.  There are no similar allegations suggesting that Regeneron knew its sales were not "real."

[14] To the extent Plaintiff points to supposed early concerns about dose flexibility, prefilled syringes, and a temporary J-Code, those concerns were each disclosed *before* any alleged corrective disclosure, Mot. 10–11, 28, and 28 n.10, which *negates* an inference of scienter.  *Supra* 5–6.

13

- FE-13's observation in August 2023 that "internal forecasts were reduced." Opp. 21; ¶ 280.

None of these allegations support scienter because *none* of these FEs are alleged to have communicated any of these observations to, or attended any "meetings" with, Individual Defendants, or anyone alleged to have made a false statement on behalf of Regeneron. Plaintiff says that there is no requirement FEs have "direct contact with executives," Opp. 21, but Plaintiff ignores the **nine cases** cited in Defendants' opening brief that hold directly to the contrary. *See* Mot. 32–35.[15] Nor is there any allegation that reflects how any of these "forecasts" or "numbers" contradicted Individual Defendants' or Regeneron's actual statements. *Id.*

*Second*, Plaintiff bizarrely argues that scienter can be inferred from the unremarkable allegation that Regeneron executives met with customers to promote the HD launch. Opp. 21–22. Plaintiff ignores that these allegations cannot show scienter because they are based on second-hand rumors and lack any detail. Mot. 29–30, 35. Even assuming their truth, the facts that executives called physicians and visited several "big[]" customers to sell a new drug demonstrate only that the executives were doing their jobs—not committing fraud. *Supra* 12. Plaintiff also alludes to other "unscrupulous sales tactics," Opp. 22, but the only SAC allegations are inscrutable FE anecdotes that "Reimbursement Managers" were asked to assist with "sales functions," and that Regeneron gave "bad access information to accounts" about HD. ¶¶ 189–192. There are no allegations about when these practices occurred or how widespread they were, or that any Individual Defendant was *ever* aware of them. Mot. 31.[16]

---

[15] Plaintiff's sole case, *Avon*, 2019 WL 6115349, at *21, involved FEs not only with insight into the practices at issue, but also "*the extent to which the individual Defendants were involved in those same practices.*"

[16] The circumstantial scienter allegations about the HD Theory fail for the same reasons as the ASP Theory. Defendants' high-level statements "celebrating [the] release" of HD and its "demand," Opp. 23, do not raise a strong inference that Defendants knew any of the allegedly contradictory anecdotes from regional and low-level FEs. Plaintiff also invokes core operations, Opp. 23–24, but even if it applied to HD, it cannot impute to senior executives knowledge of the FEs' anecdotes, which fail to establish scienter in the first place.

14

*Finally*, Plaintiff argues that the most compelling inference from its FE allegations is that Defendants knew about problems with HD and tried to "plug the sales gap with bulk purchases." Opp. 24.  It is not clear why Plaintiff believes "bulk purchases" are improper, but regardless, the vague and isolated FE anecdotes in the SAC simply do not support this narrative.  Plaintiff's narrative also assumes that Defendants' HD sales efforts "ultimately failed."  Opp. 24.  That also is not true.  Regeneron never misstated its financials, and HD is still a commercial success.  *Supra* 12.  The far more compelling inference is that Defendants believed there was strong initial demand for HD; that sales temporarily dipped, as is common for a new product; and that Defendants' sales efforts and optimism were ultimately justified by its commercial success.

### C.      Plaintiff Fails to Allege a Corrective Disclosure for the HD Theory.

Plaintiff points to three alleged corrective disclosures that revealed disappointing quarterly HD sales, but Plaintiff has alleged *no facts* that demonstrate how any of these disclosures revealed the falsity of Defendants' earlier statements about "physician enthusiasm."  Mot. 36–37.  For instance, Plaintiff notes that a single analyst questioned "the pace of the launch" after the October 31, 2024 disclosure, Opp. 35, but this statement suggests nothing more than "market dissatisfaction," not the falsity of Defendants' prior statements.  Mot. 27.

The disclosure of Regeneron's 4Q24 results on January 13, 2025 fails for the additional reason that Regeneron's stock price *increased* on the date of the disclosure.  Mot. 36.  Plaintiff admits this fact but asks the Court to look to a stock drop on the *second trading day* after the disclosure.  Opp. 36.  But "the majority of cases in this Circuit addressing the issue have held that plaintiffs cannot show loss causation at the pleading stage when a company's stock price went up, not down, on the date of an alleged corrective disclosure."  *Huey*, 2025 WL 1707581, at *7.

### CONCLUSION

For all of the above reasons, the Court should dismiss the SAC with prejudice.

15

Dated:  December 17, 2025

Respectfully submitted,

*s/ Audra J. Soloway*

**PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP**

H. Christopher Boehning
Audra J. Soloway
David P. Friedman
Daniel S. Sinnreich
1285 Avenue of the Americas
New York, New York 10019–6064
Tel: (212) 373–3289
Fax: (212) 492–0289
cboehning@paulweiss.com
asoloway@paulweiss.com
dfriedman@paulweiss.com
dsinnreich@paulweiss.com

*Counsel for Defendants*

16

**CERTIFICATION**

I hereby certify that the foregoing Reply Memorandum of Law, exclusive of the caption, table of contents, table of authorities, and the signature block, is 15 pages, in accordance with the court's order granting Defendants' Letter Motion for Leave to File Excess Pages, Dkt. 65.  I further certify that the foregoing Memorandum of Law complies with the formatting requirements set forth in Local Civil Rule 11.1.

/s/ Audra J. Soloway
Audra J. Soloway