USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/18/26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Regeneron Pharmaceuticals, Inc. Securities Litigation.

No. 1:25-cv-145 (MKV)

OPINION AND ORDER GRANTING MOTION TO DISMISS

MARY KAY VYSKOCIL, United States District Judge:

Lead Plaintiff in this putative securities class action contends that Defendant Regeneron Pharmaceuticals, Inc., and a number of its executives, engaged in two different securities frauds involving two versions of its retinal disease drug, "Eylea," Regeneron's signature drug, which has been on the market for years, and "Eylea HD," a new, high-dose version of the drug [ECF No. 54 ("SAC") ¶ 1]. For the alleged fraud involving each drug, Plaintiff pleads two different theories of liability under Section 10(b) of the Exchange Act and SEC Rule 10b-5, alleging, as one theory, that Defendants made false and misleading statements and omissions, and, as an alternative theory, that Defendants engaged in a deceptive scheme. Plaintiff also asserts violations of Section 20(a) of the Exchange Act by the individual defendants.

The alleged securities fraud involving Eylea concerns Regeneron's decision, starting in 2012, to reimburse the credit card processing fees of its wholesale distributors when retina practices purchase Eylea using credit cards. The distributors, in turn, do not pass on such fees to the retina practices that purchase Eylea instead of competing drugs. Regeneron's credit-card-reimbursement practice is already the subject of a different action, brought by the Department of Justice ("DOJ") in the District of Massachusetts under the False Claims Act. *See United States ex rel. Nunnelly v. Regeneron Pharmaceuticals, Inc.*, 780 F. Supp. 3d 336 (D. Mass. 2025) (the "Massachusetts Action"). In the Massachusetts Action, the DOJ alleges that Regeneron defrauded the Centers for Medicare and Medicaid Services ("CMS") by failing to deduct the credit card

processing fees, which Regeneron paid, from the Average Sales Price ("ASP") for Eylea that Regeneron reported to CMS for purposes of Medicare payments. Regeneron is defending itself in that action, which has survived a motion to dismiss. Regeneron maintains that it properly includes the credit-card-fee reimbursements as "bona fide service fees" ("BFSF") pursuant to CMS regulations. In this case, Plaintiff alleges that Defendants committed fraud because they represented to shareholders that the success of Eylea in the market has been driven by its effectiveness even though, Plaintiff alleges, the credit-card-fee reimbursements were also important. As for the alleged fraud involving Eylea HD, Plaintiff alleges that Defendants overstated and artificially inflated demand.

Defendants seek to dismiss this case for failure to state a claim [ECF Nos. 58, 59, 60]. The Court concludes that Plaintiff fails to allege any actionable false statements or material omissions with respect to either Eylea or Eylea HD. While Plaintiff – by piggybacking on the DOJ's allegations in the Massachusetts Action – effectively creates a general impression that Defendants engaged in some sort of misconduct with respect to the Eylea credit card fees, Plaintiff fails to plausibly allege that the alleged scheme was employed *in connection with the purchase or sale of securities*, with the requisite scienter, as required to state a claim. Plaintiff also fails to plausibly allege a deceptive scheme as to Eylea HD with the requisite scienter. Moreover, there are fatal problems with Plaintiff's allegations as to loss causation. Thus, for the reasons set forth below, the motion to dismiss is GRANTED.

## I. BACKGROUND

### A. Facts[1]

Defendant Regeneron Pharmaceuticals, Inc. manufactures and sells "medicines" [ECF No.

[1] The facts are principally taken from the Second Amended Complaint [ECF No. 54 ("SAC")]. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[F]or the purposes of a motion to dismiss we must take all of the factual allegations in the

54 ("SAC") ¶ 8]. Defendant Leonard S. Schleifer is the Co-Founder and Chief Executive Officer ("CEO") of Regeneron. SAC ¶ 63. Defendant Christopher Fenimore is the current Chief Financial Officer ("CFO"). *Id.* ¶ 64. Defendant Robert E. Landry was the CFO prior to 2024 and, thereafter, served as a Senior Advisor. *Id.* ¶ 65. Defendant Marion McCourt is the Executive Vice President and "Head of Commercial." *Id.* ¶ 66.

In 2011, Regeneron obtained FDA approval for Eylea, a prescription injection that "treat[s] wet age-related macular degeneration ('Wet AMD'), an eye disease that causes distorted vision." SAC ¶ 8. Regeneron also obtained "a market exclusivity right for 12 years, meaning no other company could sell a generic version" of the drug until 2023. *Id.* "After its launch, Eylea instantly became Regeneron's most successful and important product" and "took over a significant share of the Wet AMD market." *Id.* ¶¶ 10, 84. Notably, Lead Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa ("Plaintiff" or the "Pension Fund") expressly concedes that Eylea is, in fact, an "effective drug." SAC ¶ 12.[2] In 2023, Defendants launched "a new high-dose version of Eylea, called Eylea HD," which "is designed to allow for less frequent doses than Eylea." *Id.* ¶ 26; *see id.* ¶ 5.

Plaintiff alleges that from May 4, 2023 through April 28, 2025 (the "Class Period"), SAC at 1, Defendants misled investors about precisely how Eylea and Eylea HD sales, respectively, were achieved, *see* SAC ¶¶ 12, 33.

**1. Plaintiff's Allegations about Eylea and Credit Card Fees**

---

complaint as true."). The Court also considers the pleading of the DOJ in the Massachusetts Action, which is attached to the Second Amended Complaint [ECF No. 54-1 ("DOJ Compl.")], and Defendants' submissions of public disclosure documents that Regeneron filed with the SEC and well-publicized stock prices [ECF No. 60 ("Friedman Decl.")]. *See Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Ganino v. Citizens Utilities Co*., 228 F.3d 154, 167 n.8 (2d Cir. 2000).

[2] "Plaintiff acknowledges Eylea is a useful drug . . . ." [ECF No. 67 ("Opp.") at 1].

Plaintiff alleges that, during the Class Period, Defendants misled investors when they stated, in various ways at various times, that Eylea's "very robust performance" in the market was driven by its strong "clinical profile." SAC ¶ 266; *see id.* ¶¶ 11–17, 23–24, 125–31, 253–55. According to Plaintiff, Defendants hid that they were engaging in an allegedly illegal "scheme" that induced retina practices "to purchase Eylea not *solely* because it was a better or more effective drug, but because it gave those customers effectively free money." *Id.* ¶ 3 (emphasis added); *see id.* ¶¶ 11–17, 23–24, 125–31, 253–55.

Eylea is a "buy-and-bill" drug, meaning retina practices buy Eylea from a distributor and then request reimbursement from a third-party payor. SAC ¶¶ 15, 91. Since Eylea treats an age-related disease, the third-party payor is often Medicare. *See id.* ¶ 15. Medicare reimburses the retina practices "based on the average sales price ('ASP') of [Eylea]." *Id.* In general, the Centers for Medicare and Medicaid Services ("CMS") requires drug manufacturers to calculate ASP pursuant to complex regulations and report the ASP to CMS on a quarterly basis. *See* 42 C.F.R. §§ 414.800 *et seq.*; *see also* SAC ¶ 16. There is no dispute that Regeneron did not deduct from the ASP calculations for Eylea the credit-card-fee reimbursements that Regeneron provided to its distributors. Rather, Defendants contend that approach was permitted by CMS, which "directs that 'bona fide service fees' ('BFSF') should not be subtracted" [ECF No. 59 ("Mem.") at 6]. *See* SAC ¶¶ 42–43, 217–220. Plaintiff, however, alleges that Defendants "were required to" deduct credit card fees from the ASP and that, in 2019, Defendants' own auditor,[3] Deloitte, had advised Regeneron that credit card fees are not the type of service that can be treated as a BFSF. *Id.* ¶¶ 98, 107–08, 228.

[3] At oral argument, Defendants represented that Plaintiff had incorrectly claimed "Deloitte was Regeneron's auditor, when in fact they were simply a consultant" [ECF No. 75 ("Tr.") at 5:20–23].

Specifically, since 2012, Regeneron has "told the distributors [of Eylea] not to charge [retina practices] a fee if they purchased Eylea with a credit card, and instead, bill the credit card fee to Regeneron." SAC ¶ 13 (emphases omitted); *see id.* ¶ 95, 97, 99. Plaintiff alleges that "Schleifer personally approved the Credit Card Fee Reimbursement Scheme." *Id.* ¶ 98. According to Plaintiff, "between 2012 and 2021" Regeneron reimbursed "more than $250 million" in credit card processing fees. *Id.* ¶ 96.[4]

Plaintiff alleges that, "because Defendants paid the credit card fees for retina practices, these practices effectively paid less for Eylea than they would have otherwise." SAC ¶ 19; *see id.* ¶¶ 14, 94, 102. Specifically, the retina practices not only avoided paying credit card fees, in the first instance, but also ultimately received "a higher reimbursement [from Medicare] for each purchase of Eylea" because Defendants included the credit card fees (as BFSF) in their ASP calculations for Eylea. *Id.* ¶ 21; *see id.* ¶¶ 102, 105–06. Furthermore, Plaintiff alleges, retina practices considered it "very important" to be able to use credit cards to buy drugs, since they could "take advantage of [] credit card rewards," which "Defendants hired a consultant" to "confirm." *Id*. ¶ 96 (brackets in original); *see id.* ¶¶ 13, 20. Plaintiff further alleges that "Eylea's competitors, Avastin and Lucentis, charged a credit card processing fee through the distributors (i.e., unlike Regeneron, these competitor companies did not foot the bill for credit card fees)." *Id.* ¶ 94 (emphases omitted); *see id.* ¶¶ 95, 100.

Plaintiff contends that "the truth" about "Eylea's success" began to emerge on April 10, 2024 when the Department of Justice (the "DOJ") "announced" a lawsuit alleging that Regeneron had been defrauding Medicare (the "Massachusetts Action"). SAC ¶ 6; *see id.* ¶¶ 7, 40, 210. Plaintiff alleges that, "[o]n this news, the price of Regeneron's common stock declined by $31.50,

---

[4] Defendants point out that this number represents "less than 1% of EYLEA's U.S. net sales in that same period." Mem. at 2–3.

or 3.36%, over two consecutive trading days." *Id.* ¶ 40; *accord id.* ¶ 212. However, Plaintiff's own allegations and publicly-filed documents of which the Court may take notice contradict any neat timeline as to loss causation.

As Plaintiff acknowledges in its own pleading, in 2021, Regeneron first disclosed the DOJ investigation that ultimately led to the Massachusetts Action. SAC ¶ 123 (quoting "the Company's Form 10-Q" disclosing "allegations" that Regeneron's credit-card-fee reimbursements violated the False Claims Act by inflating the ASP for Eylea and "induc[ing]" retina practices to purchase the drug). Thereafter, in 2023, Regeneron disclosed that the DOJ had intervened in a *qui tam* action involving similar allegations [ECF No. 60-10 ("Friedman Decl., Ex. 10") at 14]. Furthermore, the DOJ publicly filed its complaint in the Massachusetts Action at the end of March 2024, which filing is attached to the Second Amended Complaint and which date preceded the drop in stock price by approximately two weeks. *See* DOJ Compl. at 49.

Regeneron is defending itself in the Massachusetts Action. *See* SAC ¶ 413; *see id.* ¶ 222. In April 2025, "the court in [Massachusetts] denied [a] motion to dismiss." *Id.* ¶ 413; Regeneron "continues to reimburse" credit card fees for Eylea. *Id.* ¶ 56; *accord id.* ¶¶ 249, 399.

**2. Plaintiff's Allegations about Eylea HD**

Plaintiff also contends that Defendants misled investors about early demand for Eylea HD, which launched in August 2023. *See* SAC ¶¶ 30–39. Plaintiff identifies a number of allegedly false statements by Defendants, including that "***[p]hysician enthusiasm was extremely high prior to EYLEA HD launch***," *id.* ¶ 37 (bolded and italicized in original);[5] *accord id.* ¶¶ 203, 270, 272, early "***revenues were driven by strong initial demand***," *id.* ¶ 37; *accord id.* ¶¶ 202, 269, 427, and the subsequent quarter of sales was "***based on growing demand and positive early physician***

[5] All emphases of quoted language hereinafter are in the original text unless otherwise noted.

***experience***," *id.* ¶ 38; *accord id.* ¶¶ 206, 323; *see id.* ¶¶ 203, 324. According to Plaintiff, Defendants knew that physicians were not interested in the new drug and "Defendants devised a scheme to create the appearance of [early] demand" by convincing "private equity-owned [r]etina [p]ractices" to purchase "bulk orders of Eylea HD in exchange for rebates and other financial incentives." *Id.* ¶ 5.

Plaintiff alleges that Defendants had "internal research" forecasting "several problems that would negatively impact [the] launch" of Eylea HD. SAC ¶ 132; *see id.* ¶ 28. In particular, Plaintiff alleges, this research "showed that physicians were skeptical of Eylea HD's [less frequent] dosing" schedule and the "lack of flexibility" to give more frequent injections. *Id.* ¶ 28. In addition, Plaintiff alleges, a consultant advised Defendants that demand might be undercut by the new drug "not coming in a pre-filled syringe," the initial lack of a permanent "J-Code (which made getting reimbursed [by Medicare] more difficult)," and "the expense of Eylea HD." *Id.* ¶ 29; *see id.* ¶¶ 138–40.

Plaintiff contends that "the problems identified by Regeneron's market research" in fact "led to significant problems with the uptake of Eylea HD among [r]etina [p]ractices." *Id.* ¶ 144. Plaintiff cites unnamed former employees of Regeneron, reporting second-hand information or their own opinions, for their allegations that physicians were not enthusiastic about the new drug. *See id.* ¶¶ 146, 149, 150, 152–57, 163. Plaintiff similarly asserts that at least one unnamed former employee had the impression that "everyone from the CEO down" was "panicking about Eylea HD's performance" in the fourth quarter of 2023. *Id.* ¶ 161; *see id.* ¶ 162 (alleging that this particular former employee was told by "a doctor from a retina practice in her region" that "Schleifer had called him directly and asked, 'why aren't you using Eylea HD?'"); *id.* ¶¶ 168–171 (alleging that Defendants Fenimore and Landry sometimes attended meetings at which "Eylea HD's [allegedly] abysmal sales performance" was discussed).

Plaintiff contends that some of the individual defendants "took the Company's private jet around the country . . . to make clandestine deals with large, private equity-owned Retina Practices to purchase Eylea HD in bulk" to boost sales, offering "rebates" and "the right to return the product." SAC ¶ 33; *see id.* ¶¶ 173–75. Plaintiff specifically alleges that "McCourt and others" flew to "one of the largest Retina Practices in the Midwest," first, "just before Christmas in December 2023" and, again, "approximately two to three months later." *Id.* ¶ 175. Plaintiff again relies on unnamed former employees of Regeneron reporting second-hand information. *See id.* ¶¶ 175, 178 (alleging that "FE-7 *heard* that seven senior leaders, including McCourt, had taken a private jet to visit [a] Clinic in Iowa," that "*[a]ccording to FE-7*, the Company wanted to 'flood distribution channels to pad sales,'" and that FE-7 believed the "Clinic *would have* received a 'big rebate' for going through with the deal") (emphases added).

With respect to loss, Plaintiff alleges that "before the market opened on January 13, 2025" (which was after this case commenced but before Plaintiff filed the Second Amended Complaint), Defendants "reported disappointing results for Eylea HD." SAC ¶ 50. Plaintiff alleges that "[o]n this news, the price of Regeneron's common stock dropped $27.64 per share, or 3.97%, to open at $669.24 per share on January 13, 2025, and on January 14, 2025, the price of Regeneron's common stock continued to decline 3.6%, or $26.03 per share, to close at $690.87 per share." *Id.* ¶ 51. Yet, despite Plaintiff's use of the word "decline," its own allegations reflect an *increase* in the stock price. *See* SAC ¶¶ 50, 51 ($690.87 per share is higher than $669.24 per share); Friedman Decl., Ex. 21 (Bloomberg Terminal data showing a 2.87% gain).

Plaintiff alleges that "[t]he full truth was revealed on April 29, 2025" with respect to both of Defendants' drugs. SAC ¶ 52. Specifically, Plaintiff alleges that "[o]n that day, Defendants disclosed even more disappointing results for Eylea *and* Eylea HD." *Id.* (emphasis added). Specifically, it alleges, "U.S. net sales for Eylea were 'down 39%'" and Eylea HD sales "were flat

on a sequential basis." *Id.* ¶ 53. "In response to this news, the price of Regeneron's stock dropped $41.95, or 6.87%, from a closing price of $610.86 per share on the prior trading day down to $568.91 per share on April 29, 2025." *Id.* ¶ 55.

With respect to Eylea HD, Plaintiff posits that Defendants' April 29, 2025 disclosures "revealed" that "physician demand had never been strong for Eylea HD." SAC ¶ 54. Specifically, Plaintiff alleges, Defendants "explained" that sales were flat because "physician unit demand 'was offset primarily by a modest wholesaler inventory drawdown.'" *Id.* ¶ 53. According to Plaintiff, this explanation reflected that wholesalers were not purchasing more Eylea HD, "and instead were relying on their existing inventory," because of weak physician demand. *Id.* With respect to Eylea, Plaintiff asserts that Regeneron stock suffered because "analysts finally connected the dots" that Eylea sales were driven by the company's credit-card-fee reimbursement practice, rather than the drug's effectiveness alone. SAC ¶ 56.

**B. Procedural History**

On January 7, 2025, shareholder Jeffrey Radtke filed the Original Complaint in this case [ECF No. 1]. Thereafter, four different shareholders, including Radtke and Plaintiff City Pension Fund for Firefighters and Police Officers in the City of Tampa, filed motions for appointment as lead plaintiff and approval of their respective selections of lead counsel [ECF Nos. 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 32]. The motion of the Pension Fund, which had the greatest financial stake, ultimately proceeded unopposed [ECF Nos. 29, 30, 31]. The Court granted the unopposed motion of the Pension Fund for appointment as Lead Plaintiff and approval of Labaton Keller Sucharow LLP and Motley Rice LLC as Lead Counsel [ECF No. 33].

Thereafter, Plaintiff filed an Amended Complaint, and Defendants filed a pre-motion letter seeking leave to file a motion to dismiss [ECF Nos. 45, 50]. The Court issued an Order granting Defendants leave to file a motion to dismiss only after Plaintiff had a final opportunity to amend

its pleading further [ECF No. 52]. The Court expressly warned that this would be "Plaintiff's last opportunity to amend the complaint to cure any deficiencies identified in Defendants' pre-motion letter" [ECF No. 52].

Plaintiff thereafter filed the Second Amended Complaint [ECF No. 54 ("SAC")]. Plaintiff asserts three causes of action: (1) "COUNT I," asserting claims "For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5" on behalf of all members of the putative class against Regeneron and the four individual defendants, SAC ¶¶ 458–64; (2) "COUNT II," asserting claims "under the provisions of Rule 10b-5(a) and (c)" against Regeneron and the individual defendants, *id.* ¶¶ 465–76;[6] and (3) "COUNT III" for "Violations of Section 20(a) of the Exchange Act" against the individual defendants only, *id.* ¶¶ 477–81.

Defendants filed a motion to dismiss the Second Amended Complaint [ECF No. 58]. In support of their motion, Defendants filed a memorandum of law [ECF No. 59 ("Mem.")] and a declaration of counsel [ECF No. 60 ("Friedman Decl.")], which attaches numerous exhibits. Most of those exhibits are properly before the Court because they are SEC filings, well-publicized stock information, and documents incorporated into the Second Amended Complaint. *See Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir.

[6] As the Court indicated at the outset of this opinion, the two different Section 10(b) counts do not correspond to the different alleged frauds involving Eylea and Eylea HD, respectively. Rather, Count I and Count II assert two different theories of liability as to both alleged frauds. Specifically, in Count I, Plaintiff alleges that Defendants made false statements or material omissions as to both Eylea and Eylea HD, and, in Count II, Plaintiff alleges that Defendants engages in deceptive schemes as to both Eylea and Eylea HD. The Court notes this point because, at the oral argument, defense counsel made clear that he did not grasp this. He incorrectly asserted that the Second Amended Complaint does not plead any "scheme to defraud" but, rather, pleads only "two theories of liability about false and material misstatements, one alleging ASP false and material misstatements, one alleging HD false and material misstatements." Tr. at 11:13–18, 12:19–22. Plaintiff's counsel thereafter affirmed on the record what the Second Amended Complaint makes clear: Plaintiff asserts "two different theories of 10b-5 liability" (*i.e.*, both misleading statements or omissions and a deceptive scheme) as to each drug. *Id.* at 23:23–25.

2000). The Court has not considered other exhibits, which are not properly before the Court on a motion to dismiss.

Plaintiff filed a memorandum of law in opposition to the motion to dismiss [ECF No. 67 ("Opp.")]. It also filed a declaration of counsel attaching a chart of "Defendants' materially false and misleading misstatements regarding Eylea and Eylea HD as alleged in the Second Amended Complaint" [ECF Nos. 68 ("Hallowell Decl."), 68-1 ("Hallowell Decl., Ex. A")]. Defendants filed a reply brief and supporting declaration [ECF Nos. 69, 70].

The Court issued an Order granting Defendants' request for oral argument [ECF No. 71]. Defendants thereafter filed a notice of supplemental authority attaching a Second Circuit decision affirming the dismissal of a putative securities class action, *Smith v. Gap, Inc.*, 177 F.4th 405 (2d Cir. 2026) [ECF Nos. 72, 72-1]. Plaintiff filed a letter in response, arguing that *Gap* is distinguishable [ECF No. 73]. The Court held an oral argument at which each side had an opportunity to be heard and to clarify its position [ECF No. 75 ("Tr.")].

## II. LEGAL STANDARD

Ordinarily, to survive a motion to dismiss, a complaint need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Private claims of securities fraud, however, are subject to heightened pleading requirements under Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"). *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022). These are "[e]xacting pleading requirements." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007).

Rule 9(b) requires that the alleged "circumstances constituting fraud . . . be stated with particularity." Fed. R. Civ. P. 9(b). To satisfy this requirement, a securities fraud complaint based

on misstatements must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re IBM Arb. Agreement Litig.*, 76 F.4th 74, 87 (2d Cir. 2023); *see ATSI Commc'ns*, 493 F.3d at 99. Where a plaintiff seeks to plead a manipulative or deceptive scheme, it "must plead with particularity . . . . 'what manipulative [or deceptive] acts were performed, which defendants performed them, when the manipulative [or deceptive] acts were performed, and what effect the scheme had on the market for the securities at issue.'" *ATSI Commc'ns*, 493 F.3d at 102 (quoting B*axter v. A.R. Baron & Co.*, 1995 WL 600720, *6 (S.D.N.Y. Oct. 12, 1995)). "General allegations not tied to the defendants or resting upon speculation are insufficient." *Id.*

Crucial here, the PSLRA requires plaintiffs to allege "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b). The required state of mind is the "intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (2007) (*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, and n.12 (1976)). To satisfy this requirement, a plaintiff must allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 48 (2d Cir. 2024). "If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior 'must be correspondingly greater' and show 'highly unreasonable' behavior or that which evinces 'an extreme departure from the standards of ordinary care.'" *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355 (alteration adopted) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

## III. DISCUSSION

Plaintiff fails to state a claim for securities fraud involving either Eylea or Eylea HD under

either of its theories of liability. As explained below, Plaintiff fails to allege any actionable false statements or material omissions with respect to Eylea by Defendants, who are permitted to tout the drug's effectiveness without mentioning other factors that materially contribute to its success in the market. As for Plaintiff's theory that Defendants engaged in a deceptive scheme with respect to Eylea, Plaintiff fatally fails to plead that such scheme was committed *in connection with* the purchase or sale of securities or intended to deceive *stockholders*, as opposed to Medicare. Turning to Eylea HD, Defendants' optimistic statements about enthusiasm for the new drug were at worst puffery. As for scheme liability, despite Plaintiff's attempt to cast Defendants' use of private jets and allegedly clandestine meetings as nefarious, Plaintiff simply describes Defendants attempting to sell their new Eylea HD drug. There are also problems with Plaintiff's allegations as to loss causation for both Eylea and Eylea HD, which is fatal for either theory of 10b-5 liability. Finally, because Plaintiff fails to allege a primary 10b-5 violation, it also fails to allege control person liability under Section 20(a).

### A. Legal Framework

#### 1. Section 10(b) of the Exchange Act and Rule 10b-5

"Section 10(b) of the Exchange Act makes it unlawful '[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.'" *Smith v. Gap, Inc.*, 177 F.4th 405, 408 (2d Cir. 2026) (quoting 15 U.S.C. § 78j(b)). As indicated above, Plaintiff asserts Section 10(b) claims under different subsections of its implementing regulation, Rule 10b-5. *See supra* n.5. Count I asserts claims pursuant to "Rule 10b-5(b)" for "false and misleading statements or omissions" as to each drug. SAC ¶¶ 458–64. Count II asserts claims "under the provisions of Rule 10b-5(a) and (c)" for a deceptive scheme as to each drug. *Id.* ¶¶ 465–76.

Subsection (b) of Rule 10b-5 "implements" Section 10(b) of the Exchange Act "by making it unlawful for issuers of registered securities '[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Gap*, 177 F.4th at 408 (quoting 17 C.F.R. § 240.10b-5(b)). To state a claim under this subsection, "a plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Id.* (quoting *City of Hialeah Employees' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025)).[7] Section "10(b) and Rule 10b-5[(b)] do not create an affirmative duty to disclose any and all material information." *Id.* at 409 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016)). Moreover, "corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

"[S]ubsections (a) and (c) of Rule 10b-5, . . . prohibit (respectively) 'employ[ing] any device, scheme, or artifice to defraud,' and 'engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit.'" *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (quoting 17 C.F.R. § 240.10b–5). "Unlike the better-known subsection (b), these subsections do not require the defendant to make a misstatement or omission; they require only deceptive conduct" or manipulative acts. *Id.*; *see Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 81 (2019). "To state a scheme liability claim" under Rule 10b-5(a) or (c), "a plaintiff must [allege]: '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and

---

[7] As explained above, the plaintiff must allege with particularity the misstatements and omissions and the facts giving rise to a strong inference of scienter. *See Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 353, 355.

(4) reliance." *Plumber & Steamfitters*, 11 F.4th at 105 (quoting *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020)).

Crucially, in all events, a claim under Section 10(b) of the Exchange Act and Rule 10b-5 must allege a fraud undertaken "*in connection with*" the purchase or sale of securities. 15 U.S.C. § 78j(b) (emphasis added); *accord* 17 C.F.R. § 240.10b-5 ("in connection with the purchase or sale of any security"); *see D'Addario v. D'Addario*, 75 F.4th 86, 96 (2d Cir. 2023); *ATSI Commc'ns*, 493 F.3d at 102. Furthermore, whether alleging a securities fraud based on misleading statements and omissions or a deceptive scheme or manipulative act, a plaintiff must adequately allege both reliance and "loss causation." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). With respect to reliance, the plaintiff must allege that "but for" the allegedly fraudulent statements or scheme, "the plaintiff would not have entered into the detrimental securities transaction." *Id.* (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately [allegedly] suffered by the plaintiff.'" *Id.* (quoting *Emergent Capital*, 343 F.3d at 197). To adequately allege loss causation, the plaintiff must allege that "the *subject* of the fraudulent statement or omission [or deceptive scheme] was the cause of the actual loss suffered." *Id.* at 173 (emphasis in original) (quoting *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)); *see also Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) ("Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed.") (internal quotation marks and citations omitted and alteration adopted).

**2. Section 20(a) of the Exchange Act**

"Section 20(a) of the Exchange Act provides that every person 'who, directly or indirectly,

controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the . . . violation.'" *Gap*, 177 F.4th at 409 (quoting 15 U.S.C. § 78t(a)). "Section 20(a) thus 'provides that individual executives, as controlling persons of a company, are secondarily liable for their company's violations of the Exchange Act." *Id.* (quoting *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 152 (2d Cir. 2021)). "To establish a prima facie case of control person liability," pursuant to Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108.

## B. Plaintiff Fails To State a Claim as to Eylea under Section 10(b) and Rule 10b-5.

### 1. Plaintiff Fails To Allege any Actionable False Statements or Omissions as to Eylea (Count I).

Plaintiff fails to identify any actionable false statement or material omission by Defendants about Eylea. Plaintiff alleges that Defendants misled shareholders by stating, in various ways and at various times, that Eylea's success in the market has been driven by the drug's "efficacy and safety." SAC ¶ 321; *see id.* ¶¶ 11–17, 23–24, 125–31, 253–55, 266–67. For example, Plaintiff alleges that McCourt made a "false and misleading" statement or omission when she stated that "***the clinical profile of EYLEA is what has allowed for [its] very robust performance . . . in the marketplace***." *Id.* ¶¶ 266–67. Plaintiff expressly acknowledges that Eylea is an effective medicine. *See* Opp. at 1 ("Plaintiff acknowledges Eylea is a useful drug"). However, Plaintiff nonetheless contends that statements touting the drug's usefulness were misleading because Eylea's success in the market was "not *solely* because it was a better or more effective drug." SAC

¶ 3 (emphasis added); *see id.* ¶ 12 (Eylea's success was "not purely" driven by its effectiveness). Rather, according to Plaintiff, retina practices have purchased the drug in significant part because Regeneron "gave those customers effectively free money" by reimbursing credit card fees and not deducting those fees from its ASP calculations for Eylea. *Id.* ¶ 3; *see id.* ¶¶ 13–21, 90–96.

As binding precedent makes clear, however, Defendants were not obligated to mention every factor that materially contributes to the success of Eylea in the market when they said that Eylea is successful because it is safe and effective. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("it bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information"); *Gap*, 177 F.4th at 409, 412. The Second Circuit has explained that "it is not enough . . . to show that an omission was material" because there is no duty to disclose all material information. *Gap*, 177 F.4th at 409; *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 239. "Instead, disclosure 'is required when necessary to make statements made, in light of the circumstances under which they were made, not misleading.'" *Gap*, 177 F.4th at 409 (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)).

Fatal for Plaintiff here, the Second Circuit has expressly held that a "company's decision to speak about one aspect of sales does not necessarily require it to address other issues." *Gap*, 177 F.4th at 412. Indeed, the Second Circuit stressed that such a theory of liability under Section 10(b) and Rule 10b-5(b) is "untenably overbroad and foreclosed by precedent." *Id.* Furthermore, several courts in this District have rejected allegedly misleading statements and omissions about particular reasons for sales, or success in the market, where the defendant "did not, explicitly or implicitly, rule out other factors playing a role in generating revenue." *New York City Pub. Pension Funds v. Coupang, Inc.*, No. 22-cv-7309 (VSB), 2025 WL 2613650, at *14–15 (S.D.N.Y. Sept. 10, 2025) (quoting *Marcu v. Cheetah Mobile Inc.*, No. 18-cv-11184 (JMF), 2020 WL 4016645, at *5 (S.D.N.Y. July 16, 2020)).

Plaintiff fails to plausibly allege that Defendants were required to spontaneously disclose information about Regeneron's practices with respect to credit-card-fee reimbursements and ASP calculations in order to make Defendant's statements about Eylea's "efficacy and safety" not misleading. SAC ¶ 321; *see Gap*, 177 F.4th at 409; *Coupang*, 2025 WL 2613650, at *14–15; *Marcu*, 2020 WL 4016645, at *5. Indeed, as noted above, Plaintiff acknowledges that Eylea has been successful in significant part, albeit not exclusively, because it is a useful drug. *See* Opp. at 1; SAC ¶¶ 3, 12. Accordingly, because Plaintiff fails to allege actionable false statements or material omissions about Eylea, Count I is dismissed with respect to the alleged securities fraud involving Eylea. *See Gap*, 177 F.4th at 409, 412.

**2. Plaintiff Fails To Allege a Deceptive Scheme or Manipulative Act as to Eylea *in Connection with* the Purchase or Sale of Securities and with the Requisite Scienter as Necessary To Plead its Theory of Liability under Subsections (a) or (c) of Rule 10b-5 (Count II).**

Plaintiff devotes much of the Second Amended Complaint to repeating the allegations of the DOJ in the Massachusetts Action that Regeneron and its executives have defrauded Medicare. *Compare* SAC ¶¶ 13–16, 19–21, 84–124, *with* DOJ Compl. ¶¶ 2–15, 42–132. As noted above, the court in Massachusetts has ruled that the allegations in the DOJ complaint were sufficient to state a claim under the False Claims Act. *See* SAC ¶ 413; *United States ex rel. Nunnelly v. Regeneron Pharms., Inc.*, 780 F. Supp. 3d 336, 350 (D. Mass. 2025). However, while Plaintiff here – in mimicking the DOJ allegations in the Massachusetts Action – may or may not allege some sort of illegal fraud scheme,[8] it fails to plausibly allege that Defendants engaged in a deceptive scheme or manipulative acts "*in connection with*" the purchase or sale of securities, with the requisite

[8] This Court would not be bound by the decision of the court in the Massachusetts Action, even if that court had opined on the adequacy of the relevant allegations to state a securities fraud scheme, rather than a FCA claim, which it did not. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

scienter, as required for Plaintiff's claim under Section 10(b) and Rule 10b-5(a) and (c) in Count II. 15 U.S.C. § 78j(b) (emphasis added).

More particularly, drawing heavily on the DOJ's allegations that Regeneron has defrauded Medicare, Plaintiff here attempts to construct a securities fraud claim by alleging that Defendants have engaged in a longstanding, allegedly illegal practice of reimbursing credit card fees and not deducting those fees from its ASP calculations to make Eylea more profitable for retina practices. *See* SAC ¶¶ 13–21, 42–43, 90–96, 102–08, 217–220, 249, 399. In ostensible support of its scheme liability theory, Plaintiff specifically alleges that "Defendants built up Eylea's market position through [this allegedly] illegal, unethical, and unsustainable business practice" and, as such, "investors did not know" about a significant reason for Eylea's success. SAC ¶¶ 24, 25; *see id.* ¶¶ 3 ("Investors did not know that Eylea's success was driven by an undisclosed—and illegal—scheme that Defendants employed to achieve sales of Eylea"), 128 ("[U]nbeknownst to investors, Defendants concealed from the market that [they] had been engaging in the illegal Credit Card Fee Reimbursement Scheme to create a competitive edge for Eylea."). Plaintiff further alleges that the DOJ's allegations that "Defendants' illegal scheme had defrauded the U.S. government out of hundreds of millions of dollars in Medicare reimbursements" also, consequently, "revealed to investors that Eylea's success was in part tied to an undisclosed and unsustainable [credit card reimbursement] practice (and not merely because it was a superior product, as Defendants led investors to believe)." *Id.* ¶ 6; *see id.* ¶¶ 210–15.

These allegations are not sufficient to state a claim for securities fraud. The Supreme Court and the Second Circuit have stressed that Section 10(b) "must not be construed so broadly as to convert every . . . fraud that happens to involve securities into a violation." *D'Addario*, 75 F.4th at 96 (quoting *S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002)). Where an alleged "scheme[] only incidentally involved securities," no claim lies under Section 10(b) and Rule 10b-5. *Id.* Indeed,

subsections (a) and (c) of Rule 10b-5 expressly make it "unlawful" to "employ any device, scheme, or artifice to defraud . . . *in connection with the purchase or sale of any security*" and to "engage in act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . *in connection with the purchase or sale of any security*," respectively. 17 C.F.R. § 240.10b-5 (emphases added). Plaintiff here alleges, in substance, that Defendants engaged in a scheme to increase sales and defraud Medicare and, "incidentally," investors were misled, too. *D'Addario*, 75 F.4th at 96; *see* SAC ¶¶ 3, 24–25, 128.

Crucially, the Second Circuit has expressly distinguished "a generalized business motive," such as the motive every company has to increase sales of its product, from a motive to commit securities fraud for purposes of scienter. *Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355; *see ATSI Commc'ns*, 493 F.3d at 102 (to state a claim based on "market manipulation," in contrast with misleading statements and omissions, "the complaint must plead with particularly facts giving rise to a strong inference that the defendant *intended to deceive investors by artificially affecting the market price of securities*") (emphasis added). Here, Plaintiff does not allege that Defendants' intent was to deceive their investors in order to commit securities fraud. Rather, Plaintiff's allegations (cribbed from a pleading about violations of the FCA) all concern Defendants' intent to create incentives for retina practices to purchase Eylea (a generalized business motive) and to bilk CMS. *See* SAC ¶¶ 3, 14–22, 94–122. For example, Plaintiff stresses that Defendants' goal was "to out-compete similar Wet AMD drugs" and that Defendants "intentionally" defrauded Medicare in order to achieve that goal. *Id.* ¶ 119. Thus, Plaintiff's allegations do not amount to a claim that Defendants undertook a deceptive scheme or manipulative acts "in connection with" the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Accordingly, Count II is dismissed with respect to the alleged scheme involving Eylea.

### C. Plaintiff Fails To State a Claim as to Eylea HD under Section 10(b) and Rule 10b-5.

#### 1. Plaintiff Fails To Allege any Actionable False Statements or Omissions as to Eylea HD (Count I).

Turning to the alleged fraud involving Eylea HD, Plaintiff fails to allege any actionable false statements or omissions. Plaintiff contends that Defendants committed securities fraud when they launched Eylea HD because they told investors that doctors were extremely "enthusias[tic]" about the new drug prior to the launch, early "revenues were driven by strong initial demand," and there was "growing demand and positive early physician experience" immediately after the launch. SAC ¶¶ 37, 202–03, 206, 269–70, 272, 323–24, 427 (emphases omitted). These statements were, at worst, "unactionable puffery." *Gap*, 177 F.4th at 411.

The Second Circuit has repeatedly reaffirmed that corporate defendants' "characterization of demand as 'strong'" and "optimistic prediction[s]" about the launch of a new product are not actionable unless plaintiffs "show that defendants believed them to be false." *Gap*, 177 F.4th at 411; *see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 174 (2d Cir. 2020); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). In particular, the Second Circuit has stressed that "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Novak*, 216 F.3d at 309. Moreover, plaintiffs must satisfy high pleading standards to "plausibly" allege that defendants "knew" their statements were false. *Abramson*, 965 F.3d at 174; *see Novak*, 216 F.3d at 309; *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 812 (2d Cir. 1996).

Plaintiff here advances two unavailing arguments that Defendants knew that their positive statements about the launch of Eylea HD were false. First, Plaintiff alleges that, prior to the launch, Defendants had "internal reports" and information from a consultant identifying several potential

problems that could undercut physician demand, including the lack of pre-filled syringes, the initial lack of a "permanent J-Code" for Medicare reimbursements, and the infrequency and inflexibility of the dosing schedule. *See* SAC ¶¶ 28–30, 132, 138–40. According to Plaintiff, the potential "problems identified by Regeneron's market research" in fact "led to significant problems with the uptake of Eylea HD among [r]etina [p]ractices." *Id.* ¶ 144. However, as the Second Circuit has repeatedly made clear, Defendants were not required to assume, let alone advise investors, that every potential problem would, in fact, materialize, *see Novak*, 216 F.3d at 309; *Gap*, 177 F.4th at 411, and Plaintiff may not "proceed with allegations of 'fraud by hindsight,'" *Novak*, 216 F.3d at 309 (quoting *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Plaintiff's second argument is that unnamed former employees of Regeneron, relying on second-hand, unverified information and their own subjective opinions, believed that Defendants were aware or worried that physicians were not enthusiastic about Eylea HD. *See* SAC ¶¶ 146, 149, 150, 152–57, 161–163. Plaintiff's allegations about these low-level former employees are not sufficient to plausibly plead that Defendants knew their positive statements about the launch were false. Indeed, courts in this Circuit regularly refuse to credit similar allegations at all. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 798 (S.D.N.Y. 2020) (collecting cases).

While not dispositive, the Court notes as an initial matter that it is not entirely clear whether Plaintiff knows the identities of the unnamed former employees it cites in its pleading. *See* Tr. at 5:16–18. At the oral argument, defense counsel suggested that these alleged witnesses were DOJ witnesses "with whom plaintiffs' counsel have not themselves interacted." *Long Miao*, 442 F. Supp. 3d at 800. Specifically, defense counsel argued that "the complaint relies heavily on a document described in the DOJ's complaint that plaintiff has never seen because it's under seal." Tr. at 5:16–18. Plaintiff's counsel never responded to this argument. The Second Circuit has made clear that securities plaintiffs may rely on "confidential sources at the pleading stage," but

only provided that "they supply sufficient specific facts to support their allegations." *Novak*, 216 F.3d at 313. In light of this proviso, district courts commonly do not credit assertions by alleged anonymous sources where, as here, specific facts render the allegations insufficient under the heightened pleading standards applicable to securities cases. In particular, district courts in this Circuit commonly refuse "to credit" allegations about unnamed witnesses "who are sourced secondhand." *Long Miao*, 442 F. Supp. 3d at 800; *see In re Lehman Bros. Sec. & Erisa Litig.*, No. 10-cv-6637 (LAK), 09-md-2017 (LAK), 2013 WL 3989066, at *3 (S.D.N.Y. July 31, 2013) (refusing to credit allegations of "confidential witness statements originally recounted in a separate complaint filed by separate counsel in a separate action"); *see also In re Millennial Media, Inc. Sec. Litig.*, No. 14-cv-7923 (PAE), 2015 WL 3443918 (S.D.N.Y. May 29, 2015).

More importantly, district courts in this Circuit "routinely decline to credit anonymous witness accounts" in securities fraud complaints where the witnesses' roles and allegations "'do not suggest'" that they "'were in a position to know the facts attributed to them.'" *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270, 296 (E.D.N.Y. 2025) (alterations adopted) (quoting *Long Miao*, 442 F. Supp. 3d at 799–800); *see Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. American Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd sub nom. Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. American Express Co.*, 430 F. App'x 63 (2d Cir. 2011). Here, Plaintiff relies on low-level former employees such as a "Reimbursement Business Manager" and an "Associate Manager" in "Accounting." SAC ¶¶ 70, 75. Furthermore, Plaintiff's specific allegations make clear these employees were not in a position to say what Defendants knew.

For example, Plaintiff cites the Reimbursement Business Manager for the broad assertion that "everyone from the CEO down" was "panicking about Eylea HD's performance" by "the fourth quarter of 2023." SAC ¶ 161. Plaintiff specifically alleges that this former employee had

this impression because "a doctor from a retina practice in her region" told her that "Schleifer had called him directly and asked, 'why aren't you using Eylea HD?'" *Id.* ¶ 162. Even if the Court credits the hearsay allegation that the CEO of Regeneron called a particular doctor to ask why he was not using the new drug, that allegation, on its face, is grossly insufficient to support an inference that Schleifer knew it was false when he said, on a "November 2, 2023 earnings call for [the] Third Quarter 2023," that the launch of Eylea HD was "off to a great start" with early "revenues . . . driven by strong initial demand." *Id.* ¶ 202 (emphasis omitted). The allegation about Schleifer calling a particular doctor obviously offers even less support for an inference that McCourt knew it was false when she said, on the same call, that "[p]hysician enthusiasm was extremely high prior to [the] launch and that interest has translated into early use in a broad range of patient types." *Id.* ¶ 203 (emphasis omitted).

Plaintiff also cites the Associate Manager in Accounting for the proposition that Regeneron executives knew Eylea HD was performing poorly "in late 2023 through early 2024." SAC ¶ 168. In particular, Plaintiff alleges, this former employee attended meetings at which "Eylea HD's [allegedly] abysmal sales performance" was discussed, and Defendants Fenimore and Landry also sometimes attended. *Id.* ¶¶ 168–171. Plaintiff does not offer any allegations about the specific information that was presented during these meetings, let alone offer any specific allegations about what Fenimore and Landry allegedly learned or said. *See id.* ¶ 171 (alleging only that "the numbers were not impressive" and "there was disappointment"). The Second Circuit has expressly held that such general allegations of internal reports or discussions of poor performance indicators are not sufficient. *See Novak*, 216 F.3d at 309.

Plaintiff further alleges that "multiple [former employees] confirmed that Defendants, including Defendants Schleifer, Landry, and Fenimore, reviewed internal reports and analysis that showed weaker demand for and sales of Eylea HD" immediately after its launch. SAC ¶ 160.

However, even crediting the former employee allegations and considering them all together, the Court concludes that Plaintiff fails to state a claim. *See Gap*, 177 F.4th at 413 (rejecting a similar set of allegations). Crucially, Defendants "public statements" were, at all times, "consistent with reasonably available data." *Novak*, 216 F.3d at 309. As Plaintiff's own pleading makes clear, Eylea HD did, in fact, generate "$43 million of net product sales in the final six weeks of the [third] quarter" of 2023 and "$123 million" in sales in the fourth quarter (the first full quarter after its launch), notwithstanding Plaintiff's unsupported assertion that Defendants knew demand was "weaker . . . [i]mmediately after Eylea HD's launch." SAC ¶¶ 37, 38, 161.

As discussed further below, Plaintiff contends that these early sales did not reflect real demand for Eylea HD because, Plaintiff alleges, some of the individual defendants "took the Company's private jet around the country . . . to make clandestine deals with large, private equity-owned [r]etina [p]ractices to purchase Eylea HD in bulk." SAC ¶ 33; *see id.* ¶¶ 173–75. However, despite Plaintiff's disparaging language, these allegations reflect that Regeneron sold large quantities of its new drug to retina practices when it launched. It therefore was not misleading, or was puffery, for Defendants to tell investors that early revenues from Eylea HD were driven by doctors' offices enthusiastically purchasing the drug. *See Gap*, 177 F.4th at 411–13. Accordingly, Count I is dismissed as to Eylea HD.

### 2. Plaintiff Fails To Allege a Deceptive Scheme or Manipulative Act with the Requisite Scienter with Respect to Eylea HD (Count II).

Plaintiff fails to allege a deceptive scheme or manipulative act as required to state its claim in Count II with respect to Eylea HD. This claim is based on Defendants' alleged private jet trips to private equity-owned retina practices "to pad sales numbers" for Eylea HD. SAC ¶ 33; *see id.* ¶¶ 173–75. As discussed above with respect to Eylea, Plaintiff fails to allege with particularity facts giving rise to a strong inference that Defendants acted to deceive investors or manipulate the

price of securities, rather than simply to sell its new product. *See Arkansas Pub. Emps. Ret. Sys.*, 28 F.4th at 355; *see ATSI Commc'ns*, 493 F.3d at 102.

In evaluating claims of securities fraud, the Court must consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). It was Defendants job to encourage retina practices to buy Eylea HD. *See In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 579 (S.D.N.Y. 2012). Indeed, Plaintiff's counsel expressly conceded at the oral argument that "there's nothing wrong with these individual defendants going out and making sales." Tr. at 34:18–19.

Plaintiff's counsel went on to argue that the trips were, nonetheless, a form of securities fraud because "the reason why they were doing it" was that Defendants "knew that these sales were not driven by physician enthusiasm." Tr. at 34:20–22. He argued that the "timing" of the trips reflected the pre-launch market research "predict[ing] that the demand was going to be low" and "internal metrics" immediately after the launch that purportedly "showed that demand was low." *Id.* at 31:18–20, 32:1. The Court has already explained that Plaintiff's treatment of pre-launch market research identifying potential problems and unspecified post-launch internal reports of poor performance is foreclosed by precedent. *See Novak*, 216 F.3d at 309.

Moreover, for its arguments that Defendants acted with the required intent to deceive investors or manipulate the price of securities, Plaintiff relies on allegations by former employees who, as discussed above, were not in a position to know what the individual defendants believed about demand or why some of them took trips to certain retina practices. *See Long Miao*, 442 F. Supp. 3d at 799–800. In particular, Plaintiff cites one former employee explaining that McCourt, along with "other senior members of Regeneron, made two trips to "one of the largest Retina

Practices in the Midwest[] in hopes of convincing them to make orders of Eylea HD," first, "just before Christmas in December 2023" and, again, "approximately two to three months later." SAC ¶ 175. A different former employee "heard" about another trip, to a different clinic, expressed her own view that "the Company wanted to 'flood distribution channels to pad sales,'" and speculated that the clinic likely "would have received a 'big rebate'" for making a big purchase. *Id.* ¶ 178.

These allegations, however, do not give rise to a strong inference that Defendants acted with the requisite scienter. Obviously, one "plausible, nonculpable" reason for McCourt to visit one of the largest retina practices in the Midwest is simply that, as Plaintiff's own pleading makes clear, such a practice has the potential to generate a lot of revenue. *Blanford*, 794 F.3d at 305 (holding that the PSLRA requires courts to consider innocent explanations for a defendant's conduct); *see* SAC ¶ 79 (alleging that the practice was responsible for a "high volume of patient visits" and high percentage "yearly sales"). The former employee allegations about the other clinic are nothing but hearsay and speculation. *See* SAC ¶ 178. In all events, even if the retina practices in question were owned by private equity companies, they presumably still require doctors who prescribe medicines for patients, which undermines Plaintiff's premise that sales to private-equity-owned retina practices necessarily reflect a lack of physician demand. Accordingly, because Plaintiff fails to allege a deceptive scheme or manipulative act with the requisite scienter, Count II is dismissed with respect to Eylea HD.

**D. Plaintiff Fails To Adequately Allege Loss Causation.**

For the reasons set forth above, Plaintiff fails to state any claim for relief under Section 10(b) of the Exchange Act and Rule 10b-5, and the Court therefore dismisses such claims. The Court notes that Plaintiff also fails to adequately allege loss causation with respect to either Eylea or Eylea HD. This provides an additional ground for dismissal. *See Amgen Inc. v. Conn. Ret. Plan & Tr. Funds*, 568 U.S. 455, 460–61 (2013).

As explained above, Plaintiff must plausibly allege that Defendants' allegedly fraudulent statements or scheme caused Plaintiff's alleged economic harm. *See Lentell*, 396 F.3d at 172. A plaintiff generally must allege that the stock price "fell significantly after the truth became known" either through "an express, corrective disclosure," or "through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson*, 965 F.3d at 179 (internal quotation marks and citation omitted and alteration adopted). Although loss causation can be a fact-intensive inquiry, Plaintiff's allegations appear to fall outside of the "parameters" established by Second Circuit precedent. *Lentell*, 396 F.3d at 174.

In particular, with respect to Eylea, Plaintiff contends that Regeneron's stock price suffered after the DOJ "announced" that it was charging Regeneron in the Massachusetts Action with the alleged fraud involving credit-card-fee reimbursements and ASP calculations, although it took time for analysts to "connect[] the dots." SAC ¶¶ 6, 7, 40, 56, 210. However, Plaintiff's own pleading and publicly-filed documents make clear that the substance of the allegations about the credit-card-fee reimbursements and ASP calculations were public long before the DOJ "announced" the Massachusetts Action on April 10, 2024. SAC ¶ 10. Specifically, Regeneron first disclosed the DOJ investigation in 2021 and, thereafter, disclosed that the DOJ had intervened in a *qui tam* action in 2023. SAC ¶ 123; Friedman Decl., Ex. 10 at 14. Furthermore, the DOJ publicly filed its complaint in the Massachusetts Action at the end of March 2024, *see* DOJ Compl. at 49, about two weeks before the April 10, 2024 announcement that allegedly caused the stock price to decline, *see* SAC ¶ 40.

As such, based on Plaintiff's own allegations, there was no specific, "express, corrective disclosure" revealing, for the first time, Defendants' alleged fraud that immediately preceded an alleged drop in the stock price. *Abramson*, 965 F.3d at 179. Plaintiff also fails to plausibly allege that a concealed risk materialized. *Id.* According to Plaintiff, Defendants had concealed that the

success of Eylea was driven, in significant part, by an allegedly illegal credit card reimbursement scheme. *See* SAC ¶ 3. Plaintiff expressly argues that Defendants failed to "warn investors of the risk [of] this *unsustainable* practice." Tr. at 29:6–7 (emphasis added); *see* SAC ¶ 6 (alleging that "Eylea's success was in part tied to an undisclosed and unsustainable practice (and not merely because it was a superior product, as Defendants led investors to believe)"). However, Plaintiff also expressly alleges that Regeneron "continues to reimburse such fees." SAC ¶ 399. As such, the Court cannot reasonably infer that the alleged risk from an allegedly unsustainable practice has materialized, causing Plaintiff's alleged loss, as required for Plaintiff to plausibly allege loss causation. *See Abramson*, 965 F.3d at 179.

Plaintiff also fails to allege with the requisite particularity that Defendants did anything in connection with Eylea HD that caused Plaintiff an actual loss. Crucially, the "*subject*" of the fraud must be "the cause of the actual loss suffered." *Lentell*, 396 F.3d at 173 (emphasis in original). As noted above, Plaintiff alleges that Defendants disclosed disappointing Eylea HD sales in January 2025, but the Second Amended Complaint itself alleges that the stock price *increased* immediately after that disclosure. *See* SAC ¶¶ 50, 51. Plaintiff also alleges that, on April 29, 2025, Defendants disclosed more disappointing sales of *both* Eylea and Eylea HD, after which the stock price did drop. *Id.* ¶¶ 52–54. The problem for Plaintiff is that it specifically and repeatedly alleges that Regeneron's stock price was "substantially dependent on the success of Eylea," the original drug. SAC ¶ 10; *see id.* ¶¶ 84, 85, 93. Plaintiff expressly stresses that it was "Eylea [that] drove Regeneron's profitability" and that "the Company's financial success was dependent on sales of Eylea." *Id.* ¶¶ 10, 84. Given Plaintiff's own allegation that sales of Eylea, the original drug, drove the stock price, and that Defendants disclosed disappointing sales of Eylea on April 29, 2025, the Court cannot reasonably infer that the alleged revelation of a supposed Eylea HD fraud was the cause of the loss that Plaintiff allegedly suffered. *See Lentell*, 396 F.3d at 173.

**E. Plaintiff Fails To Allege Control Person Liability (Count III).**

Plaintiff's failures to allege misleading statements or omissions (Count I) and a deceptive scheme or manipulative act in connection with the purchase or sale of securities and with the requisite scienter (Count II) with respect to either Eylea or Eylea HD are fatal to Plaintiff's claims pursuant to Section 10(b) of the Exchange Act and Rule 10b-5. *See Gap*, 177 F.4th at 412; *Plumber & Steamfitters*, 11 F.4th at 105; *ATSI Commc'ns*, 493 F.3d at 104. Where, as here, a plaintiff "fails to allege any primary violation," it also "cannot establish control person liability" under Section 20(a). *ATSI Commc'ns*, 493 F.3d at 108; *see Gap*, 177 F.4th at 414. Accordingly, Count III, which asserts claims under Section 20(a) against the individual defendants, is also dismissed with respect to both Eylea and Eylea HD.

## IV. CONCLUSION

For the reasons set forth above, the motion to dismiss the Second Amended Complaint [ECF No. 58] is GRANTED.

The Clerk of Court respectfully is requested to terminate the motion at docket entry 58 and to close this case.

**SO ORDERED.**

**Date: September 18, 2026**
**New York, NY**

Mary Kay Vyskocil

**MARY KAY VYSKOCIL**
**United States District Judge**